IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,

       Plaintiff,

          vs.

EARL WARNER,

       Defendant.
_____

Criminal Action

No. 12-00107


    Transcript of SUPPRESSION HEARING held on Thursday,
July 18, 2013, in the United States District Court,
700 Grant Street, Pittsburgh, Pennsylvania, before
The Hon. Arthur J. Schwab, United States District Judge



APPEARANCES:

For the Government:         Carolyn J. Bloch, Esq.
                          Assistant United States Attorney
                          700 Grant Street, Ste. 4000
                          Pittsburgh, PA  15219

For the Defendant:          David B. Chontos, Esq.
                          561 Beulah Road
                          Turtle Creek, PA  15145


Court Reporter:             Deborah Rowe, RMR, CRR
                          700 Grant Street, Ste. 5300
                          Pittsburgh, PA  15219
                          (412) 471-2510


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1                    P R O C E E D I N G S

2                              - -

3                         10:55 a.m.

4              THE COURT:  Good morning.  I apologize for keeping

5     you waiting.  This is the time and place that's been set for

6     an evidentiary hearing in Criminal No. 12-00107.

7     Specifically we are here today on Defendant's motion to

8     suppress statements made by Defendant to law enforcement

9     personnel.

10             I would ask counsel for the Government to enter

11    your appearance, please.

12             MS. BLOCH:  On behalf of the United States,

13    Carolyn Bloch.

14             THE COURT:  Welcome.  On behalf of the Defendant?

15             MR. CHONTOS:  Your Honor, David Chontos on behalf

16    of Earl Warner.

17             THE COURT:  And he's here; correct?

18             MR. CHONTOS:  He is, to my left.

19             THE COURT:  Sir, would you stand to be sworn,

20    please.

21             (The Defendant was duly sworn.)

22             THE CLERK:  Please state and spell your name for

23    the record.

24             THE DEFENDANT:  Earl Warner, E-a-r-l, W-a-r-n-e-r.

25             THE COURT:  Thank you.  You may be seated.  For

1    the record, the Court notes that this hearing is being held

2    at the Defendant's request and because the Court has

3    determined based on the written submission of the Defendant

4    and the Government that the Defendant has shown that there

5    are disputes of material fact which this hearing should

6    resolve because the Government bears the burden of proving

7    by the preponderance of the evidence that the Defendant was

8    properly advised of his Miranda rights and that Defendant

9    then knowingly waived those rights.

10            We're dealing with Document No. 44, motion to

11   suppress statements.  You may begin.

12            MS. BLOCH:  Certainly, Your Honor.  Before I call

13   my first witness, I just want to make sure it's clear from

14   both the Government's filing as well as the position of the

15   Government today, and that is that the position of the

16   Government is that Mr. Warner was not in a custodial

17   situation --

18            THE COURT:  So he did not have to be advised of

19   his Miranda rights?

20            MS. BLOCH:  Yes.

21            THE COURT:  Okay.  So the real issue here is one

22   of custody then?

23            MS. BLOCH:  Right, and voluntariness.

24            THE COURT:  Fine.  Okay.  Go ahead.

25            MR. CHONTOS:  Custody, interrogation and

1    voluntariness.

2            THE COURT:  Those are the three issues.  Thank you

3    for queueing it up that way for me.

4            MS. BLOCH:  The Government calls Pennsylvania

5    State Trooper Troy Owen.

6            (The witness was duly sworn.)

7            THE CLERK:  Please state your full name for the

8    record and spell it.

9            THE WITNESS:  My name is Trooper Troy Owen, the

10   spelling of my name is T-r-o-y; last name is O-w-e-n.

11           MR. CHONTOS:  Judge, before we begin, I do have a

12   motion.  It's based on the interpretation of Rules 615 and

13   611.  615 is excluding witnesses, a sequestration rule.  I

14   clearly understand that the case agent is officer -- FBI

15   Agent Carter; but Judge, we're -- the essence is what

16   transpired in a room.  There's three witnesses --

17           THE COURT:  What are you asking me to do?

18           MR. CHONTOS:  What I'm asking you to do is to

19   exclude Agent Carter from the room so as to promote, you

20   know, the truth-seeking function.

21           THE COURT:  Is he going to testify?

22           MS. BLOCH:  He will, Your Honor.

23           THE COURT:  So you're asking for sequestration of

24   the agent?

25           MR. CHONTOS:  Correct.

1           THE COURT:  Do you have any objection?

2           MS. BLOCH:  I don't have an objection, no.

3           THE COURT:  See how easy that is.  You just -- it

4    just goes on nicely.  You probably could have asked her

5    ahead of time, and she would have told you yes, and then it

6    would have just worked out.

7           MR. CHONTOS:  It might have, Judge.  So I'll add

8    that to my experience bag.

9           THE COURT:  Okay.  Well, great.  Glad we could be

10   of help.

11          (Agent Thomas Carter was sequestered.)

12          THE COURT:  The record should indicate that the

13   case agent has left the room.  You may proceed.

14                            - - -

15          TROY OWEN, having been duly sworn, testified as

16   follows:

17                     DIRECT EXAMINATION

18   BY MS. BLOCH:

19   Q.   Trooper Owen, as indicated, you are a trooper with

20   the Pennsylvania State Police; is that correct?

21   A.   Yes, ma'am.  That is correct.

22   Q.   You have participated and continue to participate in

23   the investigation and prosecution of the Defendant, Earl

24   Warner?

25   A.   Yes, ma'am.  That's correct.

T. OWEN - DIRECT

1    Q.   And you do so as -- have you been working out of the

2    Mercer County barracks?

3    A.   Yes.  I have been working there for about four years.

4    Q.   You are headed to a new unit; is that correct?

5    A.   Yes.  Monday I start a new position with the State

6    Police, yes.

7    Q.   And how long have you been with the State Police?

8    A.   I'm on my eighth year at the Pennsylvania State

9    Police.

10   Q.   I'd like to really hone in on this particular

11   investigation and this particular Defendant and ask you if

12   you had cause to participate in an interview of Mr. Warner

13   on April 3 of 2012?

14   A.   Yes, ma'am.

15   Q.   Did that interview take place at the Pennsylvania

16   State Police Barracks in Mercer County, Pennsylvania?

17   A.   Yes, ma'am.  It did.

18   Q.   And who else was present for that interview other

19   than yourself and Mr. Warner?

20   A.   Agent Tom Carter from the FBI.

21   Q.   If you could just inform the Court as to how the

22   particular interview on that date was arranged, and if it

23   was arranged by you.

24   A.   It was arranged by me a couple days prior to the

25   interview.  I had had phone contact with Mr. Warner.  I

T. OWEN – DIRECT

1    asked him if he would come to the barracks to be

2    interviewed.  I just basically advised that it had to do

3    with the Armando Cruz investigation.

4    Q.   At the time of your conversation with Mr. Warner,

5    were you and in turn Agent Carter conducting an

6    investigation of Mr. Cruz and other subjects in the Mercer

7    County area regarding the sexual abuse of various Mercer

8    County residents -- children?

9    A.   Yes.

10   Q.   Do you recall at the time when you made contact with

11   Mr. Warner to arrange for this interview, do you remember

12   where he was residing at the time of that conversation?

13   A.   I believe Brandy Springs Apartments, which is in

14   Mercer Borough, Mercer County.

15   Q.   At the time to the best of your knowledge did

16   Mr. Warner have his own vehicle?

17   A.   I'm not sure.

18   Q.   Did he indicate to you that in order to come and meet

19   with you, he would need to have transportation by another

20   individual?

21   A.   I don't recall.  But I do know at the end of the

22   interview he said something about his mother had brought him

23   because he didn't drive.

24   Q.   Now, you indicated that you contacted him a couple

25   days prior to schedule this meeting.  Was the date -- do you

T. OWEN - DIRECT

1    remember approximately what time he arrived at the Mercer

2    County barracks?

3        A.   It would have been shortly before 1300 hours, maybe a

4    couple minutes before that.

5        Q.   Which is 1 p.m.; correct?

6        A.   Yes, correct.

7        Q.   And that was the time, was it not, that you arranged

8    by telephone?

9        A.   Yes.

10       Q.   Did he -- were you the first -- I shouldn't say it

11   that way -- was it you or Agent Carter who first made

12   contact with Mr. --

13       A.   I believe it was me.

14       Q.   And is there some sort of waiting area at the

15   barracks where he would have arrived and you met him?

16       A.   Yeah.  When people arrive, they come in the front

17   door of the barracks, and there's a little waiting area with

18   chairs and a bench, and then there's a doorway.  And once

19   you enter that doorway, you go back into the actual barracks

20   area.

21       Q.   And the barracks area, does it include a number of

22   offices and other necessary space?

23       A.   Yes.  It includes several different offices, what we

24   call a patrol room where the troopers have roll call, and

25   then a couple bathrooms.

T. OWEN - DIRECT

1   Q.   Was Mr. -- when you first made contact with
2   Mr. Warner in the waiting room, was he accompanied by any
3   other individual?
4   A.   I don't recall.
5          THE COURT:  Excuse me for one moment, please.
6          (Brief pause.)
7          THE COURT:  You may continue.
8   Q.   At some point in time, either before the interview
9   was initiated or after, did you learn that his mother was,
10  in fact, in the waiting room and going to take him home?
11  A.   Yes.  I don't have any independent recollection of
12  her being out there at that point when he came in.  She
13  could have been there.  I do remember at the end of the
14  interview he had made mention that his mother was in the
15  waiting room.
16  Q.   Let's talk for a moment then about the actual
17  location within the barracks that either you or Agent Carter
18  selected to conduct this interview.  Was it -- why don't you
19  describe the space, both the size and what was in it and
20  things of that nature?
21  A.   It's actually an office area.  It's our crime
22  supervisor's office area.  I don't believe he was there that
23  day, and I believe Tom was the one that said, hey, can we
24  use this office?  It has a computer in there.
25          And I said sure.  It's an office area.  I actually

T. OWEN – DIRECT

1    measured it.  It is –– the dimensions is 15 1/2 –– 15

2    feet –– 15 1/2 feet by 10 1/2 feet.  There is a desk in this

3    area.  There's a computer.  There's a chair behind the desk,

4    and then on the other side of the room there's a chair.

5            As you go into the room, you go into the front

6    door; and as you look forward, there's a chair, and that's

7    where Mr. Warner was seated, and there's the desk to the

8    left.  And on the other side of the desk there's a computer,

9    and that's where Agent Carter and I were located.

10   Q.   Are there, in fact –– at the barracks are there other

11   spaces or offices that are used as what we would refer to as

12   an interrogation room?

13   A.   Yes.  We have one interrogation room, and it's in a

14   different –– it's next to this area, but it's in a different

15   room.  And in this interrogation room there is an actual

16   chain to where the chain is anchored to the wall.  If

17   somebody is under arrest or in custody, that's where they're

18   held in the interrogation room.

19           We also have other areas if somebody is under

20   arrest, benches to where they are chained to a bench.

21   Q.   And was this office such a place where someone who

22   was in custody or not in custody could be chained or

23   tethered in some way to the office space?

24   A.   No, ma'am.

25   Q.   I'm going to show you what the Government's marked as

T. OWEN − DIRECT

1    Exhibit 1.  If you could take a look at these, Trooper Owen,

2    these are four photographs of an office space, again, marked

3    as Government's Exhibit No. 1.  Do you recognize the

4    photographs?

5        A.   Yes, ma'am.  I do.

6        Q.   Did you, in fact, take those photographs in

7    preparation for today's hearing?

8        A.   Yes, I did.

9        Q.   And what do they depict?

10       A.   They depict the office area where Mr. Warner was

11   interviewed.  I took these pictures maybe a week or ten days

12   ago.

13       Q.   And as you described, is there a desk, a computer,

14   cluttered -- an office space that someone clearly uses for

15   their work?

16       A.   Yes.  And these pictures depict the same condition in

17   reference to the furniture, where it's located as of the

18   date of the interview with Mr. Warner.

19       Q.   So there's at least one image that shows the chair in

20   which you indicated Mr. Warner was seated?

21       A.   Yes.  In the photographs there's a red chair, and

22   that's where Mr. Warner was seated.

23            MS. BLOCH:  The Government moves for the admission

24   of Exhibit No. 1.

25            THE COURT:  Any objection?

T. OWEN - DIRECT

1          MR. CHONTOS:  Well, there's really more than one

2    photo.  So maybe we could go 1A, B, C, D.

3          THE COURT:  Well, first of all, has he seen the

4    photos?

5          MR. CHONTOS:  Yes.

6          THE COURT:  And how many photos are there?

7          THE WITNESS:  Sir, there's four.

8          THE COURT:  Any objection to having them marked

9    Government Exhibit 1A, 1B, 1C, 1D?

10          MS. BLOCH:  No.

11          THE COURT:  Any objection to the admission?

12          MR. CHONTOS:  No.

13          THE COURT:  Admitted without objection.  So do you

14    have stickers, or do we need to give you stickers?

15          MS. BLOCH:  Well, I have stickers.  When he's

16    done, I'd be happy to mark them --

17          THE COURT:  Thank you.

18    BY MS. BLOCH:

19    Q.   If I could just talk to you a little bit about you

20    indicated Mr. Warner was seated in the red chair directly

21    across from the door which enters the room?

22    A.   Correct.

23    Q.   Where to the best of your recollection were you and

24    Agent Carter seated in the room?

25    A.   As you enter the room, the chair that Mr. Warner was

T. OWEN – DIRECT

1    seated in is directly straight ahead.  Then off to the left

2    you'll see in the pictures there's a desk.  We were behind

3    that desk on the other side of the room.  Behind the desk I

4    believe Agent Carter was initially by the computer.  I was

5    right beside him.

6    Q.    When Mr. –– at the time Mr. Warner came into the room

7    and was seated, at any point did you and he outside Agent

8    Carter's presence discuss the nature of the questions that

9    would be forthcoming?

10   A.    No, ma'am.

11   Q.    So was there any conversation at all between you and

12   Mr. Warner in that short trip from the waiting area to this

13   office?

14   A.    I don't specifically recall, you know, if we spoke.

15   Generally almost every time somebody is waiting for me in

16   the lobby area, I'll be paged, I'll go out, greet them,

17   shake their hand, thank you for coming in, escort them back

18   to wherever we want to take them to talk to them.

19   Q.    And obviously on this occasion you had previously

20   arranged this meeting.  So you knew to expect that he would

21   be arriving at this time; correct?

22   A.    Correct.

23   Q.    So do you introduce him or does Agent Carter

24   introduce himself to Mr. Warner ––

25   A.    I don't recall.

T. OWEN − DIRECT

1    Q.   Was he fairly quickly thereafter seated in this

2    chair?

3    A.   Yes.

4    Q.   In that timeframe, from meeting him in the waiting

5    room to sitting in this chair, at any time did Mr. Warner

6    indicate that he wanted the advice or presence of an

7    attorney?

8    A.   Absolutely not.  If he would have, I would have

9    recalled that.  But I don't recall specifically if we talked

10   about anything; but clearly if he would have asked for an

11   attorney, that would have been something that was without −−

12   I would not have tried to interview him.  I would have

13   advised Agent Carter that he had asked for an attorney.

14   Q.   So you sit down in this office for the purposes of

15   conducting this interview.  Is the −− do you both, that is,

16   you and Agent Carter, intend to pose questions to

17   Mr. Warner, or are you conducting it?  Agent Carter?  What

18   was −−

19   A.   We were both willing to talk to Mr. Warner.  But I

20   guess I kind of let Agent Carter take the lead on how the

21   interview went.

22   Q.   At the time of this interview −− strike that.  So

23   prior to any questions being posed to Mr. Warner that were

24   substantive, that is, that pertained to this investigation

25   that we're talking about of Mercer County adults sexually

T. OWEN – DIRECT

1    abusing children in this area, did anyone, you or Agent
2    Carter, talk to Mr. Warner about whether or not he was bound
3    to answer your questions, free to leave, things of that
4    nature?
5    A.    Yes.  Myself and Agent Carter was present.  Before I
6    talk to somebody, I always tell them you are not under
7    arrest.  You're free to leave at any point in time.  And I
8    make sure they understand that, that you're not under
9    arrest.  You're free to leave at any point in time.
10              Sometimes I'll close the door, and I tell people
11   when I close the door I'm only closing the door for privacy.
12   You can get up at any point in time and leave.
13   Q.    And did Agent Carter on this occasion specifically
14   address this kind of discussion with Mr. Warner before
15   engaging in any conversation about the facts?
16   A.    I believe that I was the one that said that to
17   Mr. Warner, and Agent Carter was present when I said that.
18   Q.    At any time did you indicate or Agent Carter that at
19   the conclusion of this interview, he would be going home, he
20   was not going to be arrested?
21   A.    Yes.  And that's typically how I conduct an
22   interview.  I also tell them that, hey, when this is done,
23   no matter what we talk about, you're going home.  You're
24   free to leave.
25   Q.    Did you or Agent Carter confirm before going any

T. OWEN — DIRECT

1   further that Mr. Warner understood what you had just
2   explained and Agent Carter explained?
3   A.   Yes.  I asked him if he understood.  That's what I do
4   as common practice.  I make sure that they understand that.
5   Q.   And did you or Agent Carter, after he acknowledged
6   understanding what you had said, ask him if he wanted to
7   continue and answer questions?
8   A.   Yes.  Agent Carter then started to ask him -- telling
9   him what the investigation was about, and he agreed to state
10  answers to questions.
11  Q.   So let's talk for just a moment about what it is that
12  Agent Carter explained.  Did Agent Carter explain that the
13  investigation pertained to one Armando Cruz and other
14  individuals in Mercer County?
15  A.   Yes.  He did.
16  Q.   Did he talk at all to Mr. Warner about the fact that
17  Mr. Warner -- that Mr. Warner's name rather had come up as
18  someone who had been taking pornographic images of children?
19  A.   Yes.
20  Q.   Do you remember -- and if you don't, certainly you
21  can indicate that -- do you remember exactly what Agent
22  Carter said the breadth of this investigation included prior
23  to asking questions?
24  A.   I don't remember exactly what was spoken, but he did
25  tell Mr. Warner about the investigation, that there were

T. OWEN – DIRECT

1    several people involved, that Armando Cruz was one of the

2    persons, that Armando Cruz was cooperating in the

3    investigation, and that Mr. Warner, his name had been

4    brought up as being involved in taking photographs of

5    children naked.

6        Q.   And at that point was it discussed or clear that

7    Mr. Cruz had provided that information after his arrest

8    during an interview with an attorney?

9        A.   Yes.

10       Q.   At that point were you comfortable that Mr. Warner

11   understood what was about to happen, what the nature of the

12   questions would be, and did you and Agent Carter then

13   proceed?

14       A.   Yes.

15       Q.   At any time during this discussion of his right to

16   leave or what the nature of the investigation was, who, you

17   know, specifically Mr. Cruz had provided information, at any

18   time during this did Mr. Warner express that he wanted to

19   have a lawyer?

20       A.   No, ma'am.

21       Q.   Wanted to call a lawyer?

22       A.   No, ma'am.

23       Q.   Did he indicate that he wanted to leave the barracks?

24       A.   No, ma'am.

25       Q.   At that point did both you and Agent Carter begin to

T. OWEN - DIRECT

1    ask specific questions about identifiable children and
2    particular images that you had acquired during your
3    investigation?
4       A.   Yes.
5       Q.   And initially what was Mr. Warner's response to
6    questions involving he and these children?
7       A.   Initially he made a comment that it was Agent Carter
8    that had talked about, you know, it was alleged that he had
9    taken pictures, naked pictures of children; and Mr. Warner
10   had indicated that, you know, he had not done that.  I don't
11   know the exact wording, but that was -- to the effect that
12   he was not involved in that.
13      Q.   And at some point Mr. Warner's denial of having
14   engaged in that activity prompted you and Agent Carter to
15   actually show Mr. Warner some of the evidence you had
16   acquired?
17      A.   Correct.
18      Q.   Did showing him the evidence include showing him a
19   video, a short video on the computer that was in this
20   office --
21      A.   Yes.
22      Q.   -- of -- that was sexually exploitive of a victim
23   that we have identified as FW?
24      A.   Yes, ma'am.
25      Q.   Was there some discussion between Agent Carter or

T. OWEN – DIRECT

1   yourself and Mr. Warner about whose voice in particular was

2   depicted in this video --

3      A.   Yes.

4      Q.   -- and the content of the video?

5      A.   Yes.  It was confirmed in the video, and Agent Carter

6   specifically asked Mr. Warner about the voice and asked

7   Mr. Warner if he believed that he had a very distinctive

8   voice.

9      Q.   And what was Mr. Warner's response to that?

10         MR. CHONTOS:  Judge, I'm going to object.  What

11  we're here today about is not the contents of what

12  Mr. Warner said.  It's just the fact that they were said.

13  So I really think specifics as to what he is saying in this

14  interview are not relevant to why we're here today.

15         MS. BLOCH:  The only relevance I see, Your Honor,

16  is that if they're -- based upon the brief as filed by

17  Defendant thus far, one has to assume that Mr. Warner's

18  contention is that throughout this interview and the

19  questioning, he's asking for a lawyer, and he is otherwise

20  both verbally and physically prevented from leaving the

21  office, as he alleges he wished to do.

22         I will be very brief about the content of the

23  videos and the images.  But I do think that some of his

24  responses to these questions and how forthcoming he is in

25  responding are indicative of his voluntary desire to answer

T. OWEN - DIRECT

1  the questions.

2          MR. CHONTOS:  I disagree.  The Government's

3  perhaps -- it's a fair overview as to what the defense has

4  put forth.  But the content of what he says doesn't push the

5  ball forward as to whether he was in custody, whether he was

6  interrogated or what those statements -- or whether those

7  statements that he gave were voluntary or not.

8          THE COURT:  I'll overrule the objection.  I

9  think -- at a minimum it goes to whether they're voluntary

10  or not because he certainly can sit there and say nothing.

11          MR. CHONTOS:  Well, clearly they can say he gave

12  an oral response.  It would address the Court's, you know,

13  concern.  The content of his message is not relevant today.

14          THE COURT:  I overrule the objection.  I think it

15  does relate to the voluntariness.

16  BY MS. BLOCH:

17   Q.   All right.  So let's go back to this video of FW.

18  Does this video that we're speaking about clearly have

19  content that is sexually exploitive of a child?

20   A.   Yes.

21          MR. CHONTOS:  Objection.  It calls for his

22  conclusion.

23          MS. BLOCH:  It's one of the counts, and there's no

24  jury here.  I'm not sure I understand --

25          MR. CHONTOS:  It's not relevant to why we're here,

21

1   Judge.  His opinion whether --

2            THE COURT:  I'll sustain that objection.  Why

3   don't we just --

4            MS. BLOCH:  Well, then I'm going to have to ask

5   the witness what is depicted in the video.  I understand

6   this conclusion as to whether that's sexually exploitive is

7   somewhat of an opinion, but otherwise we don't know what

8   Mr. Warner is being asked about or what the responses that

9   he provides -- what context he's provided them.

10           THE COURT:  I'll sustain the objection.

11  BY MS. BLOCH:

12   Q.   So a video that was retrieved and which is the

13  subject of the pending indictment against Mr. Warner was

14  shown to him; correct?

15   A.   Correct.

16           MR. CHONTOS:  Objection, Judge.  The first part of

17  that question assumes facts that are not in evidence.  The

18  video was retrieved?  You've heard nothing about that.

19           THE COURT:  So the video that was shown to him?

20           MS. BLOCH:  The video that was shown to him and is

21  the subject of a count in this indictment that is pending

22  was shown.

23   Q.   Correct?

24           THE COURT:  Is that correct?

25           THE WITNESS:  Yes.

22

T. OWEN – DIRECT

1    BY MS. BLOCH:

2      Q.    At some point did Agent Carter ask Mr. Warner if, in

3    fact, that was his voice that could be heard in that video?

4      A.    Yes.

5      Q.    And did he in response to that question say I want a

6    lawyer?

7      A.    No, ma'am.

8      Q.    Did he answer the question freely?

9      A.    Yes.

10     Q.    And was there discussion thereafter about some of the

11   other still images as well as other video images that were

12   the subject of your inquiry with Mr. Warner and which are

13   the subject of this pending indictment?

14     A.    Yes.

15     Q.    Were there other images that were shown to him about

16   which -- about which you and/or Agent Carter questioned him

17   as to who took the image and where the image was taken?

18     A.    Yes.

19     Q.    There were images not only of FW, but also other

20   victims as set forth in the indictment; correct?

21     A.    Yes.

22     Q.    And did Mr. Warner, while being shown these various

23   depictions which are the subject of this case, indicate that

24   he wanted to speak to a lawyer?

25     A.    No, ma'am.

T. OWEN - DIRECT

1    Q.    Did he answer yours and Agent Carter's questions

2    regarding whether or not he took the images?

3    A.    Yes.

4    Q.    Were there images shown to him of the various victims

5    that he acknowledged he had taken?

6    A.    Yes.

7    Q.    At any time during this discussion was -- did

8    Mr. Warner express that he wanted to leave the room?

9    A.    At the end of the interview, he said we asked enough

10   questions.  He wanted to leave.

11   Q.    So it was he who actually prompted the conclusion of

12   the meeting?

13   A.    Yes.

14   Q.    And you're saying he said I've answered enough

15   questions?

16   A.    Yes.

17   Q.    Were there any additional questions posed to him

18   after he expressed his desire to leave?

19   A.    No, ma'am.

20   Q.    Did you escort him back out to the waiting area?

21   A.    Yes.  I escorted him back out.  That's our policy at

22   the barracks.  If somebody comes in and goes out, they have

23   to be escorted by a trooper.

24   Q.    Did you recall if, when you escorted him back to the

25   waiting room, you were then -- that his mother was then

24

T. OWEN – DIRECT

1   visible to you or not?

2   A.   Here today I don't recall.  I don't recall seeing her

3   that day.  She could have been there.  She may not have

4   been.  I don't recall.

5   Q.   At any time during the course of this interview,

6   did -- you've indicated he did not ask to leave?

7   A.   That's correct.

8   Q.   Did he at any time ask to speak with a lawyer or meet

9   with a lawyer?

10   A.   No, ma'am.

11   Q.   Did he ask to use the men's room?

12   A.   I don't recall him asking.  If he would have asked,

13   it would have been granted.  I don't recall him asking to

14   use the bathroom.

15   Q.   At any time did he ask for food or water or anything

16   of that nature?

17   A.   I don't recall.  We have water and food there.

18   Sometimes when people ask for it, yeah, we go get it for

19   them.

20   Q.   How long would you approximate this interview taking

21   place?

22   A.   An estimate would be 45 minutes to an hour, somewhere

23   in that ballpark.

24   Q.   At any time after Mr. Warner was seated in the red

25   chair, as you've described and which is depicted in

T. OWEN - DIRECT

1    Government's Exhibit 1, did he seek to move about the room,

2    and was his movement restricted in any way?

3      A.   His movement was not restricted.  I do believe at

4    some point in time he would stand up and come over and look

5    at a picture or point to the desk where the computer was

6    located.

7      Q.   Was there anything either visually or physically

8    obstructing his path to that door to the office from where

9    he was seated?

10     A.   No, ma'am.

11          MS. BLOCH:  I have no further questions, Your

12   Honor.

13                          - - -

14                    CROSS-EXAMINATION

15   BY MR. CHONTOS:

16     Q.   Sir, you're on duty today; right?

17     A.   Yes, sir.  I am.

18     Q.   And part of being on duty is you're carrying a gun;

19   right?

20     A.   I am not.  It's in the car.

21     Q.   Okay.  As you drove down to the court appearance, you

22   had your gun?

23     A.   Correct.

24     Q.   And a State Trooper would also carry handcuffs;

25   right?

26

T. OWEN — CROSS

1    A.    Correct.

2    Q.    Do you have them on you right now?

3    A.    I do.

4    Q.    Okay.  And the moment that you interviewed Mr. Warner

5    in that interview room, you were working that day; right?

6    A.    Correct.

7    Q.    In a uniform like you're dressed today?

8    A.    Yes.  Shirt and tie.  I don't know if I had the coat

9    on or not.  Yes, sir.

10   Q.    You had your gun with you?

11   A.    Yes, sir.

12   Q.    And your handcuffs?

13   A.    Yes, sir.

14   Q.    And in your eight years of experience as a State

15   Trooper, I just have to believe that you've had the occasion

16   to use your handcuffs; right?

17   A.    Yes, sir.

18   Q.    And I also have to believe in your years of

19   experience, that you've used those handcuffs to attach

20   someone to a chair; right?

21   A.    Correct.

22   Q.    Now, on that day you met Earl Warner in your lobby;

23   right?

24   A.    I believe so, yes.  That's where I would have met

25   him, yes.

T. OWEN – CROSS

1    Q.   He arrived a couple minutes before the anointed time

2    of your interview; right?

3    A.   Somewhere around 1:00, maybe a few minutes before,

4    right around 1:00 p.m.

5    Q.   Do you have any idea how long he was sitting out

6    there waiting?

7    A.   Here today I don't recall.  I would have been

8    expecting him to be there at 1:00.  So if he wasn't there in

9    that ballpark, I would have went out to see if he was out

10   there.

11   Q.   Now, at some point the desk Sergeant for lack of a

12   better phrase contacts you and says, hey, Joe Blow is here

13   for you; right?

14   A.   Generally that's how it works, yes, because my office

15   is in the back of the barracks.  The waiting area is out

16   front.  When somebody comes in, they'll ask them what

17   they're there for, and then they would page me, call me at

18   my desk and tell me that I have a visitor.

19   Q.   Sir, when you were contacted, hey, your guest is

20   here, did you immediately go out?

21   A.   I don't recall.

22   Q.   Agent Carter was already there; right?

23   A.   Yes.

24   Q.   And it was a few days earlier that you had reached

25   out to Mr. Warner and said, hey, can you come on down to the

T. OWEN - CROSS

1    barracks and chat?  We want to continue our discussion about

2    Armando Cruz; right?

3        A.    Yes.

4        Q.    And do you have a recollection, was that the day

5    before, two days before, three days before?

6        A.    I don't have an exact -- that was a few days before.

7        Q.    Okay.  Is it fair to say that after Cruz does his

8    little sit-down with his lawyer and Miss Bloch and spills

9    his guts, it's after that event you then reach out to

10   Mr. Warner to say, hey, can you come on down to chat with

11   us?  Is that fair?

12       A.    Yes.

13       Q.    Now, sir, you indicated that when you go out to get

14   Mr. Warner, you have no recollection of anyone else being in

15   the lobby; right?

16       A.    I don't.  There could have been.  I don't have any

17   personal recollection of that today.

18       Q.    You also have no recollection as to what you said and

19   what Mr. Warner might have said back to you?

20       A.    Exactly.  No, I do not, but I do know if he would

21   have asked for a lawyer --

22       Q.    Sir, you've answered my question.

23       A.    Okay.

24       Q.    Sir, you're in that interview room for about 45

25   minutes, maybe 60 minutes; right?

T. OWEN - CROSS

1    A.    Correct.

2    Q.    Are you there the whole time?

3    A.    I leave at one point in time.  I recall leaving I

4    think just one time.

5    Q.    And when you leave, Agent Carter is also outside in

6    the area --

7    A.    He's still in the room.  He's still in the room when

8    I leave.

9    Q.    So Agent Carter is there the whole time?

10   A.    Yes.

11   Q.    There's never an opportunity where Mr. Warner is

12   alone in that room?

13   A.    No.

14   Q.    When you're in the room, is there a window on the

15   door that allows you to see outside to the hallway?

16   A.    There is not.

17   Q.    Is there a window to the left or right of the door

18   that allows you to see out in the hallway?

19   A.    Not out in the hallway.  There is a window in that

20   office, but it's up high, and it just goes to the outside

21   area.

22   Q.    Okay.  Do you know what a transom window is?

23   A.    I do.  I believe I do.  The one -- it's a window you

24   can't see out or see in?

25   Q.    It's also traditionally above a door?

T. OWEN - CROSS

1    A.    Okay.

2    Q.    Is that the height of that window that you're talking

3    about?

4    A.    The window is on the opposite wall.  The front door

5    is here, and then there's a window over here (indicating),

6    and it's up pretty high.  It's probably up six or seven feet

7    up.

8    Q.    Sir, as you are beginning to question Mr. Warner, at

9    any time during that 45, 60 minutes, do you get frustrated?

10   A.    I get to the point to where I don't believe what he's

11   saying, yes.

12   Q.    And does that lack of belief in what you're hearing

13   get you frustrated?

14   A.    I guess you could say that.  I --

15   Q.    Would your reaction stop at the line of being angry,

16   meaning you're frustrated but not angry?

17   A.    I wouldn't be angry, no.

18   Q.    So at any time during that session with Mr. Warner,

19   do you pick up a chair, throw it against a wall, yell at

20   Mr. Warner "I'm tired of this shit, all this lying"?

21   A.    Absolutely not.  There is not a chair that I can pick

22   up --

23   Q.    Thank you.  Well, how many chairs are in that room?

24   A.    There's three.

25   Q.    Okay.  Mr. Warner's in one?

T. OWEN – CROSS

1    A.   Correct.

2    Q.   Agent Carter's in the second?

3    A.   Correct.

4    Q.   You're sitting in the third?

5    A.   Right.

6    Q.   Okay.  All of them are movable; right?

7    A.   Well, there's people seated in the chairs.

8    Q.   I understand, but if everyone got up out of their

9    chairs, you could go grab Mr. Warner's chair and vice versa;

10   right?

11   A.   Yeah.  I could theoretically, yes.

12   Q.   So those chairs are all movable?  They're not bolted

13   to the floor?

14   A.   Correct.

15   Q.   Now, sir, the first -- when you first enter that --

16        THE COURT:  Stay at the microphone because it's

17   easier for us to hear.  You can put the microphone in the

18   corner though if that is your preferred location.

19        MR. CHONTOS:  Thank you.

20   Q.   Sir, I just want to ask some questions about the

21   sequence of topics in that interview room.

22   A.   Sure.

23   Q.   When you first go in, the first topic is the Cruz

24   investigation, other people that might be involved.  Fair?

25   A.   At the beginning, yes.

T. OWEN - CROSS

1    Q.    Okay.  You then segway.  The second topic is what

2  generically?  I'm asking for generalities.

3    A.    About him taking pictures.

4    Q.    Okay.  Is the second topic the still photos, and the

5  third would be the video?  Or was the video second, still

6  photos third?

7    A.    I believe the pictures were addressed by Agent Carter

8  to Mr. Warner, and then at one point in time the video was

9  played, and that would have been after, and I believe there

10  was some still pictures shown after that.

11    Q.    Overview of investigation, still photos, video, some

12  more photos?  Do I have the sequence down?

13    A.    I believe so, yes.

14    Q.    Okay.  Is there another general topic, or is that

15  about the time we're getting to the 50, 55, 60-minute

16  timeframe?

17    A.    The discussion started out with the overview of the

18  investigation.

19    Q.    Yeah.  We got that crystal clear.  I'm just trying to

20  get the sequence of broad based topics.

21    A.    And then putting the video in and then showing

22  pictures and talking about pictures.

23    Q.    Okay.  After the discussion about those photos, is

24  there another topic, or are we talking that's about the end

25  of the interview?

T. OWEN – CROSS

1    A.    Mr. Warner started talking about topics.

2    Q.    And do you have a recollection as to the identity of

3    topic A, B or C that Mr. Warner brought up?

4    A.    Armando Cruz.

5    Q.    Okay.  Is there a second topic that he brought up?

6    A.    Armando taking pictures, the camera.

7    Q.    Is there a third topic that he brought up?

8    A.    I don't recall.  I don't think so.  I think it was

9    all addressed.

10    Q.    And the topics that you've identified as Mr. Warner

11    bringing up, those were at the tail end of the discussion?

12    A.    Midway, towards the end.

13    Q.    How long were you out of the room?

14    A.    Probably a minute or two.

15    Q.    Okay.  Did you have to go to the bathroom?

16    A.    No.

17    Q.    Answer a phone call?

18    A.    No.

19    Q.    Go get something to help you with the questioning?

20    A.    No.

21    Q.    Why did you go?

22    A.    Used it as a tactic, interview tactic to where I left

23    the room and left Agent Carter speak with him.

24    Q.    Would that tactic be colloquially described as up to

25    that point you're playing the bad cop, and then Agent Carter

T. OWEN - CROSS

1   can play the good cop?

2      A.   I play -- made it look like I was frustrated, and I

3   left.  And then I left him with Agent Carter, yes, for about

4   a minute or two.

5      Q.   This interview took place on April 3, 2012; right?

6      A.   Correct.

7      Q.   On April 2, the day before this interview, don't you

8   have enough evidence to arrest Earl Warner?

9      A.   I never --

10            MS. BLOCH:  Objection.  Lack of evidence.

11            THE COURT:  Why is that relevant?

12            MR. CHONTOS:  It goes to their intent there in the

13   interview room.

14            THE COURT:  I'll overrule the objection.  Let's

15   take it question by question because I don't see that it's

16   relevant, but go ahead.

17            MR. CHONTOS:  Sure.

18      Q.   Do you recall the question, or would you like me

19   repeat it?

20      A.   If you could repeat it.

21      Q.   On April 2, the day before you interview Earl Warner,

22   don't you have enough evidence to arrest Mr. Warner?

23      A.   We have a State case, and we have the Federal case.

24   Are you asking me specifically if I had enough for State

25   charges?  Is that the question?

T. OWEN - CROSS

1    Q.    Yes.  Because you're a State officer.

2    A.    Okay.  I think there's definitely evidence at that

3    point in time that would indicate that he was involved in

4    criminal activity, but I never arrest anybody until I at

5    least try to talk to them and try to interview them.

6            I never just go and rush to judgment arrest

7    people.  Even if I have evidence indicating that this person

8    likely committed a crime, I always give them an opportunity

9    to come in to be interviewed.

10   Q.    Well, that's one way to look at it.  The other way is

11   that you think that you have enough evidence, but you would

12   just like the icing on the cake, so I'm going to trying to

13   get a statement out of the accused.  Fair?

14   A.    In certain cases, yes.

15   Q.    Right.  And you drafted an affidavit of probable

16   cause?

17   A.    Correct.

18   Q.    And do you have that with you?

19   A.    I do, somewhere in the file, yes.

20           MR. CHONTOS:  Carolyn, it's discovery RV05069.

21   That's the document that I sent back to you.

22           THE COURT:  Do you have a copy for her?

23           THE WITNESS:  Just give me a second.  I have

24   probably a couple hundred pages here.

25           MR. CHONTOS:  Sure.

T. OWEN - CROSS

1      THE COURT:  Do you need that copy back in order to

2  question him?

3      MR. CHONTOS:  I don't, Judge.

4  Q.   You have your affidavit of probable cause in front of

5  you?

6  A.   Yes, sir.  I do.

7  Q.   Okay.  Is it fair to say that five-sixths of that

8  stuff in your affidavit has nothing to do with the

9  statements from Earl Warner?

10     MS. BLOCH:  Again, objection.  Relevance.

11     THE COURT:  What's the date on this document?

12     MR. CHONTOS:  It's an affidavit of probable cause.

13     THE COURT:  Is it before or after the --

14     MR. CHONTOS:  It's after the interview.

15     THE COURT:  I'll overrule the objection.

16 BY MR. CHONTOS:

17 Q.   Is it fair to say that five-sixths of that affidavit

18 of probable cause is all about Armando and what he says

19 links Warner to this crime?

20 A.   Yes.  It talks about images and videos, yes.

21 Q.   And to be fair, the last two sentences on that page

22 reference Earl Warner's statement?  Fair?

23 A.   You're saying the last two sentences?

24 Q.   Yes.

25 A.   I can read the last two sentences --

T. OWEN – CROSS

1    Q.   No.  I just want you to answer my question.  It's the

2    last two sentences in that affidavit of probable cause,

3    that's the only reference in that document to Mr. Warner's

4    statements?

5    A.   What I'm looking at, it doesn't say anything about a

6    statement in the last two sentences.

7              MR. CHONTOS:  Can I approach, Judge?

8              THE COURT:  Sure.

9    Q.   Sir, I'm going to hand you a document.  Can you

10   identify that document?

11   A.   Yes.  This is not the last page.  This is an

12   affidavit of probable cause.  This is the second to the last

13   page.

14   Q.   Okay.  On that particular page, the very end, the

15   last two sentences, that was the only references to

16   Mr. Warner's statements on that page?

17   A.   Yes.

18             THE COURT:  Just for the record, what's the

19   production number on that page, please?

20             MR. CHONTOS:  5069.

21             THE COURT:  Thank you.

22   Q.   Sir, you had indicated that if Mr. Warner had asked

23   for a lawyer, you would have told Agent Carter, hey, he

24   asked for a lawyer?

25   A.   Absolutely.

T. OWEN - CROSS

1   Q.   Okay.  And the reason why you say that is why?

2   A.   Because I would have told him because I would have

3   known we could not interview Mr. Warner if he asked for his

4   attorney.

5   Q.   And you've learned that; right?  You were taught

6   that?

7   A.   Yes.  And that's what I practice.  And it's

8   documented I practice that, yes.

9   Q.   Sir, did I ask you anything about your practice and

10  your habit?

11  A.   No, sir.

12  Q.   Now, sir, you also indicated that Earl Warner

13  acknowledged his understanding at a certain point?

14  A.   Yes.

15  Q.   How did he manifest that?

16  A.   I asked -- after I tell people that they're not under

17  arrest, they're free to leave at any point in time, the next

18  thing I ask is do you understand that?  And --

19  Q.   And what was Mr. Warner's response?

20  A.   Yes.  He understood.

21  Q.   Well, was it yes, comma, I understood --

22  A.   I don't specifically remember the exact wordage, but

23  it was yes, I understand.  That's what I believe he said.

24  Q.   Sir, leading up to today's court appearance, did you

25  have face-to-face meetings with the Government's lawyer?

T. OWEN – CROSS

1    A.    I did not.

2    Q.    Were there phone meetings with the Government's

3    lawyer?

4    A.    There was a phone call.  The U.S. Attorney called me

5    and kind of went over the issues of suppression that were

6    listed.

7    Q.    Was that phone conversation just between you and the

8    Government's lawyer, or was anyone else participating?

9    A.    I believe I was on speaker phone.  I believe Agent

10   Carter was in the background.

11   Q.    How long was the meeting?

12   A.    Maybe five to ten minutes phone call.

13        MR. CHONTOS:  Okay.  That's all I have.  Thank

14   you.

15        THE COURT:  Any redirect?

16        MS. BLOCH:  Just a few questions, Your Honor.

17   Thank you.

18                      – – –

19              REDIRECT EXAMINATION

20   BY MS. BLOCH:

21   Q.    Just so it's clear on the record, do you recall

22   whether or not you had your handcuffs on your person --

23   A.    I always carry them.  I can't remember a time where I

24   wouldn't have them on.

25   Q.    Where do you keep them?

T. OWEN - REDIRECT

1    A.   In the small of my back.

2    Q.   So I take it like even today you have them, but we

3    can't see them?

4    A.   Correct.

5    Q.   At any time did you pull them out and tether

6    Mr. Warner to a chair or any other object in the office?

7    A.   No, ma'am.

8    Q.   And just so -- I just want to make sure the timing of

9    things is clear.  When you -- did you speak to Agent

10   Carter -- in the days between your contact with Mr. Warner

11   scheduling this interview and the actual interview taking

12   place, did you talk to Agent Carter in the interim during

13   which he told you that he had met with Mr. Cruz?

14   A.   Yes.

15   Q.   Prior to that, that is, prior to arranging this

16   interview with Mr. Warner, did you know that Mr. Cruz had,

17   in fact, been indicted federally?

18   A.   Yes.  I believe so, yes.  I believe I knew that he

19   was indicted, that he was cooperating, yes.

20   Q.   Did you know he was cooperating prior to scheduling

21   the interview or in between scheduling the interview and

22   conducting the interview when you talked with Agent Carter?

23   A.   I don't recall exactly when I became aware of that.

24   Q.   I mean were you aware of it at the time you conducted

25   the interview?

T. OWEN - REDIRECT

1    A.    Yes, ma'am.

2    Q.    At the time you conducted this interview -- or rather

3    I should -- strike that -- the affidavit from which Mr.

4    Chontos has had you read, that you authored, that was an

5    affidavit in support of a State charge, am I right, in

6    Mercer County, specifically relating to the victim we

7    identified as MC?

8    A.    FW.

9    Q.    Okay.  FW.  I'm sorry.  It did not pertain to any

10   other victim that might -- that now is identified in this

11   photo --

12   A.    No.

13   Q.    Was -- clearly at the time of the interview you

14   viewed Mr. Warner as a subject of this general investigation

15   that you have described to him and to us?

16   A.    Correct.

17   Q.    Did you know the full breadth of the alleged female

18   victims of Mr. Warner at that point, or was that still part

19   of the greater investigation?

20   A.    I'm not quite sure if I understand your question.  I

21   had information that Agent Carter provided me.

22   Q.    At the time of the interview.  Right?

23   A.    Yes.  And prior to the interview he had FAXed me some

24   information about the case.

25   Q.    But I guess what I'm getting at, probably inartfully,

42

                    T. OWEN - REDIRECT

1   is that the investigation pertained not only to FW, but

2   other young girls?

3     A.   Yes, ma'am.

4     Q.   And was the hope that you would find -- you know,

5   that if there were other victims not yet identified, you

6   might find them as well?

7     A.   Yes.

8            MS. BLOCH:  I have no further questions, Your

9   Honor.

10           THE COURT:  Any recross?

11           MR. CHONTOS:  Briefly Judge.

12                          - - -

13                   RECROSS-EXAMINATION

14  BY MR. CHONTOS:

15    Q.   Sir, you used the word subject in response to a

16  question, that you knew Mr. Warner was a subject.  Do you

17  recall saying that?

18    A.   I don't specifically recall calling him a subject.

19  Subject of an investigation --

20    Q.   Right.

21    A.   I would have considered him a subject of an

22  investigation, yes.

23    Q.   Are there other labels that the Pennsylvania State

24  Police use for -- that may be someone below subject status

25  or perhaps above subject status?

T. OWEN - RECROSS

1    A.    Yes.

2    Q.    What's below a subject status?

3    A.    Person of interest.

4    Q.    Okay.  Is there a label below that?  Maybe citizen?

5    A.    Maybe witness, if somebody's a witness.

6    Q.    Okay.  How do you go from being a subject to

7    something greater?  What's necessary, and then what's that

8    label?

9    A.    Through classifications, I use somebody -- a person

10   of interest, somebody that might have been involved in a

11   crime, to where somebody's a suspect, to where I have

12   information that, yeah, probably this person committed some

13   type of criminal offense, and then the next one would be an

14   accused, somebody who's been charged with a crime.

15   Q.    So at the beginning of the interview, in your mind

16   Mr. Warner was a subject?

17   A.    Subject of an investigation.

18   Q.    I got you.  At the end of the interview did his label

19   title in your mind change?

20   A.    I don't call somebody and accuse them until they're

21   arrested, and that correlates with our reports.  We have a

22   block where we check a person's a suspect, an accused.

23   Q.    There's no doubt that you wanted to chat with Earl

24   Warner?  Right?

25   A.    Absolutely.  I always want to talk to the person of

T. OWEN - RECROSS

1    interest or a suspect to possibly gather more evidence and

2    also to hear their side of the story.  It's important to do

3    that so I can show an attorney that I gave their client an

4    opportunity to talk about the case, to give their side of

5    the story.

6        Q.   Your sense of fairness?

7        A.   That's what I do.  That's what I've been trained to

8    do.  That's --

9             MR. CHONTOS:  That's all I have.

10            THE COURT:  Any additional questions?

11            MS. BLOCH:  No additional questions, Your Honor.

12   Thank you.

13            THE COURT:  May he be released?

14            MS. BLOCH:  He may.

15            THE COURT:  Agreed?

16            MR. CHONTOS:  Agreed.

17            THE COURT:  All right.  I have a Board of Judges

18   meeting.  That's at noon.  So I'm going to go down to that.

19   They tell me it's going to be brief.  It's almost

20   inconsistent statements to say there's a Board of Judges

21   meeting and it will be brief.  So we'll just see what it

22   turns out to be.  I would hope to be back by 12:30.

23            So go get a bite to eat or whatever you do, and as

24   soon as I come back, I'll pick back up and run -- why don't

25   we just say 12:30 so the Marshals know when to have the

1    Defendant back.  If it's going to be later than that, I'll

2    let you know.  Otherwise we'll resume at 12:30, and I have

3    another hearing at 3:00 -- at 2:00 that has people on the

4    telephone.  So we will have to break for that, but that

5    shouldn't last more than 15 minutes.

6              MR. CHONTOS:  Judge, I communicated with your

7    staff I have a preexisting status conference with Judge

8    Fischer at 2:10.  That should take no longer than ten

9    minutes.

10             THE COURT:  That will be fine because we'll break

11   at 2:00.  Does that fit your schedule?

12             MR. CHONTOS:  Great.  Thank you.

13             THE COURT:  So the Marshals may remove the

14   Defendant.  We'll resume at 12:30.

15             (A recess was taken at 11:54 a.m.)

16                       – – –

17                     12:35 p.m.

18             (In open court, Defendant present with counsel:)

19             THE COURT:  You may call your next witness.

20             MS. BLOCH:  Your Honor, the Government calls

21   Special Agent Thomas Carter.

22             (The witness was duly sworn.)

23             THE CLERK:  Please state and spell your name for

24   the record.

25             THE WITNESS:  Thomas Neil Carter, C-a-r-t-e-r.

46

1              THE CLERK:  Thank you.  You may be seated.

2                          -  -  -

3              THOMAS NEIL CARTER, a witness herein, having been

4     duly sworn, testified as follows:

5                          DIRECT EXAMINATION

6     BY MS. BLOCH:

7        Q.    Agent Carter, you are an investigator with the

8     Federal Bureau of Investigation; is that correct?

9        A.    Yes.

10       Q.    And how long have you been employed as such?

11       A.    Twenty-two years.

12       Q.    Presently you work from a satellite office of the

13    Pittsburgh FBI office that's in Cranberry, Pennsylvania;

14    correct?

15       A.    That's correct.

16       Q.    And are you one of the agents then that is tasked

17    with investigating cases in Mercer County, Pennsylvania?

18       A.    Yes.

19       Q.    You are, in fact, the lead investigator at least for

20    the Federal Bureau of Investigation and the Federal

21    prosecution involving an individual by the name of Earl

22    Warner?

23       A.    Yes.

24       Q.    And that gentleman is in the courtroom here today?

25       A.    Seated with defense counsel.

T. CARTER - DIRECT

1    Q.    I'm going to direct your attention specifically to

2    April 3 of 2012 and ask you if you participated in an

3    interview of Mr. Warner at the Mercer County barracks of the

4    State Police on that date?

5    A.    Yes, I did.

6    Q.    Could you please describe how arrangements were made

7    to the best of your knowledge for that particular interview

8    to take place on that date with Mr. Warner?

9    A.    Myself and Trooper Owen were jointly investigating

10   child pornography, specifically an individual by the name of

11   Armando Cruz, and Mr. Warner's name came up in that

12   investigation.

13          Mr. Warner was called by Trooper Owen and asked to

14   come in to the State Police barracks there in Mercer for the

15   purpose of interview.

16   Q.    And did you and Trooper Owen discuss that he would

17   call him, or did you learn sometime thereafter that the

18   Trooper had called Mr. Warner for an interview?

19   A.    I learned after, and I said, well, I'd like to be

20   present, and we agreed to have me present there in that

21   interview.

22   Q.    After you -- prior -- I should say prior to

23   participating or learning of this scheduled interview, had

24   you shortly before that actually had the opportunity in your

25   investigation of Mr. Cruz to conduct an interview of him?

48

T. CARTER - DIRECT

1  A.   Yes.  February 15 I went to Mr. Warner's residence
2  with a County detective from Mercer County and spoke with
3  Mr. Warner at his residence at that time.
4  Q.   And -- all right.  So that's the occasion on which
5  you had previously talked with Mr. Warner?
6  A.   Correct.
7  Q.   And what was the subject matter of that interview?
8  A.   Armando Cruz.
9  Q.   And what prompted you to meet with Mr. Warner on that
10  date and talk about Armando Cruz?
11  A.   That I learned that Mr. Cruz and Mr. Warner were
12  friends and that Mr. Warner may have been bringing over some
13  of the same girls that Mr. Cruz was involved with.
14  Q.   Was there some reason to believe that Mr. Warner's
15  daughter had been in Mr. Cruz's residence?
16  A.   Yes.
17  Q.   And does Mr. Warner have a daughter that is
18  approximately the age of the children that are identified as
19  victims in that indictment?
20  A.   Yes.  They're friends.
21  Q.   Okay.  Actually -- you probably just misheard me or
22  maybe I misstated.  With respect to Mr. Cruz though, you had
23  had an opportunity in the context of the investigation of
24  Mr. Cruz to actually interview him, that is, Mr. Cruz?
25  A.   Mr. Cruz, oh, yes.

T. CARTER - DIRECT

1    Q.    And did that interview take place sometime shortly

2    before your interview of Mr. Warner?

3    A.    It did with defense counsel.

4    Q.    You mean by defense counsel --

5    A.    Mr. Cruz's defense counsel, yes.

6    Q.    Okay.  So when you talked with Trooper Owen and

7    learned that he had scheduled this interview with

8    Mr. Warner, did you share with the Trooper at that point

9    what you had learned from Mr. Cruz?  Or did you share it

10   with him at the time of the interview, or how did that

11   sharing of information regarding Mr. Cruz's interview take

12   place between you and Trooper Owen?

13   A.    I discussed it with Trooper Owen, not at length, but

14   I discussed it that there had been some allegations made by

15   Mr. Cruz against Mr. Warner and, therefore, I'd like to be

16   present on the interview.

17   Q.    So on that particular date, do you recall

18   approximately the time that the interview was initiated or

19   was planned for?

20   A.    Which interview are we talking about?

21   Q.    I'm sorry.  On April 3.  I apologize.  April 3, we're

22   back to the subject interview -- the subject of this

23   particular suppression hearing.  April 3 you and Trooper

24   Owen interview Mr. Warner at the Mercer barracks.  Do you

25   recall approximately what time that occurred?

T. CARTER – DIRECT

1    A.    Around 1:00.

2    Q.    Did you arrive at the barracks prior to Mr. Warner's

3    arrival?

4    A.    Yes.

5    Q.    Did you meet with Trooper Owen at all in advance of

6    the interview?

7    A.    Yes.

8    Q.    Do you recall where you were within the barracks when

9    you met with him, that is, Trooper Owen?

10   A.    Yes.  We were in the crime area, called the crime

11   area where the investigators such as –– Trooper Owen is

12   considered a Trooper.  We have desks in that area, and we

13   met at a desk area of the barracks there.

14   Q.    Were you together there when Mr. Warner arrived at

15   the barracks?

16   A.    Yes.

17   Q.    And do you remember how Trooper Owen was advised that

18   Mr. Warner was present and waiting –– or had arrived?

19   A.    No, I don't.  I think normally when I've been there

20   in the past, they go over –– they announce over the intercom

21   "Trooper Owen, front desk," or –– I don't remember

22   specifically that day, but I remember him going out to the

23   front to meet Mr. Warner.

24   Q.    And where were you –– were you –– where did the

25   interview ultimately take place?

T. CARTER − DIRECT

1    A.    It took place in the Corporal's office, the crime −−

2    Corporal's office right next to the crime area.

3    Q.    And when Mr. −− was Mr. Warner escorted back there

4    with Trooper Owen?

5    A.    Yes.

6    Q.    By Trooper Owen?

7    A.    Yes.

8    Q.    And were you already seated in the office that you're

9    describing the interview took place?

10   A.    I was, yes.

11   Q.    And was there some introduction that you engaged in

12   with Mr. Warner upon meeting him in that room?

13   A.    Yes.  I introduced myself again to him.  He

14   remembered me.  I recognized him.  He recognized me.

15   Q.    Were the three of you then seated in this room?

16   A.    Yes.

17   Q.    I'm going to show you what's been admitted as

18   Government's Exhibit 1 and ask you if you recognize the

19   office that's depicted in these images.  This is actual −−

20   actually I should say 1A through 1D.

21   A.    Yes.  That's the Corporal's office.  I remember.

22   Yes.

23   Q.    And do you recall from looking at those pictures

24   where Mr. Warner was seated for purposes of this interview?

25   A.    He was seated −− in Exhibit 1A he was seated in the

T. CARTER – DIRECT

1   red chair opposite the desk against the wall.

2       Q.   So if this were the desk, he was on this side, and

3   you were on this side (indicating)?

4       A.   Yes.

5       Q.   And did Trooper Owen sit on your side or on

6   Mr. Warner's side?

7       A.   He was on my side of the desk also next to me.

8       Q.   At any time during the course of the interview that

9   thereafter took place, was Mr. Warner restricted in any way

10  from movement about the office or out of the office?

11      A.   No.

12      Q.   At any time was -- did anyone suggest to him that he

13  would be tethered by handcuffs or some other device to a

14  chair or the inside of this office?

15      A.   No.

16      Q.   Prior to any questions being posed to Mr. Warner, did

17  you and Trooper Owen engage in a discussion with him about

18  the fact that he was free to leave at any time?

19      A.   Yes.  Specifically I told him that he was not under

20  arrest.  He was free to leave at any time if he chose to do

21  so.  He could stop the interview, and he was not being

22  arrested at the end of the interview.  He was going home.

23      Q.   Was there some request on your part or Trooper Owen's

24  for Mr. Warner to acknowledge that he had understood what

25  you had explained to him with respect --

T. CARTER - DIRECT

1    A.    After I said that to him, I said do you understand
2    that?  And he said yes, he did.  And he agreed to continue
3    the interview at that point.
4    Q.    At that -- prior to that had you asked Mr. Warner any
5    questions that were substantive in nature?
6    A.    No.
7    Q.    And before asking any questions that required a
8    response -- a substantive response from Mr. Warner, did you
9    explain to Mr. Warner what the subject of your investigation
10   was or subjects I should say?
11   A.    Yes.  I told him that we were investigating.  PSP,
12   Pennsylvania State Police and FBI were jointly investigating
13   the sexual exploitation of minors, specifically taking
14   pictures of minors under the age of 12.
15   Q.    Was there some discussion at this point about the
16   fact that your investigation of Armando Cruz had led, in
17   fact, to an interview of Mr. Cruz?
18   A.    Yes.  I told him that we had talked to many witnesses
19   and many victims at that point in the investigation, and I
20   also had just spoken to Mr. Cruz with his defense counsel
21   and that his name had come up as being one of those
22   individuals taking pictures of young girls.
23   Q.    And by that, we mean -- by pictures, we mean --
24   A.    Child pornography pictures.
25   Q.    At that point did -- from that point backward at any

T. CARTER − DIRECT

1    time did Mr. Warner articulate to you that he desired to

2    speak with or meet with an attorney?

3    A.    No.

4    Q.    Did he ask at this point in any way to leave the

5    room?

6    A.    No.

7    Q.    Did he seem by your observation to be agreeable to

8    continue the interview at this point?

9    A.    Absolutely, yes.

10    Q.    Once you confirmed, as you've indicated, that you

11    believed he understood that he was free to engage or not

12    engage in this interview, did you start to ask him with the

13    assistance of Trooper Owen questions about his involvement

14    with the various victims you have identified?

15    A.    Yes.  I asked him had he −− when I said your name has

16    come up as one of the individuals taking pictures of child

17    pornography, he initially denied it, that he didn't take any

18    pictures.

19          Then I asked him did he know a juvenile −− one of

20    the victims I'll refer to as FW initials, and then I also

21    asked him about MC, both 11-year-old girls, and he said he

22    did know FW, that he felt FW was like a daughter to him, and

23    that he questioned me then was the second victim MC, is that

24    the girl with freckles?  And she does have freckles.  So I

25    said yes.  It was.

T. CARTER - DIRECT

1   Q.   During this discussion did you then, you know, in

2   part because of his denial then take the step of showing him

3   some of the images, still images, video images that you had

4   reason to believe he had something to do with?

5   A.   Yes.  Prior to actually showing that, I asked him --

6   I explained to him the importance of being honest, and I

7   asked him to be honest, and he said he understood being

8   honest was important.  And then I proceeded to show him this

9   video that I had queued up on the computer where it -- shall

10  I describe the video?

11  Q.   I don't believe we're going to get into the specifics

12  of what's depicted, but I certainly can ask you, the video

13  that you're speaking about is one of the videos that's

14  referenced in the pending charges against Mr. Warner?

15  A.   That's correct.

16  Q.   So you show him this video in whole or in part?

17  A.   It was queued up.  It's rather lengthy, probably five

18  to six or seven minutes.  I queued it up maybe -- starting

19  maybe a quarter of the way in where when I played it, prior

20  to showing him that, I asked him -- questioned him whether

21  he -- whether he thought he had a distinct voice.  He

22  replied to me that he did feel he had a distinct voice.

23  Q.   And did you ask that because in this video there's

24  also audio, and you can hear a man's voice?

25  A.   You can hear Mr. Warner's voice about three quarters

T. CARTER - DIRECT

1  of the way into the video directing the victim to do certain

2  things.  Yes.

3      Q.   And so that's the portion that you wanted to make

4  sure you played for him?

5      A.   Yes.

6      Q.   And I take it he made some admissions thereafter

7  after it was played, which is the subject again of this

8  suppression?

9      A.   Yes.

10     Q.   Did you continue the interview beyond those

11  admissions regarding that video?

12     A.   Yes.

13     Q.   At any time at this point did Mr. Warner request to

14  leave the room?

15     A.   No.

16     Q.   Did he ask for food or water or to use the men's

17  room?

18     A.   No.  The interview only took maybe an hour at max.

19  So it was rather short.

20     Q.   Did he ask at this point to speak with a lawyer or

21  meet with a lawyer?

22     A.   No.

23     Q.   Did you then go on to show him some additional still

24  images involving FW and other victims?

25     A.   Yes.

T. CARTER – DIRECT

1    Q.    And were you seeking his response as to whether or

2    not he had been the individual who had taken those

3    photographs?

4    A.    Yes.

5    Q.    And did he continue to answer questions in that

6    regard, sometimes making admissions and other times not?

7    A.    He would make admissions when I basically proved to

8    him that it had to be him.  I mean I showed him a picture of

9    FW standing fully clothed, and he said yes.  I took that

10   picture.

11          And then the same sequence five seconds later she

12   was unclothed, and he wouldn't admit that he took that, but

13   he admitted he took the fully clothed one.

14          I asked him who would have taken that one, and he

15   said he didn't know.  So he did admit taking another series

16   of photographs with FW which was ultimately unclothed.

17   Q.    And there were some images -- were there images in

18   which you could see a male hand in there, and he was

19   questioned about whether or not that was his hand depicted

20   in some of these either video or still images?

21   A.    Yes.

22   Q.    And at any point did he make admissions with respect

23   to the male hand depicted in the still --

24   A.    He said it was his, yes.

25   Q.    During the length of this discussion, that is, about

58

T. CARTER – DIRECT

1    these various stills and/or video images that included the

2    depiction of his hand, did he ever ask for a lawyer?

3        A.    No.

4        Q.    Did he ever ask to leave the room?

5        A.    Eventually at the end of the interview, he did -- he

6    stood up and said I'm done, and I want to leave, and then

7    Trooper Owen immediately escorted him out of the room.

8        Q.    So when you say when the interview concluded, was it

9    Mr. Warner who, in fact, made the decision to conclude the

10   interview?

11       A.    Yes.  He said he had enough.  He stood up and exited

12   the room.

13       Q.    And to the best of your knowledge, was he meeting

14   anyone at the police department or elsewhere so he could

15   leave the barracks?

16       A.    I was told by Trooper Owen that his mother was out in

17   the waiting room.

18       Q.    With respect to all of the time that was spent inside

19   this office, at any time was the vantage point that

20   Mr. Warner had from the seat in which he was seated

21   obstructed in any way, either visually or physically; that

22   is, obstructed to the door?

23       A.    No.  It was never obstructed.

24       Q.    How far would you describe his chair to the door?  I

25   mean you can see it in those photographs.  I mean is it --

T. CARTER - DIRECT

1    A.    Seven to ten feet maybe.

2    Q.    After you -- after this interview had come to an end,

3    at some point shortly thereafter did you, in fact, prepare a

4    report of the interview that you and Trooper Owen had

5    conducted?

6    A.    Yes.

7    Q.    And did Trooper Owen as well prepare a report of the

8    interview that had taken place?

9    A.    Yes.

10   Q.    I'm going to show you what's been marked as

11   Government's Exhibit No. 2.

12         MR. CHONTOS:  Judge, I would just ask for an offer

13   of proof.

14         THE COURT:  Well, let's mark it as Government's

15   Exhibit 2; right?

16         MS. BLOCH:  Correct.

17         THE COURT:  Let's mark it.

18         MS. BLOCH:  It's marked.

19         THE COURT:  And so you want to enter into a

20   stipulation?  Is that what you're saying?

21         MR. CHONTOS:  No.  I object.  What's the offer of

22   proof?  Why are we showing him that document?

23         MS. BLOCH:  We're showing this document because

24   this is the report of the interview that we're discussing

25   that you're seeking to suppress.

T. CARTER - DIRECT

1              MR. CHONTOS:  I understand that, but the basis --

2    why is that relevant here?  What's transpired in this

3    hearing that allows that to be admitted or talked about?

4              MS. BLOCH:  Well, because in the ordinary course

5    of his professional responsibilities when conducting an

6    interview he would draft a report of same --

7              THE COURT:  Is the purpose to show his report is

8    consistent with his testimony?

9              MS. BLOCH:  I'm really actually offering it

10   because it comports with the layout, logistics of what

11   transpired in the barracks, which is the subject of the

12   Defendant's argument.  I can attempt to offer it later if,

13   in fact, Mr. Warner elects to testify --

14             THE COURT:  I guess the objection is why is that

15   the best evidence since you have the witness here

16   testifying?

17             MS. BLOCH:  I was viewing it much like an exhibit

18   such as the photographs of -- I mean we are -- the subject

19   of this particular hearing, it's a little different than --

20   we're not offering it -- it's not evidence in a trial as to

21   his guilt or innocence on this count but rather that this

22   gentleman's testimony is exactly as he recalled it the day

23   after this particular interview took place.

24             MR. CHONTOS:  Judge, we have to hear an

25   evidentiary basis for that document to become an exhibit.

T. CARTER - DIRECT

1          THE COURT:  I'll sustain the objection.  I don't

2   believe that the exhibit which summarizes I guess the --

3   that it's consistent with the testimony we just heard --

4   that it is proper to be offered as testimony.

5          MS. BLOCH:  I have no further questions at this

6   time.

7          THE COURT:  Do you want to stipulate that the

8   report that's Government Exhibit No. 2 is -- summarizes the

9   interview and is consistent with the witness's testimony?

10          MR. CHONTOS:  Not willing to do that.

11          THE COURT:  Okay.

12                          - - -

13                    CROSS-EXAMINATION

14   BY MR. CHONTOS:

15   Q.    Sir, you've been a Trooper or an agent 22 years?  Did

16   I hear that right?

17   A.    Correct.

18   Q.    And as a result of that, your training and your

19   experience, the warnings emanating from Miranda versus

20   Arizona include right to remain silent, any statements you

21   make may be used against you, the right to the presence of a

22   lawyer, either retained or appointed.  Correct?

23   A.    Yes.

24   Q.    You're familiar with those warnings; are you not?

25   A.    Yes.

T. CARTER - CROSS

1    Q.   And in this situation on April of 2012, those
2    warnings were not administered by you to Mr. Warner; right?
3    A.   That's correct.
4    Q.   And because of that, it's fair to say that it would
5    be impossible for Mr. Warner to have waived something that
6    he wasn't told about?  Fair?
7    A.   No.
8    Q.   Okay.  Well, I'll ask it this way.  Can you waive
9    something -- can you waive Miranda warnings if Miranda
10   warnings are not given?
11   A.   They weren't applicable at that point.
12   Q.   Oh, but do you understand that's a different
13   question?
14   A.   Well, that's my reasoning for not giving them.
15   Q.   Okay.  But my question is you can't waive something
16   that you're never given?
17        MS. BLOCH:  Objection, Your Honor.  He's testified
18   he didn't give Miranda warnings.  There's no question --
19        THE COURT:  Sustained.
20   Q.   There's only three people in that room; right?
21   A.   That's correct.
22   Q.   Any breaks at all?
23   A.   Breaks?
24   Q.   Yeah.  Like you leaving the room?
25   A.   No.

T. CARTER – CROSS

1    Q.   You're there the whole time?

2    A.   Yes.

3    Q.   Okay.  Mr. Warner's there the whole time?

4    A.   Yes.

5    Q.   And Trooper Owen is there the whole time?

6    A.   Yes.

7    Q.   Did Mr. Warner ask for food or drink?

8    A.   No.

9    Q.   Okay.  What about a bathroom break?

10   A.   No.  Like I said, it was only an hour long.

11   Q.   Okay.  Now, the contents of that office, those photos

12   fairly and accurately depict the contents of that office;

13   right?

14   A.   Yes.

15   Q.   Are you aware when those photographs were taken?

16   A.   I believe they were taken recent.  I think Trooper

17   Owen said a couple weeks ago.

18   Q.   But you've looked at them; right?

19   A.   I've been in that office several times, and it looks

20   pretty much the same today as it did back then.

21   Q.   Is there a blackboard or a whiteboard in that office?

22   A.   Yes.

23   Q.   And when Mr. Warner walked in, there was some writing

24   on that whiteboard?  Fair?

25   A.   Yes.

T. CARTER – CROSS

1    Q.   And you put that information up there; right?

2    A.   Yes.

3    Q.   And your reasoning for putting that information up

4    there is your invited guest, Mr. Warner, you wanted him to

5    see that; right?

6    A.   At some point.  Not initially.  I had referred to it;

7    and as I said, when I mentioned -- I had mentioned that I

8    talked to many witnesses and many victims.  I wanted him to

9    see the victims and the witnesses that I did interview.

10   Q.   And those people's names are on that whiteboard?

11   A.   Yes.

12   Q.   So are both other culpable individuals' names on that

13   whiteboard and victims on that whiteboard?

14   A.   Other culpable -- Mr. Cruz's name was on there.

15   Q.   Anyone else?

16   A.   No.

17   Q.   So it's Cruz -- is there a line connecting or a line

18   going from Cruz's name to Warner's name?

19   A.   No.

20   Q.   So it's just C-r-u-z and spelled out, Warner, those

21   are the only two names on the board?

22   A.   I don't specifically recall whether I put the first

23   name on there, but those two names were on there as well as

24   the names of the victims.

25   Q.   There's a desk in that office; right?

T. CARTER - CROSS

1    A.    Yes.

2    Q.    Three chairs; right?

3    A.    Yes.

4    Q.    All the chairs are movable; right?

5    A.    Yeah.  I would say so.

6    Q.    The makeup of the walls are cinder block but maybe

7    painted?

8    A.    I'd have to look.  I don't recall the makeup of the

9    walls.

10    Q.    Okay.  Well, take a look at the photos.  Is there

11    drywall or is that cinder block?

12    A.    It looks like there's drywall.

13    Q.    Okay.  The entire interview you stayed in your chair,

14    and Mr. Warner stayed in his; right?

15    A.    Mr. Warner moved closer to the desk when I turned the

16    TV screen around to show him the video.  That's the only

17    time he probably moved.

18    Q.    So it's your recollection that when you showed him

19    that video, Mr. Warner just had to scoot over in his chair?

20    He did not get up out of his chair and walk around and look

21    at it from the same direction that you were looking at it?

22    A.    I don't remember exactly whether he got up or whether

23    he had to scoot around, but I know he was able to view it.

24    But whether he specifically got up and stood next to me, I

25    don't remember, but I think -- he was close enough to see it

T. CARTER - CROSS

1  to me, but I'm not sure whether he physically got up out of

2  the chair or scooted his chair.  I don't remember that.

3     Q.   And your mechanism for showing that video is a

4  portable, a laptop computer; right?

5     A.   No.  Actually we showed it on the State Police

6  computer there.

7     Q.   So that's like a tower unit?

8     A.   It was a monitor on the State Police desk, yes.

9     Q.   Now, sir, before Mr. Warner -- before you see

10 Mr. Warner on that April 2012 day, you have a meeting with

11 the State Trooper; right?

12    A.   No.  We talked on the phone, as I stated earlier.

13    Q.   I apologize.  Mr. Warner arrived a little bit before

14 1:00 or thereabouts; right?

15    A.   Yes.

16    Q.   Okay.  Do you arrive at like 12:15, 12:20?

17    A.   On that day, yes.

18    Q.   So you arrive sometime before Mr. Warner comes into

19 your inner office; right?

20    A.   Yes.

21    Q.   And you have a meeting with the State Trooper; right?

22    A.   I guess you would categorize it as a meeting.  We met

23 there prior to him arriving.  Yes.

24    Q.   And one of the goals of that meeting was to lay out a

25 plan to what's going to happen?  Fair?

67

T. CARTER - CROSS

1   A.   To get the truth, yes.

2   Q.   Did my question ask anything about the truth?

3   A.   Yeah.  You asked me what the plan was, and I said it

4   was to get the truth.

5   Q.   The questioning plan, okay, that's my question.  Did

6   you guys decide in that little pre-interview meeting who was

7   going to lead?

8   A.   No.

9   Q.   Okay.  So you guys both went in there, and whoever

10  asked the first question takes the ball and runs with it?

11  Is that how it was?

12  A.   Well, that happened to be me.  So yes.

13  Q.   Okay.  So you're telling us that in that

14  pre-interview meeting you and the State Trooper didn't

15  devise like a little plan as to what we're going to talk

16  about first, what about second, what about third?  Is that

17  what you're telling us?

18  A.   It wasn't specifically stated we're going to talk

19  about first, second, third.  What was planned was we were

20  going to show him a video -- I was going to ask him

21  questions about what he had done, and I was hoping he would

22  be honest and tell me the truth.

23  Q.   Did you and the State Trooper talk about, hey, I want

24  to talk about topic A, B, C and D or something along those

25  lines?

T. CARTER - CROSS

1    A.    No.

2    Q.    Let me see if I got this right.  So you and Owen

3   don't know what the other one's going to be doing when you

4   go into that interview room?

5    A.    We're going to ask questions when we go in the

6   interview room.  Did I know specifically what Trooper Owen

7   is going to do?  No.

8    Q.    And do you think he knew what you were going to do?

9    A.    I don't know what he thought.

10   Q.    Do I have it right that you did not go out into the

11  lobby to get Earl Warner to come back?

12   A.    That's correct.

13   Q.    Do I have it right that you don't know if any other

14  human being was out there in that lobby with Earl Warner?

15   A.    I didn't physically see somebody, but Trooper Owen

16  told me his mother was there.

17   Q.    Trooper Owen imparted that kernel of information when

18  the interview was over; right?

19   A.    I believe so, yes.

20   Q.    Now, sir, April 2012, April 3, that's the interview,

21  but my next group of questions have to do with immediately

22  before that.  March 26, 2012, you sit down with Cruz and

23  Cruz's lawyer and listen to what Cruz has to say; right?

24   A.    I don't remember the exact date, but I did sit down

25  with him, yes.  If that's the date, I made a report of it.

T. CARTER - CROSS

1   I don't have that report with me.

2   Q.   I'm referring to RV05048.  Sir, I'm going to show you

3   what's been denominated RV05048 and direct your attention to

4   Paragraph 14.  I'm going to put a star where I direct your

5   attention --

6           THE COURT:  Do you want to make that an exhibit or

7   not?

8           MR. CHONTOS:  It's really just going to refresh

9   his recollection, Judge, because he wasn't certain on the

10  date, and I think after he looks at that his recollection

11  will be refreshed.

12          THE COURT:  And that's a page of his --

13          MS. BLOCH:  Are you sure this is his affidavit --

14          THE WITNESS:  No.  What is this?

15  BY MR. CHONTOS:

16  Q.   Sir, have you looked at that document around the

17  star?

18          MS. BLOCH:  I would object to the presentation

19  like this.

20          MR. CHONTOS:  Judge --

21          THE COURT:  I sustain the objection.  What is the

22  document?

23          MR. CHONTOS:  Judge, all I'm doing is trying to

24  refresh his recollection --

25          THE COURT:  Yeah, but it has to be a document that

T. CARTER - CROSS

1    he created or something --

2              MR. CHONTOS:  No.  No.  I disagree, Judge.  I can

3    show him a plate of spaghetti if it refreshes his

4    recollection --

5              THE COURT:  Do you have the date the spaghetti was

6    made or what?  I don't understand.

7              THE WITNESS:  This is not my report.

8              MS. BLOCH:  It's not a report.  That's the other

9    thing.  You're just confusing him.

10   BY MR. CHONTOS:

11    Q.    Sir, as you sit there right now, do you know what

12   date you met with Cruz and Cruz's lawyer?

13    A.    No.

14    Q.    Okay.  Might there be a document in the world that

15   would refresh your recollection as to the date?

16    A.    The report that I authored, yes.

17    Q.    Okay.  So -- well, I'm going to show you a document

18   05048 and ask if that document might refresh your

19   recollection as to the date you met with Cruz and his

20   lawyer?

21    A.    That's not my document.

22              MS. BLOCH:  Objection.  I don't think it is or is

23   not -- can you give him the whole document --

24              THE COURT:  I sustain the objection.  Does

25   Government No. 2 have the date?  Does Exhibit Government

T. CARTER - CROSS

1    No. 2 have the date that he can't remember?

2              MS. BLOCH:  No.  I'll check, but I don't believe

3    so.

4              THE WITNESS:  I had Cruz's reports --

5    BY MR. CHONTOS:

6      Q.   Sir, I'm going to hand you documents 05042 through

7    05056.

8              THE COURT:  Just so the record is clear, this is

9    like if you would write down on a piece of paper some date

10   and you then hand it to the witness and say does this

11   refresh your recollection as to the date?

12             MR. CHONTOS:  And if it doesn't, it doesn't.

13             THE COURT:  Well, I still think it's

14   objectionable.  But -- so you're handing those pages?

15             MR. CHONTOS:  Correct.

16             THE COURT:  Okay.

17             THE WITNESS:  What would you like me to do with

18   them?

19   BY MR. CHONTOS:

20     Q.   Is that a document you authored?

21     A.   It's an affidavit for an application for a search

22   warrant.

23     Q.   Right.  And whose name is at the top?

24     A.   Mine.

25     Q.   Go to the last page, please.  Who's name's there?

72

T. CARTER - CROSS

1    A.    My signature.

2    Q.    So is it fair to say that's a document you authored?

3    A.    Yes.

4    Q.    Okay.  Could you turn to page 5048?  We're back to

5    the star page.

6    A.    Okay.

7    Q.    Can I have the document?

8          Have I taken the document from you?

9    A.    You took it from the desk.

10   Q.    Is it in front of you right now?

11   A.    No.

12   Q.    After looking at that document, does it refresh your

13   recollection as to the date that you met with Cruz and

14   Cruz's lawyer?

15   A.    Can I see it again?  Because you took it.  I was

16   looking at the star.

17   Q.    Could you -- have I handed you the document?

18   A.    Yes.

19   Q.    Okay.  Could you turn to page 5048?

20   A.    Okay.

21   Q.    Have you had sufficient time to look at that area

22   where I've starred?

23   A.    Yes.

24   Q.    Do you think that sufficiently would refresh your

25   recollection as to the date that you met with Cruz and

T. CARTER – CROSS

1    Cruz's lawyer?

2    A.    Well, I met with Cruz several times.  On this -- yes.

3    It would refresh my memory that he was debriefed by me on

4    March 26, yes.

5    Q.    Have I removed the document from you?

6    A.    Yes.

7    Q.    Does that refresh your recollection as to the date

8    you met with Cruz?

9    A.    One of the dates, yes.

10   Q.    Okay.  And that date's March 26, 2012?

11   A.    Is that a question?

12   Q.    Yeah.

13   A.    Yes.

14   Q.    Okay.  Your purpose in meeting Cruz was to learn more

15   information?  Fair?

16   A.    Again, to get the truth and to learn the full

17   investigation, more about the investigation that we were

18   looking into.

19   Q.    So in a roundabout way, the purpose was to learn more

20   information?

21   A.    That would be part of it, yes.

22   Q.    Okay.  In that interview Cruz implicates himself?

23   Fair?

24   A.    Again, I don't have that report in front of me.  I

25   was not prepared to discuss one of Cruz's debriefs on this

T. CARTER - CROSS

1   date.

2   Q.   You're the case agent on Cruz's case and Warner's;

3   right?

4          MS. BLOCH:  Objection, Your Honor.  I'm not sure I

5   understand the relevance of the subject matter that was

6   discussed with Mr. Cruz for purposes of the interview of

7   Mr. Warner.

8          THE COURT:  So we have a relevancy objection?

9          MR. CHONTOS:  Judge.  We're a week -- about a week

10  removed -- a week prior to the interview with Mr. Warner.

11  So demonstrating what knowledge they have about the big

12  picture and Warner's involvement colors, influences, what

13  they do with Warner in that room.  That's what I'm doing.

14         MS. BLOCH:  Well, what they discussed, I mean he's

15  not denying that he had already interviewed him.  That's

16  what he stated on the record.

17         THE COURT:  I sustain the objection.  If you want

18  to ask him what knowledge he had prior to going into that

19  room, you can ask him that question.

20  Q.   From that interview with Cruz, you learned that Cruz

21  implicated Earl Warner; right?

22  A.   Yes.

23  Q.   And on March 28, 2012, don't you go to Cruz's former

24  workplace and grab two disks that Cruz told you about two

25  days earlier?

T. CARTER – CROSS

1    A.    Again, I don't remember the date, but I did go to

2    Cruz's workplace and get two disks that Mr. Cruz told me he

3    downloaded from Mr. Warner's computer.

4    Q.    And you -- once you got those, you looked at them;

5    right?

6    A.    Yes, I did.

7    Q.    And what you saw corroborated what Cruz told you live

8    and in person?  Fair?

9    A.    I mean corroborated some things, yes.

10   Q.    And as it relates to Earl Warner, you had

11   corroboration that Earl Warner had child porn on his

12   computer?

13   A.    Yes.

14   Q.    Okay.  And a few days after that is when you're

15   chatting with Earl Warner at the Mercer barracks; right?

16   A.    Chatting?  We sat down and interviewed.  I mean

17   chatting to me would be like something I would do with a

18   friend over lunch or something.  I wasn't chatting with him,

19   no.

20   Q.    I apologize for, you know, that word.  You talked

21   with Mr. Warner?

22   A.    Yes.

23   Q.    So prior to Mr. Warner coming in, you have enough

24   cause to arrest Mr. Warner; do you not?

25   A.    No.  I do not.

T. CARTER - CROSS

1    Q.    Why not?  What are you missing?

2    A.    It's still early in the investigation.  I have one

3    Defendant telling me that there's another person involved.

4    What I wanted to do was talk to Mr. Warner to see whether he

5    would tell me the truth about his involvement.  Did I have

6    enough?  No.  I did not.

7    Q.    Well, you got corroboration of what that one

8    Defendant already told you; right?  Corroboration came from

9    the disk at his workplace?

10   A.    I have some corroboration, yes.

11   Q.    And prior to April 3, you had already chatted with

12   how many of the children?

13   A.    I don't recall specifically how many of the children

14   I interviewed, but at least three.

15   Q.    And some of those three pointed the finger at Earl

16   Warner; right?

17   A.    They implicated Mr. Warner had taken photos and

18   touched them inappropriately, yes.

19   Q.    So we have the victims' statements saying Earl

20   Warner's responsible.  We have what I'll label a

21   co-Defendant, Mr. Cruz, saying Earl Warner's responsible.

22   You get corroboration of what co-Defendant Cruz says by

23   going to his workplace and getting the disks.  Okay.  Did I

24   accurately describe those three chunks of evidence you have?

25   A.    Accurately?  We have information from the children,

T. CARTER - CROSS

1    which is unsubstantiated.  I had the disk, but that Mr. Cruz

2    claims came from Mr. Warner's computer, and one

3    specifically -- the video where I described Mr. Warner that

4    I showed to him, that was from Mr. Cruz's disk that he

5    downloaded.  And what was the other part?

6    Q.    Prior to talking with Mr. Warner on April 3, Cruz is

7    already arrested; right?

8    A.    Yes.

9    Q.    You already talked to him; right?

10   A.    Yes.

11   Q.    Was the deal already struck with the Federal

12   Government that Cruz was, you know, going to plead --

13         MS. BLOCH:  Objection.

14   Q.    -- take an agreement?

15         MS. BLOCH:  Objection.  A, irrelevant; B, the

16   terms of which are under seal.

17         MR. CHONTOS:  I don't want the terms, Judge.  I

18   just want has a deal already been cut by the time -- before

19   Warner is interviewed is Cruz's deal already struck?

20         THE COURT:  I overrule the objection.  You can

21   answer yes or no.

22         THE WITNESS:  I don't remember specifically the

23   time when it was -- whether he signed the plea agreement

24   prior to me interviewing Mr. Warner.  He did sign the plea

25   agreement.  I'm not sure of the date.

T. CARTER - CROSS

1   Q.   Is a document here in the world that might refresh

2   your recollection as to the date?

3   A.   In the world?

4   Q.   Yeah.

5   A.   I'm sure a plea agreement exists, yes.

6   Q.   Okay.  Sir, prior to Mr. Warner coming in that

7   office, did you believe Earl Warner had committed some

8   crimes?

9   A.   I had had allegations that Mr. Warner committed

10  crimes, yes.  Did I believe?  It's my job to either prove or

11  disprove those allegations.

12  Q.   My question wasn't did you have allegations?  My

13  question is based upon the information you had at that

14  moment, which included some of those allegations, did you

15  believe you had sufficient cause to believe Earl Warner had

16  committed some crimes?

17  A.   My beliefs are irrelevant.  My job is to investigate

18  the crime.  My belief, if I had enough evidence, then I

19  would have applied for a complaint -- I would have asked for

20  an indictment.  But at that point my next logical step was

21  to interview Mr. Warner.

22  Q.   Before April 3, 2012, what knowledge did you have

23  about Mr. Warner's criminal history?

24  A.   I don't think I had any knowledge.

25  Q.   So it's fair to say that prior to sitting down and

79

T. CARTER – CROSS

1    chatting with Mr. Warner in that early day in April,

2    April 3, you had no knowledge about his prior dealings with

3    law enforcement?  Is that fair?

4    A.    Other than the time I said I went to his house with

5    the detective --

6    Q.    Right.  Back in February.

7    A.    Right.

8    Q.    Okay.  But in the February meeting, the topic,

9    subject of Miranda, that never came up in the February

10   meeting; did it?

11   A.    No.

12   Q.    Now, when you show Mr. Warner that video, your

13   purpose in doing that is to elicit a reaction; right?

14   A.    No.

15   Q.    Okay.  Your purpose in showing Mr. Warner that video

16   is to get him to comment on it?

17   A.    No.

18   Q.    Well, if your purpose is not to get a reaction or not

19   to comment, why are you showing it to him?

20   A.    To get him to tell me the truth.

21   Q.    Okay.  So that would be something different than a

22   reaction or a comment in your eyes; right?

23   A.    The truth is the truth.  I wanted him to admit, yes,

24   that was him or, no, it wasn't him.  But it was kind of

25   obvious it was him.  It was his voice.

T. CARTER - CROSS

1    Q.   The bottom line is when you show him the video, you

2    want something from him that you can then use at time of

3    trial?  Right?

4    A.   Again, I'll tell you I wanted to get the truth from

5    him.

6    Q.   I'll ask the question again.  The reason why you show

7    him the video is you want to get something from him that the

8    Government can use at time of trial against him?

9    A.   No.

10   Q.   Same question with the photos.  Your reasoning for

11   showing him the photos is so you can get something from him

12   so the Government -- that the Government can then use that

13   against him at time of trial?

14   A.   I was gathering evidence.

15   Q.   And part of your definition of evidence would be a

16   comment from the Defendant?  Fair?

17   A.   It would be the truth.

18   Q.   Did I ask anything about the truth?  I asked about a

19   comment.  Didn't I?

20   A.   Well, my investigation is about the truth.  When I

21   ask the Defendant -- when I show him a video, I'm asking him

22   to tell me the truth.

23   Q.   I've moved away from the video.  I'm taking about the

24   photos.

25   A.   Same thing.

T. CARTER - CROSS

1    Q.   When you showed him the photos, your goal in showing

2    him the photos was to get something from him that you could

3    then use later to prosecute him?

4    A.   I don't understand what you mean, get something.

5    Q.   A reaction, a comment, a statement --

6    A.   The truth.

7    Q.   When you showed him the photos, your goal was to get

8    a reaction, a comment or a statement from you showing that

9    to him so you could then use that in prosecuting him?

10   A.   We're not going to see eye to eye on that question.

11   Q.   Pardon me?

12   A.   We're not going to see eye to eye on the question.

13   The statement I was trying to get to him was the truth.

14         MR. CHONTOS:  Judge, I would ask for the Court to

15   direct him to answer the question.

16         THE COURT:  I decline to do so because if he

17   answered the question that it wasn't his goal, then you

18   wouldn't use it at trial.  So I'm not going to direct him to

19   answer.  I think he's answered the question as best he can

20   answer it.

21   BY MR. CHONTOS:

22   Q.   At any time during your meeting with Mr. Warner on

23   April 3, do you talk to him, advise him about any adverse

24   consequences that might flow to him if he doesn't talk to

25   you?

T. CARTER – CROSS

1    A.    If he does not talk to me?

2    Q.    Right.

3    A.    No.

4    Q.    Do you talk to him about what would happen if he did

5    talk to you, such as the Court might go easier?  You might

6    get some leniency, things like that?

7    A.    No.  Only towards the end when he got up and stood to

8    leave, one of the questions he asked was what's going to

9    happen now?

10   Q.    And you gave him a response; right?

11   A.    Yes, I did.

12   Q.    Now, during your interview with Mr. Warner, did you

13   ask him any questions about his educational level?

14   A.    No.

15   Q.    Did you know anything about his education?

16   A.    No.

17   Q.    Did you ask him any questions during your interview

18   about his mental health?

19   A.    No.

20   Q.    Prior to that meeting, did you know anything about

21   his mental health?

22   A.    No.

23   Q.    During that meeting did you ask him any questions

24   about his physical condition?

25   A.    No.

T. CARTER – CROSS

1    Q.   Prior to April 3 did you know anything about his

2  physical condition?

3    A.   No.

4    Q.   Sir, the interview in February 2012, 100 percent the

5  subject matter of that interview with Mr. Warner was about

6  Cruz?  Is that fair?

7    A.   No.

8    Q.   90 percent about Cruz?

9    A.   I mean it started talking about Cruz, and then he

10  started to talk about his association with some of the same

11  girls.  So that was part of the interview also.

12          MR. CHONTOS:  That's all I have.

13          THE COURT:  Any additional questions?

14          MS. BLOCH:  Yes, Your Honor.  Thank you.

15                      – – –

16               REDIRECT EXAMINATION

17  BY MS. BLOCH:

18    Q.   In response to some of the cross, let's start where

19  Mr. Chontos started, and that is in terms of addressing

20  various subject matters with Mr. Warner, you indicated on

21  cross that you discussed Mr. Cruz and that Mr. Cruz's name

22  along with Mr. Warner's appeared on this whiteboard.

23          Was there discussions as well about an individual

24  that you had identified in your investigation of Mr. Cruz by

25  the name of Tim?

T. CARTER - REDIRECT

1    A.    Yes.

2    Q.    Did you pose some questions to Mr. Warner about this

3    other gentleman that you only knew to be Tim as to whether

4    or not Mr. Warner knew who that was?

5    A.    Yes.

6    Q.    Were you evidence gathering as part of your larger

7    investigation, gathering evidence as it applied to this Tim

8    person as well?

9    A.    Yes.

10   Q.    And at the time of this interview of Mr. Warner, did

11   you have reason to believe that this Tim guy was involved in

12   unlawful conduct with these young female victims?

13   A.    Yes.

14   Q.    And did, in fact, Mr. Warner offer some information

15   about his knowledge of Tim and his relationship with

16   Mr. Cruz?

17   A.    Yes.

18   Q.    Do you recall if Tim's name appeared on the

19   whiteboard as well?

20   A.    I don't remember whether his name was on there or

21   not.

22   Q.    You had indicated that prior to conducting this

23   interview on April 3 of 2012 with Mr. Warner, that you

24   had -- had you interviewed some other witnesses to include

25   Mr. Cruz, and you informed him of that?

T. CARTER – REDIRECT

1    A.    Yes.

2    Q.    The victims that were speaking about him, you've

3  indicated more than once that they are essentially one and

4  the same as the victims involved in the Cruz investigation

5  and prosecution.  When you first interviewed the three

6  victims that you indicated you had already identified, was

7  the sole focus in those initial interviews Mr. Cruz?

8    A.    Yes.

9    Q.    And at some time thereafter was there an inquiry

10 regarding Mr. Warner as your evidence developed over time

11 with regard to him?

12   A.    Yes.  He became part of the investigation as the

13 investigation went on, yes.

14   Q.    So your investigation of this entire matter starts

15 with conduct alleged to have been committed by Mr. Cruz?

16   A.    That's correct.

17   Q.    And so was Mr. Warner even on the table at that point

18 when these first victims were interviewed?

19   A.    In the very beginning, no.

20   Q.    When you went to Mr. Warner's residence in February,

21 was one of the factors or maybe the only factor that brought

22 you there was because you had found images of his daughter

23 among Mr. Cruz's evidence?

24   A.    That was one of the reasons, yes.

25   Q.    So you had identified a child that was in the custody

T. CARTER - REDIRECT

1   and care of Mr. Warner in images that you believed were

2   unlawful in Mr. Cruz's evidence?

3           MR. CHONTOS:  Objection, Judge.  His belief's not

4   relevant.

5           THE COURT:  Sustained.

6   Q.    Was she naked?

7   A.    Yes.

8   Q.    All right.  Did you go and talk to her father and/or

9   mother, to the extent that she existed, about the fact that

10  you had found images during your investigation of Cruz?

11  This is in February now, the first time you met with

12  Mr. Warner.

13  A.    I don't specifically recall asking him specifically

14  about his daughter that day.  I remember asking about his

15  daughter and his friends -- her friends and the association

16  between them all and trying to get a feel as to why these

17  girls were going to Cruz's house and why these girls were

18  coming to his house.

19          THE COURT:  Excuse me for a moment.

20          (Brief pause.)

21          THE COURT:  You may continue.  Thank you.

22  Q.    You indicated on cross-examination that your primary

23  responsibility as an investigator is to discover or uncover

24  evidence to be used in the prosecution of a Defendant such

25  as Mr. Warner?

87

T. CARTER - REDIRECT

1          I just want to talk for a minute about

2   different -- evidence gathering tools that you regularly

3   employ.  Do those include conducting surveillance, depending

4   upon the nature of the case?

5   A.   Yes.

6   Q.   Do those include executing search warrants when

7   appropriate?

8   A.   Yes.

9   Q.   Does that include conducting undercover operations in

10  appropriate cases?

11  A.   Yes.

12  Q.   Does that include interviews of victims and other

13  witnesses?

14  A.   Yes.

15  Q.   And does it, in fact, regularly include an effort to

16  get admissions from the subject of your investigation?

17  A.   Yes.

18  Q.   And that those admissions that you hope to get are,

19  in fact, then frequently used in a trial, if there is one,

20  of a particular Defendant?

21  A.   Yes.

22          MS. BLOCH:  No further questions.

23          THE COURT:  You may recross.

24                     - - -

25              RECROSS-EXAMINATION

T. CARTER - RECROSS

1   BY MR. CHONTOS:
2      Q.   Well, to use the Government's own words, so when
3   you're showing Mr. Warner the video, you hope to get
4   something out of his mouth that can later be used against
5   him; right?
6      A.   Evidence and the truth, yes.
7               MR. CHONTOS:  So we're back to that.  I'm done.
8               THE COURT:  Any additional questions?
9               MS. BLOCH:  No.
10              THE COURT:  May the witness be excused on behalf
11  of the Government?
12              MS. BLOCH:  Yes.
13              THE COURT:  Defendant?
14              MR. CHONTOS:  No more questions.
15              THE COURT:  Any additional evidence on behalf of
16  the Government?
17              MS. BLOCH:  No additional evidence, Your Honor.
18  Thank you.
19              THE COURT:  You may step down, sir.  Thank you.
20  Are you ready to proceed with the Defendant's portion of the
21  hearing?
22              MR. CHONTOS:  Judge, the Defendant just indicated
23  he needs to go to the restroom.
24              THE COURT:  So we'll just take a break for a
25  moment while the Marshals take him back.  Does anybody else

1   want an official break now?

2                (Brief pause.)

3                (The Defendant was duly sworn.)

4                       - - -

5           EARL WARNER, the Defendant herein, testified as

6   follows:

7                       DIRECT EXAMINATION

8   BY MR. CHONTOS:

9     Q.   Sir, you're Earl Warner?

10    A.   Yes, sir.

11    Q.   You're the Defendant here?

12    A.   Yes.

13    Q.   Sir, I want to take you back to February 15, 2012,

14  what I'll label as interview one.  Did you have an

15  opportunity on that day to chat with Agent Carter?

16    A.   Yes.  I met him that day.  He did very little

17  talking.

18    Q.   Was there another person there?

19    A.   Yes.  Someone -- a Detective from the Mercer

20  courthouse.

21    Q.   Are you able to characterize the topic or topics that

22  was -- that was talked about there on February 15?

23    A.   I was -- 90 percent of it was about a gentleman I had

24  met and known for six months.  His name was Armando Cruz.

25    Q.   And where did this discussion with you and these two

E. WARNER - DIRECT

1   law enforcement officers take place?

2      A.   In my dining room.

3      Q.   What time during the day?

4      A.   It had to be just prior to 3:00 because my daughter

5   hadn't got home from school yet.

6      Q.   How long was that discussion?

7      A.   I'd have to guess probably around 45 minutes or so,

8   maybe a little bit longer.

9      Q.   Do you recall how it ended?

10     A.   Mr. Cruz called on the phone and talked to Mr. Carter

11  or however -- the detective or whatever, and he said he was

12  on his way home from work, and they jumped up, and they said

13  they had to leave right then and there.

14     Q.   Did they then follow through with what they just

15  said?

16     A.   Yeah.  Yeah.  I guess he was on his way home from

17  work.

18     Q.   Were there questions and answers between you and

19  Agent Carter and the other gentleman?

20     A.   Yes.

21     Q.   Okay.  Are you able to give the Court like an overall

22  impression as to what this interview No. 1 was about?

23     A.   They were trying to find out if I had information

24  about Mr. Cruz to help them.  And they were bringing up

25  stuff that of course I wouldn't have known or I'd have

E. WARNER – DIRECT

1   called the cops because one of the questions was, for

2   example, did you know that he was having sex with his

3   daughter?  No.  I didn't.

4      Q.   Mr. Warner, I want to shift gears now to interview

5   two.  That's the April 3, 2012, interview.  Where did that

6   take place?

7      A.   Mercer –– it was supposed to be at my mom's house,

8   but they switched to Mercer State Police Barracks.

9      Q.   Do you remember what time?

10     A.   It was 1:00.  I got there like 15 minutes prior.

11     Q.   How did you get there?

12     A.   My mom.

13     Q.   Your mom took you there in a car?

14     A.   Pardon me?

15     Q.   Did your mom take you there in a car?

16     A.   Yes.

17     Q.   Did you get ––

18     A.   Officer Owen said that if he would –– she couldn't

19   bring me, that he could come and get me if need be, and I ––

20   and we said no.  That she'd bring me.

21     Q.   Did your mom park the car?

22     A.   Yes.

23     Q.   Did you guys both get out?

24     A.   Yes.

25     Q.   Where did you go?

E. WARNER - DIRECT

1    A.    In the police barracks.

2    Q.    When you got in there, what did you do?

3    A.    I went up to the window and told someone behind the

4  glass that I was there to see Mr. Owen, Officer Owens.

5    Q.    Did you receive any instruction --

6    A.    Pardon me?

7    Q.    Did you receive any instruction from that person you

8  just spoke to?

9    A.    They told me and my mom to go ahead and sit in the

10  waiting room, that they would tell them I was there.

11    Q.    How long did you wait?

12    A.    I'd say ten, fifteen minutes because I had enough

13  time to read almost everything on the walls.

14    Q.    At some point a State Trooper came out?

15    A.    Yes.

16    Q.    And was that the State Trooper who testified earlier

17  today?

18    A.    Yes.

19    Q.    Tell the Court what transpired with you and Trooper

20  Owen out there in that lobby.

21    A.    He came to -- there's a doorway like here, and here's

22  like the lobby (indicating).  When he came in, he was at the

23  doorway, and he greeted me, and I told him, you know, that I

24  was there and everything.  And he introduced himself to me

25  because that was the first time I met him.

E. WARNER - DIRECT

1    Q.   Do you recall what he said?

2    A.   He just said he -- I'm Officer Owen, you know.

3    Q.   And did you have a response to that?

4    A.   And he said thank you for coming.  And I says, yeah.

5    I talked to my brother, and I said I called all over Mercer

6    County, all over the county looking for a lawyer and

7    couldn't find one.

8    Q.   Did he have a response?

9    A.   He says you're really not going to need one today.

10   And I said I want a lawyer.

11   Q.   And he said, well, he says come back here.  He says

12   first empty your pockets.  And I just looked at him, and

13   said okay.  So I emptied my pockets, and he confiscated

14   about an inch, inch and a half long pair of fingernail

15   clippers and told me I'd get them back after I left.

16          And then he took me straight back to the police

17   barracks to a -- it was kind of hard to explain.  You go

18   back and take like a left and then come back into another

19   office, which led into the office where Mr. Carter was.

20   Q.   The discussion that you had referencing your brother,

21   the efforts you made and your statement that, hey, I want a

22   lawyer, where did that take place?

23   A.   In the doorway between the hallway and the lobby.

24   Q.   When you're there in the doorway, how far away is the

25   seating area in that lobby area?

E. WARNER – DIRECT

1   A.   Oh, the lobby ain't that big.  I'd say –-

2   Q.   If it helps you, Mr. Warner, use some people, places,

3   things that you see here in this courtroom.

4   A.   I'm guessing I'd say maybe to the front of this lady

5   here sitting, that built-up part right there, probably about

6   from the doorway that far is where that wall goes kind of

7   like that (indicating).

8   Q.   So if you're in the doorway, is the seating area in

9   the lobby right where I am?

10   A.   I'd say a little bit closer.  About there

11   (indicating).

12   Q.   And how far in number of feet would you estimate that

13   to be?

14   A.   Ten feet, a guess.

15   Q.   Sir, did you have a reaction to the trooper saying

16   what he said when you said I want a lawyer?

17   A.   I was just dumbfounded because I thought that –- I

18   never thought about it.  When I talked to my brother, he

19   said you should never go and talk to somebody when they call

20   you in the way they did for the simple fact of it was

21   initially set at my house, and it was supposed to be me and

22   Officer Owen.

23        Well, he called on the 20 –- I have it wrote

24   down –- 26th or something like that.  And I wasn't home.  He

25   called my mom.  And I got home late that night, and when I

E. WARNER – DIRECT

1   did, she told me that the Mercer State Police called me, and

2   I'm –– okay.  And they says that they wanted me to return

3   their phone call.  I says all right.  And so the following

4   day I called the Mercer barracks.

5       Q.   Did you get ahold of Trooper Owen at that time?

6       A.   Yes, I did.

7       Q.   And what was –– what –– were arrangements made at

8   that point?

9       A.   He said –– had told my mom that he'd come to my house

10  to interview me, and when I'm talking to him, I said I don't

11  want my house –– I said please don't bring a car with –– all

12  decorated with lights and stuff because of my mom's

13  neighbors.

14          And he said to me, he said have you spoken to the

15  FBI?  And I said yes, I have.  And he got dumbfounded a

16  little bit, and he says you just recently talked to the FBI?

17  I says no.  I talked to the FBI February 15.  And he says

18  oh.

19          He says, well, he says why don't we kill two birds

20  with one stone?  He says I'll just have him come up, and

21  we'll both talk to you at the same time.

22      Q.   Were you okay with that?

23      A.   And I said yeah, okay.  He says I'm calling in

24  reference to Armando Cruz.  And I told my brother, and he

25  said there's something don't sound right.  I think you

96

E. WARNER – DIRECT

1   should have a lawyer.  I started out by calling Randy
2   Hendrick.
3      Q.   Well, Mr. Warner, from that conversation was there --
4   I mean in your mind in that conversation they were going to
5   come to you.  How did it switch to you go to them?
6      A.   As soon as Mr. Carter's name was brought into, then
7   all of a sudden it got transferred from my mom's house to
8   the police station.
9      Q.   Sir, I want to take you into the interview room where
10  you were.  When you walk in, what's one of the first things
11  that you see?
12     A.   The office is real small.  I'd say -- I don't know.
13  Roughly about the size of behind the Judge's desk here,
14  about that size.  And when I walked in the door, straight
15  ahead of me is a -- one of them whiteboards where you write
16  with the magic markers and you wipe them off.
17     Q.   Sir, I'm going to show you Government's Exhibits 1A,
18  1B, 1C and 1D and ask if you recognize those photographs.
19     A.   Yes.
20     Q.   Is that the room you were in?
21     A.   It is, but it wasn't like this.
22     Q.   Okay.  On the day that you were in, compare it to the
23  photos.  What's different?
24     A.   This thing here wasn't there (indicating).
25     Q.   That's not any good for us.  You're pointing to a

E. WARNER - DIRECT

1   particular photo; right?  Which photo are you pointing to?
2   This one (indicating)?
3   A.    Yeah.
4   Q.    On the back it says what?
5   A.    A1.
6   Q.    1A.  With Photograph 1A in your hand, what's
7   different?
8   A.    I don't remember this, that's -- being there with all
9   that stuff on.  The desk was -- the desk was going up and
10  down this way (indicating).  It was brought over -- if you
11  put these two exhibits together with that chair like that,
12  this main desk was brought over this way further
13  (indicating) to the right, and that desk wasn't there
14  (indicating).
15  Q.    Mr. Warner, you've put together Exhibits 1B and 1A
16  because both 1A and 1B show a red chair?
17  A.    Yes.
18  Q.    And on I think it's 1B, does 1B reflect a whiteboard?
19  A.    Yes.
20  Q.    Okay.  When you walked in, was the whiteboard as it
21  is in 1B, meaning blank, or was there stuff on the
22  whiteboard?
23  A.    No.  There was a tree on it.
24  Q.    A tree?  What do you mean?
25  A.    Like a -- the only way I could explain it is if

E. WARNER – DIRECT

1    someone had a family tree, and there's something that goes

2    down to their family and breaks up and does different

3    things.  It kind of reminded me of that.

4        Q.   All right.  Where the family members are in that

5    family tree, were they square, circle, triangles?  Do you

6    have a memory?

7        A.   They was plain, like a person's name, and then it

8    said they were from California.  Then underneath it had a

9    number, and it had so many kids.  I think -- as a matter of

10   fact, I think the first one was like 96 kids.

11            It came down, and there was another guy's name,

12   and it said something -- there was another state out west.

13   And then after a while it came down and said Cruz and came

14   across, and it said 12 kids underneath it.

15       Q.   When you've described those, you've used a hand

16   motion indicating to me like there was some sort of visual

17   connection between those two entities?

18       A.   Yeah.  There was a line underneath the names and

19   down.  It was like a family tree.

20       Q.   Okay.  I got you.  When you saw -- was your name on

21   that board?

22       A.   Yes.  Under Cruz's.

23       Q.   When you saw that, did you have some sort of

24   reaction?

25       A.   I was shocked.

E. WARNER - DIRECT

1    Q.    Why were you shocked?

2    A.    Because my name was on it.  And the first thing that

3    was asked was if I -- Mr. Carter was, do you notice anything

4    about this board?  And I said yeah.  My name's on there.

5    Q.    Were there some more questions about the board?

6    A.    Yeah.  They asked me if I knew anybody else who's

7    name was on there, and I said I knew Cruz, and I had heard

8    the guy's name that was on top.

9              THE COURT:  All right.  We'll break, and we'll --

10   when do you believe you'll be back?

11             MR. CHONTOS:  My conference is at 2:10.  I believe

12   I'll be here no later than 2:25.

13             THE COURT:  Okay.  And then we'll resume around

14   2:25.

15             (Proceedings were adjourned at 1:54 p.m.)

16                        - - -

17                      2:40 p.m.

18             (In open court:)

19             THE COURT:  You may continue.

20             MR. CHONTOS:  Thank you, Judge.

21   BY MR. CHONTOS:

22   Q.    Mr. Warner, when we took a break, we were talking

23   about your reaction to the whiteboard.  That's where we

24   were.  Okay.  I want to just pick back up there.

25             After you make your observations of the contents

E. WARNER – DIRECT

1   of the whiteboard, do you have a recollection of Officer

2   Carter ever leaving the room?

3      A.   When I first got that?

4      Q.   No.  During the whole time.

5      A.   Yes.

6      Q.   Do you recall how long Officer Carter was gone?

7      A.   Not that long.  I'd say maybe ten minutes, something

8   like that.

9      Q.   Did he leave with anyone else?

10     A.   No.  There was only me and him in there.

11     Q.   Well, where was officer -- the State Trooper?

12     A.   He was outside the doorway.

13     Q.   Okay.  So at one point the State Trooper left?  Do I

14  have it right?

15     A.   Yes.

16     Q.   Okay.  Was there an incident that happened before the

17  State Trooper left?

18     A.   The one time -- the State Trooper stepped out twice.

19     Q.   Tell me about the first time he left.

20     A.   The first time there was a -- roughly at the

21  beginning of the interview or however you want to put it,

22  they had asked me how I knew about -- how I had first heard

23  about Armando Cruz, and I started explaining.  Well, my

24  story must have taken longer than he liked, and he got very

25  upset.

E. WARNER – DIRECT

1    Q.    Who got upset?

2    A.    The State Police Officer, Mr. Owens.

3    Q.    That's a conclusion that he was upset that you've

4    reached.  What I want to ask you is what did you see?  What

5    did you hear that allows you to make that conclusion?

6    A.    He said he was sick of the lying, and he was fed up

7    with it, and he stood up and took his chair and bounced it

8    off the wall.

9    Q.    The State Trooper did that?

10   A.    Yes.

11   Q.    What did he do after that?

12   A.    He picked the chair up and put it back on its legs

13   and stormed out of the offices.

14   Q.    Is Agent Carter in the room when the chair bounces

15   off the wall?

16   A.    Yes, sir.

17   Q.    Where is that chair that was thrown placed in

18   relationship to you?

19   A.    I don't understand.

20   Q.    Okay.  After the chair was thrown, the State

21   Trooper --

22   A.    He picked it up, and he put it like off in front of

23   the desk to the right where I'm sitting because I was

24   sitting against the wall where that whiteboard is.

25   Q.    You're sitting in front of the whiteboard?

E. WARNER – DIRECT

1    A.    In front of me –– there's a cabinet here

2    (indicating).   There's a desk here (indicating), and the

3    State Police Officer sat directly in front of me with his

4    knees almost touching mine.

5    Q.    Mr. Warner, you made some directions, and that's

6    really not going to do well when we read the transcript.

7    So –– hold on.   I'm just going to ask you some questions.

8    A.    Okay.

9    Q.    You're sitting in front of the whiteboard.   The

10   whiteboard is at your back?

11   A.    Yes.   I'm up against the wall.

12   Q.    And you made a motion to your left.   What's to your

13   left?

14   A.    There's a –– I'm not sure what you call them.   It's

15   one of them vertical like file cabinets where the doors go

16   from left to right.

17   Q.    I'm going to show you Government's Exhibit 1B as in

18   boy.   Does that reflect that vertical cabinet?

19   A.    Yes.   Yes.

20   Q.    So the vertical cabinet is to your right?

21   A.    No.   To my left.

22   Q.    I'm sorry.   That's right.   Okay.   And what's to your

23   right?

24   A.    A desk.

25   Q.    And is that the desk that you saw the video at?

E. WARNER – DIRECT

1    A.    No.

2    Q.    Okay.  Is that the desk that Agent Carter was sitting

3    behind?

4    A.    Yes, that the FBI agent was sitting behind the desk

5    right beside me to the right.

6    Q.    After the State Trooper leaves, does Agent Carter

7    remain in his seat on the other side of the desk?

8    A.    No.

9    Q.    What happens?  Where does he go?

10   A.    He came around the desk, grabbed the chair and stood

11   it back up in front of me where the State Police Officer had

12   been sitting prior.

13   Q.    Does he sit in the chair?

14   A.    Yes.

15   Q.    Okay.  How far or how close is Agent Carter sitting

16   in that chair in relationship to you?

17   A.    Not real close.  I'd say maybe two feet, if that,

18   about like that.  Let me show you.  Two feet.

19   Q.    Is Agent Carter sitting in a chair close enough to

20   you that if you bend over at your waist, could you touch him

21   with your hand?

22   A.    Oh, yes.  But he was nowhere near as close to me as

23   Officer Owen was.  When he was sitting in front of me, I

24   could almost smell his breath.

25   Q.    And Trooper Owen was that close to you where you

E. WARNER – DIRECT

1    could almost smell his breath before he threw the chair?

2    A.   When -- no.  After he stood up, he wasn't because he

3    was backing away from me.  But prior to that there when he

4    was sitting in front of me, there was probably within six

5    inches from my kneecaps to his kneecaps.

6    Q.   And the "he" that you're making reference to with

7    that six-inch gap, that's Trooper Owen?

8    A.   Pardon me?

9    Q.   The individual who was about six inches away from

10   your kneecaps, that's Trooper Owen?

11   A.   Yes.  The FBI agent, he had -- he tried to treat me

12   with -- the best way I could explain it, he was real

13   professional and real courtesy of me.

14   Q.   That's Agent Carter?

15   A.   Yes.  He was very nice to me.  He -- everything he

16   did was real professional pretty much, and the -- he really

17   didn't -- wasn't mean to me at all.

18   Q.   When the chair bounces off the wall and the Trooper

19   storms out of the room, did you have a reaction to that?

20   A.   My mouth fell open.

21   Q.   Okay.

22   A.   And not only did my mouth fall open, so did

23   Mr. Carter's.

24   Q.   You saw that?

25   A.   Oh, yes.  He was surprised.  Because I -- in my

E. WARNER – DIRECT

1    mind –– and I don't know if it's true or not –– in my mind I

2    think –– well, it scared me at first.

3        Q.   Well, why did it scare you, Mr. Warner?

4        A.   Well, first of all, I was shocked to me because I was

5    raised that the FBI is like super gods, and the State Police

6    are very professional, and things weren't ever done that

7    way, and I was scared.

8        Q.   Scared of what?

9        A.   Well, I'm in a room with two officers and –– I'm in

10   an office with an FBI agent, which is to me is like a king,

11   and a State policeman, and you know, then to me, like I

12   said, I was raised that they're nothing but pure

13   professional.

14       Q.   But the question, Mr. Warner, was why were you

15   scared?  What were you scared of?

16       A.   I wasn't –– Mr. Owen was so mad, and I wasn't sure if

17   I was going to get hit or what.  I didn't know what was

18   going down.

19       Q.   Before Trooper Owen leaves the room, are they, Agent

20   Carter or Trooper Owen, asking you questions about things

21   that you did do?

22       A.   They were asking me questions about Armando, some of

23   them.  Then they were asking me and telling me that there

24   was –– they had heard that I had involvement, and they just

25   kept asking questions like that there.

E. WARNER – DIRECT

1    Q.   At any time while you're in there, do they ask you

2    any questions about your physical health?

3    A.   No.

4    Q.   About your mental health?

5    A.   No.

6    Q.   What about any medicines you might be taking?

7    A.   No.

8    Q.   Do they ask you any questions about your education?

9    A.   No.

10   Q.   Do they ask you any questions about your prior

11   involvement with local police?

12   A.   I think so.  And from -- I'm not sure if that was in

13   the beginning though or if it was later on.  But they asked

14   me about my police record, and they said that they seen I

15   had a DUI.

16   Q.   Mr. Warner, you've had more than one DUI.  Is that

17   fair?

18   A.   Yes.  Two.

19   Q.   All right.  In either of those situations were you

20   advised of the Miranda warnings?

21   A.   No.  There was no reason to.

22   Q.   Mr. Warner, you were arrested about six days after

23   this, April 9, 2012.  Is that about right?

24   A.   Yes, 9:00 a.m.

25   Q.   Okay.  And Trooper Owen was the person that said,

107

E. WARNER – DIRECT

1   hey, you're under arrest?

2     A.    I woke up with his knee on my spine.

3     Q.    Okay.  And do you recall at that time if the Trooper

4   advised you of your Miranda warnings?

5           MS. BLOCH:  Objection, Your Honor.  I don't see

6   how this is relevant to the interview on April 3 which he

7   seeks to suppress.

8           MR. CHONTOS:  It's the juxtaposition that gave him

9   to do it then but not at the interview.

10          THE COURT:  Why is that –– I don't understand why

11  that's relevant.  They did it later when he was arrested.

12          MR. CHONTOS:  Uh–huh.

13          THE COURT:  Help me.  I don't understand.

14          MR. CHONTOS:  Okay.

15          THE COURT:  No.  I'm not sustaining the objection.

16  I just want to understand the point.

17          MR. CHONTOS:  I had a point.  It escapes me, so

18  I'm going to move on, Judge.

19          THE COURT:  Okay.  Well, if it comes back to you,

20  you can share it.

21          MR. CHONTOS:  Sure.

22  BY MR. CHONTOS:

23    Q.    Mr. Warner, do you recall how long you were in that

24  interview room?

25    A.    I'd say approximately around an hour, hour and

E. WARNER - DIRECT

1    fifteen minutes.

2    Q.    Okay.  While you're there, did you make any efforts

3    to leave?

4    A.    I stood up a couple of different times.

5    Q.    Well, do you recall how many?  Because a couple is

6    kind of vague.

7    A.    I'd say at least two times.

8    Q.    All right.  Let's talk about the first time that you

9    got up.

10   A.    When I was -- the first time I stood up was when he

11   threw the chair; and like I said, I was kind of worried.

12   And when he went out, I was scared, and then this sounds

13   stupid, but I felt comfortable around Mr. Carter because I

14   didn't think he would hit me or do anything.

15          And he brought his chair over, the chair over and

16   sat it down, and then when he did that there, it was like

17   someone just reached up and smacked me right in the face.

18   It was like good cop, bad cop.  I seen this on TV.

19   Q.    All right.  You mentioned there was a second time

20   that you got up.

21   A.    I stood up the second time because I was called a

22   liar.

23   Q.    And who called you a liar?

24   A.    Mr. Owens, and I said I don't have to put up with

25   this.  I said -- I started to go because he stood there and

E. WARNER - DIRECT

1    says -- he said something and ended in I'm sick of your

2    lying.

3      Q.    Trooper Owen said that to you?

4      A.    Yes.

5      Q.    And you indicated that you got up?

6      A.    Yes.  I stood up.

7      Q.    Out of your chair?

8      A.    Yes.

9      Q.    The physical movement of you getting up out of your

10   chair, did that cause some physical movement of Trooper

11   Owen --

12     A.    He stood up.

13     Q.    Okay.  And where did he stand up in relationship to

14   you?

15     A.    In front of me.  He was sitting in front of me.

16     Q.    What impression, what reaction was going through your

17   mind when you stand up, he stands up?  What's going on in

18   your mind?

19     A.    I should have never trusted him to go out there.  I

20   should never -- I should have never done it.

21     Q.    Did you want to leave at that time?

22     A.    Almost definite.  He --

23     Q.    Why didn't you?

24     A.    He was standing in front of me, and probably I'm

25   guessing maybe a foot between him and that file cabinet on

E. WARNER - DIRECT

1    that side, foot and a half on this side is that desk.  And

2    I'm no skinny person.  I'm pretty fat.  There's no way I was

3    going to squeeze around him.

4       Q.   Did you feel trapped?

5       A.   Yes.

6       Q.   Any reason why you didn't say, hey, guys, time out.

7    I'm done.  I'm out of here?

8       A.   I just told him I wanted a lawyer.  And when I said

9    it the first time, Mr. Carter says to me, he says to me --

10   he says, well, he says next time I come up, I'll see you,

11   I'll make sure I bring a lawyer for you.

12      Q.   The first time that you said to a law enforcement

13   officer that you wanted a lawyer was out there in the lobby

14   right in the door well; right?

15      A.   Right.

16           MS. BLOCH:  Objection, Your Honor.  He's leading

17   the witness.

18           MR. CHONTOS:  Well, it's already been testified

19   to.

20           THE COURT:  I'll sustain the objection.  It's

21   getting repetitious.

22      Q.   Mr. Warner, in that last answer a little bit ago

23   you've indicated that you told Agent Carter that you wanted

24   a lawyer?

25      A.   They were both sitting there.

E. WARNER – DIRECT

1    Q.    Okay.  Once you're in the room, was that the one and

2    only time that you said, hey, I want lawyer?

3    A.    Twice.

4    Q.    Is there an event that happened before or after the

5    first statement that you made, hey, I want a lawyer?

6    A.    The chair throwing.

7    Q.    Okay.  So walk us through the sequence.  Chair

8    throws.  What happened?

9    A.    He –– the chair hit the wall.  He was running his

10   mouth about he's fed up with this stuff, da–da–da, and he

11   stepped out the door, and I stood up, and I said I need a

12   lawyer.  And ––

13   Q.    Now, segway into that second time that you said that

14   you wanted a lawyer.  What event was surrounding that?

15   A.    Mr. Owens the first time –– the second time he was

16   sitting in front of me and asking something, and I said ––

17   he didn't like whatever my answer was, he got upset and told

18   me I was lying.  And I said I don't have to put up with this

19   shit.  I said I want a lawyer.  I want a –– and –– that's

20   all it was.

21   Q.    Do you recall on the first time inside the room that

22   you asked for a lawyer or the second time that you asked for

23   a lawyer, did they have any oral response to your asking for

24   a lawyer?

25   A.    Mr. Owens –– Officer Owens didn't.  Mr. Carter did.

E. WARNER – DIRECT

1    He –– like I said, one of the –– the first time or the

2    second time I'm fuzzy on it.  I'm not sure which time it

3    was, but he said next time I come up I'll bring you a

4    lawyer.

5        Q.    And the author of that statement was Agent Carter?

6        A.    Pardon me?

7        Q.    The author of that statement was Agent Carter?

8        A.    Yes.

9              MR. CHONTOS:  Mr. Warner, the Government's lawyer

10   might have some questions for you.

11             THE DEFENDANT:  That's fine.

12             THE COURT:  You may begin.

13                        –  –  –

14                     CROSS–EXAMINATION

15   BY MS. BLOCH:

16       Q.    Mr. Warner, we'll go back a bit and talk about that

17   February 15 interview you've discussed.  At no time, as you

18   indicated, did you feel the least bit threatened, you

19   weren't in custody.  Agent Carter and a Detective came and

20   talked to you about Mr. Cruz, and they asked you questions,

21   am I not right, about your daughter?

22             MR. CHONTOS:  Judge, I'm just going to object to

23   the use of the phrase in custody.  It connotes a definite

24   legal meaning.  I'm not sure this witness has the capability

25   to discern that from a legal standpoint, and its inclusion

E. WARNER - CROSS

1    in the question is unfair.

2              THE COURT:  I'll overrule the objection.  You may

3    answer the question, please.

4    BY MS. BLOCH:

5    Q.    Mr. Warner, on February 15 the agents came to talk to

6    you about your daughter.  Correct?

7    A.    Yes -- no.  I'm sorry.  They didn't come -- when they

8    came to talk to me, it had nothing to do with my daughter.

9    Q.    Nothing to do with your daughter?

10   A.    No.

11   Q.    They didn't talk about Mr. Cruz and finding images of

12   her because she was hanging out there?

13   A.    No.

14   Q.    During that interview did you tell them that your

15   daughter was friends with Mr. Cruz's daughter?

16   A.    Yes.

17   Q.    Okay.  And that's why she would go to his house?

18   A.    Pardon me?

19   Q.    And that was why she would be at his home?  Correct?

20   A.    She had been -- spent the -- two different slumber

21   parties over at the house, yes.

22   Q.    Two different what?

23   A.    Two different nights she spent at a slumber party at

24   his place.

25   Q.    So let me get this straight.  He asked you about

E. WARNER – CROSS

1  Mr. Cruz.  He asked you about your daughter and the time

2  that she was spending at Mr. Cruz's house?

3  A.   No.

4  Q.   Did he -- did you advise Agent Carter that -- strike

5  that.  Did Agent Carter --

6  A.   First of all, Agent Carter wasn't the one doing the

7  talking.  Second of all, it was the Detective from the

8  courthouse.  And he asked me how we knew -- how I knew

9  Mr. Cruz.  And I said because my daughter ran with his

10  daughter.

11       And then he asked if my daughter ever spent the

12  night up there, and I said a couple times at a slumber

13  party.  And they said, well, why hasn't she stayed there

14  more than that?  And I said if you didn't have feelings that

15  he was doing something wrong, and I said he made me feel

16  uncomfortable.

17  Q.   Mr. Cruz made you feel uncomfortable?

18  A.   Yes.

19  Q.   All right.  So at this point in time, February 2012,

20  your daughter was approximately 11 years old; am I right?

21  A.   When?

22  Q.   February of 2012.  We're talking about your

23  11-year-old daughter now.

24  A.   She -- yeah.  She was -- when they came, she was 11,

25  and a couple weeks later she turned 12.

115

E. WARNER – CROSS

1    Q.   So you'll agree with me she was 11 years old in

2    February of 2012, and she had been spending time based upon

3    your own testimony at Mr. Cruz's home for sleepovers?

4    A.   Yes.

5    Q.   And according to you, she was friends with Mr. Cruz's

6    daughter?

7    A.   With MC-II.

8    Q.   You'll agree with me, would you not, that Mr. Cruz's

9    daughter was 17 at the time?

10   A.   Physically, yes.  Not mentally.  And let me add that

11   is what the detective from the courthouse said, not me.

12   Q.   All right.  So your daughter, who is 11 according to

13   you, is friends with Mr. Cruz's daughter, who's 17, and

14   under that relationship your daughter sleeps at Mr. Cruz's

15   house, and they're talking to you about that?

16   A.   The –– well, she wasn't 17 at the time, but ––

17   Q.   Just answer my question.  Are the agents talking to

18   you about the fact that your daughter is sleeping at Mr.

19   Cruz's house?

20   A.   Then the answer is no.  She wasn't 17 years old.

21   Q.   No.  I said are they asking you about your own

22   daughter spending time at Mr. Cruz's home?

23   A.   No.  I brought that up.

24   Q.   Did you talk about the fact with the agents, whether

25   you raised it or they did, about the fact that there was

346

E. WARNER - CROSS

1    some reason to believe Cruz was taking pornographic pictures

2    of these girls, to include your daughter?

3       A.   No.

4       Q.   Did you not say, Mr. Warner, during that meeting that

5    if Mr. Cruz was taking pictures of your daughter of that

6    nature, you would kill him?

7       A.   No.

8       Q.   So you're saying if Agent Carter were to take the

9    witness stand and say if that's exactly what you said --

10      A.   I'll take a lie detector test.  No.  Now, I'll tell

11   you what I said.  Before he left there, they said we stopped

12   and talked to your daughter at school.  This was after he

13   told me that Mr. Cruz was having sex with his daughter, who

14   had just turned 16 at the time, and which my daughter's not

15   allowed to run around with kids that much older, that we

16   found out after the fact, but that's beside the point.

17            When they said that they stopped at the school and

18   talked to my daughter, I said why did you stop and talk to

19   my daughter?  I said is he touching my kid?  And they

20   says -- after -- the detective from the courthouse said

21   we're not allowed to tell you that.

22            I said it's my kid, and they said we can't tell

23   you that.  And I'm saying, well, I'll tell you right now if

24   he touched my kid, and he raped my kid, I am a judge, I am a

25   jury and I am the executioner is exactly what I said.

347

E. WARNER – CROSS

1   Q.   And you'll agree with me if all of that transpires as

2   you've just depicted it, that thereafter you continued to

3   have a friendship with Mr. Cruz --

4   A.   No.

5   Q.   -- oh, wait, and that Mr. Cruz as recently as

6   February 14 of 2012, was at your home because you play a

7   computer game with him?

8   A.   Yes.

9   Q.   On a regular basis?

10  A.   He wasn't -- he stopped at my house to drop his

11  computer off for me to borrow.  He didn't stay.  Because

12  they asked me where the computer was.  I said he came back

13  and picked it up.

14  Q.   Let's talk about the April 3 interview.  You'll agree

15  with me, would you not, that you received a phone call from

16  Trooper Owen asking you if you would meet with him to

17  provide some answers to some questions involving Mr. Cruz

18  and the conduct that was alleged?

19  A.   No.

20  Q.   He didn't call you and ask you to talk to you about

21  Mr. Cruz?

22  A.   He told my mother, and I got a message, and then I

23  returned his call the following day.

24  Q.   At that time did you have a phone?

25  A.   Pardon me?

E. WARNER – CROSS

1    Q.   At that time did you personally have a phone?

2    A.   No.

3    Q.   Is that why he called your mother, because that was

4    the number he had for you?

5    A.   Yes.  I went –– when I went to my mom's, she told me

6    that they had called earlier that day.

7    Q.   All right.  So you were still living in your

8    apartment ––

9    A.   Yes.

10   Q.   But you went to your mother's house.  She told you

11   the Trooper called, and you returned the call the next day?

12   A.   Yes.

13   Q.   And he asked you if he could talk to you about

14   Mr. Cruz and that general subject?  Correct?

15   A.   He said to me, he says we'd like to talk to you or

16   I'd like to talk to you involving Mr. Cruz.

17   Q.   Okay.  And then is it your testimony that then you

18   had another conversation with him on the phone before the

19   actual interview that took place on April 3?

20   A.   No.

21   Q.   So during that call, he tells you that Agent Carter

22   wants to talk to you, too.  And so in that light, he asks

23   you if you –– he'll either come and get you, would you mind

24   coming to the barracks?  And you agreed?  You said, hey, my

25   mom will drive me?

E. WARNER – CROSS

1    A.   He asked me if I'd talked to the FBI, and I said yes.

2    And he says recently?  And I said no.

3    Q.   Right.  I get that.  But with respect to April 3, you

4    agreed to come to the barracks.  Your mother was going to

5    drive you, and you were going to meet with Trooper Owen and

6    Agent Carter?

7    A.   Yes.

8    Q.   And you go to the barracks at the appropriate time,

9    and they're prepared to meet with you, and you come into the

10   waiting room, and you wait for Trooper Owen to come out --

11   A.   Yes.

12   Q.   And this gentleman we're talking about (indicating).

13   Trooper Owen came out?

14   A.   Yes.

15   Q.   And he escorted you back to the office in which the

16   interview took place?

17   A.   He greeted himself, and we talked, and he searched me

18   and then took me back to the desk.

19   Q.   He searched you?

20   A.   Yes.

21   Q.   And where did the search take place?

22   A.   In the doorway -- right inside the doorway of the

23   hallway that breaks off right by the waiting room.

24   Q.   So he patted you down?

25   A.   Yes.

E. WARNER - CROSS

1    Q.    What did he do?  Did he --

2    A.    He made me empty my pockets, and he checked me.  He

3    confiscated a pair of fingernail clippers off me.

4    Q.    Did he ask you if you had a weapon?

5    A.    Yes.

6    Q.    And did you say I have this nail clipper?

7    A.    No.

8    Q.    Did you -- you emptied your pockets?

9    A.    Yes.

10   Q.    And that fell out?

11   A.    No.  He told me to empty my pockets, and I did, and

12   when he seen the fingernail clippers, he took them off me

13   and told me I could have them back when I left.

14   Q.    So you go back to this room with Trooper Owen?

15   A.    Yes.

16   Q.    And you sit down, and Agent Carter reintroduces

17   himself to you?

18   A.    As I was coming through the doorway, Mr. Carter was

19   standing on the side of the desk, and Mr. Owen asked me

20   if -- he said this is Mr. Carter.  Do you remember him?  I

21   said yes.  I do.

22   Q.    So you're seated and facing them.  All right.

23   A.    After a period of time I'm asked to look at this

24   whiteboard, see if I see him there, and I did that there.

25   Q.    Let's make sure that we get the timing of things with

121

E. WARNER - CROSS

1   respect to the whiteboard and the questions that the two

2   officers are posing to you at the right time.

3       A.   All right.

4       Q.   You walk in.  He reintroduces himself.  And as you've

5   acknowledged, he was courteous throughout the entire

6   interview --

7       A.   Yes.

8       Q.   You sat down.  And then these two officers explained

9   to you that you are there of your own free volition, you're

10  permitted to leave, you're not going to be arrested.  You're

11  going to be permitted to leave at the end of the interview.

12  Correct?  They explain all that to you?

13      A.   Mr. Carter did.

14      Q.   All right.  But Trooper Owen was present?

15      A.   Yes.

16      Q.   So he explained you're free to leave?  You don't have

17  to answer these questions?  And then he went on to explain

18  what the nature of the investigation was; correct?  He told

19  you that we're investigating allegations about Mr. Cruz and

20  you with regard to the sexual exploitation of children in

21  Mercer County.  Correct?  That's what he told you?

22      A.   Yes.  He told me that I was not being arrested that

23  day.  Mr. Carter said this, but not Mr. Owens never said

24  nothing.  Mr. Carter said that there.  And the -- he told

25  me -- I asked --

E. WARNER – CROSS

1    Q.   He asked you if you understood what he was explaining

2    to you?

3    A.   Pardon me?

4    Q.   He asked you if you understood what he explained to

5    you about your freedom to leave --

6    A.   Yes.

7    Q.   -- at any time?  And you acknowledged that you did

8    understand I'm free to leave?

9    A.   Yes.

10   Q.   I don't have to answer these questions?

11   A.   Yes.

12   Q.   But I'm going to do it?  And I know what it's all

13   about?  And you said, yes, I will answer these questions?

14   A.   I didn't say anything.  I just said yes, and he asked

15   me questions, and --

16   Q.   And then you answered him, started to answer them?

17   A.   I tried to explain things as best I could.

18   Q.   So you started to answer them?

19   A.   Right.

20   Q.   Right.  And initially you were denying that you had

21   any knowledge of the taking of these pictures, the taking of

22   the video --

23   A.   Not initially.  The whole time.

24   Q.   So it's your testimony that you never said -- made

25   any admissions with respect to your voice being portrayed in

E. WARNER - CROSS

1  the video --

2   A.   The only thing I was asked for was right before I

3  left, is -- I was asked don't they -- that person on the

4  tape, do they have a deep voice just like you do?  And I

5  agreed they did.

6   Q.   So you're saying you were in this room for an hour to

7  an hour and fifteen minutes, and you never answered any

8  single question with an admission that it was you?

9   A.   No.

10   Q.   So this keeps going on, and you just keep responding,

11  according to you?

12   A.   They had explained -- they had me explain how I met

13  Mr. Cruz.  When they asked me why I felt so uncomfortable

14  about him, I says -- well, I says he reminded me like one of

15  these TV shows that someone is always snapping a camera in

16  your face.  You take a bite of a hot dog, and he snaps a

17  picture of it, everything he did, and finally me and him got

18  into it, and he couldn't handle it --

19   Q.   But again, none of that had anything to do with your

20  friendship, which you continued to maintain until the very

21  end, until Mr. Cruz went off to jail --

22   A.   I had friends -- I wouldn't say he was a friendship.

23  I would say an acquaintance I had until February 15.  After

24  February 15, no.

25   Q.   And do you remember when Mr. Cruz went off to jail?

E. WARNER - CROSS

1    A.    February 15.

2    Q.    That's the day he went to jail?

3    A.    I guess.  All I know -- this is the last time I heard

4    about him because the phone rang, and Mr. Carter answered

5    the phone, and it was like a big rush thing, he's on film,

6    and he jumped up and headed for the door.

7    Q.    So you will agree with me at this point so you're

8    going through this process of being interviewed, and it

9    pertains to all these images and photographs and videos of

10   children that you agreed you knew, that you knew who the

11   victim was identified as FW, you knew who MC was.  You

12   looked at these pictures.  You knew who these girls were?

13   A.    I knew --

14   Q.    You said that they were friends with your daughter.

15   They came into your house --

16   A.    I just said -- well, FH or whatever, yes.

17   Q.    They slept at your house?  They had sleepovers;

18   right?

19   A.    Basically -- or -- I'm sorry -- FW was there quite a

20   bit.

21   Q.    You indicated to Agent Carter that she was like a

22   child to you, your own child?

23   A.    Yes.

24   Q.    So she spent quite a bit of time at your residence?

25   A.    Yes.

E. WARNER - CROSS

1    Q.   You'll agree with me that the photographs that you

2    were being shown depicted the inside of your house?

3    A.   Yes.

4    Q.   And so what you're saying here is that you told them

5    during this interview contrary to their testimony that you

6    didn't take any of those pictures?

7    A.   They asked me -- they were showing me pictures.  And

8    there was like a slide show.  And it wasn't just pictures.

9    I'm whoa, whoa, whoa, whoa.  Back up.  And they backed up a

10   couple pictures, and another one they backed up, and I

11   looked at this picture, and I said that's my bathroom

12   because I seen my shower curtain in the background.  And

13   then they went on from there.

14   Q.   And what about the ones with your hand in it?

15   A.   My hand was not in pictures.

16   Q.   Well, they showed you pictures --

17   A.   With a hand.

18   Q.   With a hand in it?

19   A.   Right.

20   Q.   Will you agree with me that Armando Cruz has skin

21   color completely different than yours?

22   A.   Yes.  He's Mexican.

23   Q.   And you would agree with me, would you not, that the

24   pictures that they showed you, that they are -- that they

25   have testified you responded to ultimately positively as

E. WARNER - CROSS

1  being you showed a very pale male hand?

2  A.   I never said that it was my hand.  If I would have

3  said it was my hand, Officer Owens wouldn't have got a court

4  order and came and took pictures of my hands.  So no.  I did

5  not say it was my hand.

6  Q.   Mr. Warner, you would agree that thus far your

7  testimony is completely different from both Agent Carter and

8  Trooper Owen with respect to the whole dynamic of this

9  particular --

10  A.   Oh, yes.  They both said they sat behind a desk when

11  Owen, Mr. Owens, sat within inches of me.  And he never once

12  ever sat behind the desk, ever.

13  Q.   Trooper Owen never got up and threatened you, threw a

14  chair against the wall?

15  A.   Yes.  He did.

16  Q.   Intimidated you, sat knee to knee with you?

17  A.   Was you there?

18       MR. CHONTOS:  Is there a question there, Judge?

19  A.   Was you there?

20       MR. CHONTOS:  Objection.

21  A.   I didn't think so.  Yes, he did, and I'll take a lie

22  detector test.  That's what happened.

23       THE COURT:  Sir --

24       THE WITNESS:  I'm sorry.  I will take a lie

25  detector --

E. WARNER - CROSS

1          THE COURT:  Sir, there's not -- there's a

2   question, and I'll overrule the objection.  You can answer

3   the question she asked you.

4     A.   I will take a lie detector test I never -- he sat

5   right in front of me.

6          THE COURT:  Do you want to ask the question again,

7   please?

8     Q.   The question that I posed to you, Mr. Warner, was the

9   reality is that at no time during this interview did either

10  Agent Carter or Trooper Owen attempt to intimidate you or

11  threaten you or scare you or go knee-to-knee, toe-to-toe

12  with you in any fashion so as to force you to stay in that

13  room?

14         MR. CHONTOS:  Objection, Judge.  It's a compound

15  question based upon what we've already learned, the

16  insertion of Agent Carter in that question when this witness

17  has already said Carter was nothing but a gentleman.  And

18  then --

19         THE COURT:  I'll overrule the objection.  You may

20  answer the question.

21    A.   I'm not understanding the question.  What I said is

22  true.

23    Q.   Mr. Warner, you understand the import of this

24  particular hearing; do you not?

25    A.   Yes.

128

E. WARNER - CROSS

1    Q.    So if you were to prevail at this proceeding, all the

2    Government's other evidence would come in against you at

3    trial, but not these statements that the agents took down as

4    admissions with respect to the conduct.  Correct?

5    A.    I was explained that, yes.

6    Q.    So you understand that now?  You understand that

7    their testimony is they legitimately in the course of their

8    work interviewed you, and you provided them with statements,

9    admissions with respect to the conduct that's charged in the

10   indictment?

11   A.    They asked me questions that I answered, if that's

12   what you're asking me, yes.

13   Q.    And if you were to prevail, your answers to those

14   questions, which you're now suggesting were not in the

15   positive, they weren't you --

16   A.    First of all, I apologize, Your Honor, the way I have

17   to answer this.  I stood here and said to tell the truth.

18   I've told the truth.  I am not -- whether -- I was raised

19   that you don't lie on God.  I was spoken -- I just said I

20   was talking God's word.  I would tell the truth.  Everything

21   I said you're telling me I'm a liar, and you're

22   contradicting me, and I take exception to that very much

23   because that's not true.

24           Everything I said is the truth.  Mr. Carter sat in

25   front of me, his knee within three to six inches of mine.

1    And I'm sure more than likely, which I will be more than

2    glad to let you see the evidence, there's more than likely a

3    camera there, and they filmed the whole thing.  Bring it in.

4    Because he sat that close to me.

5              THE COURT:  Any other questions?

6              MS. BLOCH:  No other questions, Your Honor.

7              THE COURT:  Okay.  Any other questions?

8              MR. CHONTOS:  No, Your Honor.

9              THE COURT:  Okay.  Sir, you may step down.

10             THE WITNESS:  Thank you.

11             THE COURT:  Any other evidence on behalf of the

12   Defendant?

13             MR. CHONTOS:  Judge, as my -- not today, Judge,

14   but we would ask for another opportunity -- another date to

15   bring on Mr. Warner's driver to that incident.

16             THE COURT:  His Mother?  And why can't she be here

17   today?

18             MR. CHONTOS:  She's on her way back from vacation.

19             THE COURT:  And when does she arrive?  Is she back

20   tomorrow?

21             MR. CHONTOS:  I think she's back by, you know,

22   after sun -- after the sun sets tonight.

23             THE COURT:  Okay.  Well, why don't we do it

24   tomorrow?  Is that the only other witness you have?

25             MR. CHONTOS:  Yes, Judge.

1              THE COURT:  Okay.  And how long do you think her

2     testimony will take?

3              MR. CHONTOS:  Twelve minutes.

4              THE COURT:  What's your schedule like tomorrow?

5              MS. BLOCH:  I can be here.  I have a scheduled

6     meeting, but it could be delayed somewhat if we were just

7     taking a brief amount of testimony.

8              MR. CHONTOS:  Judge, I know I have --

9              MS. BLOCH:  In the morning that is, Judge.  I have

10    something scheduled at 10 o'clock.

11             THE COURT:  How about noon?  How about noon?  Ms.

12    Bloch, how's that work for you?

13             MS. BLOCH:  That's fine.

14             MR. CHONTOS:  I'm now to that date, Judge.  I have

15    an interview with a Sex Offender Board psychologist in my

16    office at 10 a.m. tomorrow.  Based on my experience, that

17    probably is going to end about 11:15, 11:20.  So me getting

18    -- actually being physically in the room at 12 noon, that's

19    probably a stretch.  12:45, 1:00?

20             THE COURT:  Where's this interview?

21             MR. CHONTOS:  At my office in Turtle Creek.

22             THE COURT:  And where's your expert from?

23             MR. CHONTOS:  She is coming down from Armstrong

24    County.

25             THE COURT:  Well, it seems to me the most

1    convenient thing for both of you is to conduct the interview

2    in my jury room at no expense to you, and that would save

3    her going all the way to Turtle Creek, and it would put you

4    physically here.

5              MR. CHONTOS:  I appreciate the Court's offer to

6    use the building.  I have her number.  It's her cell phone;

7    and remember, Judge, just so you're aware, I represent a man

8    in Butler County.  He's the Defendant.  The sex Offender

9    Board wants him to be interviewed, and Miss Julia Lindemuth,

10   L-i-n-d-e-m-u-t-h, is the State employee who's going to

11   conduct the interview.

12             THE COURT:  Okay.

13             MR. CHONTOS:  So --

14             THE COURT:  So State employees are allowed in this

15   building.

16             MR. CHONTOS:  Oh, it's just a question of me

17   getting ahold of her in time for the Court to set that date.

18   That's all.  I mean if I call her now and leave a message,

19   she may very well not --

20             THE COURT:  Your client seems to want to talk to

21   you.  He keeps raising his hand.

22             (Brief pause.)

23             MR. CHONTOS:  Judge, so that's my only issue is me

24   getting notice to her to say, hey, the place of the meeting

25   has changed.

```
 1              THE COURT:  Okay.  So are you saying you want to
 2   go out in the hall and make a phone call, or are you just --
 3   you're just informing me that --
 4              MR. CHONTOS:  Well, Judge, I'll do anything that
 5   the Court wants.  I don't have to make that phone call if we
 6   can decide that like, you know, 12:30 or 12:45 --
 7              THE COURT:  Well, I have an 8:30, 9:30, 11:30 and
 8   a 12:30.  So I need to slide you in.  I'm trying to do that
 9   over lunchtime since that way I'm not going to conflict with
10   any other Judge hopefully.
11              So do you want to go out in the hall and call her
12   and see if she can't come here?
13              MR. CHONTOS:  Absolutely.
14              THE COURT:  Thank you.
15              MR. CHONTOS:  You're welcome.
16              (Brief pause.)
17              MR. CHONTOS:  Judge, thank you for the
18   opportunity.  I wasn't able to speak to her.  I left her a
19   detailed message, told her essentially that I need to have
20   our 10:00 a.m. interview with my Butler County Defendant,
21   that interview to take place here in Judge Schwab's jury
22   deliberation room.
23              THE COURT:  And your Defendant's going to be here
24   also?
25              MR. CHONTOS:  Well, of all the people involved
```

1    here, he's the easiest for me to tell him where to go.

2            THE COURT:  No.  I understand that.  I'm just

3    trying to figure out logistics so that there will be -- you

4    would come in with your client is what you're saying?

5            MR. CHONTOS:  Absolutely.

6            THE COURT:  Fine.  So we'll continue this hearing

7    until noon tomorrow, and we'll try to wrap it up in about a

8    half an hour if that works for everyone.  Any objection to

9    that procedure on behalf of the Government?

10           MS. BLOCH:  No objection.

11           MR. CHONTOS:  No, Judge.  Twelve noon is fine.

12   The only other little tidbit from our end, Judge, is -- and

13   perhaps Carolyn and I could work on that through the

14   evening -- is the date of the plea agreement with Cruz.

15   That seemed to be a little bit of an issue.  It might not be

16   an issue if it's after April 3.

17           THE COURT:  So you're going to stipulate?  You're

18   asking for a stipulation?

19           MR. CHONTOS:  Right, but I don't know that date,

20   and Carolyn and I can probably try to resolve that.

21           THE COURT:  All right.  And just so you know,

22   unless there's an objection, I think we're going to be able

23   to rule without proposed findings of fact and conclusions of

24   law from you all.  So --

25           MR. CHONTOS:  Well, I'll attune to that potential

1    disposition, sad that we're going to do that, but I

2    understand the big picture.

3              THE COURT:  No.  I mean if you want to do it, I'll

4    let you file proposed findings of fact and conclusions of

5    law.  It's just I mean I've sat -- it's not a three-day

6    hearing.  So even my limited ability to remember it because

7    I'm blessed with outstanding support --

8              MR. CHONTOS:  Why don't we reserve that final

9    decision until tomorrow?

10             THE COURT:  Fine.

11             MR. CHONTOS:  Thanks.

12             THE COURT:  The Marshals may remove the Defendant.

13   And do we need to notify anyone that he needs to be here

14   tomorrow, or will you all handle it?

15             THE MARSHAL:  We'll take care of it.

16             THE COURT:  Thank you.

17             (Proceedings were adjourned at 3:25 p.m.)

18                              - - -

19                   C E R T I F I C A T E

20

21             I, Deborah Rowe, certify that the foregoing
     is a correct transcript from the record of proceedings in
22   the above-titled matter.

23

24   S/Deborah Rowe   _____

25   Certified Realtime Reporter