```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,

         Plaintiff,
                                        Criminal Action
     vs.
                                        No. 12-00107
EARL WARNER,

         Defendant.
_____



     Transcript of SUPPRESSION HEARING held on Friday,
July 19, 2013, in the United States District Court,
700 Grant Street, Pittsburgh, Pennsylvania, before
The Hon. Arthur J. Schwab, United States District Judge



APPEARANCES:

For the Government:        Carolyn J. Bloch, Esq.
                           Assistant United States Attorney
                           700 Grant Street, Ste. 4000
                           Pittsburgh, PA  15219

For the Defendant:         David B. Chontos, Esq.
                           561 Beulah Road
                           Turtle Creek, PA  15145



Court Reporter:            Deborah Rowe, RMR, CRR
                           700 Grant Street, Ste. 5300
                           Pittsburgh, PA  15219
                           (412) 471-2510



Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription
```

```
 1                        P R O C E E D I N G S
 2                                 - - -
 3                              12:00 noon
 4              (In open court, Defendant present with counsel:)
 5              THE COURT:  Good afternoon.  Thank you for all
 6   coming back.  We're currently in the presentation of
 7   evidence on behalf of the Defendant relating to Defendant's
 8   motion to suppress Defendant's statements, Document No. 44.
 9   You may call your next witness.
10              MR. CHONTOS:  Thank you, Your Honor.  Shirley
11   Warner.
12              (The witness was duly sworn.)
13              THE CLERK:  Please state and spell your name for
14   the record.
15              THE WITNESS:  Shirley Warner, S-h-i-r-l-e-y,
16   W-a-r-n-e-r.
17                                 - - -
18              SHIRLEY WARNER, a witness herein, having been duly
19   sworn, testified as follows:
20                         DIRECT EXAMINATION
21   BY MR. CHONTOS:
22     Q.   Miss Warner, what is your relationship to Earl
23   Warner?
24     A.   He's my son.
25     Q.   I want to take you back to April 3, 2012.  Did you
```

1  have an opportunity to take Earl to the Pennsylvania State
2  Police --
3      A.  Yes, I did.
4      Q.  -- Barracks there in Mercer County?
5      A.  Pardon?
6      Q.  In Mercer County?
7      A.  Yes.
8      Q.  How did you get there?
9      A.  I drove.
10     Q.  Parked the car?
11     A.  Yes.
12     Q.  Did Earl get out?
13     A.  Yes.
14     Q.  Did you stay in the car?
15     A.  No.  I got out and went in with him.
16     Q.  And tell us what happened once you first got in
17  there.
18     A.  We walked in, and there was chairs to the left of us,
19  and we both sit down and waited for somebody to come out.
20     Q.  At some point did someone come out?
21     A.  Yes.
22     Q.  What did you see Earl do in response to that someone
23  coming out?
24     A.  He stood up.
25     Q.  Did the two people walk towards each other or what?

S. WARNER - DIRECT

1    A.   Yes, more or less, and to the center of the room.
2    Q.   When they're at the center of the room, can you give
3　us an estimate as far as distance that you are away?
4    A.   Probably eight to ten feet.
5    Q.   Okay.  When they're kind of like in the center of the
6　room, do you hear the conversation -- well, was there a
7　conversation between the two when they were there in the
8　center of the room?
9    A.   Yes.
10   Q.   Why don't you tell us what you heard.
11   A.   Earl said he needed a lawyer.  Do I need a lawyer?
12 And the officer said no.  And at that point the officer put
13 his hand -- I don't know what you would call it -- put it
14 like on his shoulder to guide him in, and he went in.
15   Q.   Was there a door there?
16   A.   Yes.
17   Q.   And they went in that door?
18   A.   Yes.
19        MR. CHONTOS:  Okay.  That's all the questions I
20 have.
21        THE COURT:  You may cross-examine.
22                         - - -
23                    CROSS-EXAMINATION
24 BY MS. BLOCH:
25   Q.   Ms. Warner, this meeting between your son and the

1   Pennsylvania State Police Officers, that was arranged
2   initially through a phone call to your home; correct?
3     A.   Yes.
4     Q.   And that was approximately maybe three days prior to
5   that?
6     A.   I think maybe it was longer than that because he had
7   been called prior to that, and it was canceled.  And then
8   they called him again.
9     Q.   And so Mr. Warner, your son, and the Trooper had at
10  least one, maybe more than one conversation on the telephone
11  to arrange this --
12    A.   No.  I talked to him.  I talked to the gentleman on
13  the phone.
14    Q.   Did you tell your son that he had called for him?
15    A.   Yes.
16    Q.   And to the best of your knowledge did Mr. Warner then
17  call the Trooper to make the specific arrangements for the
18  date and time --
19    A.   No.  They said they would call back, which they did.
20    Q.   And did they speak to Mr. Warner then, your son?
21    A.   No.  He wasn't there.  So they spoke to me again and
22  told me what time and where to go.  So I took him out.
23    Q.   Was there some discussion that if you were unable to
24  drive Mr. Warner to the barracks, that they would pick him
25  up?

1   A.   I'm sorry.  I didn't hear you.

2   Q.   Was there some discussion that if you were unable to
3   drive your son to the police barracks, that they would --

4   A.   I don't think we discussed it, but it was just
5   naturally if he needed a ride, he would get one.  And I
6   usually was the one that gave it to him.

7   Q.   And what was your understanding of what they were
8   going to be discussing?

9         MR. CHONTOS:  Judge, I'm going to object.  It
10  assumes that she had some knowledge about that.

11        THE COURT:  Okay.  We're on cross-examination.
12  You may continue.  Objection overruled.

13  A.   They said that they wanted to talk to him about -- I
14  can't think of his name -- Armando.

15  Q.   And did you know what the subject matter was?

16  A.   I don't think I did at that point, no.  They just
17  said they wanted to discuss with him about Armando, and so
18  that's what I told him.

19        THE COURT:  Do you know Armando's last name?

20        THE WITNESS:  I think it's Cruz.

21        THE COURT:  Thank you, ma'am.

22  Q.   Do you recognize the police officer in the room today
23  that you have testified your son first met with in the
24  barracks?

25  A.   That Earl met with when he went out?  Yes.  This one

1 right here (indicating).
2    Q. And have you seen this gentleman since then?
3    A. Have I seen him since then?
4    Q. Have you seen this Trooper since then?
5    A. At a hearing that they had in Mercer.
6    Q. And did the gentleman testify at that hearing against
7 your son --
8    A. No. They postponed it for some reason.
9    Q. On the date on which your son was arrested, they came
10 to your home; did they not, the officers, troopers?
11    A. Yes.
12    Q. And you and your son, Mr. Warner, were home at the
13 time?
14    A. Pardon me?
15    Q. You and your son were at your house at that time?
16    A. Yes. I'm hard of hearing.
17    Q. Was this Trooper there as well on that date?
18    A. Yes. He was there.
19    Q. All right. Did you give him a hard time?
20    A. No.
21    Q. You didn't give him a hard time when you opened the
22 door?
23    A. No. I didn't even know they were beating at the door
24 saying they were going to kick the F-ing door in; and when I
25 come out, this gentleman pulled the doors -- I was unlocking

1  it -- and broke my little finger.
2  Q.  Did you say to Trooper Owen and the other arresting
3  officers that in anger, can't someone just get an F-ing --
4  and I'm using that word -- shower when you opened the door
5  to them?
6  A.  No.  I didn't say that.  No.  I would have had no
7  reason to say that.  My concern was him having shoes on.
8  They wanted him to go out without shoes, and I said I'm
9  putting his shoes on him.  He's not going out in his bare
10 feet.
11 Q.  You said -- how old are you, Ms. Warner?
12 A.  Seventy-four.
13 Q.  Do you wear hearing aids?
14 A.  No.
15 Q.  You're just hard of hearing?
16 A.  Yes.
17 Q.  And how many feet were you away from Trooper Owen and
18 your son?  Approximately eight to ten feet?
19 A.  Yes.
20 Q.  There were no microphones I take it in the room?
21 A.  There was no what?
22 Q.  Microphones in the room?
23 A.  Not that I was aware of.
24 Q.  So that didn't help you to hear what was being
25 said --

1  A.  There was nothing going on around me that I wouldn't
2 have heard.  We were the only ones there.
3           MS. BLOCH:  No further questions, Your Honor.
4           THE COURT:  Redirect?
5           MR. CHONTOS:  Yes.
6                            - - -
7                     REDIRECT EXAMINATION
8 BY MR. CHONTOS:
9  Q.  Miss Warner, there is three people seated at this
10 table; right?
11  A.  Right.
12  Q.  Over there where a bunch of blue chairs are, that's
13 the jury box.
14  A.  Right.
15  Q.  Can you, using the jury box, can you identify the
16 Trooper that you had interaction with in the lobby that
17 morning on April 3?
18  A.  Yes.
19  Q.  Okay.  Is he the closest one to the jury box or the
20 one seated in the middle?
21  A.  I don't understand the question.
22  Q.  How many people are at this table?
23  A.  Three.
24  Q.  Okay.  Two males and one girl?
25  A.  Right.

1  Q. Which of the males you had interaction with?

2  A. This one right here (indicating).

3  Q. Okay. Can you see their tie colors?

4  A. Yes.

5  Q. Okay. Describe the tie color of the person you had
6  interaction with.

7  A. It's blue, and it has -- it's somewhat -- a little
8  bit of light blue or white in it.

9         MR. CHONTOS: Judge, can we have the record
10 reflect that she's identified Trooper Owen?

11        THE COURT: Any objection?

12        MS. BLOCH: No.

13        THE COURT: The record may so indicate.

14 BY MR. CHONTOS:

15 Q. Ma'am, in response to the Judge's question, you used
16 the last name of Armando as Cruz?

17 A. Yes.

18 Q. Did you learn of the Cruz name after your son got
19 arrested?

20 A. No. I had met him prior to.

21 Q. Okay.

22 A. The reason I get the names mixed up is because my
23 daughter had a student that stayed at her house, and his
24 name's similar. That's why I get them confused.

25        MR. CHONTOS: Thank you.

1        THE COURT:  Any recross?
2        MS. BLOCH:  No.
3        THE COURT:  May the witness be excused on behalf
4   of the Defendant?
5        MR. CHONTOS:  She can, Judge.
6        THE COURT:  Government?
7        MS. BLOCH:  Yes.
8        THE COURT:  You may step down, ma'am.  Be careful.
9   Any other evidence on behalf of the Defendant?
10       MR. CHONTOS:  The Defendant would now rest, Judge.
11       THE COURT:  Any rebuttal?
12       MS. BLOCH:  One moment, Your Honor, if I may.
13       (Brief pause.)
14       MS. BLOCH:  I have just a few questions, Your
15  Honor, so I would like to recall Trooper Troy Owen.
16       THE COURT:  You're still under oath.  You may take
17  the stand.
18                           - - -
19       TROOPER TROY OWEN, having been previously sworn,
20  testified as follows:
21                    DIRECT EXAMINATION
22  BY MS. BLOCH:
23   Q.  Trooper Owen, you testified earlier about the nature
24  of the waiting room at the Mercer barracks.  And I just want
25  to first just make clear what your recollection is.

T. OWEN - DIRECT

1      When you came out to meet with Mr. Warner and
2  escort him back to the office for the interview, do you
3  recall -- you indicated that you had no idea if his mother
4  was in the room.  Do you recall specifically at that time
5  whether she -- there was only one person or the waiting room
6  had multiple people in it?
7    A.   I don't recall specifically.
8    Q.   And I'm going to ask you this again in light of
9  Ms. Warner's testimony.  When you first met with Mr. Warner,
10 did he ask you if he needed a lawyer for this interview?
11   A.   No.  He did not.
12         MS. BLOCH:  I have no further questions.
13         THE COURT:  You may cross.
14                          - - -
15                    CROSS-EXAMINATION
16 BY MR. CHONTOS:
17   Q.   So Trooper, are you telling us that Miss Warner
18 wasn't in that room?
19   A.   That's not what I'm saying.  I'm saying I don't know
20 if there was other people in the room.  I don't have any
21 independent recollection today.
22         MR. CHONTOS:  Thank you.
23         THE COURT:  Any additional questions?
24         MR. CHONTOS:  No.
25         THE COURT:  You may step down, sir.  Any

1  additional evidence on behalf of the Government?
2          MS. BLOCH:  None, Your Honor.
3          THE COURT:  Defendant?
4          MR. CHONTOS:  No.
5          THE COURT:  Any objection to my closing the record
6  on behalf of the Government?
7          MS. BLOCH:  No objection.
8          THE COURT:  Defendant?
9          MR. CHONTOS:  You can close the record.
10         THE COURT:  Thank you.  I declare the record
11 closed.
12         MR. CHONTOS:  Judge, can we approach, just
13 counsel?
14         THE COURT:  Sure.
15                    - - -
16         (Sidebar conference as follows:)
17         THE COURT:  Yes, sir?
18         MR. CHONTOS:  Judge, thank you for the conference
19 at sidebar.  I recognize the reality that we're dealing
20 with, and that's really primarily driven from basically the
21 Court sua sponte just asking Miss Bloch yesterday after 35
22 minutes of cross-examination do you have any more questions?
23 I've been doing this long enough to know that that's a very
24 strong signal, and I'm not blind to that fact.
25         But what I would like the opportunity, as I

1  continue to advocate for my client, is the opportunity to
2  put pen to paper.  I know that it's a tough road to hoe.  I
3  see the writing on the wall.  But I still have a client to
4  serve.
5              Secondarily, on Tuesday, Miss Bloch and I had a
6  discussion about a way to resolve the case.  I communicated
7  that to my client.  It's just a little too quick for him to
8  grasp the reasonableness of that offer.  That's my spin on
9  the offer.  Not his yet.
10             So if we proceed down that normal trail, findings
11 of fact, conclusions of law, that may very well give us --
12 him and I an opportunity to discuss the merits and the
13 reasonableness of that offer.
14             So bottom line, what I'm asking is the Court to
15 just do this in a normal situation, allow us the opportunity
16 to have findings of fact, conclusions of law; and ultimately
17 it may very well contribute to a resolution that can save
18 all of us a lot of time, energy and effort.
19             THE COURT:  Well, as to your second point, as I
20 said yesterday, if you want to do findings of fact and
21 conclusions of law, that's fine.  I don't understand your
22 first comment.  I mean I often have situations where counsel
23 says they don't want to do findings of fact and conclusions
24 of law.  Sometimes I rule from the bench.  Sometimes I rule
25 later, next week or sometime.

1           But I don't understand your first point.  I
2  mean -- not everybody asks to do findings of fact and
3  conclusions of law, but I told you I'd give you that
4  opportunity.  That doesn't mean I've prejudged everything.
5  It was just I was trying to figure out from my schedule and
6  standpoint and, quite frankly, from the court reporter's
7  standpoint because if you want to do findings of fact and
8  conclusions of law, then she needs to prepare a transcript.
9  I need to ask her how long that will take.
10          If you're not going to do findings of fact and
11 conclusions of law, then her schedule doesn't impact
12 whenever I decide it.  So I'm just really trying to work
13 through her schedule and whether I needed to ask her a
14 question or not.
15          So I didn't indicate that I was prejudging
16 anything, but I certainly have had situations where I ruled
17 on suppression motions from the bench.  I've ruled on them
18 the following week without findings of fact.  I waited for
19 findings of fact.  So all three courses are my normal
20 practice based on whatever counsel wants.
21          MR. CHONTOS:  Very well.  Then I'm most
22 appreciative of this discussion, and I do want the
23 opportunity to put pen to paper.
24          THE COURT:  Okay.  Then I will ask the question
25 that I always ask is when the court reporter will have the

```
 1   transcript.
 2              (A discussion was held off the record, and sidebar
 3   proceedings were concluded.)
 4                            - - -
 5              (In open court:)
 6              THE COURT:  Any objection to the parties filing
 7   proposed findings of fact and conclusions of law on or
 8   before September 13, 2013?
 9              MR. CHONTOS:  Judge, that's fine with the
10   defense's schedule.
11              THE COURT:  Is that acceptable to the Government?
12              MS. BLOCH:  That is acceptable, Your Honor.  Thank
13   you.
14              THE COURT:  Anything else on behalf of the
15   Government?  Defendant?
16              MR. CHONTOS:  Judge, any likelihood that you could
17   suggest to the Marshals here that Mr. Warner get returned to
18   his place in Mercer if at all possible?
19              THE COURT:  I don't understand.
20              MS. BLOCH:  Pursuant to the writ, he will be --
21   he's been in Mercer County custody on pending charges in
22   Mercer County.  He will be returned because there's no
23   further scheduled proceeding.  I can't predict exactly when
24   the Marshals will return him --
25              THE MARSHAL:  We'll take him back today.
```

1       THE COURT: That means he's going back today. Is
2  that the question? People don't stay here overnight. So --
3  okay. All right. Everyone should remain seated, and the
4  Marshals may take the Defendant downstairs.
5       (Proceedings were concluded at 12:20 a.m.)
6                          - - -

17                    C E R T I F I C A T E

19       I, Deborah Rowe, certify that the foregoing
20  is a correct transcript from the record of proceedings in
21  the above-titled matter.

23  S/Deborah Rowe  _____
24  Certified Realtime Reporter