IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

       Plaintiff,

      vs.

EARL D. WARNER,

       Defendant.

Criminal Action

No. 12-107

_____

    Transcript of proceedings on January 22, 2014,
United States District Court, Pittsburgh, Pennsylvania,
before Arthur J. Schwab, District Judge

APPEARANCES:

For the Government:      Carolyn J. Bloch, Esq.

For the Defendant:      David B. Chontos, Esq.

Court Reporter:      Richard T. Ford, RMR, CRR
                     6260 U.S. Courthouse
                     Pittsburgh, PA  15219
                     (412) 261-0802

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1          (Proceedings held in open court; January 22, 2014.)

2          (Jury not present.)

3          THE COURT:  Good morning.  I wanted to have a

4  discussion outside of the presence of the jury.  We're in

5  Criminal No. 12-00107.  I would ask counsel for the Government

6  to enter your appearance, please.

7          MS. BLOCH:  On behalf of the United States, Carolyn

8  Bloch.

9          THE COURT:  Good morning.  On behalf of the

10  Defendant?

11          MR. CHONTOS:  Good morning, Judge, David Chontos on

12  behalf of Mr. Warner.

13          THE COURT:  Defendant is here, correct?

14          MR. CHONTOS:  He is, seated to my right.

15          THE COURT:  I want to talk about the cautionary

16  jury instruction relating to the viewing of the child

17  pornography evidence.  A suggested cautionary jury instruction

18  is set forth in Document No. 91 at Pages 44 -- excuse me, 43

19  and 44 dealing with cautionary jury instruction to be given

20  prior to viewing child pornography evidence and one to be

21  given following the evidence.

22          We have had several discussions, I think at least

23  on two occasions, and on both of those occasions counsel for

24  the Defendant has said that the trial strategy of the

25  Defendant and defense counsel is that they do not wish to have

1   this cautionary jury instruction given.

2          Is that a fair summary?

3          MR. CHONTOS:  It is, Judge.

4          THE COURT:  I just want to put a colloquy on the

5   record to make sure that Defendant personally has been a part

6   of that discussion with defense counsel and endorses that

7   decision, if not being the author of that decision.

8          So, sir, would you stand and be sworn, please.

9          (Defendant duly sworn.)

10         THE COURT:  All right.  Now, while I initially

11  thought that the instruction needed to be given regardless of

12  the Defendant's view of whether it should be given or not, we

13  have concluded, based on the work yesterday afternoon and

14  night, that this is a right of the Defendant and he has the

15  right to waive the cautionary jury instruction if he wishes.

16         I have encouraged the Defendant and his counsel to

17  have the instruction given, but in light of their collective

18  continued desire not to have the instruction given, I believe

19  that that can be waived by the Defendant.

20         So I have a few questions of you, sir.  First of

21  all, is it still your desire to not have the cautionary jury

22  instruction given relating to the child pornography evidence?

23         THE DEFENDANT:  I will do what my lawyer wants me

24  to do.

25         THE COURT:  Well, I understand that, but I want to

1    make sure this is your decision that you -- have you had

2    adequate time to discuss this matter with your counsel?

3              THE DEFENDANT:  He has discussed it with me, but I

4    don't completely understand it to be honest with you.  I don't

5    understand a lot of this stuff.

6              THE COURT:  Well, I want you to take some time,

7    again, because this is the third time we have had this

8    discussion.  Talk to him now off the record and I want to hear

9    from you if it's true that it is your decision that the

10   cautionary instruction relating to child pornography not be

11   given.  Okay?  So will you have that discussion with him.  But

12   I want to make sure I have an informed and knowledgeable

13   waiver of the giving of that instruction.

14         (Defendant and his counsel confer off the record.)

15              THE COURT:  Sir, have you had adequate time to

16   discuss the matter with your attorney?

17              THE DEFENDANT:  Yes, sir, I have.

18              THE COURT:  Okay.  Do you --

19              THE DEFENDANT:  He broke it down to me and

20   explained it a different way to me this time, a way that I

21   understood it a little better.

22              THE COURT:  So do you understand the issue?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  Do you waive your right to have that

25   instruction given?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Do you need any additional time to

3    discuss the matter with your attorney?

4          THE DEFENDANT:  No, I do not.

5          THE COURT:  Anything else that counsel for the

6    Government believes we should put on the record?

7          MS. BLOCH:  Your Honor, if the Court would just be

8    so kind as to actually read what the cautionary instruction

9    would be that Mr. Warner is now agreeing to forgo.

10          THE COURT:  I have already given a copy of those

11   two instructions to the Defendant.  He has them before him.

12   They are Document No. 91, Page 43 and 44.  Have you had an

13   opportunity to review those pages, sir?

14          THE DEFENDANT:  I don't know.

15          THE COURT:  Okay.  Well, you should have a copy in

16   front of you.  Do you have it in front of you now, sir?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  If you would take a few minutes and

19   read them over, those two instructions, one to be given prior

20   to the viewing of child pornography evidence and one to be

21   given following the evidence.  Those are the actual words that

22   we would be giving but for your waiver.

23          (Pause in proceedings.)

24          THE COURT:  Sir, have you had adequate time to read

25   the actual language of the cautionary jury instructions

1   relating to prior to viewing child pornography evidence and

2   then following that evidence?

3           THE DEFENDANT:  Yes, sir.

4           THE COURT:  Do you still maintain that you do not

5   wish to have those instructions given?

6           THE DEFENDANT:  I don't want this No. 2, the words,

7   "felony evidence," but I definitely want this one at the final

8   instructions.

9           MR. CHONTOS:  Judge, if I may.  He doesn't want the

10  sandwich created today.

11          THE COURT:  Well, we need to make a good record

12  here, so "sandwich" doesn't help me get a good record.  In

13  Philadelphia they sometimes have different sandwiches than we

14  have here in the Western District.

15          MR. CHONTOS:  Judge, at docket 91 --

16          THE COURT:  Let me do it.  Sir, it is my

17  understanding that you wish the instruction at 23.1 and 23.2

18  on document 91, Pages 43 and 44, not be given, correct?

19          (Defendant and his counsel confer off the record.)

20          THE COURT:  Correct, sir?

21          THE DEFENDANT:  Give my one second, please, sir.

22          THE COURT:  Sure.

23          (Defendant and his counsel confer off the record.)

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  On the other hand, though, you do want

1    included in the final jury instructions Roman numeral 3 on

2    Page 44 of Document No. 91, correct?

3                    THE DEFENDANT:  Yes, sir.

4                    THE COURT:  All right.  Do you need any more time

5    to discuss this important matter with your counsel?

6                    THE DEFENDANT:  No, I trust my attorney, and sorry

7    it took me so long, I am slow reading.

8                    THE COURT:  There's no rush, this is an important

9    matter.

10                   The Court has had the Defendant before the Court

11   several times, including today.  I have been able to watch him

12   interchange with his attorney during the jury selection

13   process and able to watch him during this particular colloquy.

14   I believe by the words he said, but also by his demeanor and

15   interaction with his counsel, that he is making a voluntary

16   and informed decision to waive his right to the cautionary

17   jury instruction relating to being given prior to the viewing

18   of child pornography evidence and following the viewing of the

19   child pornography evidence during trial.

20                   So the only instruction that will be given relating

21   thereto will be the final jury instruction, Roman numeral 3 at

22   Document No. 91, Page 44.

23                   Anything else on the record before we bring in the

24   jury?

25                   MS. BLOCH:  Nothing else, Your Honor, thank you.

1           MR. CHONTOS:  No, Judge.

2           THE COURT:  Okay.

3       (Recess taken.)

4       (After recess; jury present in open court.)

5           THE COURT:  Ladies and gentlemen, thank you for

6   being here and being here on time.  I hope you had a good

7   night's rest.  And we will put in a fairly full day today, so

8   you can be prepared for that.  But I thank you for being here

9   and putting up with the very cold weather that's out there.

10          I do have, as I mentioned yesterday, a Board of

11  Judges meeting at 12:30, so we will break a little before

12  12:30 for lunch and we will resume around 1:30.  If the

13  meeting goes longer, you will be my excuse to leave.

14          We didn't deal with the issue of sequestration of

15  witnesses.  Do you -- why don't the two of you, counsel, why

16  don't you talk and see if you can reach agreement as to

17  whether you want the witnesses sequestered or not.

18      (Counsel confer off the record.)

19          MS. BLOCH:  The parties agree to sequestration of

20  witnesses.

21          THE COURT:  I will order the witnesses be

22  sequestered.  Since I don't know who the witnesses are, it is

23  counsel's responsibility to make sure that that order is

24  enforced, and I will so order.

25          Ladies and gentlemen, that's so that witnesses that

Carter - Direct

1   may go on the stand don't sit here during other people's

2   testimony.  So that's the purpose of the sequestration.

3          Yes, you may call your first witness in the

4   Government's case in chief.

5          MS. BLOCH:  Government calls Special Agent Thomas

6   Carter.

7          THOMAS CARTER, a witness herein, having been first

8   duly sworn, was examined and testified as follows:

9          THE WITNESS:  Thomas N. Carter, C-A-R-T-E-R.

10                     DIRECT EXAMINATION

11  BY MS. BLOCH:

12  Q.   If you could please state your name and tell the jurors

13  what your occupation is.

14  A.   Thomas Carter, I am special agent with the FBI.

15  Q.   Agent Carter, how long have you been working as an FBI

16  agent?

17  A.   Approximately 23 years.

18  Q.   Are you assigned to the Pittsburgh office of the FBI?

19  A.   I am.

20  Q.   Do you work from a smaller satellite office on a

21  day-to-day basis?

22  A.   Yes, there's two of us assigned to the North Pittsburgh

23  resident agency located in Cranberry Township.

24  Q.   Does that cause you then to tend to investigate cases

25  which are north of the city?

Carter - Direct

1    A.    Yes.

2    Q.    I take it Mercer, Pennsylvania, is north of Pittsburgh?

3    A.    Yes, it's one of the counties that we cover.

4    Q.    In terms of the kind -- if you could just describe the

5    kinds of investigations you have undertaken during your career

6    and what in the last five to ten years has been your mainstay

7    of cases.

8    A.    I have been primarily violent crime, I work gangs,

9    drugs, homicides.  I was assigned to City of Pittsburgh

10   homicide for five years.  When I got assigned to the resident

11   agency for North Pittsburgh, I have been assigned a lot of

12   child pornography cases.

13   Q.    For how long would you say you have been dealing with

14   cases involving child exploitation?

15   A.    Since 2005.

16   Q.    Did you serve from its inception as the lead

17   investigator on the investigation of the Defendant, Earl

18   Warner?

19   A.    Yes, I did.

20   Q.    Prior to that did you serve as the lead investigator on

21   a related case by the name of Armando Cruz?

22   A.    Yes.

23   Q.    If you could, just describe for the jurors a little bit

24   how your investigation was initiated regarding Mr. Cruz.

25   A.    The FBI in San Diego, California, an agent reached out

Carter - Direct

1    to me and advised me that there was an individual from

2    San Diego in the military.  He was going to Mercer,

3    Pennsylvania, and staying with an individual named Armando

4    Cruz.  The Armando Cruz investigation then started.

5            San Diego sent some images of young girls clothed

6    and then these images also had some images of these young

7    girls nude.  What I did was take these images clothed, got the

8    state police in the local area of Mercer, went to the state

9    police barracks, and then the state trooper who was actually a

10   soccer coach at the middle school, we had this trooper go to

11   the middle school and sit with school officials and he

12   identified through the yearbook who these young girls were.

13   Q.    Approximately was this in and around December of 2012?

14   A.    Yes.

15   Q.    At this point I take it none of the images of the young

16   female children were familiar to you?

17   A.    No.

18   Q.    For purposes of this trial and your testimony here

19   today I ask that you only speak about the children using their

20   first names.

21           Who did you learn, through the assistance of the

22   Pennsylvania State Police and the school personnel, were the

23   children that they could identify that were depicted?

24   A.    It was Faith, Margie, Harley.  Those were the three

25   main ones.  Also Bri -- Brianna.  And those were the three

72

Carter - Direct

1    main -- four main girls in the pictures.  There was also two

2    younger ones, Faith's younger sisters.

3        Q.    And Bri, the person you're speaking about, do you know

4    who Bri is today?

5        A.    Yes.

6        Q.    Who is that?

7        A.    It's Brianna Warner, it's the Defendant's daughter.

8        Q.    Did you have the opportunity, once the various victims

9    were identified, to ask questions of the young females

10   depicted regarding specifically Mr. Cruz?

11       A.    Yes.  I made liaison with Children and Youth Services

12   in Mercer County.  Children and Youth Services investigator

13   and I went to the school and we interviewed the girls at the

14   school with the school personnel there.

15       Q.    When you say "Children and Youth Services," is the

16   person that accompanied you somebody who's job it is to deal

17   with the safety and well-being of children in the county?

18       A.    Yes, it was a caseworker from Children and Youth

19   Services.

20       Q.    The interviews that you undertook of these children,

21   were they on some level probative in regards to the

22   investigation that you had initiated of Mr. Cruz?

23       A.    Yes.  The purpose was to identify the girls and to find

24   out what was going on at the Cruz residence.

25       Q.    Did you thereafter, with the assistance of the

Carter - Direct

1  Pennsylvania State Police, document all the evidence that you

2  gathered in the form of a search warrant affidavit and present

3  that to a federal magistrate for the search of Mr. Cruz's

4  residence?

5  A.   Yes.

6  Q.   Did he live in a house, in an apartment, if you could

7  just describe where he lived?

8  A.   He lived in a brick row house.  It was approximately

9  three apartments attached together.  It was in the City of

10  Mercer.

11  Q.   How far, in terms of distance, was his home from what

12  you later learned to be Mr. Warner's home?

13  A.   Approximately two to three miles away.

14  Q.   On February 15th of 2012, the search warrant that we

15  are speaking about, was that the date on which you and the

16  Pennsylvania State Police executed the warrant at the

17  residence?

18  A.   At Mr. Cruz's residence, yes.

19  Q.   When you first arrived and initiated this search, was

20  Mr. Cruz present?

21  A.   No, he was not.

22  Q.   At some point in time during the course of your search

23  did he return home?

24  A.   The search was concluded.  We did the search in the

25  morning.  Mr. Cruz I later learned was at work.  He was at

Carter - Direct

1    work and he returned after his workday was complete.

2    Q.    Before you had in person contact with Mr. Cruz that

3    day, did you in fact actually have contact with the Defendant,

4    Earl Warner, on February 15th?

5    A.    Yes.

6    Q.    Did you have an opportunity to speak to Mr. Warner?

7    A.    I did.

8    Q.    Where did that conversation occur?

9    A.    Myself and a detective went to Mr. Warner's apartment,

10   336 Brandy Springs Apartments.  We knocked on the door.  He

11   was there.  We went into the residence.  He invited us in.

12   And we talked to him primarily about Mr. Cruz and his

13   daughter.

14   Q.    "His" being Mr. Cruz's daughter or Mr. Warner's

15   daughter?

16   A.    Mr. Warner's daughter, Brianna.

17   Q.    What prompted you to reach out to Mr. Warner and go to

18   his home that day?

19   A.    In the interview with some of the girls also there was

20   some allegations made against Mr. Warner at that time prior to

21   going -- during the search, during the gathering of evidence

22   at Mr. Cruz's, there was some evidence that was learned from

23   the girls that Mr. Warner was also engaged in the same

24   activity, and that's taking pictures of girls.

25   Q.    At that point in time you didn't have any physical

Carter - Direct

1    images that were alleged to have been taken by Mr. Warner?

2    A.    No.

3    Q.    So you indicated you went inside Mr. Warner's home.

4    Did you sit somewhere within the home to conduct this short

5    interview or conversation?

6    A.    Yes, at his dining room table.

7    Q.    At any point in time during your presence within his

8    home did you have the opportunity to look around?  Is it two

9    stories?

10   A.    Yes, two stories.  I did not go to the second story.

11   It is a small apartment.  We were on the first floor.

12   Q.    If you can recall, what did you tell Mr. Warner was the

13   purpose of your visit?

14   A.    That we were there to discuss Mr. Cruz and actually I

15   was trying to find out where Mr. Cruz was.

16   Q.    Was this in the middle of the day?

17   A.    Yes.  The search ended around 12 noon at Mr. Cruz's

18   residence.  Then we went to Mr. Warner's residence right

19   after.

20   Q.    To the best of your knowledge at that point in time was

21   Mr. Warner a working individual?

22   A.    He was not.

23   Q.    Why don't you indicate how the conversation started.

24   Did you discuss right out of the gate the purpose of your

25   visit to Mr. Warner's home?

Carter - Direct

1    A.   Yes, it was to learn background of Mr. Warner, to learn

2  of where Mr. Cruz was.

3    Q.   Did Mr. Warner acknowledge that he in fact knew

4  Mr. Cruz?

5    A.   Yes, he said they were friends, they played video games

6  together on Mr. Cruz's computer at his residence.  He told me

7  that they had gone swimming with the kids and they took --

8  Mr. Warner and Mr. Cruz took the girls swimming.  Mr. Warner

9  told me that Mr. Cruz always had a camera with him and that

10 Mr. Cruz would take pictures while Mr. Warner was there also.

11   Q.   Let's just clarify so that it's clear on the record.

12 When you say "took the girls," which girls are you referring

13 to?

14   A.   Faith, Margie, Harley, and then Mr. Warner advised that

15 there was another girl there that he didn't know who it was.

16   Q.   Did he acknowledge then that he was familiar with this

17 group of girls as being a group of friends?

18   A.   Yes.

19   Q.   Did they have some relationship with his daughter?

20   A.   They were all friends with his daughter, Brianna.

21   Q.   Was she approximately 11 years old at the time?

22   A.   Yes.

23   Q.   What were the ages of the girls we are speaking about?

24   A.   They were all under 12 also.  12, 11, and one was 10 I

25 believe.

Carter - Direct

1   Q.   Did he indicate how much time he was spending with this
2   group of girls?

3   A.   They would come over regularly to his house.

4   Q.   Did you talk to him at all about whether or not he had
5   seen images of naked girls on Cruz's computer?

6   A.   Yes.  He said he did not.

7   Q.   What about a camera, did you speak to Mr. Warner about
8   whether or not he had ever seen Mr. Cruz with images of naked
9   girls on his camera?

10  A.   Can I refer to my report?

11  Q.   Sure.

12  A.   Mr. Warner asked regarding his daughter, whether there
13  was any images.  I advised him I didn't know whether there
14  were any images -- I told him that at the time.

15       As far as other images, Mr. Warner said Mr. Cruz
16  always had a camera.

17  Q.   Early in your report did you indicate, when you posed
18  questions to him as to whether or not there were images that
19  he had seen on his computer or camera, did he give you a
20  response?

21  A.   He said he did not recall ever seeing any nude
22  photographs of any young girls on Cruz's computer or Cruz's
23  camera.

24  Q.   Or Cruz's camera, okay, thank you.

25       Did he indicate when he last spent time with his

Carter - Direct

1    friend, Mr. Cruz?

2    A.    The previous evening, on February 14th, yes.

3    Q.    Did he indicate when he was at his house?

4    A.    He stated that he was there between 5 o'clock -- he

5    stated he came first at 5 o'clock, then he returned at

6    7 o'clock and left at 10 o'clock.

7    Q.    So he was there at 5, left, came back, and then stayed?

8    A.    Yes.

9    Q.    Did he indicate, was he there for the purpose of

10   playing computer games?

11   A.    Yes.

12   Q.    I am going to jump ahead a little bit and ask you if at

13   some point in the late part of March of 2012 Mr. Cruz

14   ultimately decided to enter a guilty plea to charges brought

15   federally?

16   A.    Yes.

17   Q.    Did he similarly agree to cooperate in your

18   investigation of Mr. Warner and other persons involved in this

19   activity?

20   A.    Yes, he did.

21   Q.    Did you have the opportunity to interview him?

22   A.    Yes.  On March 26th I interviewed Mr. Cruz, along

23   with his counsel, here at the US Attorney's office.

24   Q.    Were you directed by Mr. Cruz to retrieve two disks,

25   computer disks?

79

Carter - Direct

```
 1    A.    Yes.   During that interview Mr. Cruz indicated that
 2   Mr. Warner had been taking nude photographs of Faith, Harley,
 3   and Margie.  He said that he was concerned that Mr. Warner was
 4   going to tell the police, so, therefore, he went over to
 5   Mr. Warner's house, brought his thumb drive with him, put it
 6   in Mr. Warner's laptop computer, and then downloaded images
 7   from Mr. Warner's computer onto his thumb drive.  Mr. Cruz
 8   then said he went back to his residence and produced two DVDs
 9   of these images that he took from Mr. Warner's computer.
10    Q.    I am going to just stop you for a second.  You
11   indicated he said he was afraid Warner would tell.  Tell whom
12   what?
13    A.    That he was afraid that -- Cruz advised that he was
14   afraid he was going to tell the police about taking images of
15   children, the girls.
16    Q.    Cruz was taking, that he was afraid he would turn him
17   in?
18    A.    Yes.
19    Q.    All right.
20    A.    Upon him producing these two CDs from Mr. Warner's
21   computer, he said he took them to his work place and secreted
22   them in the rafters of his work place, which is called
23   Richardson Cooling, where he worked.
24          I went to Richardson Cooling on March 28th and I
25   went to exactly the place where he told me they would be and I
```

Carter - Direct

1    found two CDs located behind a beam, a metal beam in the back

2    of the warehouse where he worked in the warehouse, exactly

3    where he told me they would be.

4      Q.    I am going to show you what's been identified as

5    Government's Exhibit 20.1 and 21.1.  If you could take a look

6    at the contents of this envelope.

7      A.    These are the CDs that I retrieved from Richardson

8    Cooling on March 28th, 2012.

9      Q.    How do you recognize those two disks as such?

10     A.    I marked them and I dated them and I put my initials on

11   the bottom of each one, TC, on the bottom of each DVD here.

12     Q.    At the time you retrieved them, were they in these hard

13   plastic cases?

14     A.    No, actually I removed them from a white sleeve, the

15   sleeves were pretty torn up and beat up, so I put them in the

16   hard cases to preserve them so they wouldn't get damaged.

17     Q.    At some point in time shortly after that did you make

18   working copies of these particular disks so you could preserve

19   the originals?

20     A.    I did.

21     Q.    What did you do with the originals thereafter?

22     A.    I entered them into evidence in this evidence bag, I

23   entered them in the FBI evidence room in Pittsburgh,

24   Pennsylvania.

25     Q.    Did you at some point in and around the retrieval of

Carter - Direct

1   these disks look at the full contents of each of the two

2   disks?

3       A.   I did.

4       Q.   Generally speaking, what did you observe contained on

5   these disks?

6       A.   I observed images of child pornography of Faith,

7   Margie, and Harley.  And also of Brianna.

8       Q.   Were you able to recognize these females from the

9   images you had previously obtained in the Cruz investigation?

10      A.   Yes.  And also I was able to determine, since I had

11  been in Mr. Warner's residence, I was able to determine from

12  the background that these pictures were taken in Mr. Warner's

13  apartment.

14      Q.   There were a few videos as well contained on one or

15  both of those disks?

16      A.   Yes.

17      Q.   Did you view those as well?

18      A.   Yes, I did.

19      Q.   There was one particular video, was there not, that had

20  audio as well, you could hear the photographer who was filming

21  the video's voice?

22      A.   Yes, a portion of it was played yesterday in the

23  opening.

24      Q.   Having spoken to Mr. Warner earlier, did you recognize

25  the voice that you heard on that particular --

Carter - Direct

1    A.    Immediately I recognized Mr. Warner's voice.  I

2    interviewed Mr. Warner at his residence.  Upon hearing that

3    video and hearing his voice, immediately it was recognized as

4    Mr. Warner.

5    Q.    So did you then together with, again, the assistance of

6    the Pennsylvania State Police work on putting together a

7    search warrant affidavit for Mr. Warner's residence?

8    A.    Yes.

9    Q.    Prior to actually obtaining that warrant and executing

10   that warrant did you have an opportunity to actually interview

11   Mr. Warner on April 3rd of 2012 at the barracks in Mercer

12   County?

13   A.    Yes.  On April 3rd, 2012, myself and Pennsylvania

14   State Trooper Troy Owen interviewed Mr. Warner at the state

15   police barracks.

16   Q.    I am going to move actually past that interview to the

17   actual search and discuss with you the contents of that

18   interview a little bit later.

19        In addition to reviewing the contents of the two

20   disks you have spoken about, did you also provide the contents

21   to Corporal Pearson of the Pennsylvania State Police for his

22   analysis as well?

23   A.    Yes, Corporal Pearson is the forensic computer examiner

24   for the state police.  We use him exclusively.  I gave copies

25   of these original CDs from Mr. Warner's computer to Corporal

Carter - Direct

1   Pearson for his review also.

2   Q.    All right.  Like I said, I am going to jump ahead to

3   the actual search.  Did you conduct a search of Mr. Warner's

4   home on April 9th of 2012?

5   A.    Yes, I did.

6   Q.    Was Mr. Warner home at the time you arrived to conduct

7   the search?

8   A.    No, he was not.

9   Q.    Did he too at some point either during the execution of

10  the search or at the conclusion of the search return home?

11  A.    The search was ongoing and the state police and

12  detective brought back Mr. Warner from his mother's residence

13  to his residence at 336 Brandy Springs.

14  Q.    Let's talk a little bit about the various items that

15  were seized from the home.  You and your fellow agents

16  conducting the search keep track of what you retrieve for

17  purposes of placing those items into evidence and for purposes

18  of court, is that correct?

19  A.    Yes.

20  Q.    Let's talk first about whether or not you found any

21  computers inside Mr. Warner's home.

22  A.    We did.

23  Q.    Why don't you describe those computers and indicate

24  where you found them?

25  A.    A Dell laptop computer was found, it was found in his

Carter - Direct

1   daughter's bedroom, I believe it was his daughter's bedroom.

2           Then there was a -- it was a desktop tower

3   computer, HP Media, that was found in the storage room as you

4   first walk into the residence.  Both the desktop and the

5   laptop, the hard drives had been removed, there were no hard

6   drives in the computer.

7   Q.   Did you find an Acer laptop computer?

8   A.   No, I did not.

9   Q.   Did you in fact find an Acer laptop box?

10  A.   Yes.

11  Q.   I am going to show you what's identified as

12  Government's Exhibit 15.1 and ask you if this is the Acer box

13  you found on that date?

14  A.   It is.

15  Q.   Do you recall exactly where this box was found within

16  Mr. Warner's home?

17  A.   Yes, it was found in the dining room near the hutch in

18  the dining room, near the table and the hutch in the dining

19  room.

20  Q.   Was it on top of the cabinet, below, beside the

21  cabinet?

22  A.   It was beside it.

23  Q.   Are there contents within this box that were discovered

24  at the time of the search?

25  A.   Yes.  There's an owner's manual, an instruction manual.

Carter - Direct

1    Q.    We have that marked and identified as 16.1, is that

2    correct?

3    A.    Yes.

4    Q.    All right.

5    A.    Also a power cord and pictures of the laptop.

6    Q.    Is this exactly how you found it on that date?

7    A.    Yes, it is.

8    Q.    Inside the manual is there also a picture of the laptop

9    that was at some point contained within the box?

10   A.    Yes, there is.

11   Q.    Do we have that marked as well as Exhibit 17.1?

12   A.    17.1, yes.

13   Q.    I would like you to just take a look at the outside of

14   that Acer box.  There is a lot of labeling from the

15   manufacturer, correct?

16   A.    Yes.

17   Q.    Is there anywhere on the outside of the box where it

18   indicates where the particular computer was manufactured?

19   A.    Yes, it states it's made in China, manufactured in

20   2011.

21   Q.    Now I would like to show you what's been marked and

22   identified as Exhibit No. 22.  Is this a certificate of

23   authenticity together with the business record provided to you

24   in connection with your investigation from Acer Corporation?

25   A.    Yes, it is.

Carter - Direct

1          MS. BLOCH:  Your Honor, the Government moves for

2   the admission of Exhibits 15.1, 16.1, 17.1, and 22.

3          THE COURT:  Haven't I ruled on all the exhibits

4   except two?

5          MS. BLOCH:  I didn't understand that your pretrial

6   ruling was one in the same, but I will presume that --

7          THE COURT:  Let's do it differently.  Yes.

8          MR. CHONTOS:  Judge, Ms. Bloch's numbering, did

9   that include that last document that the agent has, that

10   business record?

11          MS. BLOCH:  Yes, that is 22.

12          MR. CHONTOS:  Okay, fine.  Judge, I don't have any

13   objection other than 22, and I made my objection to 22

14   earlier.

15          THE COURT:  Why don't we do this.  Why don't you

16   move into evidence all of the exhibits that I have already

17   pre-ruled upon.

18          MS. BLOCH:  Certainly, Your Honor.  At this stage I

19   will move --

20          THE COURT:  Is there an exhibit list in the front

21   of the book here?

22          MS. BLOCH:  I don't believe it actually is in the

23   front, but I can provide the Court with another one, but I do

24   believe you have -- is that a current one?

25          THE COURT:  I don't know whether it is the current

Carter - Direct

1   one or not.  There is no date on it.

2        MS. BLOCH:  The last exhibit is No. 26.

3        THE COURT:  The list that I have ends with

4   Government Exhibit No. 21.1.

5        MS. BLOCH:  Bear with me for one minute.

6        May I proceed?

7        THE COURT:  Sure.  Why don't you move the exhibits

8   since that's why I pre-ruled on them.  Any objections will be

9   preserved.

10        MS. BLOCH:  All right.  The Government moves for

11  the admission of Exhibits 1.1, inclusive of the A exhibits,

12  through -- first through Exhibit 9.24, all of which are

13  images.

14        THE COURT:  I will admit those into evidence.

15  Again, if there were any objections, they will be preserved

16  and overruled.

17        You may continue.

18        MS. BLOCH:  The Government moves for the admission

19  of Exhibits 10.1 through 10.3.

20        The Government moves for the admission of Exhibits

21  12.1 through 21.1.

22        THE COURT:  They will be admitted into evidence.

23  If there is any prior objection made, those objections will be

24  preserved.

25        MS. BLOCH:  And, lastly, Your Honor, the Government

Carter - Direct

1    moves for the admission of Exhibits 22 through 26.

2              MR. CHONTOS:  Judge, our objection would be 22, 24,

3    and 26, and that's been prior put in writing, our objection

4    has.

5              THE COURT:  I will overrule the objections and 22,

6    23, 24, 25, and 26 will come into evidence with the objections

7    preserved.

8              MS. BLOCH:  Thank you, Your Honor.

9              THE COURT:  That brings us to the box, correct?

10             MR. CHONTOS:  The box, yes.

11             THE COURT:  So are we putting a number on the box?

12             MS. BLOCH:  The box does have a number, Your Honor.

13             THE COURT:  What's the number on the box, please?

14             MS. BLOCH:  The box is 15 --

15             THE WITNESS:  15.1.

16             MS. BLOCH:  15.1.

17             THE COURT:  You are having a picture admitted into

18   evidence in place of the box itself, correct?

19             MS. BLOCH:  Pursuant to the Court's request, yes.

20             MR. CHONTOS:  Judge, the contents of the box are 16

21   and 17.

22             THE COURT:  I understand.  The reference to the

23   place of manufacture, is that showing up in 15.1?

24             MS. BLOCH:  Give me one moment, I will have to

25   check.

Carter - Direct

1          THE COURT:  I don't see it, but it may be.

2          MS. BLOCH:  I think it may not actually,

3    Your Honor.  No, it's not.  It was on the side.

4          THE COURT:  Okay.  Then I would ask that you create

5    another exhibit with an image, since there is a reference to

6    it in testimony, and you can make that 15.2.

7          MS. BLOCH:  All right.  Certainly, Your Honor.

8          THE COURT:  Any objection to --

9          MR. CHONTOS:  No.

10         THE COURT:  It will be admitted without objection.

11         So now we don't need to identify or move any

12   additional exhibits into evidence since they are all already

13   admitted into evidence.  If I may suggest, once you add 15.2,

14   if you could then file the exhibit list on the ECF system.

15         MS. BLOCH:  You may find, Your Honor, as well that

16   when he speaks about what is the SanDisk memory cards, those

17   two indicate that they are made in China, we have in fact

18   attempted to photograph that, it's just very hard to see

19   because it is imprints.

20         THE COURT:  Again, if he refers to it, then I think

21   you need to do your best to mark it as .2 and add it to the

22   exhibit list.  Whenever you are done with your Plaintiff's

23   case in chief and we have all the exhibits, if you would file

24   the exhibit list on ECF, I would appreciate it.

25         MS. BLOCH:  Certainly, Your Honor.

Carter - Direct

1           THE COURT:  Acceptable?

2           MS. BLOCH:  Acceptable.

3    BY MS. BLOCH:

4     Q.   All right.  So, all that being said, I want to direct

5    you to the document before you, the certificate from Acer

6    Computer Company.  If you could please first read the actual

7    certificate of authenticity that's been completed by an Acer

8    Corporation employee.

9           MR. CHONTOS:  Judge, is this necessary for this

10   witness to read a document when the jury is going to get it?

11          THE COURT:  It is a short document, isn't it?

12          MS. BLOCH:  Yes.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  I overrule the objection.  Just read it

15   slowly.  We sometimes speak faster when we are reading.

16          THE WITNESS:  "Certificate of authenticity of

17   domestic business records pursuant to Federal Rule of Evidence

18   902(11).

19          "I, Yvonne Gerlach, G-E-R-L-A-C-H, attest under

20   penalties of perjury, or criminal punishment for false

21   statement or false attestation, that I am employed by the Acer

22   America Corporation and that my official title is legal

23   assistant.

24          "I am a custodian of records for such business

25   entity.  I state that each of the records attached hereto is

Carter - Direct

1    the original record or a true duplicate of the original record

2    in the custody of Acer America Corporation and that I am the

3    custodian of the attached records consisting of one page.

4            "I further state that all records attached to this

5    certificate were made at or near the time of the occurrence of

6    the matter set forth by or from information transmitted by a

7    person with knowledge of those matters.

8            "Such records were kept in the course of a

9    regularly conducted business activity of Acer America

10   Corporation.

11           "And such records were made by Acer America

12   Corporation as a regular practice.

13           "I further state that this certificate -- that this

14   certification is intended to satisfy Rule 902(11) of the

15   Federal Rules of Evidence."

16           Dated 1/6/2014, and it appears to be signed by

17   Yvonne Gerlach.

18   Q.    Let's look at the spelling of her name where it is

19   actually printed, it may be easier for you to read, is that

20   G-E-R-L-A-C-H, Gerlach?

21   A.    Yes, G-E-R-L-A-C-H, yes.

22   Q.    So she signs the certificate and attached to it is a

23   business record from Acer Corporation, correct?

24   A.    Yes.

25   Q.    On it does it indicate that the Acer laptop computer

Carter - Direct

1   with the serial number and product number that appears at the

2   top, that it was manufactured or originated in China?

3          MR. CHONTOS:  Objection, Judge, 403.  It should be

4   excluded.  They are going to have the document.  It speaks for

5   itself.  We don't need comment on it.

6          THE COURT:  Overruled.

7          THE WITNESS:  Yes, it does.  It says it's made in

8   China.  Origin, China.

9   BY MS. BLOCH:

10   Q.   At the very top underneath the serial number and

11   product number there's an indication that there was no history

12   on the particular unit, that it was not registered.  Do you

13   know what that means?

14   A.   Yes, it means it cannot be determined who bought it and

15   where it was purchased from, but it did travel in interstate

16   and foreign commerce, being origin of China.

17          MR. CHONTOS:  Objection, Judge, move to strike.  He

18   is offering an opinion on a document.

19          THE COURT:  Sustained.

20          MR. CHONTOS:  Will the record be stricken?

21          THE COURT:  Yes.  I sustain the objection and it

22   will be stricken.

23          MR. CHONTOS:  Thank you.

24   BY MS. BLOCH:

25   Q.   I would like to move to some of the other items that

Carter - Direct

1   you seized from the search starting with this exhibit.  Can

2   you identify what is contained in those particular bags?

3       A.    Yes.  This is the camera that I removed from

4   Mr. Warner's residence, the Canon PowerShot SX120.

5                This is the SanDisk eight gigabyte memory card that

6   I removed from the coffee table from Mr. Warner's.  And the

7   camera has a four gigabyte SanDisk inside the camera, memory

8   disk.

9       Q.    When you seized these items, where were they -- were

10  they similar -- the contents of those memory cards, those are

11  sort of memory cards to store photographs, am I correct?

12      A.    Yes.

13      Q.    Can they store videos as well?

14      A.    Yes.

15      Q.    This particular digital camera uses a memory card to

16  function?

17      A.    That's correct.

18      Q.    Did you yourself examine the contents of these at any

19  time?

20      A.    Yes.

21      Q.    Did you submit these as well to Corporal Pearson for

22  his analysis?

23      A.    Corporal Pearson from the state police, yes.

24      Q.    I may have missed this and I apologize, Agent Carter.

25  Where is it exactly that the Canon PowerShot camera was

Carter - Direct

1   located when you seized it from the Defendant's home?

2   A.    The Canon PowerShot SX120 was found on the desk in the

3   living room.  The memory card was found on the table in the

4   living room.

5              THE COURT:  Do you want to put on the record the

6   exhibit number of each of those items sometime in your

7   examination, please.

8   BY MS. BLOCH:

9   Q.    You are welcome to do so now.

10   A.    The memory card, eight gigabyte, 14.1, 14.2.

11              The camera, 12.1, 12.3.

12   Q.    Through 12.3?

13   A.    Yes.

14              Then the memory card inside the camera, 13.1 and

15   13.2.

16   Q.    I am going to show you now Exhibit 18.1.  What is 18.1?

17   A.    18.1 is a Steeler dress outfit.

18   Q.    Is this a child's dress?

19   A.    Yes.

20   Q.    Where did you find this within Mr. Warner's home?

21   A.    I found this in the -- in Mr. Warner daughter's

22   Brianna's bedroom at the foot of the bed in a pile of clothes.

23   Q.    Why is it that you seized this particular outfit?

24   A.    Because this particular outfit is worn by the child

25   Faith in a sequence of photographs depicting her nude.

Carter - Direct

1    Q.    Had you already seen that series of photographs on the

2    two disks you obtained via Mr. Cruz prior to the search?

3    A.    Yes, I did.

4    Q.    Now I am going to show you Exhibit No. 19.1.  What is

5    19.1?

6    A.    19.1 is a Verizon Wireless cell phone bill with the

7    address of Earl Warner, 336 Brandy Springs, Mercer, PA, 16137.

8    Proof of indicia that Mr. Warner lives and resides at this

9    residence.

10   Q.    Does the bill indicate that there are three phones

11   assigned, cell phones, assigned to Mr. Warner?

12   A.    Yes.

13   Q.    What date does the bill have on it?

14   A.    The bill summary is October 20th to November 19th.

15   Q.    Of what year?

16   A.    The bill date is November 19, 2011.

17   Q.    I take it you determined Mr. Warner lives at the

18   residence at 336 Brandy Springs?

19   A.    Yes.

20   Q.    Who else lived there at that time?

21   A.    His daughter, Brianna.

22   Q.    Anybody else?

23   A.    No.

24   Q.    Agent Carter, while the search was being conducted, did

25   you and another FBI agent take pictures of the various rooms

Carter - Direct

1   which you were searching, how you found them, things of that

2   nature?

3       A.    Our search photographer and FBI employee was present.

4   That individual took the photos.  I directed that individual

5   to take certain photos, but that individual took the photos.

6       Q.    Did you accompany the agent who took the photos through

7   the house and direct he or she as to how to take the

8   depictions?

9       A.    Yes.

10      Q.    Were there things that you saw, given your

11  investigation to date, that you wanted to depict in the

12  photographs?

13      A.    Yes.

14      Q.    Why is that?

15      A.    Because they matched -- the interior content of

16  Mr. Warner's residence matched the photographs that I had

17  viewed to document that the photographs which were taken

18  during the summer of 2011 when I searched his residence,

19  several months later the contents of the residence were still

20  the same.

21      Q.    Did you observe them to essentially be the same, at

22  least to the extent that you had previously seen them?

23      A.    Yes.

24      Q.    Did they appear to be the same as you had seen them in

25  the photographs?

Carter - Direct

1    A.   Yes.

2    Q.   There were quite a series of photographs taken that

3  day, is that correct?

4    A.   Yes.

5    Q.   Did you go through them and select approximately 24

6  images for purposes of showing the jury today the insides of

7  Mr. Warner's apartment?

8    A.   That's correct, yes.

9    Q.   All right.

10        MS. BLOCH:   Ms. Wikert, if you could please bring

11  up Exhibit 9.1.

12  BY MS. BLOCH:

13    Q.   This picture is what, Agent Carter, if you could

14  describe as we go through these images?

15    A.   This is the front entrance to 336 Brandy Springs

16  Apartments where Mr. Warner lived.

17    Q.   Go to 9.2.  What is that?

18    A.   This is the entranceway through the front door.

19    Q.   Walking into the house?

20    A.   Yes.

21    Q.   No. 3, .3?

22    A.   This is the living room off to the right as you walk in

23  the hallway.  This is to the right of the hallway.

24    Q.   9.4?

25    A.   This is to the left.  This is, I guess the first one

Carter - Direct

1    would be the dining room, and then this would be categorized

2    as the living room.  It is one room, one -- he had it broken

3    up to the dining room to the right and this would be the

4    living room to the left.

5        Q.   9.5, please.

6        A.   This is the small window that goes from the living room

7    area into the kitchen.

8        Q.   9.6.

9        A.   This is a different angle of the dining room.

10       Q.   9.7.

11       A.   The stairway leading upstairs to the second story.

12       Q.   9.8.

13       A.   This is his daughter Brianna's bed.

14       Q.   9.9.

15       A.   Another picture of his daughter's bed.

16       Q.   9.10.

17       A.   This is Mr. Warner's bedroom.

18       Q.   What is depicted on top of the bed?

19       A.   Those are blankets, bedspreads, all in a large ball in

20   the middle of the bed.

21       Q.   Is this how it appeared when you first entered the

22   room?

23       A.   Yes.

24       Q.   Were there any blankets or quilts that you recognized

25   from the images you had examined prior to the search rumpled

Carter - Direct

1    up in this ball?

2    A.   Yes.

3    Q.   What did you do to essentially take the following

4    pictures so you could accurately depict the quilts?

5    A.   I removed the ball from the bed and laid each one out

6    so we could photograph each one in its entirety.

7    Q.   All right.  So then we will move to 9.11.

8    A.   That's in his bedroom, computer desk.

9    Q.   Let's talk about this computer.  Was there a tower with

10   it or just the desktop screen?

11   A.   That's how it appeared.  There was a tower down in the

12   downstairs storage area, but there was no tower here.

13   Q.   Is that the tower you earlier testified that the hard

14   drive had been removed?

15   A.   Yes.

16   Q.   9.12.

17   A.   That's one of the blankets or quilts that were on his

18   bed.

19   Q.   9.13.

20   A.   Same thing, on his bed.

21   Q.   9.14.

22   A.   That's another quilt that was on his bed displayed.

23   Q.   9.15.

24   A.   That's the bedspread that was displayed.

25   Q.   9.16.

Carter - Direct

1    A.    Another blanket.

2    Q.    9.17.

3    A.    Another blanket/quilt from his bed.

4    Q.    9.18.

5    A.    That's the computer tower down in the storage closet

6   downstairs.

7    Q.    9.19.

8    A.    That's this Steeler dress on the floor in his

9   daughter's bedroom where I found it next to the pile -- it was

10  in the corner of the pile, I moved it out and photographed it.

11   Q.    9.20.

12   A.    That's the fabric on the couch in the living room.

13   Q.    And did you direct that the agent take this particular

14  photograph?

15   A.    I wanted the floral design photographed, yes.

16   Q.    9.21, please.

17   A.    That is the ceiling fan on top of the ceiling of

18  Mr. Warner's residence, missing all of the paddles.

19   Q.    That's obviously an unusual picture to have taken.   Why

20  did you direct this picture be taken?

21   A.    Because in the video of Faith, you can fully see this

22  fan up on the ceiling, which is being filmed from the ground,

23  you can actually see this fan in the video where Faith is

24  dancing nude over top of Mr. Warner, you can see this video --

25  or you can see this fan in that video, that dance video.

Carter - Direct

1    Q.    Is that the video that the jurors saw a small portion

2    of in the opening?

3    A.    Yes, yesterday.

4    Q.    9.22.

5    A.    That is a picture of the closet to the left where

6    Mr. Warner had some long gun firearms.  We removed them and

7    photographed them next to the computer desk.

8    Q.    9.23.

9    A.    That's Mr. Warner's bathroom with the black shower

10   curtains.

11   Q.    And, last, 9.24.

12   A.    That is the general picture of the living room.  We had

13   done some searching and we removed some things.  I found the

14   ceiling paddles were placed in -- so we could photograph the

15   trinkets that were around the area.  But this is like an exit

16   photograph right before we left.

17   Q.    When you say "trinkets," were there specific trinkets

18   or items on tables that you specifically directed the pictures

19   include?

20   A.    Yes, for instance, that white, right in front of the

21   fish tank, that white Indian female statue, that one there,

22   yes, I wanted that photographed.

23         There's another Indian statue over by the table and

24   the lamp next to -- yes, right there.

25   Q.    Thank you.

42

Carter - Direct

1          MS. BLOCH:  Your Honor, the Government at this

2    point would like to excuse Agent Carter from further testimony

3    and have him return after more of the evidence is admitted, if

4    that's all right with the Court.  I have advised defense

5    counsel of such.

6          THE COURT:  Any objection?

7          MR. CHONTOS:  No, Judge.

8          THE COURT:  You may do so.

9          MS. BLOCH:  Thank you.

10         THE COURT:  So do you want him to step down,

11   correct?

12         MS. BLOCH:  Well, he is obviously available for

13   cross-examination.

14         THE COURT:  Sure.

15                   CROSS-EXAMINATION

16   BY MR. CHONTOS:

17   Q.   Agent Carter, very early in your testimony you

18   indicated, I think you probably misspoke, but the

19   identification of Cruz through the soccer coach and, you know,

20   checking on who the young girls are, I think you indicated

21   December, 2012.  Did you mean December, 2011?

22   A.   No.

23   Q.   So the soccer identification with the girls, the soccer

24   coach, December of 2011?

25   A.   No, I am sorry, it would be December, 2012, that's

Carter - Cross

1    correct.

2    Q.   The one photograph that we saw that was --

3            MR. CHONTOS:   Young lady, could you pull up 9.22?

4    Thank you.

5    BY MR. CHONTOS:

6    Q.   You made reference to the long guns.   Those are

7    shotguns or a rifle?

8    A.   I believe they are deer rifles and one was a

9    muzzleloader.   The state trooper rendered them safe on that

10   day.

11   Q.   Not only --

12   A.   We didn't take them.

13   Q.   Not only were they safe that day, but Mr. Warner was

14   allowed to possess them under the law?

15   A.   I don't know that.

16   Q.   Okay.   Any particular reason why you didn't learn that?

17   A.   No.   Wasn't my focus on that day.   But we didn't take

18   them.   There was no reason to take them.

19   Q.   Any contributing reason that you didn't take them

20   because you thought that he was allowed to possess them?

21   A.   The state trooper handled that portion of the search,

22   yes.

23   Q.   Now, you began this investigation by something that

24   happens in Denver, there is a search warrant, some photos were

25   gathered, correct?

Carter - Cross

1    A.    The initial investigation began in Denver, but then I
2    was notified by San Diego FBI.
3    Q.    Right, because there was some communication from Denver
4    to San Diego, San Diego to you?
5    A.    Yes.
6    Q.    The agents in San Diego sent you a copy of what they
7    got, right?
8    A.    Yes.
9    Q.    What you got from San Diego was several hundred images,
10   is that fair?
11   A.    I don't know the exact number, but it was quite a few.
12   Probably over 100, yes.
13   Q.    The material that you got from San Diego, is it fair to
14   characterize that as Armando Cruz's collection?
15   A.    Yes.  He had subfolders, apparently they had subfolders
16   named with the girls' names on.
17   Q.    One of the things that you observed in that stuff you
18   got from San Diego was some initials, A-R-M, C-R-U-Z, or
19   something like that that led you to believe that might be
20   someone's name, right?
21   A.    That's correct, yes.
22   Q.    Ultimately it did link up with someone's name, Armando
23   Cruz, right?
24   A.    Yes.
25   Q.    Then underneath that, that's I think what you were

Carter - Cross

1    referring to, the subfolders, there were some initials being

2    used in those subfolders that your investigation then, oh,

3    those are particular girls, correct?

4        A.    Yes.

5        Q.    Those girls in the stuff you got from San Diego

6    included Faith, right?

7        A.    Yes.

8        Q.    Margie?

9        A.    Yes.

10       Q.    Harley?

11       A.    Yes.

12       Q.    And Earl Warner's own daughter, Brianna?

13       A.    Yes.

14       Q.    Anyone else?

15       A.    Yes.

16       Q.    How many?

17       A.    I want to recall, I think there were nine folders with

18   nine different victims on it.

19       Q.    You testified in the grand jury in this case, right?

20       A.    Yes.

21       Q.    That's what happens in a federal case, you testify in

22   front of the grand jury, then the grand jury issues an

23   indictment charging a citizen with a crime; fair?

24       A.    Yes.

25       Q.    Do you recall testifying on April 17th, 2012, that

Carter - Cross

1    there were approximately ten girls?

2       A.   I said I didn't know the exact number.  That would be

3    accurate that it was nine or ten, yes.

4       Q.   Now, Agent Carter, on the day the search was being

5    executed at Earl Warner's house, you had some interaction with

6    him after the search, right?

7       A.   It was during the search.

8       Q.   The tail end of that search?  Because some other agents

9    found him elsewhere and brought him to you at his house where

10   you were doing the search, right?

11      A.   That's correct.

12      Q.   You told him about the search warrant, right?

13      A.   Yes.

14      Q.   Hey, this is what's going on here, right?

15      A.   I explained to him that we had a federal search warrant

16   for his residence.

17      Q.   Right.  Did he -- he gave you a reply, right?

18      A.   Yes, he did.

19      Q.   His reply was, you didn't have to get no search

20   warrant, I would have just let you search, you can search

21   whatever I have; fair?

22      A.   Words to that effect, yes.

23      Q.   Mr. Warner also indicated to you that he expressed some

24   concern about Mr. Cruz's interaction with young girls at that

25   time, did he not?

Carter - Cross

1    A.    Can I look at my report?

2    Q.    Sure.

3    A.    Not on this day.

4    Q.    Sir, I made earlier reference to your grand jury

5    appearance in April of 2012.  You also testified in December

6    of 2012, did you not?

7    A.    I don't recall the exact days, but I did testify.

8    Q.    You testified twice?

9    A.    Yes.

10    Q.    I am going to show you your grand jury testimony from

11    December 19th, 2012, in particular Page 27, Lines 12 and 13.

12    Again, Lines 12 and 13.

13    A.    Yes.

14    Q.    Have you reviewed that document?

15    A.    Yes.

16    Q.    Have I removed it from you?

17    A.    Yes.

18    Q.    Okay.  Does that refresh your recollection as to

19    Mr. Warner also expressing some concern about Mr. Cruz and

20    Mr. Cruz's interaction with some young girls?

21    A.    I do remember him telling me he was concerned with the

22    cigarettes and alcohol, but I am not sure whether it was on

23    this interview or whether it was on the April 3rd interview.

24    I believe it was the April 3rd interview now that I think

25    about it because it is not documented on the April 9th

Carter - Cross

1    interview.  But he did express some concern.

2    Q.    Well -- now, Agent Carter, I think you clarified it,

3    but I want to go over something.  During your execution of

4    that warrant you found two memory cards, right?

5    A.    Yes.

6    Q.    One was just laying there in the living area?

7    A.    One was on the table in the living area.

8    Q.    Then the second one was actually inside the camera,

9    right?

10   A.    Yes.

11   Q.    That particular camera, can it take -- can it store a

12   photo without that memory card being in?

13   A.    That would be a technical question for Corporal

14   Pearson.  I don't know that.

15   Q.    But you felt comfortable enough to saying that camera

16   could take video, right?

17   A.    Because it was relayed to me by Corporal Pearson.  That

18   is a question I specifically asked him, yes.

19   Q.    Now, back to the search photos.

20           MR. CHONTOS:  Could you give me 9.4.

21   BY MR. CHONTOS:

22   Q.    9.4 is Mr. Warner's living area before you guys do any

23   search activities, right?

24   A.    Yes.

25           MR. CHONTOS:  9.24, please.

Carter - Cross

1  BY MR. CHONTOS:

2      Q.    That's the after, correct?

3      A.    Yes.

4      Q.    Okay.  Where were those fan blades?

5      A.    I believe they were under the couch.

6            MR. CHONTOS:  Exhibit 19.1, the Verizon bill.

7  BY MR. CHONTOS:

8      Q.    Sir, you took that from Mr. Warner's home, right?

9      A.    Yes.

10     Q.    It lists three phones, right?

11     A.    Yes.

12     Q.    The monthly bill, about 80 bucks, $83 or so?

13     A.    This says total amount due, $359.

14     Q.    Right.  But let's look at the right side of that page.

15  They have a breakdown of charges.

16     A.    Okay.

17     Q.    Do you see that on the screen?

18     A.    Yes.

19     Q.    Three phones, 83.03, right?

20     A.    Yes.

21     Q.    Agent, I want to reference the indictment.  Count 4,

22  some of the images that relate to Count 4 were on the Cruz CDs

23  at his job, right?

24            MS. BLOCH:  Objection, Your Honor, that's outside

25  the confines of direct examination at this point.

Carter - Cross

1          THE COURT:  Will you be asking him in the

2     Government's case in chief when he returns to the stand the

3     questions in that regard?

4          MS. BLOCH:  Yes, and through Corporal Pearson as

5     well.

6          THE COURT:  What is your thought, counsel?

7          MR. CHONTOS:  I can wait.

8          THE COURT:  Okay.

9     BY MR. CHONTOS:

10     Q.   Agent Carter, at the house of Mr. Warner any video

11     cameras recovered?

12     A.   No.

13     Q.   There were a decent amount of cell phones recovered,

14     right?

15     A.   There were more than two, yes.

16     Q.   Correct.  I count up in the living room area three

17     Samsungs, a Verizon, and a Motorola.  Correct?  If you have

18     your inventory receipt there, that might help you.

19     A.   I do.

20     Q.   Living room area, three Samsung, one Verizon, one

21     Motorola?

22     A.   Okay.  You asked the question how many cell phones?

23     Q.   I am trying to confirm.  In the living room area there

24     were five, three Samsung, one Verizon, one Motorola?

25     A.   Yes.

Carter - Cross

1    Q.    In the bedroom that you believe to be the daughter's,

2  two Samsungs, a Nokia, one Motorola?

3    A.    Yes.

4    Q.    Then under the table in the living room an LG?

5    A.    Yes.

6    Q.    I have ten.  Is my math right?

7    A.    Yes.

8    Q.    Any of those phones do video?

9    A.    I don't know that.

10   Q.    Were any of those phones forensically analyzed?

11   A.    Yes, Corporal Pearson received all those phones.

12   Q.    Corporal Pearson was also part of the search team at

13  Warner's residence, was he not?

14   A.    No.

15   Q.    Now, sir, on one of the documents, I think it was the

16  Acer document, you indicated after reading the document that

17  it appears to be someone's signature, right?

18   A.    Yes.

19   Q.    Do you remember that?

20   A.    Yes.

21   Q.    That person, you have never seen her signature before,

22  have you?

23   A.    No.

24   Q.    Now, sir, the memory cards that you got, the larger

25  eight gigabyte, that was on the coffee table?

Carter - Cross

1    A.    Correct.

2    Q.    The four gigabyte was actually in the camera?

3    A.    Yes.

4    Q.    Now, sir, when you had interaction with Mr. Warner

5    there at the search of his house, the conversation changed to

6    Mr. Warner asking you some questions, and one of those

7    questions was about any images of Brianna on that.  Do you

8    remember that?

9    A.    That was not during the search.  That was when I

10   searched Cruz's house and I went to Mr. Warner's house, that

11   was on February 15th.

12   Q.    Thank you.

13         So on that February 15th discussion Mr. Warner

14   asked -- well, prior to that you had already looked at the

15   stuff that you got from San Diego, right?

16   A.    Yes.

17   Q.    After looking at that stuff from San Diego, you then

18   explore through a local police officer to get some

19   identification of those girls, right?

20   A.    Yes.

21   Q.    Through those preliminary steps on an investigation you

22   learn one of those girls was Brianna Warner, right?

23   A.    Yes.

24   Q.    So before meeting with Mr. Warner in the middle of

25   February -- in the middle of February, you knew Brianna Warner

Carter - Cross

1   was part of that collection of stuff that you got from

2   San Diego, right?

3       A.   Mr. Cruz's collection, yes.

4       Q.   Correct.  So when Mr. Warner asked, hey, is my daughter

5   on any of that stuff, you gave him a reply, correct?

6       A.   That's correct.

7       Q.   Your reply was, don't know?

8       A.   That's right.

9       Q.   That wasn't truthful, was it?

10      A.   Mr. Warner then indicated to me that if there was, he

11  would kill the person, and rather than cause problems at that

12  point I told him no.

13      Q.   Sir, did I ask for the explanation or did I just ask

14  whether your statement to Mr. Warner at that time was

15  truthful?

16      A.   It was truthful because Mr. Cruz's pictures were at

17  Mr. Cruz's house.

18      Q.   Sir, prior to meeting Mr. Warner in February you knew

19  Brianna Warner was on Cruz's collection that you got from

20  San Diego, correct?

21      A.   Yes.

22      Q.   When Mr. -- then Mr. Warner asked you, hey, is my

23  daughter on that stuff; correct?

24      A.   I told him I didn't know.

25      Q.   Right.  But you did know?

Carter - Redirect

1   A.   I did.

2   Q.   Now, Mr. Carter, Count -- I will wait for that.

3        MR. CHONTOS:  Thank you.  That's all I have.

4        THE COURT:  Any redirect at this time?

5        MS. BLOCH:  Just a few clarification questions,

6   Your Honor.  Shall I proceed?

7        THE COURT:  Sure.  If counsel for Defendant wants a

8   break, he will tell me.

9                    REDIRECT EXAMINATION

10  BY MS. BLOCH:

11  Q.   Agent Carter, just a couple of clarification questions

12  and I just want to make sure I didn't misspeak.  When you

13  received the information from the San Diego FBI office

14  regarding the finding of images that they believe may have

15  been taken in Mercer County involving Mr. Cruz, that was in

16  December of 2011, correct?

17  A.   Yes.

18  Q.   That's why the early stages of both the Cruz

19  investigation and the Warner investigation are the early part

20  of 2012?

21  A.   Yes.

22  Q.   So the search, just so it's clear in my mind, the

23  search of Cruz's is February 15th, 2012; the search of

24  Warner's residence is April 9th, 2012?

25  A.   That's correct.

Carter - Redirect

1    Q.   All right.  Mr. Chontos asked you about these
2    subfolders with actually the victim's names.  Just so --
3              MR. CHONTOS:  Objection to the characterization,
4    Judge.
5              THE COURT:  Sustained.  You may rephrase, please.
6    BY MS. BLOCH:
7    Q.   He asked you if the information that you had received
8    either physically or by speaking with the agents in San Diego
9    indicated to you that the person who was under investigation
10   either in San Diego or Denver had created subfolders?
11   A.   Yes.
12   Q.   So when you learned that there are subfolders, that's
13   not something that you can attribute specifically to Mr. Cruz,
14   rather, but the people out west?
15   A.   That's correct.
16   Q.   The names of these subfolders, at least in part, were
17   the names of the victims we have been speaking about in this
18   case?
19              MR. CHONTOS:  Objection, characterization.
20              MS. BLOCH:  I can rephrase it, Your Honor.
21   BY MS. BLOCH:
22   Q.   The names are the same as the names of the -- in the
23   charge in the superseding indictment presented against
24   Mr. Warner, the three victims identified in each of those
25   counts are three of the same names that appear in those

Carter - Redirect

1   subfolders?

2   A.   Yes.

3   Q.   You spoke about seizing the ten cell phones in the

4   various locations that Mr. Chontos referred to.  Did you or

5   anyone else at the search site determine if any of those were

6   active or if they were just old phones that had no battery

7   power?

8   A.   They appeared to all be old.  As I said, Corporal

9   Pearson then received them from us.  But at the time when we

10  put them in evidence they appeared to be old and not being

11  used.

12  Q.   So if I -- just so it's clear as well.  You had

13  conversations with the Defendant, Earl Warner, the first of

14  which was on February 15th when the Earl Cruz [sic]

15  investigation is deep into the search of his house, am I

16  correct?  Armando Cruz, excuse me.

17  A.   I talked to Mr. Warner after the search of Mr. Cruz's

18  residence.

19  Q.   Then the next time you spoke with him was April 3rd

20  at the Pennsylvania State Police barracks?

21  A.   Yes.

22  Q.   Then you testified to having conversation with him on

23  the day of the search of his residence on April 9th?

24  A.   Yes, briefly, yes.

25          MS. BLOCH:  I have no further questions, thank you.

Pearson - Direct

1        THE COURT:  Any additional questions at this time?

2        MR. CHONTOS:  No, Judge.

3        THE COURT:  Okay.  You may step down, sir.

4     (Witness excused.)

5        THE COURT:  You can remove the evidence from the

6  witness box.

7        MS. BLOCH:  Yes, certainly.

8        THE COURT:  Please.  Thank you.

9        You may call your next witness, please.

10        MS. BLOCH:  Your Honor, the Government calls

11  Corporal Robert Pearson.

12     ROBERT PEARSON, a witness herein, having been first

13  duly sworn, was examined and testified as follows:

14        THE WITNESS:  My name is Robert, last name is

15  Pearson, P-E-A-R-S-O-N.

16                 DIRECT EXAMINATION

17  BY MS. BLOCH:

18   Q.   Good morning.  If you could please state your name.

19   A.   Good morning, my name is Robert Pearson.

20   Q.   How are you employed, Mr. Pearson?

21   A.   I am a corporal with the Pennsylvania State Police.

22   Q.   How long have you been a corporal with the state

23  police?

24   A.   I have been with the department since 1992.  I believe

25  I was promoted in 2006 maybe.

Pearson - Direct

1   Q.   To the corporal status?

2   A.   To the corporal status, correct.

3   Q.   So prior to that you were a trooper?

4   A.   Correct.

5   Q.   Presently in which unit do you work?

6   A.   I work in the BCI's computer crime investigation unit.

7   Q.   What does BCI stand for?

8   A.   Bureau of Criminal Investigations.

9   Q.   From which office of the BCI do you work?

10  A.   My physical location?

11  Q.   Yes.

12  A.   It's Edinboro.  I am the supervisor of the northwest

13  computer crime unit up at Edinboro, Pennsylvania.

14  Q.   Both before and after you had obtained corporal status

15  did you conduct and do you conduct actual criminal

16  investigations that involve the use of computers and technical

17  equipment?

18  A.   Yes.  In 2000 I was named a Troop E, which is Erie, in

19  that area, computer crime investigator.  Then in 2003 I took

20  the position of the computer crime task force coordinator for

21  northwestern PA, I think it's 16 counties.

22  Q.   Do you still conduct actual investigations of

23  particular subjects?

24  A.   Yes.

25  Q.   In addition to that, do you separately conduct forensic

Pearson - Direct

1    analysis of computer equipment both in your own and in other

2    law enforcement officers' investigations?

3    A.    That's correct, yes.

4    Q.    How does someone go about requesting your assistance in

5    an investigation where your forensic skills might be helpful?

6    A.    Essentially we provide assistance to all law

7    enforcement agencies.  I am deputized with the FBI office

8    specifically out of Erie.  So I do a lot of work hand-in-hand

9    with the FBI office in Erie.

10          But we do forensic work or I do forensic work for

11   any of the local agencies that need our assistance, plus my

12   department.

13   Q.    Let's just talk a little bit about your training and

14   education that brings you to be a supervisor of this computer

15   crimes investigation unit.  Starting with, do you have an

16   undergraduate degree that pertains to your field generally?

17   A.    I have a degree in criminology, yes.

18   Q.    I take it since your employment in 1992 with the

19   Pennsylvania State Police you have spent a lot of time

20   participating in training programs, some of which are programs

21   that offer certifications and things of that nature?

22   A.    Correct, yes.

23   Q.    Most recently do you, in addition to attending such

24   trainings, do you participate as an instructor as well in

25   training of less experienced law enforcement officers?

Pearson - Direct

1   A.    Yes, correct.  Since 2003 when I took over the task

2   force, one of my primary duties is to perform educational

3   assignments throughout -- to other departments.  I have also

4   worked for Edinboro University of Pennsylvania over a couple

5   of summers teaching law enforcement officers basic computer

6   forensics or basic Internet investigation techniques.

7           I am also currently employed with Fox Valley

8   Technical College on the side teaching classes for ICAC, which

9   stands for Internet crimes against children.  Basically I

10  teach some of the proactive investigation techniques that we

11  use to locate child pornography offenders on the Internet.

12  Q.    Let's talk a little bit more about your experience in

13  conducting investigations that involve child pornography and

14  child exploitation.  Obviously just as you described there's

15  circumstances in child pornography cases where there is

16  Internet activity between offenders.  Do you also conduct

17  investigations that involve exploitation that's not

18  necessarily discovered initially over the Internet?

19  A.    Certainly.  Anything that would -- another agency or my

20  agency would get involved with or come to have knowledge of

21  and if they obtain the evidence, they would essentially bring

22  it to me to conduct a forensic examination of that.

23  Q.    How many forensic undertakings or forensic studies do

24  you participate in in any given year, given month, if you

25  could estimate?

Pearson - Direct

1    A.    Yeah, I have been posed that question before.   I think

2  on a low average we are seeing about four a month since 2000.

3  So, new, 400 or so -- around 400 plus since I started computer

4  investigations.

5    Q.    Can you sort of give a percentage of how much of your

6  time, both as a forensic expert as well as an investigator,

7  you spend on cases involving child exploitation?

8    A.    Unfortunately, I think it's probably upwards of

9  80 percent of my caseload has to do with child pornography

10  investigations.

11    Q.    Corporal Pearson, have you previously testified in

12  court as an expert in computer forensics and the investigation

13  of child exploitation cases?

14    A.    Yes, in both state and federal court.

15          MS. BLOCH:   Your Honor, at this point the

16  Government offers Corporal Pearson as an expert in those

17  fields, an expert in forensics as well as conducting the

18  investigations involving child exploitation.

19          THE COURT:   Any objection?

20          MR. CHONTOS:   No, Judge, and no questions.

21          THE COURT:   Okay.   You may continue.

22  BY MS. BLOCH:

23    Q.    Corporal Pearson, did you -- were you tasked by the

24  FBI, specifically Special Agent Thomas Carter, to conduct some

25  forensic analysis in the case that's pending before the court

Pearson - Direct

1   today, that is regarding Mr. Warner?

2   A.   Yes, ma'am.

3   Q.   On April 9th, 2012, following the execution of the

4   search conducted by the FBI and the Pennsylvania State Police

5   at Mr. Warner's home, did you take receipt of certain camera

6   and related equipment with the task of examining it from your

7   perspective, the forensic expert perspective?

8   A.   That's correct.  I received the items from Special

9   Agent Kirk Brace at the Edinboro office -- or my Edinboro

10  office, excuse me.

11  Q.   Initially, that is on April 9th, were you provided

12  with a camera containing one SanDisk memory card, along with

13  another SanDisk memory card that was orphaned or not within

14  the camera?

15  A.   That's correct, yes.

16  Q.   I am going to show you Exhibits 14.1 to 14.2, 12.1 to

17  12.3, and 13.1 to 13.2.  If you could just take a look at

18  those items for me, please.  Let's start with the camera.  If

19  you could just identify the make and model of that camera,

20  please.

21  A.   This camera is a Canon PowerShot SX120 digital camera.

22  Q.   If you could just look -- you can take it out of the

23  bag, that's okay.

24  A.   The media card appears to be within the camera.  Do you

25  want me to remove that also?

Pearson - Direct

1    Q.    Yes, I would like you to check to see if that exhibit

2    is contained presently within the slot that the memory card is

3    in.

4    A.    It is.

5    Q.    Is that a particular exhibit that you were tasked with

6    examining?

7    A.    Yes, it is.  It's a four gigabyte SanDisk memory card.

8    Q.    Before we move on to your examination of these

9    particular items, if you could take a look at the exterior of

10   the Canon camera.  Is there anywhere on the exterior that the

11   manufacturer has indicated where the camera was manufactured?

12   A.    The camera is stamped or, excuse me, there is a label

13   applied at the bottom of the camera that states, made in

14   China.

15   Q.    Similarly, the memory card that's contained within the

16   camera, as well as the one that's outside the camera, those

17   are made by a company called SanDisk, am I correct?

18   A.    That is correct, they are both SanDisk cards.

19   Q.    One is four gigabyte, meaning -- well, we will talk

20   about that.  One is four gigabyte and one is eight gigabyte.

21   Am I right about that?

22   A.    That is correct.

23   Q.    Which one is actually in the camera?

24   A.    The four gigabyte memory card.

25   Q.    Do the memory cards themselves have an indicator on the

Pearson - Direct

1   exterior as to where they were manufactured?

2   A.   Yes, they do.

3   Q.   If you could just describe how it appears and what it

4   says.

5   A.   The memory cards are -- essentially it looks like they

6   are stamped on the rear of the card, made in China.

7   Q.   Are they both stamped similarly?

8   A.   I am going to remove this card from it because looking

9   through the plastic is making it harder to read.  Yes, both of

10   them are labeled, made in China.

11   Q.   I am going to show you now what's identified as

12   Government's Exhibits 24 and 26.  Are these each respectively

13   certificates of authenticity from Canon Corporation and from

14   SanDisk Corporation indicating the place of manufacture for

15   the particular items we are speaking about?

16          MR. CHONTOS:  Judge, objection.  He is here as an

17   expert forensic computer guy to tell the jury and to tell us

18   all what he found on the stuff.  That's his focus.  It's

19   beyond the focus.

20          THE COURT:  It's the same as the affidavit we heard

21   a few moments ago, correct?

22          MS. BLOCH:  Correct.

23          THE COURT:  It is in evidence and I don't know that

24   we need to read it.

25          MS. BLOCH:  Can we just indicate, Your Honor, where

Pearson - Direct

1    the two corporations indicate these items originated?

2                MR. CHONTOS:  No, I object.

3                THE COURT:  I sustain the objection.  The exhibit

4    is in evidence.  The jury will have it.

5    BY MS. BLOCH:

6        Q.   All right.  We are going to move on.  You initially

7    conducted your forensic investigation of the camera and the

8    two disks -- the two memory cards, rather, we are speaking

9    about.

10       A.   Yes, that's right.

11       Q.   This particular camera, does it take still digital

12   photographs?

13       A.   It does.

14       Q.   Is it capable of taking videos?

15       A.   It is, yes.

16       Q.   How does one go from still to video, if you're the

17   user?

18       A.   Basically there is a selection dial at the top and

19   basically you just turn it from one selection to another.

20       Q.   Does this -- would this camera function if it did not

21   have a memory card inside?

22       A.   I would have to test that.  Some cameras have a small

23   bit of internal memory, but I would have to test it.  I do not

24   know.

25       Q.   When you were tasked with examining these exhibits,

Pearson - Direct

1   what all did you accomplish in so doing?  Like, did you look

2   at the camera to determine whether there were images stored in

3   its memory, if possible?

4     A.   I don't recall that particular -- I know I looked at

5   the cards, the contents of the cards, but I do not actually

6   remember -- when we got the camera, there were no batteries in

7   the camera, so I made the assumption there was no evidence on

8   the camera itself.

9     Q.   Then address your examination first to the four

10  gigabyte, that is the card that was inside the camera?

11    A.   Correct.

12    Q.   Did you -- one of your tasks, was it not, as per Agent

13  Carter's request, was that you looked for sexually exploitive

14  images of children?

15    A.   Correct.

16    Q.   Is that essentially that and/or any other images that

17  might pertain to the investigation, is that what you were

18  pulling or looking for?

19    A.   Yes, I was just recovering the data at the time to see

20  what was on there and pertinent.

21    Q.   So if we are talking about the four gigabyte, did you

22  find in fact some data contained within that four gigabyte

23  memory card?

24    A.   Yes.

25    Q.   Did that include any images of children?

Pearson - Direct

1    A.   Yes.

2    Q.   Was there one such image that was either naked,

3 partially naked, something of that nature?

4    A.   Yes, there was a singular image of what appeared to be

5 a juvenile or prepubescent female from, I believe it was, like

6 the neck down to the waist.  She was nude.  So it exposed her

7 chest area.

8    Q.   Did you also find images, photographs of Earl Warner's

9 Pennsylvania identification card?

10    A.   I found I believe four images, correct, yes.

11    Q.   Of the same card?

12    A.   The same -- yes, it appeared as if he was trying to get

13 a better picture of his driver's license.

14        MS. BLOCH:  Ms. Wikert, if you could just pull up

15 Exhibit No. 23, please.

16 BY MS. BLOCH:

17    Q.   Is this in fact one of the images of the four that you

18 pulled from that memory card?

19    A.   Yes, it was.

20    Q.   Where does it indicate Mr. Warner lives?

21    A.   336 Brandy Springs, in Mercer, PA.  The ZIP code is

22 16137.

23    Q.   Does it have a validation and expiration date?

24    A.   License issued June 30th, 2011.  Expires

25 January 31st, 2014.

Pearson - Direct

1    Q.    Thank you.

2          MS. BLOCH:  Ms. Wikert, if you could please pull up

3    image No. 7.44A.

4    BY MS. BLOCH:

5    Q.    Is that the image that you spoke about that was on the

6    particular memory card in this camera?

7    A.    That is correct, yes, it was.

8          MS. BLOCH:  Let's look at 7.44.

9    BY MS. BLOCH:

10   Q.    Let's just speak for a second about the information

11   that's -- this obviously includes the image we just saw as

12   well as some additional information.  If you could just

13   explain for the jurors generally what this is.

14   A.    What you are looking at is kind of Windows

15   interpretation of the metadata.  The metadata, if you are

16   familiar with digital cameras or cell phone cameras or

17   anything like that, is just data that's implanted inside a

18   picture by the camera itself when it is taking it.  So the

19   user is not doing it, it is basically taking the date and time

20   and all your camera settings and stuff, so when you take a

21   picture, inside the digital code inside there all of this

22   information that you're kind of seeing -- like in this example

23   they have taken, you are seeing the Canon PowerShot name,

24   model, f-stop, and some other technical camera settings are

25   embedded within the picture in order for maybe future use down

Pearson - Direct

1  the road or processing or something like that.  That's kind of

2  what we are looking at right here.

3      Q.   This particular photo, though, it indicates that it was

4  taken on October 2nd of 2011, am I right?

5      A.   That's correct.

6      Q.   At 6:54 a.m.?

7      A.   Correct.

8      Q.   Now I am going -- in the context of your -- strike

9  that.

10          Let's move beyond.  So then are these the only

11  relevant images you extracted from the particular card that

12  was in the camera itself?

13      A.   Yes.  Yes, ma'am.

14      Q.   The eight gigabyte camera card, you referred to that as

15  an orphan card.  Is that because it was not in the camera

16  itself?

17      A.   Correct.  We do that commonly if we find hard drives

18  that aren't in a computer, we call them orphan drives or

19  orphan memory.

20      Q.   Were there images you found there pursuant to your

21  investigation that you extracted that depicted children naked

22  with their genitals exposed?

23      A.   Yes.  Yes, ma'am.

24      Q.   Did you, in keeping with your forensic work, did you

25  prepare a report to that effect?

Pearson - Direct

1  A.    I exported the images out to I believe a CD and a

2  printed copy.  I believe initially it was digital.  It was

3  emailed I believe or sent to Agent Carter.  Again I am a

4  little fuzzy with that specifically on the report getting to

5  him.

6          But the images were exported out using my forensic

7  software, EnCase is what I use, which is the forensic software

8  that's utilized, which allows me to export the images found

9  for further examination by the investigating officer or agent

10 in this case.

11 Q.    When you do that, when you are exporting images, is

12 there some mechanism within your forensic software that

13 protects the original evidence?

14 A.    Yes.  When we do a forensic examination of any computer

15 or in this case digital media, we use two things.  Hardware

16 write blockers, which is basically just a piece of hardware

17 that you stick the card into, it is like a one-way valve.  It

18 allows data to go from the card to my computer, but I can't go

19 from my computer to the card.  So it prevents me from altering

20 the evidence at all.

21          Also, our forensic software basically traces a

22 forensic image, it is an exact bit-by-bit duplicate of that

23 onto my computer.  That way we don't have to use the original

24 cards anymore, so it prevents damage down the road or anything

25 like that and it can go back into our locked property room.

Pearson - Direct

1    So then we work off of that forensic image.

2              The forensic image itself has built-in controls,

3    basically so if somebody goes and attempts to alter or if

4    something happens, a virus or something, when we load it into

5    our forensic software, it immediately gets flagged and we get

6    alerted there is something wrong with the image, it has been

7    altered since day one, start again.  So that's basically the

8    forensic image.

9    Q.   Let's just speak a little again about the metadata

10   then.  When an image is taken and stored in that memory card,

11   for each image that you found did you find similarly connected

12   metadata, the information that reflected the camera that took

13   it, the date on which it was taken, the time on which it was

14   taken?

15   A.   That's correct, yes.

16   Q.   So for each of the extracted images, those are the

17   still images, were you able to determine at least from these

18   two memory cards that they were all taken with a Canon

19   PowerShot Model SX120 IS?

20   A.   That's correct, yes.

21   Q.   That is what the metadata for each image reflected?

22   A.   Yes, just like what we just saw there.

23   Q.   On the second disk we are speaking about -- I am sorry,

24   the memory card, on this eight gigabyte memory card, was there

25   also a short video as well?

Pearson - Direct

1    A.    Correct, yes.

2    Q.    Did it too meet the parameters of your search, i.e.,

3    that you were looking for images that depicted children

4    engaged in sexually explicit activity?

5    A.    Correct, one image -- excuse me, one movie file.

6    Q.    When this particular camera, a Canon PowerShot, Model

7    SX120, takes video, does it leave the same kind of metadata?

8    A.    Similar.  Similar metadata, but it does leave pertinent

9    metadata.  It is not in the same format or same structure

10   because it is a movie file and it's not the same jpeg that the

11   standard camera uses to take a picture.  This is a different

12   standard.  So the metadata is in there or somewhat in there,

13   but there are less options like f-stops and ISOs, but there is

14   some metadata.

15   Q.    Does it pop up the same way that the metadata does for

16   an image or do you have to actually go into the movie file and

17   do further forensic review?

18   A.    Yeah, for me to locate it, I had to go into the

19   actual -- the binary, the guts of the movie itself and locate

20   it.  Now, I am sure there is software that will actually

21   highlight that metadata, but I didn't go that route.

22   Q.    If you didn't have a memory card with the images on it,

23   could you tell what kind of metadata a particular camera left,

24   or would it not leave it if the memory card wasn't in there?

25   A.    Well, technically if you are asking if I just have a

Pearson - Direct

1   picture, like if you emailed me a picture or something like

2   that, is that what you are getting at, would that picture have

3   metadata on it?

4   Q.   Yes.  Would it?

5   A.   Yes.  The metadata will stay as long as the picture is

6   unaltered, hand it to you and copy it a thousand times over,

7   as long as it is unaltered, then the metadata will stay with

8   it.

9   Q.   Okay.  At some point later, as it got closer to trial,

10  were you also provided with two disks to analyze as well for

11  similar content, that is, images which depicted children

12  engaged in sexually explicit activity and/or other imagery or

13  video that pertained to that?

14  A.   Correct, two.

15  Q.   Two disks?

16  A.   Two CDs, correct.

17  Q.   Okay.  These are Government's Exhibits 20 and 21.  Are

18  these the original CDs, copies, exact copies of which you

19  examined?

20  A.   Yes, ma'am.

21       THE COURT:  Excuse me for a minute.  Do you want a

22  break this morning?

23       A JUROR:  Yes, Your Honor

24       THE COURT:  We will take a break until 11:30.  If

25  that doesn't give you enough time, just tell the deputy and we

74

Pearson - Direct

1    will adjust to your schedule.  So we will stand in recess

2    until 11:30.  If you need to 11:35, whatever time the jury

3    needs is fine.

4           (Recess taken.)

5           (Back on record in open court.)

6           THE COURT:  You may continue.

7    BY MS. BLOCH:

8    Q.    Corporal Pearson, I believe we left off with you

9    talking about how you, just like you had done with the memory

10   cards, you had also examined the contents of the two disks

11   that you acquired.  And you extracted images from those as

12   well.

13          Did you use the same kind of forensic tools and

14   software to do that?

15   A.    Correct.  We used the EnCase forensic tool, which is

16   the primary tool I use for forensic examinations.  I created

17   an image and examined it that way, yes.

18   Q.    At some point were you asked to break down images or a

19   series of images in keeping with the parameters of the charges

20   contained in the superseding indictment?

21   A.    That's correct, yes.

22   Q.    Did you in fact acquire a copy of that indictment for

23   purposes of breaking down the information that you had in an

24   understandable way?

25   A.    That is correct, yes.

Pearson - Direct

1    Q.   We have marked, have we not, the images that
2    specifically pertain to Count 1 of that superseding indictment
3    with the No. 1 in the front, like 1.1 through -- were there in
4    fact, let me see, 39 images relative to Count 1, do you
5    recall?
6    A.   I don't recall the specific number.  I would have to
7    refer to it.
8    Q.   I am going to show you actually what is Government's
9    Exhibit No. 25, which is a calendar for the months of May and
10   June of 2011.  Is this a calendar that you generated with
11   information on it that you extracted from these different
12   media?
13   A.   That's correct, yes, it was.
14   Q.   So the information that's laid out on Exhibit 25 is
15   actually your information.  Does it indicate -- does it
16   reflect dates on which you found images or videos?
17   A.   It reflects the metadata date that was embedded in each
18   individual image or video, yes.
19   Q.   So on any particular calendar date --
20       MS. BLOCH:  If you could bring up Exhibit 25.
21   Thank you.
22   BY MS. BLOCH:
23   Q.   Let's just look, for example, at May 12th.  Just so
24   it's 'easy to understand what you did.  If you could just
25   explain to the jurors exactly what's reflected on May 12th

Pearson - Direct

1   based upon your findings.

2   A.   Yes.  The initial block where it says addit, A-D-D-I-T,

3   essentially that means additional images.  They were kind of

4   images that didn't fall within the threshold of the initial or

5   the defined definition of the initial counts of the

6   indictment.

7   Q.   So you don't mean definition, you just mean they

8   weren't within the parameters of the dates that the specific

9   counts were?

10   A.   Correct.

11   Q.   Or seven counts, right?

12   A.   Yes.  And there were, as indicated there, there were

13   seven images on May 12th that were found or located.  And

14   the metadata indicates they were taken within the hours of

15   05:16 a.m. and 07:05 a.m.  So early morning.

16   Q.   The second one says Count 5 and there is another one

17   below it that says Count 5, MVI underscore 412.AVI and MVI

18   underscore 414.AVI.  Those are two separate movie files.  AVI

19   is a format of a movie type that's taken specifically with

20   this type of camera.  Those were found based on the metadata

21   to be taken on -- or created I guess on the 12th of May

22   also.  So that's how the calendar is kind of set up.

23          Our Count 5 indicates that the images were created

24   on July 13th, 2011.  When you looked at the contents --

25   prior to looking inside the particular videos, what was the

Pearson - Direct

1    July 13th date?

2    A.    That was the date that was brought over essentially

3    through maybe the files' CD creation software called Nero.

4    Brings over a creation date from whatever media it came from.

5    Like assuming it's generally the same, a computer, it would

6    have brought a date over from the computer or some other

7    medium.

8              Again, without knowing the exact steps the original

9    disk took before becoming a disk, I can't tell you exactly

10   where that 714 came from or whatever the date was that was

11   reflected.

12   Q.    But in order for it to become a disk, it would have to

13   flow from a camera to a computer to a disk, would it not?  You

14   couldn't get images off a camera to a disk without there being

15   some medium in between?

16   A.    In most cases I am going to say you are correct.  There

17   may be certain cameras out there that allow the quick steps or

18   something, sort of kind of a shortcut.  But in 99 percent of

19   all cases you're taking the camera itself, the media, the

20   pictures, copying them to a computer, and then you would save

21   them to a disk off of that computer.

22   Q.    Can you tell by looking at the Canon PowerShot camera

23   whether it functions just like that, a camera that you would

24   have to hook into a computer, download your images, and then,

25   if someone so chose, you could take them off the computer and

Pearson - Direct

1   put them on a disk?

2     A.   To be honest, I can't tell that.  It would be done by

3   the software you had installed on the computer itself.  So it

4   would be something that Canon would provide as a secondary

5   piece of software to do it.  Again, it's rare and it would be

6   an extra step that you would take to do that, so I do not

7   know.

8     Q.   Maybe you don't quite understand what I am saying.  You

9   are describing a circumstance under which you would still have

10  to use a computer because you said computer software?

11    A.   Correct.  So what would happen is the software, maybe

12  you would have to see the camera as maybe an external hard

13  drive or external drive.  When you say, "all right, burn this

14  disk," you would have to go out to the camera, grab the

15  images, say grab, copy the images onto your new disk for

16  burning.  So, again, that would be a secondary piece of

17  software.

18    Q.   All right.  So what I would like to do is sort of go in

19  chronological order at this point because I think it would be

20  the easiest way to show it.

21         Count 1 from the indictment that you were reviewing

22  and in fashioning the one exhibits, that is 1.1, 1.1A through

23  1.39 and 1.39A, is that reflected on your calendar?

24    A.   Yes, it is.

25    Q.   What does your calendar indicate your findings were?

Pearson - Direct

1    A.    Count 1 on June 4th -- and I indicated there -- there

2    we go.   I indicated MC, which is what was instructed to be the

3    initials of the subject in these images, Marge, Marjorie, I

4    believe, but I indicated them as MC as the initials of the

5    juvenile.   39 is the number of images.   And, again, the hours

6    are 06:34 and 47 seconds a.m. to 09:21:17 hours a.m.   That is

7    the time frame these 39 images were taken according to the

8    metadata.

9    Q.    That's 6:34 a.m. in military time?

10   A.    Correct.

11   Q.    To 9:21 a.m.

12        MS. BLOCH:  Ms. Wikert, if we could pull up

13   Exhibits 1.1 and 1.1A together.

14   BY MS. BLOCH:

15   Q.    Okay.   This is in fact one of the images you extracted

16   that we have referred to as 1.1A?

17   A.    Correct, yes.

18   Q.    Beside it is that the metadata associated with this

19   particular image?

20   A.    That is correct, yes.

21        MS. BLOCH:  Can you blow that up just a little bit

22   bigger.   Thank you.

23   BY MS. BLOCH:

24   Q.    So the date of this particular image, that is the date

25   it was taken, is June 4th of 2011?

Pearson - Direct

1    A.    That's correct, yes.

2    Q.    At least according to the metadata.  And at 6:34 a.m.?

3    A.    Correct.

4    Q.    Where does it indicate the camera that took the image?

5    A.    Okay, that's indicated on that screen there, that's how

6    it is depicted within the viewer there.

7    Q.    It says model, Canon PowerShot SX120.  Then it goes on.

8    A.    Correct.

9    Q.    Now, did all of the still images on all four items you

10   examined, the two disks and the two memory cards, indicate

11   that particular camera, the ones we are putting in evidence?

12   A.    That's correct, yes.

13   Q.    Okay, thank you.

14         MS. BLOCH:  I would like to pull up 1.2 and 1.2A,

15   please.

16   BY MS. BLOCH:

17   Q.    Is this the second of what I will describe as a series,

18   is that the proper terminology for this?

19   A.    Certainly, yes.

20   Q.    So can you please give the date and time that this

21   particular image was taken?

22   A.    The date is June 4th, 2011, at 6:34 a.m. hours.

23   Q.    So that's the same exact time as the image before it?

24   A.    Yes.

25   Q.    What about 1.3 and 1.3A, what is the metadata

Pearson - Direct

1  associated with this particular image?

2  A.   It indicates for this particular image, again, June 4,

3  2011, at 6:35 a.m. hours.

4  Q.   So it's turned to the next minute?

5  A.   That's correct.

6  Q.   I know we can't see it now that Ms. Wikert has blown it

7  up, but does it indicate as well it is the Canon PowerShot?

8  A.   Yes, ma'am.

9  Q.   Again, for simplicity purposes, all of our images have

10  metadata that look like that with the time and date and Canon

11  PowerShot?

12  A.   Correct.

13       MS. BLOCH:  Ms. Wikert, if you could jump to images

14  1.39 and 1.39A.

15  BY MS. BLOCH:

16  Q.   This is the last of our 1 exhibits that are within the

17  parameters on your calendar, is that correct?

18  A.   Correct, on that date.

19  Q.   Metadata reflects what, Corporal Pearson?

20  A.   June 4, 2011, at 09:21 hours a.m.

21       MS. BLOCH:  Now, for purposes of speeding things

22  along, I have asked that Ms. Wikert prepare a run of just the

23  images, so they are the A exhibits, 1.1A through 1.39A in the

24  series.

25       If you could just play them with enough time in

Pearson - Direct

1    between each for the jurors to see it, digest it, and then

2    move on.

3              Slow down just a touch.

4              Thank you.

5    BY MS. BLOCH:

6      Q.   Okay, let's move to the 2 exhibits, Corporal Pearson.

7    If you could look at your Exhibit No. 25, the calendar.   In

8    keeping with your task, Count 2, charges that there were

9    images taken on June 8, 2011, so I am going to direct your

10   attention to June 8th, starting with 2.1 and 2.1A, please.

11             MS. BLOCH:   I am sorry, we can first submit the

12   calendar, I am sorry.   I just need the second page too,

13   please.   There we go.

14             So if we could blow up June 8th.

15   BY MS. BLOCH:

16     Q.   Okay.

17     A.   June 8, what is depicted there is basically Count 2 of

18   the indictment.   FW, which is the initials of the little girl,

19   her first name is Faith.   Those are images depicting her.

20             And there are 23 taken on the date of June 8.   The

21   time frame, again, in the metadata is 03:09 hours, which is

22   3 o'clock in the morning essentially, 3:09 a.m., to 03:53

23   hours a.m.

24             MS. BLOCH:   If we could bring up now 2.1 and 2.1A

25   together, please.

Pearson - Direct

1          All right, thank you.

2    BY MS. BLOCH:

3    Q.   So this is the first of this particular series -- is it

4    okay if I use that phrase?

5    A.   That's fine.

6    Q.   So if we could look at 2.1 and 2.1A.  Does the metadata

7    reflect what you just indicated, that the first image was on

8    that date at 3:09 a.m.?

9    A.   That is correct, yes.

10   Q.   Was it taken again with a Canon PowerShot?

11   A.   Yes, it was.

12        MS. BLOCH:  All right.  I would like to go to the

13   last one.  Actually, Ms. Wikert, if we could drop down to

14   No. 2.23 and 2.23A.

15   BY MS. BLOCH:

16   Q.   So this is the end of that particular series on that

17   date, this is the last time which is reflected on the

18   calendar?

19   A.   Correct, yes.

20   Q.   So June 8, 2011, at 3:53 a.m.?

21   A.   Yes.

22        MS. BLOCH:  Ms. Wikert, if you would please show

23   the A exhibits only in a series again.

24        Thank you.

25        If you could pull up Exhibit 25 again, please.

Pearson - Direct

1   BY MS. BLOCH:

2     Q.   Count 3, if we could talk about the No. 3 exhibits.

3          MS. BLOCH:   If we could focus particularly on

4   June 12th, Diane.

5   BY MS. BLOCH:

6     Q.   Why don't you relate to the jurors what this reflects.

7     A.   Certainly.   June 12th is relative to Count 3 of the

8   indictment.   Again, they are depicting images relating to a

9   young girl Faith, or FW.   In this particular series the

10  calendar indicates there are 28 images in total for the date

11  on the 12th spanning from the time of 09:24 hours a.m. to

12  09:49 hours a.m.

13          MS. BLOCH:   Let's pull up Exhibits 3.1 and 3.1A.

14  BY MS. BLOCH:

15    Q.   Look at the metadata on 3.1.   Corporal Pearson, is this

16  the first of that series by date and time?

17    A.   Yes, ma'am.   June 12th, 2011, and the time is

18  09:24 a.m., which is the first of the series on that date.

19          MS. BLOCH:   Let's go to the last of those,

20  Ms. Wikert, which is 3.28 and 3.28A.

21  BY MS. BLOCH:

22    Q.   Is this the last of the images that appears in this

23  series?

24    A.   Yes, ma'am.   Taken June 12th, 2011, at 09:49 hours

25  a.m.

Pearson - Direct

1    Q.   Again, were these images that are reflected in the

2    three exhibits all taken with a Canon PowerShot?

3    A.   Same metadata, yes, ma'am.

4         MS. BLOCH:  Ms. Wikert, if you would kindly, again,

5    play the images from 3.1A to 3.28A.

6         Thank you.

7    BY MS. BLOCH:

8    Q.   All right.  Corporal Pearson, I am going to ask --

9    direct your attention now to the 4 exhibits, that is 4.1

10   through 4.23.  Again, on your calendar, Exhibit No. 25, do you

11   reflect data on June 13th of 2011 that pertains to this

12   series of images that is Count 4?

13   A.   That is correct.  I have indicated that these images

14   are pertaining to the child victim named Harley, we call her

15   Harley, initials HE.  There are 23 images.  The hours that

16   they were taken based on the metadata is 05:40 hours a.m. and

17   05:53 hours a.m.

18   Q.   Also reflected on here is, is there not, that there

19   were another series of images -- rather, a collection of

20   images that are part of Count 7?

21   A.   Correct.

22   Q.   You can speak to that now.

23   A.   Certainly.  Count 7, which is -- I believe it has been

24   instructed or talked about is a possession of child

25   pornography.  There are 40 additional images that had metadata

Pearson - Direct

1    for that date of June 13th.  There were 40 of those on that

2    date.  The time frame again was between 05:40:24 -- excuse me,

3    05:40 a.m. and again 07:36 hours a.m.  I am eliminating the

4    seconds off it.  They are there on the calendar.

5    Q.    These images that relate to Count 7, the possession

6    count, those are all on the eight gigabyte memory card, am I

7    correct?

8    A.    Which count?

9    Q.    Seven, the possession count.

10   A.    Yes.  I am sorry.  Yes, correct.

11          MS. BLOCH:  All right.  So let's go back to Count 4

12   if you could, Ms. Wikert, and bring up 4.1 and 4.1A.

13   BY MS. BLOCH:

14   Q.    This is the metadata associated with the first image,

15   am I right?

16   A.    That is correct.

17   Q.    Does it reflect that the Canon PowerShot SX120 took

18   this picture on June 13th at 5:40 a.m.?

19   A.    It is, yes.

20   Q.    This is the first of the series, is that right?

21   A.    That's correct.

22          MS. BLOCH:  If we can bring up the last of that

23   series, please, 4.23 and 4.23A.

24   BY MS. BLOCH:

25   Q.    Is this the last of that series based on the metadata?

Pearson - Direct

1    A.   Yes, ma'am, June 13th, 2011, 05:53 a.m. hours.

2         MS. BLOCH:  All right.  If you would please,

3    Ms. Wikert, play this series of photos, that is Exhibits 4.1A

4    to 4.23A.

5         Thank you.

6    BY MS. BLOCH:

7    Q.   Corporal Pearson, I would like to talk now about the

8    exhibits starting with the No. 5, that is 5.1 and 5.2.  Those

9    are two videos, are they not?

10   A.   That is correct.

11        MS. BLOCH:  If you could pull up Exhibit 25.

12   BY MS. BLOCH:

13   Q.   Are those videos reflected on May 12th, 2011?

14   A.   That is correct.

15   Q.   Those are those MVI you previously referenced?

16   A.   Yes, M underscore 412.AVI and MVI underscore 414.AVI.

17   Q.   The date of May 12th was derived, as you indicated,

18   by going inside the actual video itself and sort of extracting

19   information about its creation date?

20   A.   Correct, the camera put that metadata inside the video

21   itself.

22   Q.   Its production date?

23   A.   Correct.

24   Q.   Does it tell you on a video, can it tell you what

25   camera or video camera was used to take it?

Pearson - Direct

1    A.    It certainly could, yes.  I would have to review the

2   metadata here.  Off the top of my head I don't know if this

3   one does.  Metadata could include anything from a camera, so I

4   don't know specifically if this one did or not.

5    Q.    When you were looking at it -- we talked at some length

6   about the notion of it going from camera to computer to disk.

7   When there is a file creation date -- am I saying that

8   correctly?

9    A.    Certainly, yes.

10    Q.    That appears forensically for your analysis as well,

11   and on those particular two videos, what was the file creation

12   date that was reflected?  Was it July 13th -- I am sorry --

13   yes, July 13th?

14    A.    I would have to refer to my report if that is all

15   right.

16    Q.    Please do so.

17    A.    Yes, I am sorry, 07/13/2011.  File MVI underscore

18   412.AVI indicated a file creation date of 07/13/2011.  So

19   June 13th, 2011, at 09:47:32 p.m.

20    Q.    Is 07 July I think?

21    A.    What did I say?

22    Q.    June.

23    A.    I am sorry.

24    Q.    So the creation date is off slightly by about two

25   months from the production date that you extracted from the

Pearson - Direct

1    actual video, but it was July 13th, 2011?

2    A.    Correct.

3    Q.    All right.

4          MS. BLOCH:   Ms. Wikert, if you could please play

5    those two videos.

6          Thank you.

7    BY MS. BLOCH:

8    Q.    This video file that was the second one, the MVI

9    underscore 14, did it immediately follow 12, MVI 12?  Can you

10   tell that in terms of time?

11   A.    Based on the metadata?

12   Q.    Yes.

13   A.    The initial video, the 412, it is written at 06:32

14   hours.   The second one is 06:52 hours.   So minus the time it

15   took to take the video and stuff, 15 minutes maybe.

16   Q.    Now we are at May, again, May 12th of 2011 -- I am

17   sorry, excuse me, strike that.   June 12, 2011.   These pertain

18   to Exhibits 6.1.   It's a video, am I right, Corporal Pearson?

19   This is reflected on May 12th of 2011 -- I am sorry,

20   June 12th.   That is my misstatement, I apologize.

21   A.    I thought we covered both of these.

22          Yes, June 12th there is another video similarly

23   named MVI underscore 0583.AVI.   Again, that was on

24   June 12th.

25   Q.    2011?

Pearson - Direct

1    A.    2011, yes.

2    Q.    All right.  Are you able to tell from the metadata the

3    length that the video file runs?

4    A.    Not that I know of from the specific data, no.

5              MS. BLOCH:  All right.  Ms. Wikert.

6          (Video played.)

7    BY MS. BLOCH:

8    Q.    Just so it's clear, just like I asked you about the

9    other video, this particular video had a file creation date

10   that was slightly different than its production date that you

11   found in the video.  If you could look back at your notes as

12   well, or report, was it in fact file created on July 23rd of

13   2011?

14   A.    I don't know.  I don't know that without -- the initial

15   one we found on the SD card I believe?  No.  I don't recall --

16   I don't know, I don't recall.  I just have the metadata in

17   front of me.

18   Q.    Let me see if I have that right with me.

19          Do you have this report in front of you?

20   A.    I do not have any of the images, no.

21   Q.    I am not sure I have that with me either.  I will move

22   onto the next question actually.

23          Let's talk about Count 7.  You have alluded to it

24   on your calendar a few times because it happened to fall on

25   dates that we had already calendared or discussed.

Pearson - Direct

1    A.    Certainly.

2    Q.    Count 7, as you indicated, involves, as you know, you

3    are extracting images, were you not, that pertained to the

4    possession count.  So you examined the two memory cards, am I

5    right, for that purpose?

6    A.    Correct.

7    Q.    So all Count 7 images that are reflected on your

8    calendar stem from extraction from those two pieces of digital

9    equipment?

10   A.    Media, yes.

11   Q.    So let's just look at the calendar together,

12   Exhibit No. 25.  I believe that the first such date on which

13   you found images from those two, some of which I take it with

14   respect to Count 4 you indicated that the Harley images were

15   found on the eight gigabyte memory card.  So there is

16   duplication there, correct?

17   A.    Correct.

18   Q.    So if you could just indicate the dates to the jurors

19   on which you found images from the two memory cards.

20   A.    The 13th of June, 2011, I believe as we covered

21   earlier, on the 13th there was 40 images.  Again, this is

22   all based on metadata, embedded information.  And it looks

23   like 05:40 hours a.m. on that date through 07:36 hours on that

24   date.

25         The additional image on the 16th of June,

Pearson - Direct

1   metadata indicates that it's actually at 10:16 hours, which

2   would be 10 a.m.

3            There's two more images on the 26th of June.  The

4   metadata indicates those were taken at 12:18 hours, which

5   would be a little after noon, 18 minutes after noon, and 16:40

6   hours, or 4:40.

7   Q.   Is that it?

8   A.   I believe so.

9   Q.   All right.

10           MS. BLOCH:  Ms. Wikert, if you could please, let's

11  show those images if you can starting obviously with 7.1 and

12  1A.

13           THE COURT:  When we complete the 7 series, we will

14  break for lunch.

15  BY MS. BLOCH:

16  Q.   This is one of the images we have already looked at, is

17  it not, that was on -- relative to Count 4, the production

18  count?

19  A.   Correct.

20  Q.   So, again, these are in fact on the eight gigabyte

21  SanDisk?

22  A.   Yes, from the victim, Harley.

23           MS. BLOCH:  Just so there is not duplication, are

24  those the first 23 images?  Are you able to tell quickly?  I

25  was just going to jump ahead, but if you can't, we can just

Pearson - Direct

1    play -- let's play the images.

2              You can go quickly through these since we have

3    already seen these.

4              Are those all the 7s?

5              Thank you.

6              THE COURT:  As I understand it, you have shown all

7    the images relating to all seven of the charges, correct?

8              MS. BLOCH:  Correct.

9              THE COURT:  Okay.  We are going to break for lunch

10   now.  Ladies and gentlemen, I want to again caution you, you

11   are not supposed to talk about this case, even among

12   yourselves, nor with anyone else.  You should not permit

13   anyone to talk to you about the case.  So you don't talk about

14   the case.  If you come back early for lunch and you are

15   sitting back in the jury room, you don't talk about the case.

16             Don't listen or read anything about the case, do

17   not do any Internet or other researches, and don't form any

18   opinions until the evidence is all in.

19             We will resume at 1:30.  I will be back as soon

20   as -- as close to that time as I can.

21             It's crisp outside, but I encourage you to go out

22   and walk around and enjoy the Burgh.

23             Anything else on behalf of the Government?

24             MS. BLOCH:  Nothing else, Your Honor, thanks.

25             THE COURT:  Defendant?

1          MR. CHONTOS:  No, Judge.

2          THE COURT:  Okay.  You may go to lunch.  I would

3   like everyone to stay in place while the jury goes out to

4   lunch and then everybody else can go to lunch after the jury

5   has cleared the door.  Okay.  So everyone may remain seated

6   and the jurors may go to lunch.  See you about 1:30.  Be back

7   at about 1:20 for me if you would, please.  Thanks.

8          (Jury exits courtroom.)

9          (In open court; jury not present.)

10          THE COURT:  Anything else on behalf of the

11  Government?

12          MS. BLOCH:  Nothing else, Your Honor, thank you.

13          THE COURT:  On behalf of the Defendant?

14          MR. CHONTOS:  Judge, yes.  I chatted with the

15  marshal's representative here.  He would like the opportunity

16  to chat with his brother and sister.

17          THE COURT:  Any objection?

18          MS. BLOCH:  I do object.  I don't think the

19  Marshal's Service allows contact.

20          THE COURT:  The Marshal Service will work with me.

21  Do you have any objection to his, in the custody of the

22  marshals, talking to his brother and/or sister?

23          MS. BLOCH:  Are they witnesses?

24          MR. CHONTOS:  No.

25          THE COURT:  Okay.  What are their names, please?

1              MR. CHONTOS:  Don Warner and -- your sister's first

2    name?  Rhonda Gilmore.

3              THE COURT:  They are not going to be called by the

4    Government, correct?

5              MS. BLOCH:  That's correct.

6              THE COURT:  They are not going to be called by the

7    Defendant, correct?

8              MR. CHONTOS:  They are not.

9              THE COURT:  So subject to whatever rules the

10   marshals want to have in place, if the marshals wish to permit

11   the brother and sister of the Defendant to chat with him over

12   lunch, they may do so.

13             MR. CHONTOS:  Judge, here's those parameters and

14   that's why I brought it up.  I asked down on the second floor,

15   lawyers, screen, they have a conference room.  There's room

16   for two other individuals.  That's a no-no under their rules.

17             I then said, could we right here in the courtroom,

18   judge clears everyone out but for you, Mr. Warner, myself, and

19   his brother and sister to sit right here at the table and we

20   can converse.  Again, the reaction was, that's a no-no.

21             So that's why I bring it up because it doesn't seem

22   as though we can have a workable solution.

23             THE COURT:  The marshals will work through it.  If

24   that means only one person is in the room at one time, then

25   only one person is in the room.

1              MR. CHONTOS:  Oh, I don't think -- their

2     opposition, I don't mean to speak for them, it's like one,

3     two, or three, one's not allowed, two's not allowed, and

4     clearly three's not allowed.  It is a blanket.

5              THE DEPUTY MARSHAL:  Judge, family members are not

6     allowed in the interview room.  I told counsel they can sit

7     here and have a conversation back and forth.  He can't sit

8     with them because he's in custody.

9              THE COURT:  Sure.  Are you able to bring him back

10    here at --

11             THE DEPUTY MARSHAL:  We will stay here until they

12    have their conversation.

13             THE COURT:  Okay.

14             MR. CHONTOS:  But the parameters --

15             THE COURT:  I have got a Board of Judges meeting.

16    So I need to go.

17             MR. CHONTOS:  Judge, I understand that, but can

18    Mr. Warner sit in his chair so what separates him from the

19    family is the front rail?

20             THE COURT:  We will go into recess, you can take

21    the Defendant back down.  We will figure out how to do this

22    some other time.  Take care.  Thank you.  The marshals may

23    remove the Defendant.

24             (Lunch recess taken.)

25             (After lunch recess; on record in open court.)

Pearson - Direct

1          THE COURT:  Ladies and gentlemen, thank you for

2     being back here on time, I appreciate it very much.

3          You may continue your examination.

4          MS. BLOCH:  Thank you, Your Honor.

5          DIRECT EXAMINATION (Continued)

6     BY MS. BLOCH:

7     Q.    Corporal Pearson, before we move on to some of the,

8     what we are calling additional images that you referenced on a

9     particular calendar, Exhibit No. 25, I want to talk to you for

10    a second again about some of the questioning we went through

11    regarding Count 6 and the video that we played.  That you have

12    referenced on your calendar as being on June 12th, correct?

13    A.    Correct, June 12th.

14    Q.    Just explain again the June 12th day you acquired,

15    that was the metadata that was inside the video, am I correct?

16    A.    That is correct, yes.

17    Q.    Separate from that we had been discussing file creation

18    dates and what that means.  My understanding of your testimony

19    thus far is that you can create a file, so to speak, and that

20    date is reflected when you look at a particular file, such as

21    a movie file, when someone takes it from a camera to a

22    computer?

23    A.    File creation is technically in the file system, is any

24    time that file is placed on a new drive or a new storage

25    device, like a hard drive.  So if I copied it on January 1st

Pearson - Direct

1  to your drive, no matter what the metadata says, the file

2  creation date will be January 1st.  Now, eight months later,

3  August 1st, you take that copy to another device, another

4  hard drive, separate, that would now reflect the August 1st

5  creation date because it's the date you are creating that file

6  on that device.

7  Q.   So if you were to take a movie file that you used a

8  camera for and loaded it onto your computer say on

9  July 23rd, 2011, even if you had produced it in June, it

10  would show up as a file creation date at that time that you

11  loaded all your images from your camera onto your computer?

12  A.   Correct.

13  Q.   I think I asked you, I am not exactly sure how I

14  phrased it, but I asked you what the file creation date that

15  appeared -- you answered it with respect to the videos

16  displayed at Count 5, but Count 6 you couldn't recall?

17  A.   That's correct.

18  Q.   Over the course of the break did you look back at the

19  evidence and refresh your recollection as to the date on which

20  it revealed the file was created?

21  A.   I did, yes, I did.

22  Q.   What did that indicate?

23  A.   That reflects July 23rd of 2011 as the creation date.

24  Q.   So that's a difference of about a little over a month?

25  A.   Correct, the metadata shows June 12.

Pearson - Direct

1    Q.   Right.  So when you did your metadata analysis of the

2    videos and the still images on the disks, that was

3    post-indictment and much -- that was some time after you did

4    your analysis of the memory cards?

5    A.   Yes.

6    Q.   Okay.  Now, I would like to talk --

7         MS. BLOCH:  Ms. Wikert, if you could bring up

8    Exhibit No. 25.

9    BY MS. BLOCH:

10   Q.   I just want to sort of finish out our calendar.  We

11   have talked a lot about these additional images that you have

12   referenced on the particular dates.  Were you requested in

13   your extraction process of picking out images that displayed

14   the sexual exploitation of a child, you pulled it all down

15   based on upon your training and experience, is that correct?

16   A.   That's correct.

17   Q.   We have talked a lot about the specific images that

18   apply to the various counts that are charged, Counts 1 through

19   7?

20   A.   Yes.

21   Q.   But there are additional images, right?

22   A.   Yes.

23   Q.   That's why you referred to them as such?

24   A.   As additional images, that's correct, on the calendar.

25   Q.   It is not my intention, Your Honor, to publish those

Pearson - Direct

1    individually to the jury, but I would like to discuss with you

2    what the contents of those additional images are, who the

3    victims are by your recollection from the others.  Are they

4    one in the same?  Do they depict the girls that are depicted

5    in the images and videos at Counts 1 through 7?

6       A.   The images that are kind of inclusive on the calendar

7    are images depicting child pornography and they are inclusive

8    of all three of the child victims, Faith, Harley, and

9    Margie -- Margaret, Margie, MC I guess.  So they are inclusive

10   of all three child victims.

11      Q.   In some images are the girls naked and there is full

12   display of their genitalia?

13      A.   Correct, yes.

14      Q.   Are there some images not unlike the ones we have

15   already seen where sometimes it was just a focus on a

16   clothed --

17      A.   Clothing.

18      Q.   Unzipped pants or something like that?

19      A.   Correct.

20      Q.   Let's just then look to the calendar.  Most of these

21   additional images -- well, actually there are two dates in

22   May, correct -- rather, three -- excuse me, four dates in May

23   on which you have plotted on the calendar as having discovered

24   images that meet that definition, so to speak, in your mind

25   and which have been moved -- they are in evidence.  If you

Pearson - Direct

1    could just lay out for the jurors exactly what those mean.

2    A.   On May 1st you will see the inclusion of additional

3    images.  There's one image there created at 06:40 hours, again

4    in the morning, a.m.

5          On the 11th, there's the inclusion -- there's

6    additional images that were located again via metadata.  There

7    were 11 images on the date May 11th.  Again, in the morning.

8    This is a longer time span, 06:40 hours through 19:15 hours,

9    which is like 7:15 p.m.  So this spans the whole day on the

10   11th.

11         On the 12th of May we have seven additional

12   images, which runs the time span of 05:16 a.m. to 07:05 a.m.

13   hours, early morning.

14         And on May 31st we have 12 additional images,

15   again from 04:37 hours to 04:48 hours.  Again, in the early

16   morning hours.

17         MS. BLOCH:  In June, please, Ms. Wikert.

18         THE WITNESS:  On June 5th, there were two images.

19   Again, approximately 03:18 hours.  That would be division by

20   seconds, so they didn't specify, but somewhere in that minute.

21   BY MS. BLOCH:

22   Q.   So that's 3:18 a.m.?

23   A.   Yes, correct.  Sorry.

24         On the 6th of June, you are looking at 27

25   additional images running from the hours of 14:30 -- so,

Pearson - Direct

1  again, that's like 2:30 in the afternoon -- to 18:49, which is

2  like 6:49 p.m. in the afternoon.  Again, that was 27 images on

3  the 6th of June.

4          On the 7th of June, there were five additional

5  images, running the hours of 06:12 a.m., 6:12 in the morning,

6  to 6:16 in the morning.  So, again, five images on the 7th.

7          On the 26th of June, there was one additional

8  image, again that was taken at 16:40 hours, which is like 4:40

9  in the afternoon.  Again, that was on the 26th of June.

10  Q.    Thank you.

11          MS. BLOCH:  One moment, Your Honor.

12  BY MS. BLOCH:

13  Q.    I just want to ask you a question in your expert sort

14  of forensic capacity and based upon your experience, your

15  training, all of the information obviously that you've shared

16  with the jurors.  If in the regular world when someone takes

17  pictures using a digital camera or videos using a digital

18  camera, based upon, again, your experience and training, what

19  is your expert opinion as to whether or not images, for

20  example, taken with this Canon PowerShot IS120, that in

21  addition to the metadata which you have described reflects the

22  actual production date, that this file creation date is

23  reflective of the producer's transfer of those images to his

24  computer?

25  A.    Okay.

Pearson - Direct

1    Q.   Let's speak to that.  Am I phrasing that --

2    A.   What was the question?

3    Q.   Well, the question is, given your experience, training,

4    and your expert knowledge of how -- what the process generally

5    is --

6    A.   Certainly.

7    Q.   -- would it be your expert opinion that in fact the

8    person who produced the images with this Canon PowerShot, all

9    of the images that we've displayed to the jury today, that

10   they were transferred to a computer that generated that file

11   creation date?  Every one of these images had it, does it not?

12   A.   For the disks, CDs, excuse me?

13   Q.   Correct.

14   A.   That is the general procedure that the average home

15   user or average user would ever use to create -- save their

16   pictures off from the camera to your computer so you can use

17   them in whatever capability you are going to use them for.

18   But then when you want to back them up or give them away, you

19   put them on CD from the computer.

20   Q.   By giving them away, do you mean email or share them?

21   A.   Sure, relatives.  Sure.

22        MS. BLOCH:  I have no further questions,

23   Your Honor.

24        THE COURT:  Just so the record is clear, when you

25   were talking about the additional images, you are talking

Pearson - Cross

1    about the 8.1 through 8.66A, correct?

2              MS. BLOCH:  That is correct, Your Honor.

3              THE COURT:  Okay.  So they are in evidence, but you

4    decided not to show those to the jury, correct?

5              MS. BLOCH:  Correct.

6              THE COURT:  Okay.

7              MS. BLOCH:  Well, at least through this witness I

8    should say.

9              THE COURT:  Correct.  I understand.

10             You may begin at your convenience.

11             MR. CHONTOS:  Thank you, Judge.  Could I have 13.1,

12   please.

13                         CROSS-EXAMINATION

14   BY MR. CHONTOS:

15   Q.    Exhibit 13.1 is the memory card that you examined?

16   A.    Yes, sir.

17   Q.    Based on your understanding, that's a four gigabyte

18   SanDisk and that was in the Canon camera that you looked at,

19   right?

20   A.    That's correct, sir, yes.

21             MR. CHONTOS:  Exhibit 14.1.  Thank you.

22   BY MR. CHONTOS:

23   Q.    That's a SanDisk eight gigabyte memory card that you

24   also examined?

25   A.    That's correct, sir.

Pearson - Cross

1    Q.    Your understanding is that was just laying around the

2   house, orphaned I think is the phrase we used?

3    A.    That is correct, yes, sir.

4    Q.    Are you able to tell us, looking at this Exhibit 14.1,

5   the eight gigabyte memory device, the date of the first photo

6   on that exhibit?

7    A.    Forensically looking at it or looking at it like this?

8    Q.    Oh, forensically.

9    A.    Okay.  I can only tell you, again, not sitting where I

10  sit right today, without looking at it, as I sit here, I

11  cannot tell you specifically the first image found on that,

12  but the card has been used 100 times I guess.  So if I took a

13  picture of a tree and then three days later I took a picture

14  of a cow, I can tell you when the tree picture was taken.  Do

15  you know what I mean?

16   Q.    So on those memory cards when you actually use an

17  external matter such as a camera, when that memory card is

18  inside that camera, when you actually hit delete, it actually

19  does what it's promised, it deletes it from that memory card;

20  is that what you're telling us?

21   A.    Potentially, yes.

22   Q.    Potentially or in this case?

23   A.    Like are there deleted images on the card, is that the

24  question you are asking?

25   Q.    No.  Does this Canon camera have the capability to

Pearson - Cross

1   delete an image from a memory card such as this when it's

2   inside?

3       A.   I do not know specifically about this camera.

4       Q.   So are you in a position to tell us from your

5   examination of the 14.1, the eight gigabyte memory device, as

6   to when the last image was on that -- was placed on that

7   device?

8       A.   Maybe.

9       Q.   Okay.  Real similar answer to the first, you were a

10  little equivocal on the first, equivocal fairly on the last

11  date, right?

12      A.   Certainly.

13      Q.   Same series of questions with the four gigabyte that

14  was inside the Canon camera.  You are a little equivocal on

15  the date of the first photo, a little equivocal on the date of

16  the last photo; fair?

17      A.   Fair.

18      Q.   Exhibit 25, you looked at two months, May of 2011 and

19  June of 2011?

20      A.   That is correct.

21      Q.   Okay.  Can we reach the conclusion that when you

22  examined all the stuff, two memory cards, the CDs taken from

23  Cruz's work place, can we conclude that all that stuff gives

24  you no photograph, no image taken prior to May 1 of 2011?

25      A.   We can conclude that the metadata fits within the range

Pearson - Cross

1  of May and June.

2  Q.   Very well.

3       Based upon your forensic review, there is no

4  metadata on any of the stuff that you reviewed that points to

5  an image prior to May 1?

6  A.   There should not.

7  Q.   Likewise, the metadata of the stuff that you reviewed,

8  the two memory sticks and the CDs from Cruz's work place, also

9  tell you that there's no images with a date past July 1 of

10 2011?

11 A.   That's correct, yes, sir.

12 Q.   So essentially all the metadata tells us is we are

13 dealing with two months?

14 A.   May and June, correct, 2011.

15      MR. CHONTOS:  12.3.

16 BY MR. CHONTOS:

17 Q.   12.3 is the Canon camera, right?

18 A.   Yes, sir.

19 Q.   In that can you see where I am pointing?

20 A.   Yes, the trash bin icon.

21 Q.   That's the place where the user of that camera would

22 hit to delete an image that appears on the view finder, right?

23 A.   Probably, yes, sir.

24 Q.   Why is there a little hesitation with the "probably?"

25 A.   I have never done it, so I am not going to say

Pearson - Cross

1    100 percent.  It could be other things, but I am going to say

2    that picture generally means you are going to trash something

3    or, you know --

4       Q.    Is it your understanding that when you delete photos on

5    that particular camera they are not stored in some sort of

6    internal non-memory stick location?

7       A.    I am sorry, I don't understand the question.

8       Q.    Earlier you told us about that some cameras have a

9    little bit of what I will label internal memory.

10      A.    Certainly, yes.

11      Q.    Does this Canon camera have that internal memory?  I

12   think you indicated no.

13      A.    I don't know.

14      Q.    Sir, you authored a report April 11, 2012, did you not?

15      A.    Yes, sir.

16      Q.    Do you have that with you?

17      A.    I believe I do.

18            Yes, sir.

19      Q.    That report uses the phrase, "images of girls deleted

20   and non-deleted," at the top of Page 2.

21      A.    Correct.

22      Q.    I am curious as to the use of the phrase, "deleted."  I

23   understand what non-deleted is.  There is an actual image.

24      A.    That's correct.

25      Q.    But your use of the word "deleted," based upon what we

Pearson - Cross

1  have heard so far, you don't have a clue as to whether things

2  were deleted or not, right?

3      A.   Oh, no, I didn't say that.

4      Q.   Why in that report is the phrase "deleted" referenced?

5      A.   Because several of the images found on the card had

6  been deleted.  Through the use of my forensic software I am

7  able to recover these files that had been deleted by a user.

8      Q.   How does that square then with what we learned just a

9  little bit ago that when you delete something from that memory

10 card it does get deleted?

11     A.   I believe your question was, can you tell what the last

12 photo was on the thing, on the media card.  I believe that was

13 the question.  Basically --

14     Q.   Well, that was a question.  You have answered that.

15     A.   Okay.

16     Q.   But using these two SanDisks inside a device such as a

17 Canon camera, when you hit delete, that deletes it from that

18 little memory stick, right?

19     A.   If there is a deletion function, then it should delete

20 it, yes, on the memory card.

21     Q.   This Canon camera had the delete function?

22     A.   It has the icon which indicates delete or trash.

23     Q.   What I am trying to figure out is, the Canon camera has

24 a delete function.  We know that if it operates properly with

25 a memory stick inside and you hit delete, that memory stick

Pearson - Cross

1    will not maintain that image.

2        A.    Correct.

3        Q.    But yet in your report you make reference to deleted

4    matters.

5        A.    Correct.

6        Q.    Sir, the -- I know you reviewed the two CDs, the

7    compact discs found at Cruz's work place, right?

8        A.    That's correct, sir.

9        Q.    Were you ever asked to review what I will label Cruz's

10   collection that came from San Diego via Denver?

11       A.    I did forensically work on the Cruz case, but not in

12   conjunction with this case.

13       Q.    Very well.  Basically do you recall the number of

14   images that Cruz's collection was made of?

15       A.    I don't.  I don't.

16       Q.    Any number you throw out there would be purely a guess?

17       A.    Oh, yes.

18       Q.    Sir, Count 5 deals with one of the videos.  Are you

19   able to tell us the date that that video was made?

20       A.    I can only show you the metadata that was embedded

21   within the video file itself, but that's as far as I know.

22       Q.    The same goes for Count 6?

23       A.    Correct.

24       Q.    That's a video count as well?

25       A.    Yes.

Pearson - Cross

1    Q.   Not to mislead you, but Count 5 had two video clips.

2    A.   Certainly.

3    Q.   One was much shorter than the other.

4         Sir, were you aware of several cell phones taken

5    from Mr. Earl Warner's residence?

6    A.   I believe so, yes.

7    Q.   Did you forensically analyze those phones?

8    A.   I personally did not, no.

9    Q.   You're like the supervisor of that forensic unit for

10   northwestern Pennsylvania, right?

11   A.   That's correct, sir.

12   Q.   So when you say "I personally didn't," you would know

13   if one of your subordinates did as well, right?

14   A.   I know who did, yes.

15   Q.   Was that done by a subordinate?

16   A.   Yes, it was.

17   Q.   It's fair to say that there's no linkage with what was

18   found or lack of things found on those Earl Warner phones to

19   this case?

20   A.   Correct.

21   Q.   Otherwise, you would have already talked about it?

22   A.   Yeah.

23   Q.   Was that a yes?

24   A.   That was a yes, sir.

25   Q.   Sir, we have walked through the various counts and I am

Pearson - Cross

1   going to try my best to walk through those counts and give a

2   source of the information.   I am going to ask you at the end,

3   do you agree with that summarization of the source.   I have a

4   little chart to help maybe.

5               Count 1, the source was the Cruz work place CDs, is

6   that right?

7   A.   Are we going per count?

8   Q.   Yes.

9   A.   I believe so.

10  Q.   Count 2, Faith, the CD is from the CDs from Cruz's work

11  place?

12  A.   I believe so, yes, sir.

13  Q.   Count 3, Cruz's CDs and the memory card?   Count 3 is

14  the Steeler outfit if that rings a bell.

15  A.   I know there was a large portion on the CD, I am just

16  trying to rehash the memory card.   I don't recall if it

17  exactly came from the memory card or not, but I know a portion

18  came from one of the CDs.

19  Q.   Count 4, just the memory card?

20  A.   Yes, sir.

21  Q.   Count 5, that's one video -- or two short videos?

22  A.   Correct.

23  Q.   The Cruz work place CDs?

24  A.   Yes, correct.

25  Q.   Count 6, the longer video with audio, Cruz's work place

Pearson - Cross

1   CDs?

2   A.   Correct.

3   Q.   Count 7, as you described, simple count of possession,

4   memory card?

5   A.   Memory cards, correct.

6   Q.   Sir, you walked through Count 7, possession, two memory

7   cards, and you indicated that there were 40 images created on

8   June 13, 2011.  Do you remember that?

9   A.   May I refer?

10  Q.   Absolutely.

11  A.   Thank you.

12       You said what date was that, sir?

13  Q.   June 13, 2011.

14  A.   For Count 7?

15  Q.   Yes.

16  A.   Yes, I indicated 40 images.

17  Q.   Right.  That wasn't all for Count 7 because you then

18  segued to one image on June 16, right?

19  A.   Correct.

20  Q.   Two images on June 26th, correct?

21  A.   Correct.

22  Q.   My math, 43 images would support Count 7?

23  A.   Correct, sir.

24  Q.   You also indicated that Count 4, Harley, of those 40 on

25  June 13, 23 support Count 4, correct?

Pearson - Cross

1    A.    They were on the memory card, yes, sir.

2    Q.    So 43 to start, take out 23 going to Count 4, we're

3  left with 20 at Count 7; agree?  Is my math right?

4    A.    I am not sure how many were charged or how that works:

5  Your math is correct, I am not sure of the legal end of it.

6    Q.    I understand.  Now, sir, I want to make sure that I

7  understand file creation date, metadata date, any differences.

8  Okay?  I have a digital camera in my hand.  I have a little

9  memory stick inside.  I take a picture.  That would be a file

10 creation date as I took it right today, right?

11   A.    Today's date, yes, sir.

12   Q.    Yes, it would bear all that metadata, including today's

13 date, right?

14   A.    As long as the camera is set accurately, yes, sir.

15   Q.    Does that mean that that camera is a lot like the VCR

16 on our televisions that we have got to set the date correctly?

17   A.    Certainly, yes.

18   Q.    Does that same theory apply to the underlying metadata?

19   A.    Oh, yes, sir.

20   Q.    So the first time the camera is opened up out of the

21 box you stick your little memory device in the camera, on the

22 view finder it is going to walk through with you to set like

23 the date and time and things like that?

24   A.    Potentially, yes, sir.

25   Q.    If the operator does not take that preliminary step of

Pearson - Cross

1    setting the date and the time and whether you want English or

2    French or what timezone you're in, they don't walk through all

3    of those prompts, is there metadata?

4    A.   Yes, yes.  Like I said, I would guess so, surmise so,

5    yes, sir.

6    Q.   All right.  Go back to my example.  I take that today.

7    A week from today I take that little memory chip out of my

8    camera and I put that on my laptop.  If you were to then look

9    at my laptop, the file creation date would be seven days from

10   today, right?

11   A.   If you copied the pictures from your card onto your

12   hard drive on your laptop, yes, sir.

13   Q.   If you were to then look at my laptop about eight days

14   from now, looking back seven days or just the day before, the

15   metadata would be different than the file creation data?

16   A.   Metadata doesn't change.  It will also stay the date of

17   today.

18   Q.   Very well.  All right.  Now, sir, on the Count 6,

19   that's the video with some audio, we come up with a new phrase

20   "production date."  Is that the same as file creation date?

21   A.   I think if we were using the term "production date,"

22   that would be closer, more akin to the metadata date.

23   Q.   Why is that?

24   A.   Because that would be a better time, essentially a more

25   solid time because the camera or the machine that is doing the

Pearson - Cross

1    content creation, in this case the Canon camera, is stamping

2    it internally with the date and time that should be fixed.

3            So if you use the term "file creation date," if I

4    wait a month and a half from now and burn it to a computer --

5    excuse me, copy it to a computer, now the file creation date

6    is changed to whatever that date is of the copy.

7    Q.    Sir, you are of the opinion, are you not, that the

8    videos from Count 5 and the videos from Count 6 were taken by

9    the same camera, right?

10   A.    Correct, yes, sir.

11   Q.    It is your belief that that was the Canon camera here?

12   A.    That's correct, sir, yes.

13            MR. CHONTOS:  That's all I have.  Thank you.

14            THE COURT:  Any redirect?

15            MS. BLOCH:  Yes, Your Honor, I do.

16            THE COURT:  You may begin.

17                    REDIRECT EXAMINATION

18   BY MS. BLOCH:

19   Q.    First, Corporal Pearson, I just need --

20            THE COURT:  Just wait until you come back to the

21   microphone, please.  Thank you.

22   BY MS. BLOCH:

23   Q.    I just didn't want things to be a little bit confused.

24   The calendar that you generated was based upon and only on

25   images that you believed met the parameters of this case

Pearson - Redirect

1   generally, that is, that they pertained to the exploitation of

2   children?

3       A.   That's correct.

4       Q.   Were there any images that you didn't pull on the

5   memory cards, for example, or on the disks that were not

6   imagery that pertained to child pornography?

7       A.    Certainly.  I mean, images that we discussed earlier

8   like the driver's licenses.  There are pictures I recall of

9   like a dirty bedroom, kind of a messed up bed, dirty laundry,

10  things like that that are not included on the calendar.

11      Q.   For that reason there are dates that are not plotted on

12  this month, they could have been before or after May and June?

13      A.   They certainly could have, yes.

14      Q.   We did talk, however, specifically about one particular

15  image that you did indicate on the four gigabyte memory card,

16  I believe you testified in reference to Exhibit No. 7.44.

17  This image, this was the four gigabyte that had the driver's

18  license on it?

19      A.   That is correct.

20      Q.   This particular image had metadata that was dated as

21  late as October 2nd of 2011, correct?

22      A.   That is correct.

23      Q.   So were there other images that may have been on that

24  memory card that were not images pertaining to child sexual

25  exploitation that aren't here?

Pearson - Redirect

1    A.    I believe the driver's license metadata was in
2    September sometime, it was way out of this realm.
3    Q.    So metadata applies to images that are innocent, of a
4    cow, for example, and images such as we're talking about here?
5    A.    Certainly.
6    Q.    So that's why there's metadata even associated with the
7    driver's license?
8    A.    Sure.
9    Q.    It's not plotted on the calendar, however?
10   A.    Correct, this is just on images pertinent to the reason
11   at hand.
12   Q.    So when you were asked by Mr. Chontos whether or not
13   you could date -- he asked you if everything was confined to
14   May or June.  Your answer to him was, yes.  Was that in
15   keeping with the images that we are speaking about in court
16   today?
17   A.    Certainly, yes.
18   Q.    Did you -- were you ever tasked with assessing the
19   parameters of the dates of the use of the camera, for example,
20   on dates that had nothing to do with this case?
21   A.    No, no.
22          MS. BLOCH:  One moment, Your Honor.
23   BY MS. BLOCH:
24   Q.    There is one other thing I would like to clarify,
25   Corporal Pearson.  When we were talking about the videos, on

Pearson - Redirect

1   direct examination and then referenced in cross we were

2   talking about how post-indictment you looked inside these

3   videos and you could actually find for the first time a date

4   that we are using now that we are calling a production date.

5   Prior to that was it your belief that all we had was the file

6   creation date for those videos?

7   A.   Yeah, that's correct.  In fact, I was asked directly

8   numerous times, or at least asked directly once, reference

9   metadata in video files.  I basically stated that it's not

10  common, you don't see it on cell phone videos, so I am going

11  to say, no, there is not going to be any metadata on the

12  videos.

13         Then as we got down closer and I started

14  specifically looking within the file itself, I found the

15  metadata sitting there and I reported on it.

16  Q.   Just so it's clear, with respect to the two short

17  videos that are made -- that made up Count 5 of this

18  indictment -- let me just grab something, one second.

19         Count 5 specifically says that on or about

20  July 13th of 2011.  That was the file creation date,

21  correct?

22  A.   Based on the CDs.

23  Q.   Right.  Then approximately -- you then found the

24  production date which you testified to, which I believe is

25  reflected on your calendar and shows it as being May 12th?

Pearson - Redirect

1    A.   That is correct.

2    Q.   So approximately two months earlier?

3    A.   Correct.

4    Q.   With respect to Count 6, as you indicated just after we

5    returned from lunch, the file creation date on that file was

6    July 23rd of 2011?

7    A.   Correct.

8    Q.   I believe earlier you testified, in keeping with your

9    calendar, that Count 6 was produced on June 12th,

10   approximately one month earlier?

11   A.   June 12th, correct.

12        MS. BLOCH:  I have no further questions,

13   Your Honor.

14        THE COURT:  Any recross?

15        MR. CHONTOS:  Yes, sir.

16             RECROSS-EXAMINATION

17   BY MR. CHONTOS:

18   Q.   Sir, on CD1 taken from Cruz's work place, what's the

19   grand total of images, good, bad, or ugly, on that CD?

20   A.   I don't know.

21   Q.   Same question for CD2 from Cruz's work place, same

22   answer?

23   A.   I have no idea.

24   Q.   Same question for the four gigabyte little memory

25   stick.

Pearson - Recross

1    A.    I do not know.

2    Q.    Same answer, same question for the eight gigabyte?

3    A.    Again, correct.

4          MR. CHONTOS:  Thank you.

5          THE COURT:  Any additional questions?

6          MS. BLOCH:  No, thank you, Your Honor.

7          THE COURT:  Okay.  May the witness be excused on

8    behalf of the Government?

9          MS. BLOCH:  He may, thank you.

10         THE COURT:  Defendant?

11         MR. CHONTOS:  Yes, Judge.

12         THE COURT:  Thank you, sir.

13         THE WITNESS:  Thank you, sir.

14         (Witness excused.)

15         THE COURT:  You may call your next witness.

16         MS. BLOCH:  Your Honor, the Government calls Fawn

17   Mills.

18         FAWN MILLS, a witness herein, having been first duly

19   sworn, was examined and testified as follows:

20         THE WITNESS:  Fawn Marie Mills, F-A-W-N, M-A-R-I-E,

21   M-I-L-L-S.

22                DIRECT EXAMINATION

23   BY MS. BLOCH:

24   Q.    Good afternoon.  Would you please state your name again

25   and you need to make sure you speak into the microphone so you

Mills - Direct

1  can be heard.

2     A.    Fawn Marie Mills.

3     Q.    Ms. Mills, are you the mother of Faith?

4     A.    Yes.

5     Q.    I am going to ask Ms. Wikert to put up Exhibit 3.1A.

6  You are going to see it on your little screen.  Do you

7  recognize the girl in this picture?

8     A.    Yes.

9     Q.    Who is that?

10    A.    That is my daughter, Faith.

11    Q.    Ms. Mills, where do you presently live, the general

12 area?

13    A.    Mercer, Pennsylvania.

14    Q.    How long have you lived in the Mercer area?

15    A.    I just moved back into Mercer probably about two months

16 ago.

17    Q.    Have you spent most of your adult life in Mercer,

18 Pennsylvania?

19    A.    Yeah.  Between Mercer and Fredonia, yeah.

20    Q.    Where is -- am I pronouncing it right, Fredonia?

21    A.    Yes.

22    Q.    Where is it?

23    A.    A small town on the other side of Mercer.

24    Q.    Do you know the Defendant, Earl Warner?

25    A.    Yes.

Mills - Direct

1    Q.    How do you know Earl Warner?

2    A.    His daughter and my daughter, Faith, were really good

3    friends.

4    Q.    Were they approximately the same age?

5    A.    Yes.

6    Q.    Did you -- the home, the various homes you have lived

7    in in Mercer, were they proximate to Mr. Warner's home?

8    A.    When they were friends, yes.

9    Q.    About how far did they live apart when they were

10   friends?

11   A.    Probably just like a few blocks.

12   Q.    A few blocks.  How old -- if you could just describe

13   the time frame that you recall Faith and Mr. Warner's daughter

14   being friends.

15   A.    Probably about close to a year they were friends.

16   Q.    Was this approximately the time that Faith was 11, 12

17   years old?

18   A.    Yeah.

19   Q.    Is that the first time that you met Mr. Warner in

20   connection with their friendship or did you meet him in some

21   other way or know him --

22   A.    That was the first time.

23   Q.    Were you ever in his home?

24   A.    Yes.

25   Q.    What were the reasons that you were in his home?

Mills - Direct

1    A.   I would go up to get Faith.  Faith spent a lot of time

2  with Brianna, and I went up there with the girls and went up

3  to visit when we got bored, it was just a companion, company.

4    Q.   Did you drive there, walk there?

5    A.   Mostly walk.

6    Q.   Were there occasions during their friendship that Faith

7  would sleep over at the Warner home?

8    A.   Yes.

9    Q.   Similarly, did his daughter ever sleep at your home?

10    A.   No.

11    Q.   Is there a reason why?

12    A.   She always told me she -- because we invited her a

13  lot --

14         MR. CHONTOS:  Objection, Judge, hearsay.

15         THE COURT:  Well, first of all, who's the "she?"

16         THE WITNESS:  Brianna.

17         THE COURT:  So I will sustain the objection.

18  BY MS. BLOCH:

19    Q.   Let's talk about the last home that Mr. Warner lived in

20  that you were in or that Faith was in, where was that located,

21  do you remember?

22    A.   Brandy Springs Road.

23    Q.   Is that the one that is within a few blocks of your

24  home?

25    A.   Yes.

Mills - Direct

1    Q.    Prior to that, he lived elsewhere, correct?

2    A.    Not to my knowledge.  The whole time I knew him he

3    lived at Brandy Springs.

4    Q.    When you were inside Mr. Warner's home, were you

5    downstairs, upstairs?  Where were you within the house?

6    A.    Mostly downstairs unless -- I mean, I went upstairs a

7    couple times just walking to use the rest room.  But it was

8    mostly downstairs.

9    Q.    Do you remember now how Faith and Mr. Warner's daughter

10   became friends initially, how they met?

11   A.    School.

12   Q.    Did they go to the same what, elementary school or --

13   A.    Yes.

14   Q.    At some point in time did Mr. Warner provide Faith with

15   a cell phone?

16   A.    Yes, he did.

17   Q.    Do you know the circumstances around that?  How was it

18   that he --

19   A.    He bought her a cell phone and when I tried to call her

20   the one day, it was blocked.  He had it on there where only

21   him and Brianna could call her, no one else could get through.

22   Q.    I am going to stop you there for just a second and

23   backtrack a little and get to that cell phone.

24         How long had Faith been hanging out at the Warner

25   house at the time that Mr. Warner bought her a phone?

Mills - Direct

1    A.    It probably would have been seven, eight months.

2    Q.    During that seven-, eight-month period, did he, to the

3    best of your knowledge, buy Faith any other gifts?

4    A.    He told me about, like, he bought her like pants,

5    shirts.  He bought her like hair stuff, makeup.

6    Q.    Did Faith ever show you the things that he bought her?

7    A.    No.

8    Q.    At any point in time during this approximate year that

9    they were friends did Mr. Warner have a conversation with you

10   about adopting Faith?

11   A.    Yes, he did.

12   Q.    What was the substance of that conversation?

13   A.    I told him, no, she was my daughter.

14   Q.    What did he say?

15   A.    He wanted to adopt her so that way because he -- he

16   said that he knew I was low on money and he could be a better

17   parent.

18   Q.    At any time during this seven-month to a year

19   friendship did Mr. Warner give you money or give you food?

20   A.    A couple times.

21   Q.    What were the circumstances that he did that?

22   A.    I thought it was just out of friendship to help me out

23   because I was low on cash and food a couple times.  And he

24   just made the agreement that as long as I let Faith go up

25   there and hang out with Brianna, it was kind of like there was

Mills - Direct

1    a couple times like he gave me some tobacco and it was like

2    for cigarettes.  And when I had tobacco, he was out, I would

3    return it.  We kind of like shared like as far as that goes.

4    But as far as food and that, he never asked for it back.

5        Q.   So he would ask for the tobacco back for himself?

6        A.   Yeah, if he was out and I had extra.

7        Q.   So you started to say something that when he gave you

8    money and he gave you food, it was because as long as Faith

9    could come over?

10       A.   Yeah.

11       Q.   What is it that he said in connection with giving you

12   the money and giving you the food that made you believe that

13   it was in exchange for Faith?

14       A.   He says as long as I let Faith come up to hang out with

15   Brianna, being they were really best friends, and Brianna

16   didn't have no one to play with up there, he didn't want it

17   back.

18       Q.   So now let's talk a little bit about the phone.  So he

19   gave Faith a phone.  Did you know at the time he gave it to

20   her?

21       A.   Yeah, he asked me prior to that, and I said -- I told

22   him as long as he paid for it, because I couldn't afford it.

23   And with Faith being in school and that, I kind of felt that,

24   yeah, she could use a phone in case of emergency.  But the

25   agreement was we keep track of the contacts and that way she's

Mills - Direct

1   not contacting anyone that we didn't know.  And I would still
2   be able to get ahold of her.

3       Q.    So when did you figure out, like approximately how long
4   had she had the phone when you figured out that your number
5   had been blocked?

6       A.    Probably about a week.

7       Q.    What -- so you -- do you remember what prompted you to
8   call Faith?

9       A.    I just called her to check on her to see how she was
10  doing because I always called her before we went to bed when
11  she was up there with Brianna, tell her good night and I loved
12  her, and I couldn't get ahold of her.

13      Q.    Then what did you do?

14      A.    I waited until the next morning, and when she got home
15  I confronted her about it.  She told me that Earl blocked all
16  the numbers except for his and Brianna's phone.

17      Q.    Did she say why -- strike that.

18            What did you do?  Did you have a conversation with
19  Mr. Warner about it?

20      A.    Yes, I did.  I made Faith return the phone.

21      Q.    Was there anything else that you discovered you
22  personally had been blocked from access to Faith's
23  information, Facebook or any other sort of Internet?

24      A.    No.

25      Q.    Social network?

Mills - Direct

1    A.   No.

2    Q.   At any time during the course of that approximate year

3    that Faith had a friendship with Brianna and she was spending

4    time at Mr. Warner's house, did she ever tell you that

5    Mr. Warner was taking pictures of her?

6    A.   No.

7    Q.   Did she ever say that he asked her to get naked or

8    things of that nature?

9    A.   No.

10   Q.   Were you aware of the occasion on which -- well, strike

11   that too.

12         Did you have a conversation with Mr. Warner shortly

13   before his arrest at your home?

14   A.   No, it was at his home.

15   Q.   Why don't you tell us the substance of that

16   conversation.

17   A.   It was like a day after, I just got back from Buffalo,

18   New York, I was living up there for a few months.  And he

19   asked me to come up there.  And I hadn't seen him for awhile

20   and he was a good friend and so I got my mother's van and I

21   drove up there.  We talked for a little bit.

22         And he -- he seemed a little scared, but then at

23   the same time he wasn't.  He just said that the FBI was

24   looking for him and he was down at the store and while he was

25   down at the store they were asking the neighbors, he felt

Mills - Direct

1  maybe they came into his apartment while he was gone.

2  Q.   Did he talk to you at all about an individual by the

3  name of Armando Cruz?

4  A.   Yes.

5  Q.   In that same conversation or prior?

6  A.   It was in the same conversation.  He thought -- he knew

7  the FBI was looking for him to talk to him about Armando to

8  see if -- he thought maybe it was to see if he knew anything.

9  Q.   Did he express that he was worried that he would get

10 arrested too?

11 A.   No.

12 Q.   At any time did Faith tell you that she didn't want to

13 go to Mr. Warner's house anymore?

14        MR. CHONTOS:  Objection, hearsay.

15        THE COURT:  Sustained.

16 BY MS. BLOCH:

17 Q.   Did Faith stop going to Mr. Warner's house at some

18 point?

19 A.   No.

20 Q.   Was there an occasion on which Mr. Warner came to your

21 door and was banging on your door and wanted Faith to come

22 out?

23 A.   Yes.  He -- him and Brianna was there banging on the

24 door.  Faith wasn't feeling good, she was upstairs laying in

25 bed, did not want to come out.  She woke up and we just pretty

Mills - Direct

1   much left the lights off and the TV off.  We just kind of sat

2   there.  And I had -- I called Earl's cousin, Jim, I was dating

3   him at the time, and Jim came from work.  But before Jim

4   got -- just before Jim come home, Armando came by and picked

5   Earl and Brianna up and took them home.  Jim said next time

6   call the cops.

7   Q.   Did Mr. Warner say why he was banging and wanted Faith

8   to come out?

9   A.   He just said he wanted Faith to come out.  He wanted to

10  talk to her.  He thought she was mad at him for some reason.

11  Q.   Ms. Mills, were you ever arrested in connection with

12  charges related to the well-being of your children, Faith most

13  importantly?

14  A.   Yes.

15  Q.   Those charges related sort of -- I am not sure of the

16  exact terminology, but it was reckless endangerment, things of

17  that nature?

18  A.   Yes, failure to protect my kids.

19  Q.   Are you presently on probation for that offense?

20  A.   (Witness nods head.)

21  Q.   Your children live with foster parents, is that

22  correct?

23  A.   Yes.

24  Q.   They have been living with those foster parents for

25  over a year?

Mills - Cross

1    A.    Yes.

2              MS. BLOCH:  No further questions.

3              THE COURT:  Any questions?

4                    CROSS-EXAMINATION

5    BY MR. CHONTOS:

6    Q.    Your phraseology in describing Mr. Warner was, he was a

7    good friend?

8    A.    Yes, he was.

9    Q.    Helped you out?

10   A.    Yes.

11   Q.    Helped your daughter out?

12   A.    Yes.

13   Q.    11-, 12-year-olds like to have a cell phone, get new

14   clothes, new pants, new shirts, experiment with makeup, right?

15   A.    Yes.

16   Q.    To your understanding, Mr. Warner provided that to his

17   daughter as well, right?

18   A.    Yes.

19   Q.    Because your daughter was such good friends, it didn't

20   surprise that you Mr. Warner treated her just like he treated

21   his daughter, right?

22   A.    Right.

23   Q.    Ma'am, when you tried to reach your daughter during her

24   only week of having that cell phone and you couldn't get ahold

25   of her, you said that the next day you reached out to her,

Mills - Cross

1   right?

2       A.    Yes, once she got home, yes.

3       Q.    The relationship between your daughter and Brianna, was

4   that like maybe 12 months start to finish?

5       A.    Approximately.

6       Q.    And in month maybe seven or eight is when the cell

7   phone arrived, right?

8       A.    Yes.

9       Q.    So in month one through six when your daughter stayed

10  over, you called the home, the land line, right, to say good

11  night to her, right?

12      A.    I usually called Earl's phone.

13      Q.    So there was another -- so there was a mechanism for

14  you to get ahold of your daughter other than her recently

15  acquired cell phone, right?

16      A.    Right.

17      Q.    That must not have been upsetting to you and

18  troublesome to you not to be able to reach her that evening,

19  right?

20      A.    Right.

21      Q.    Because you didn't call Earl on his cell phone or you

22  didn't even try the land line, right?

23      A.    Well, at that time his phone was out of minutes is what

24  he told me because he let his phone go so he could get minutes

25  for the girls.

Mills - Cross

1    Q.    I think I heard you.  So he let his minutes run down so

2    the girls would then have more minutes to talk?

3    A.    Yes.

4    Q.    Something a father would do, right?

5    A.    Right.

6    Q.    Now, when Mr. Warner and his daughter came and knocked

7    on your door, earlier you guys had invited them over, right?

8    A.    Not to my knowledge, no, I didn't.

9    Q.    So was that how things went in this relationship with

10   your family and Earl and his daughter, that just up out of the

11   blue they show up at your doorstep?

12   A.    Most of the time they called, but Faith wasn't feeling

13   good for a couple days and Brianna was getting a little bit

14   mad, upset, because Faith hadn't been up with her.  And she

15   was afraid that Faith was mad at her.  So --

16   Q.    Brianna missed her friend?

17   A.    Yeah.

18   Q.    Now, the Government asked you some questions about a

19   conversation that you had with Mr. Warner and you described

20   that he was scared a little, but then again not, right?

21   A.    It was like -- he seemed like nervous.

22   Q.    You learned the reason why he was nervous is because

23   the word on the street is FBI wants to talk to him, right?

24   A.    Right.

25   Q.    That would make you nervous, right, if FBI wanted to

Mills - Cross

1   talk to you?

2     A.   Yes.

3     Q.   During that discussion did Mr. Warner say words to this

4   effect, him talking to you:  You know, if you make an

5   accusation, you need proof.  If you make an accusation without

6   proof, you can get in trouble.  Is that ringing a bell?

7     A.   No, I don't remember that.

8     Q.   During that conversation with Mr. Warner did he tell

9   you, you know, your kids were molested twice, a third time you

10  will lose your kids for good?

11    A.   He informed me on that like when it was before I moved

12  to Buffalo and we suspected Armando.

13    Q.   You and him?

14    A.   Yes.

15    Q.   The suspicions that you had came from -- the primary

16  source of your suspicions that Armando Cruz was doing

17  something wrong was from your daughter, right?

18    A.   Yes.

19    Q.   Your daughter told you some things that were going on

20  at the Cruz household, right?

21    A.   She told me on a couple things, yes.

22    Q.   Your failure to act to protect your daughter is what

23  led to the Mercer County District Attorney's office to

24  prosecute you for endangering the welfare of a child, right?

25    A.   Yes.

Mills - Cross

1   Q.   You were sentenced on that matter January 18th of

2   2013?

3   A.   Approximately that time.  I can't remember the exact

4   date.

5   Q.   About a year?

6   A.   Yes.

7            MR. CHONTOS:  That's all I have, thank you.

8            THE COURT:  Any redirect?

9            MS. BLOCH:  One moment, Your Honor.

10           No questions, thank you.

11           THE COURT:  May the witness be excused on behalf of

12   the Government?

13           MS. BLOCH:  She may.

14           THE COURT:  Defendant?

15           MR. CHONTOS:  Yes.

16           THE COURT:  Ma'am, be careful getting down.  Thank

17   you.

18      (Witness excused.)

19           THE COURT:  Call your next witness, please.

20           MS. BLOCH:  Laura Holmes.

21           MR. CHONTOS:  Judge, may we approach while the

22   witness is on her way up?

23           THE COURT:  Do you mean like chatting over at

24   sidebar?

25           MR. CHONTOS:  Please.

1              THE COURT:  Certainly.

2          (On record at sidebar as follows.)

3              THE COURT:  Give the court reporter some space to

4    move over there, please.  Yes, sir.

5              MR. CHONTOS:  It is really an offer of proof that I

6    am requesting because I don't have a clue as to where we are

7    going with this.

8              THE COURT:  Okay.

9              MS. BLOCH:  I think he does have a clue because we

10   have already talked about it.

11             MR. CHONTOS:  No, Carolyn, let's be clear on that.

12             THE COURT:  That's fine.  Give him an offer of

13   proof, please.

14             MS. BLOCH:  Ms. Holmes is Harley Evans' mother.

15   She will identify Harley in the images.  She will provide a

16   date of birth.  She will talk about her limited knowledge of

17   her daughter's time spent at Mr. Warner's house.

18             THE COURT:  Okay.  Thank you.

19          (Back on record in open court.)

20         LAURA HOLMES, a witness herein, having been first duly

21   sworn, was examined and testified as follows:

22             THE WITNESS:  Laura Lee Holmes, L-A-U-R-A, L-E-E,

23   H-O-L-M-E-S.

24             THE COURT:  Ma'am, do you want to move forward so

25   you can get close to that microphone.  Great, thank you.

Holmes - Direct

1          You may begin.

2                    DIRECT EXAMINATION

3  BY MS. BLOCH:

4     Q.   If you would state your name a little louder, please.

5     A.   Laura Lee Holmes.

6     Q.   Ms. Holmes, where do you presently live generally?

7     A.   Slidell, Louisiana.

8     Q.   Are you presently employed?

9     A.   No.

10    Q.   Do you have a daughter named Harley?

11    A.   Yes, I do.

12    Q.   How old is Harley currently?

13    A.   She is 14 years old.

14    Q.   Back in 2011 were you living in Louisiana then?

15    A.   Yes.

16    Q.   Had you previously lived in Mercer, Pennsylvania?

17    A.   Yes.

18    Q.   Did you sometimes return to the Mercer area to visit?

19    A.   Yes, that's where most of my family is.

20    Q.   When did you move to Louisiana then?

21    A.   2010.

22    Q.   Was your daughter friendly with a young girl named

23 Brianna?

24    A.   Yes, ma'am.

25    Q.   How is it that they were friends?

Holmes - Direct

1    A.   They met when they started preschool, so they were

2    about three or four.

3    Q.   Did they remain friends until Harley moved to Louisiana

4    with you?

5    A.   Yeah, and they were still friends then too.

6    Q.   Did you come -- by reason of their friendship, did you

7    get to know Brianna's parents?

8    A.   Yes, ma'am.

9    Q.   What is Brianna's father's name?

10   A.   Earl Warner.

11   Q.   Do you see Earl Warner in the courtroom today?

12   A.   Yes.

13   Q.   Can you describe what he is wearing?

14   A.   A white shirt.

15   Q.   Does he have a tie on?

16   A.   (Witness nods head.)

17   Q.   When you lived in Mercer before you moved to Louisiana,

18   how far away did you and Harley live from Mr. Warner?

19   A.   About five minutes.

20   Q.   Is that by car or by walking?

21   A.   Probably by car.

22   Q.   Did the friendship that Brianna and Harley have

23   together include play dates at each other's houses,

24   sleep-overs, things like that?

25   A.   They went and played together and stuff.  And when Earl

Holmes - Direct

1  lived in Sharon, Pennsylvania, she spent the night there.  But

2  when Earl moved to Mercer, she didn't spend the night, but her

3  and Brianna played together.

4       Q.    So who is Gwen?

5       A.    That would be Earl's wife -- or was his wife then.

6       Q.    So at some point in time they lived together and your

7  daughter did spend time there?

8       A.    Yes.

9       Q.    Were you ever in the current home of Mr. Warner, that

10 is the home that he kept while you were in Louisiana?

11      A.    No.

12      Q.    That was on Brandy Springs?

13      A.    Correct.

14      Q.    Did you ever take your daughter there, though?

15      A.    If I took her over to play with Brianna or anything, I

16 never went to the house, I went to Brandy Springs Park.  When

17 you pull in there, the apartments are like right beside it.

18      Q.    By a park, did it have a swing set, things like that?

19      A.    It had a swing set, like baseball, courts, stuff like

20 that, soccer.

21      Q.    So it was a big park?

22      A.    Yes.

23      Q.    Why is it that Harley didn't spend the night with the

24 Warners after Mr. Warner moved to Brandy Springs?

25      A.    They just -- she never really asked to and I

Holmes - Direct

1    personally, you know, like if the mom and dad -- you know, the

2    mom isn't there or something, it's just the way I was brought

3    up, you know, the child doesn't spend the night.  And I just

4    didn't feel right letting her spend the night.

5    Q.   Was it your understanding then when he lived at Brandy

6    Springs his wife or former wife was no longer living with him?

7    A.   Right.

8    Q.   Did you know that from him directly or did you know

9    that from Harley?

10   A.   I knew that from Harley.

11   Q.   I am going to direct your attention specifically to the

12   summer of 2011 and ask you if at some point during that summer

13   you came to visit Mercer and she started spending time again

14   with Brianna?

15   A.   Yes.  We came up for a vacation.

16   Q.   Where did you stay when you would come for vacation?

17   A.   At my mother's house in Mercer.

18   Q.   Do you specifically remember during that visit taking

19   Harley over to the Brandy Springs Apartment area?

20   A.   Harley went over there once or twice, yes.

21        MS. BLOCH:  I would like to pull up, Ms. Wikert,

22   starting with Government's Exhibit 4.1A.

23   BY MS. BLOCH:

24   Q.   Do you recognize this photo?

25   A.   (Witness nods head.)

Holmes - Direct

1    Q.    Who is in the photo?

2    A.    My daughter.

3    Q.    Do you know where this photo is taken?

4    A.    No.

5    Q.    Let's look at Government's Exhibit 4.11A.  Is this also

6    your daughter?

7    A.    Yes.

8    Q.    All right.  Let's take a look at 4.15A.  Is that your

9    daughter?

10   A.    (Witness nods head.)

11   Q.    Is Harley on the right?

12   A.    The right.

13   Q.    Do you know the girl beside her?

14   A.    (Witness shakes head.)

15   Q.    Never seen her before?

16   A.    I don't know her.

17   Q.    Let's just pull up one more and that's 4.19A.  Is that

18   Harley on the left?

19   A.    (Witness nods head.)

20   Q.    Do you know the little girl that's on the right?

21   A.    (Witness shakes head.)

22            MS. BLOCH:  One moment, Your Honor.

23            THE COURT:  The answer to the question is, no,

24   ma'am?

25            THE WITNESS:  Correct, no.

Holmes - Cross

1          THE COURT:  Thank you.

2     BY MS. BLOCH:

3       Q.   Can I just ask you for purposes of the record if you

4     could please provide Harley's birth date.

5       A.   10/21/99.

6          MS. BLOCH:  Thank you very much.  No further

7     questions.

8          THE COURT:  Any questions?

9          MR. CHONTOS:  A few, Judge, thank you.

10                    CROSS-EXAMINATION

11    BY MR. CHONTOS:

12      Q.   Ma'am, when did you leave Mercer to go down to

13    Louisiana?

14      A.   In October, 2010.

15      Q.   Your first return visit was kind of like the Christmas

16    of 2011?

17      A.   No, the summertime of 2011.

18      Q.   How long did you stay in the summer of 2011?

19      A.   Approximately a week.

20      Q.   Was it after school had left out?

21      A.   Yes.

22      Q.   Your understanding of where your daughter was going to

23    school at the time, was school out like June 1 or June 15?

24      A.   Down south school's out in May.

25      Q.   Very well.  So before Memorial Day or maybe a tad

Holmes - Cross

1  after?

2    A.    It was around June when we came down.

3    Q.    So you were up here first part of June, 2011?

4    A.    Yes.

5    Q.    June, 2011, that first week, that was the last

6  interaction face-to-face that your daughter had with

7  Mr. Warner's daughter, Brianna?

8    A.    As far as I know.

9    Q.    Have they stayed in touch by telephone or, you know,

10  Skype or emails or anything like that?

11    A.    I think they have.

12    Q.    You think they have?

13    A.    I know they have.

14    Q.    Is that because you chat with your daughter perhaps and

15  say, hey, who were you chatting with; and she says, Brianna;

16  something like that?

17    A.    (Witness nods head.)

18    Q.    You need to answer, ma'am.

19    A.    Yes.

20    Q.    Ma'am, does the name Armando Cruz register anything

21  with you?

22    A.    Yes.

23    Q.    What does it register?

24    A.    He was a neighbor and he has done stuff to my daughter

25  as well.

Holmes - Cross

1  Q.   Did you learn that from your daughter?

2  A.   No.

3  Q.   You learned that from law enforcement?

4  A.   Yes.

5  Q.   Ma'am, you indicated that once there was a separate

6  household that Mr. Warner lived with his daughter.  At that

7  time his daughter was staying with Mr. Warner, right, not with

8  Gwen?

9  A.   As far as I know they were sharing.  Like she would

10  visit her mother, but she would stay with her father too.

11           MR. CHONTOS:  Okay.  Thank you.

12           THE COURT:  Any additional questions?

13           MS. BLOCH:  No further questions.

14           THE COURT:  May the witness be excused?

15           MS. BLOCH:  Yes, she may.

16           MR. CHONTOS:  Yes.

17           THE COURT:  Ma'am, be careful getting down.  Thank

18  you.

19       (Witness excused.)

20           THE COURT:  Call your next witness, please.

21           MS. BLOCH:  Government calls Margie.

22           MR. CHONTOS:  Your Honor, would we be able to take

23  a break, my client needs to visit the rest room.

24           THE COURT:  Sure.  We will take our afternoon break

25  now until 3:10.

Margie - Direct

1          On the order of witnesses, who are the rest of the

2   witnesses today?

3          MS. BLOCH:  Who are they?

4          THE COURT:  Yes.

5          MS. BLOCH:  The next witness is Faith.  If we still

6   have time, it will probably be Armando Cruz.

7          THE COURT:  Okay.  We will stand in recess until

8   3:10.

9      (Recess taken.)

10      (Back on record in open court.)

11          THE COURT:  You may be seated.  Call your next

12   witness, please.

13          MS. BLOCH:  The Government calls Margie.

14      MARGIE, a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16          THE COURT:  Are you comfortable?

17          THE WITNESS:  Yes.

18          THE COURT:  Why don't you slide up a little closer.

19   Great, thank you very much.

20                    DIRECT EXAMINATION

21   BY MS. BLOCH:

22   Q.   I am going to ask you the questions first, okay.  Will

23   you just state your first name on the record.

24   A.   Margie.

25   Q.   Margie, how old are you?

Margie - Direct

1    A.    13.

2    Q.    What's your birthday?

3    A.    March 26th, 2000.

4    Q.    Margie, are you -- what grade are you in in school?

5    A.    Eighth.

6    Q.    Where do you go to school?

7    A.    Mercer High School.

8    Q.    Have you always lived in Mercer, Pennsylvania?

9    A.    Yeah.

10   Q.    You live with your parents?

11   A.    Uh-huh.  Yes.

12   Q.    And your sister too?

13   A.    Yeah.

14   Q.    I am going to take you back in time a little bit and

15   ask you if you -- about some of your friends.  I am going to

16   take you back to 2011 when you were 11 years old.  Okay?

17   A.    Uh-huh.

18   Q.    Do you know a girl named Faith?

19   A.    Yeah.

20   Q.    Who is Faith?

21   A.    She's my cousin.

22   Q.    Is she your friend too?

23   A.    Uh-huh.

24   Q.    Did you spend, back then in 2011, did you girls spend a

25   lot of time together?

Margie - Direct

1    A.    Yeah.

2    Q.    Was she one of your best friends?

3    A.    Yeah.

4    Q.    Did you meet some other girls when you would hang out

5    with Faith?

6    A.    Yes.

7    Q.    Did you ever meet a girl named Harley?

8    A.    I knew her in school before she moved.

9    Q.    Okay.  Do you know where she moved?

10   A.    I think Tennessee or some place down there.

11   Q.    So was she in your grade, Harley?

12   A.    Yeah.

13   Q.    Did you ever meet a girl named Brianna?

14   A.    Yes.

15   Q.    Who was she?

16   A.    She was Faith's friend.

17   Q.    Did you ever go to Brianna's house to play?

18   A.    Yeah.

19   Q.    Did you ever go alone or did you always go with Faith?

20   A.    I always went with Faith.

21   Q.    Do you remember where Brianna lived?

22   A.    Toward the high school in apartments.

23   Q.    If I said the name, would you remember it do you think?

24   A.    Yeah.

25   Q.    It might have been called Brandy Springs Apartments?

Margie - Direct

1    A.    Yeah, it was.  I remember that.

2    Q.    Was there a park near her apartment?

3    A.    Yeah.  We used to play sports down there by the

4  laundromat.

5    Q.    Did you and the other girls spend time at the park?

6    A.    Yes.

7    Q.    So we are talking about when the weather is nice, like

8  maybe the summertime or early summer of 2011?

9    A.    Yeah.

10   Q.    Had you -- how did you first go to Brianna's house to

11 play?  Did she call you on the phone?

12   A.    Faith called me on the phone, asked me if I wanted to

13 go to Brianna's house.

14   Q.    So you did?

15   A.    Uh-huh.

16   Q.    How would you girls get there?  Did you live close

17 enough to walk or would someone drive you?

18   A.    My mom would drop me off.

19   Q.    Were you ever at Faith's house and you walked over to

20 Brianna's house to play?

21   A.    Well, yeah.  We didn't walk.  Her grandma dropped us

22 off.

23   Q.    When you went to Brianna's house, who did she live with

24 then?

25   A.    Earl.

Margie - Direct

1  Q.  Did you call him Earl?

2  A.  Uh-huh.

3  Q.   Is that how you met Earl or did you know Earl before

4  that?

5  A.   I didn't know Earl before that.

6  Q.   Do you see the man that you're talking about, Earl, in

7  the courtroom today?

8  A.   Uh-huh.

9  Q.   Where is he?

10       THE COURT:  Do you want to help me out?  Instead of

11  "uh-huh," say either yes or say no.  That would be helpful.

12       THE WITNESS:  Okay.

13       THE COURT:  Thank you.

14       THE WITNESS:  Yes.

15  BY MS. BLOCH:

16  Q.   You do see him?

17  A.   Yes.

18  Q.   Would you describe what he is wearing.

19  A.   A white shirt and blue tie.

20  Q.   How well did you get to know Earl?

21  A.   Pretty much.

22  Q.   Did you spend -- when you would go to play at

23  Brianna's, did sometimes you and Faith spend the night?

24  A.   Yes.

25  Q.   Did you ever spend more than one night in a row?

Margie - Direct

1    A.    Yeah.

2    Q.    What would you guys do when you were hanging out at the

3    house mostly?

4    A.    We would mostly clean, play with Brianna.

5    Q.    What does that mean?  Would you watch television?  What

6    would you do?

7    A.    Listen to music on the computer; and then like after

8    that we would take a shower before we went to bed.

9    Q.    Did you guys get a good night's rest when you were

10   at --

11   A.    Sometimes.

12   Q.    Were there ever times that you stayed up all night?

13   A.    Yeah.

14   Q.    When you spent the night at Brianna's house, was Earl

15   always there?

16   A.    Yes.

17   Q.    Did you spend time talking to him?

18   A.    Sometimes.

19   Q.    Was he -- would he hang out with you and the other

20   girls?

21   A.    Not most likely.

22   Q.    Did he sometimes spend time with you?

23   A.    Yes.

24   Q.    Can you describe his voice?

25   A.    It was like dark, kind of scary voice.

Margie - Direct

1    Q.    Would you recognize it if you heard it now?

2    A.    Yes.

3    Q.    Were there times, Margie, that you -- Earl would get

4    you alone in the house?

5    A.    Yes.

6    Q.    How would he get you alone in the house, do you

7    remember?

8    A.    When like he asked Faith and Brianna to take a shower.

9    Q.    Okay.  Then you would be alone?

10   A.    Yeah.

11   Q.    What would he do?  What would he say to you?

12   A.    I don't remember.

13   Q.    Did you -- when they would take a shower, were they

14   taking a shower together?

15   A.    Yes.  We all three would sometimes.

16   Q.    Did you do the shower at night?  Did you shower in the

17   morning?

18   A.    We did both.

19   Q.    Were you ever alone in Earl's bedroom with him?

20   A.    Yes.

21   Q.    Were you ever alone in his living room with him?

22   A.    No.

23   Q.    Were you sometimes with him in the living room with the

24   other girls somewhere around?

25   A.    Yes.

Margie - Direct

1    Q.   Did Earl like to take pictures of you girls together?

2    A.   Yes.

3    Q.   Did you like getting your picture taken?

4    A.   No.

5    Q.   Did Bri like to get her picture taken?

6    A.   No.

7    Q.   Did Bri ever make a point of not wanting to be in the

8    picture?

9    A.   Yes.

10   Q.   Did she ever run away from having pictures taken?

11           MR. CHONTOS:  Objection, relevance.

12           THE COURT:  Overruled.

13   BY MS. BLOCH:

14   Q.   Go ahead, you can answer.

15   A.   Yes, she would sometimes cover her face.

16   Q.   Did Earl ever take pictures of you when you were naked?

17   A.   Yeah.

18   Q.   How many times do you remember that happening when you

19   were at Earl's house?

20   A.   A couple times.

21   Q.   Was there any other adult in the house when he took

22   those pictures of you?

23   A.   No.

24   Q.   Did anybody else other than Earl take pictures of you

25   naked when you were at Earl's house?

Margie - Direct

1    A.    I don't remember.

2    Q.    Well, was there -- let me just clarify that then.   So

3    when you are getting your pictures taken by Earl and you are

4    naked, there are no other adults around?

5    A.    Yes.

6    Q.    Yes, meaning there were not?

7    A.    There were not any adults around.

8    Q.    Do you know a man named Armando Cruz?

9    A.    Yes.

10   Q.    Did he take pictures of you naked?

11   A.    Yes.

12   Q.    Did he take pictures of you naked at his house, his own

13   house?

14   A.    Yes.

15   Q.    Did he take naked pictures of you at Earl's house?

16   A.    No.

17   Q.    Did Earl ever promise you gifts or other things for

18   taking naked pictures for him?

19   A.    Sometimes.

20   Q.    What would he ask you?   What would he tell you he'd

21   give you?

22   A.    Some sweets.

23   Q.    Did he have special sweets that you particularly liked?

24   A.    Chocolate cupcakes.

25   Q.    Where would he get the cupcakes?

Margie - Direct

1    A.   I don't know.

2    Q.   Did he already have them there?

3    A.   Yes.

4    Q.   Did he ever ask you to take naked pictures when you

5    were really sleepy?

6    A.   Yes.

7    Q.   Did you have conversations with him then when you would

8    say that I'm really sleepy?

9    A.   Yes.

10   Q.   What would he say?

11   A.   Take some pictures for me first.

12   Q.   First before what?

13   A.   Before I went to bed.

14   Q.   Okay.  Did you ever tell him you didn't want to take

15   the pictures?

16   A.   Yes.

17   Q.   What would you say?

18   A.   I'm sleepy, I want to go to bed.

19   Q.   Did he ever scare you?

20   A.   Yes.

21   Q.   How did he do that?

22   A.   He would do the scary voice sometimes.

23   Q.   What would he say?

24   A.   I don't remember.

25   Q.   When you were taking the pictures for him naked,

Margie - Direct

1  Margie, would he tell you what positions to take or where to

2  sit?

3     A.    Yes.

4     Q.    Give me an example of what he would say to you?

5     A.    Like he would ask me to pose this way and I kind of had

6  to do it.

7     Q.    Would he tell you to get undressed while he was taking

8  the pictures?

9              MR. CHONTOS:  Objection, leading.

10             THE COURT:  Sustained.

11  BY MS. BLOCH:

12    Q.    Did he ever ask you -- did he ever take pictures of you

13  while you were getting undressed?

14    A.    Sometimes.

15    Q.    Did he ever ask you to smile?

16    A.    Yes.

17    Q.    Were you able to smile?

18    A.    Hardly.

19    Q.    Tell me why you couldn't smile.

20    A.    Because I was really sleepy and I don't like smiling

21  while I'm sleepy.

22    Q.    Did Earl touch you when he was taking the photographs

23  of you?

24    A.    Yes.

25    Q.    Where would he touch you?

Margie - Direct

1    A.    Like my ankles and my feet.

2    Q.    Anywhere else?

3    A.    My hands.  That's probably it.

4    Q.    Was there anything he particularly liked about you or

5    he said he liked about you?

6    A.    He liked my hair.

7    Q.    Did he take pictures of your hair?

8    A.    Yes.

9    Q.    Did he touch your hair?

10   A.    Yes.

11   Q.    Would he brush your hair?

12   A.    Yes.

13   Q.    Did he take pictures of you when your hair was wet?

14   A.    Yes.

15   Q.    Or would you have just come out of the shower?

16   A.    Yes.

17   Q.    Would he come into the bathroom and take your picture

18   with your hair?

19   A.    Yes.

20   Q.    Were you alone when he did that?

21   A.    Yes.

22   Q.    Did he ever take pictures standing close to you or over

23   top of you?

24   A.    Yes.

25   Q.    Do you remember that occasion?

Margie - Direct

1    A.    No.

2    Q.    Were you on his bed when he asked -- when he did that?

3    A.    Yes.

4          MS. BLOCH:   If you could pull up, Ms. Wikert,

5    Exhibit No. 1.8A.

6    BY MS. BLOCH:

7    Q.    Do you recognize that picture, Margie?

8    A.    Yes.

9    Q.    Is that you?

10   A.    Yes.

11   Q.    Do you recognize where you are?

12   A.    In Earl's bedroom.

13   Q.    Is that his bed?

14   A.    Yes.

15   Q.    Do you recognize the bed frame?

16   A.    Yeah.

17   Q.    Do you recognize anything you're laying on?

18   A.    His bed sheet and blanket.

19   Q.    This gray blanket or this quilt back here?

20   A.    The quilt.

21         MS. BLOCH:   1.16A, please.

22   BY MS. BLOCH:

23   Q.    Who is that?

24   A.    Me.

25   Q.    Are you still laying on his bed?

Margie - Direct

1    A.   Yes.

2    Q.   Were you sleeping or were you pretending to sleep?

3    A.   I was pretending to sleep.

4    Q.   Is that because he asked you to pretend you were

5  asleep?

6    A.   Yes.

7    Q.   Do you recognize any of the stuffed animals in that

8  picture?

9    A.   Yes, it's a goat and my favorite dog.

10   Q.   Did you take them with you when you went to his house?

11   A.   Yes.

12   Q.   Did he want you to have the animals in the picture or

13  did they just happen to be there?

14        MR. CHONTOS:  Objection, Judge, the question calls

15  for this witness to climb in his head.

16        THE COURT:  Sustained.

17        THE WITNESS:  Sometimes --

18        THE COURT:  Strike the answer.  Please disregard

19  the answer, ladies and gentlemen of the jury.

20  BY MS. BLOCH:

21   Q.   I will ask you the next question.  Did Mr. Warner ever

22  ask you to put those animals in the picture?

23   A.   Sometimes.

24        MS. BLOCH:  If you could pull up Exhibit 1.22A.

25  BY MS. BLOCH:

Margie - Direct

1    Q.    Is that you, Margie, still in the bed?

2    A.    Yes.

3    Q.    Are you yawning?

4    A.    Yes.

5    Q.    Or are you pretending to yawn, which one?

6    A.    I'm yawning.

7    Q.    Do you remember this series of pictures being taken of

8    you in his bedroom?

9    A.    Yes.

10   Q.    So in the beginning you had your T-shirt on, right?

11   A.    Yes.

12   Q.    Did he ask you to take your T-shirt off?

13   A.    Yes.

14          THE COURT:  How many more photographs do we have

15   for this young lady?

16          MS. BLOCH:  Six.

17          Will you please put up 1.27A.

18   BY MS. BLOCH:

19   Q.    Is that you sitting on his bed?

20   A.    Yes.

21   Q.    Did he ask you to get into this position?

22   A.    Yes.

23          MS. BLOCH:  I would like you to pull up 8.33A,

24   please.

25   BY MS. BLOCH:

Margie - Direct

1    Q.    Is that you, Margie?

2    A.    Yes.

3    Q.    Do you recognize where you are sitting now?

4    A.    No.

5    Q.    All right.  Do you recognize those underpants?

6    A.    Yes.

7    Q.    Are those your underpants?

8    A.    No.

9    Q.    Whose underpants are they?

10   A.    Bri's.

11   Q.    Why do you have them on?

12   A.    Because I forgot to bring clothes one day.

13   Q.    And you spent the night?

14   A.    Yes.

15         MS. BLOCH:  Let's look at No. 8.35A, please.

16   BY MS. BLOCH:

17   Q.    Do you remember Earl Warner taking pictures of you like

18   this?

19   A.    No.

20   Q.    You don't remember that.

21         MS. BLOCH:  Let's pull up 8.39A.

22   BY MS. BLOCH:

23   Q.    Do you recognize this picture, Margie?

24   A.    Yes.

25   Q.    Is that you in the picture?

Margie - Direct

1    A.    Yes.

2    Q.    Is that your long hair?

3    A.    Yes.

4    Q.    Who took that picture of you?

5    A.    Earl.

6    Q.    Is that in his bathroom?

7    A.    Yes.

8    Q.    Did you just get out of the shower in this picture?

9    A.    Yes.

10   Q.    Did he ask you to stand in that position so he could

11   take a picture of your hair like that?

12   A.    Yes.

13         MS. BLOCH:  One moment, Your Honor.

14         No further questions.

15         THE COURT:  Any questions?  You may begin.

16              CROSS-EXAMINATION

17   BY MR. CHONTOS:

18   Q.    Young lady, every time you went to Earl's house you

19   were with Faith, right?

20   A.    Yes.

21   Q.    Are you able to tell us in a number of months, number

22   of weeks, when you went to Brianna's house?

23   A.    No.

24   Q.    When you first met Mr. Warner, is it he who told you,

25   just call me Earl?

Margie - Cross

1    A.    Yeah.

2    Q.    Okay.  That was okay with you?

3    A.    Yes.

4    Q.    All right.  Because most moms and dads when you see an

5    adult you address them as Mr. Warner or Mrs. Warner, right?

6    A.    Yes.

7    Q.    When school started in late August of 2011, maybe

8    September, right around Labor Day of 2011, were you still in

9    the same class with Brianna?

10   A.    Yes.

11   Q.    September, October, Thanksgiving, Christmas time of

12   2011, were you still going over to Mr. Warner's place with

13   Brianna and with Faith?

14   A.    I don't remember.

15   Q.    Young lady, at some point you indicated that Brianna,

16   Faith, and yourself would sometimes shower together, right?

17   A.    Yes.

18   Q.    Would it also be some times that one of you would take

19   pictures of the other?

20   A.    Yes.

21   Q.    Tell me about that.

22   A.    I don't know how to answer that.

23   Q.    Okay, that's fair.

24         Would you take pictures of Faith or Brianna?

25   A.    No.

Margie - Cross

1    Q.   Would Faith take pictures of you or Brianna?

2    A.   Yes.

3    Q.   Would Brianna take photos of you or Faith?

4    A.   Yes.

5    Q.   So of the three -- two photographers, the people taking

6    the pictures included Faith and Brianna, right?

7    A.   Yes.

8    Q.   When Faith would take some photos of you and Brianna,

9    were you clothed?  Did you have clothes on?

10   A.   No.

11   Q.   You were naked?

12   A.   Yes.

13   Q.   Okay.  Do you remember the camera that Faith used to

14   take photos of you naked and Brianna naked?

15   A.   Not all of it.

16   Q.   Do you remember the color of the camera?

17   A.   Black.

18   Q.   Do you remember if it had a very long lens?  Do you

19   know what I mean by "lens?"

20   A.   Long -- the scope.

21   Q.   If I were to ask you any more questions about the

22   camera other than color, would you be able to tell us anything

23   else about the camera?

24   A.   Probably not.

25   Q.   Okay.  When Faith was taking photos of you and Brianna,

Margie - Cross

1   where was Mr. Warner?

2       A.    Downstairs on the computer.

3       Q.    So the photos that Faith took of you and Brianna

4   without any clothes on, that was done on the second floor?

5       A.    Yes.

6       Q.    Was it done in Brianna's bedroom?

7       A.    No.

8       Q.    Was it done in Mr. Warner's bedroom?

9       A.    No.

10      Q.    Your memory is that those photos were taken in the

11  bathroom?

12      A.    Yes.

13      Q.    As you were getting in and out of the shower?

14      A.    Yes.

15      Q.    Now, how is it that you became aware of Mr. Cruz?

16      A.    Through Earl.

17      Q.    Did Earl introduce you to Mr. Cruz?

18      A.    No.

19      Q.    Did you know Mr. Cruz's daughter?

20      A.    Yes.

21      Q.    Did Faith -- Faith is your cousin, right?

22      A.    Yes.

23      Q.    Did Faith introduce you to Mr. Cruz's daughter?

24      A.    Yes.

25      Q.    Did that introduction, the first time that you met

Margie - Cross

1    Mr. Cruz's daughter, did that take place at Brianna's place or

2    at Mr. Cruz's place?

3        A.    Mr. Cruz's.

4        Q.    When you first were there, the first opportunity to

5    meet him and his daughter, you were present, he was present,

6    his daughter was present, Faith was present, and was Brianna

7    there?

8        A.    No.

9        Q.    So just the four people that I named?

10       A.    Yes.

11       Q.    Were you -- that first meeting at the Cruz place, was

12   that before you ever set foot in Bri's house with Mr. Warner?

13       A.    Yes.

14       Q.    Are you able to tell us from the time you first met

15   Mr. Cruz to the time you set foot in Bri's house?

16       A.    No.

17       Q.    Was it a matter of days or was it a matter of months?

18       A.    Months.

19       Q.    Young lady, you indicated that Mr. Cruz -- or

20   Mr. Warner at times touched your ankles, your feet, your

21   hands, and I think you then said that's about it?

22       A.    Yes.

23       Q.    When I use the phrase "private parts," do you know what

24   that means?

25       A.    Yes.

Margie - Cross

1    Q.   That means your area below your waist and above your

2    knees?

3    A.   Yes.

4    Q.   That area where you might go to the bathroom?

5    A.   Yes.

6    Q.   Did Mr. Warner ever touch your private parts?

7    A.   Sometimes.

8    Q.   Now, at some point, young lady, you guys -- and when I

9    say that, you, Brianna, Faith -- you guys all stopped going to

10   Mr. Cruz's house, right?

11   A.   Yes.

12   Q.   At that point you transitioned and you started to go to

13   Brianna's house, Mr. Warner's house, right?

14   A.   Yes.

15   Q.   The reason you stopped going to the Cruz house was that

16   Faith and Marissa Cruz, Mr. Cruz's daughter, had a verbal

17   fight?

18   A.   Yes.

19   Q.   Young lady, during your interaction with Mr. Warner, do

20   you recall him telling you that Mr. Cruz is a bad man?

21   A.   Yes.

22   Q.   Do you recall Mr. Warner telling you to stay away from

23   him?

24   A.   Yes.

25   Q.   Did you follow his advice?

Margie - Cross

1   A.   Yes.

2   Q.   Did Mr. Warner tell you, I'm going to get back at

3   Mr. Cruz?

4   A.   Yes.

5   Q.   He was going to get even with Mr. Cruz?

6   A.   Yes.

7   Q.   Did you want Mr. Warner to get back at Mr. Cruz on your

8   behalf?

9   A.   No.

10  Q.   Mr. Cruz did some terrible things to you, did he not?

11  A.   Yes.

12  Q.   Did Mr. Warner indicate to you that he was going to get

13  Mr. Cruz for that?

14  A.   Yes.

15  Q.   You were okay with that?

16  A.   No.

17  Q.   Were you okay with Mr. Warner doing what he wanted to

18  do to get back at Mr. Cruz?

19  A.   No.

20  Q.   Young lady, during your interaction with Mr. Cruz, he

21  threatened you, didn't he?

22  A.   Yes.

23  Q.   He told you if you tell anyone, I'll kill your mom and

24  dad?

25  A.   Yes.

Margie - Cross

1    Q.   Did Mr. Warner ever say that to you?

2    A.   No.

3    Q.   At some point you learned Mr. Cruz had taken photos of

4    you, right?

5    A.   Yes.

6    Q.   You saw them on the computer?

7    A.   Yes.

8    Q.   Mr. Cruz's computer?

9    A.   Yes.

10   Q.   Was Faith with you?

11   A.   Yes.

12   Q.   Was anyone else?

13   A.   No.

14   Q.   Did you see other girls other than yourself and other

15   than Faith on Cruz's computer?

16   A.   Yes.

17   Q.   Are you able to tell us how many different girls?

18   A.   No.

19   Q.   Was it more than you two?

20   A.   Yes.

21   Q.   Was it more than ten?

22   A.   Yes.

23   Q.   When you and Faith saw those on Mr. Cruz's computer,

24   did you do anything?

25   A.   We tried to delete them.

Margie - Cross

1   Q.   So you're a little computer savvy, you had the computer
2   there, you looked for the delete button and you hit delete?
3   A.   Yes.
4   Q.   Do you think you were successful?
5   A.   No.
6   Q.   Why not?
7   A.   Because he came down the stairs when we were trying to
8   delete the pictures.
9   Q.   Did you at any time when you started to interact with
10  Mr. Warner tell Mr. Warner that?
11  A.   Yes.
12  Q.   You told Mr. Warner that Mr. Cruz had taken photos of
13  us, right?
14  A.   Yes.
15  Q.   Now, young lady, Mr. Cruz -- earlier you answered the
16  question -- did some terrible things to you, right?
17  A.   Yes.
18  Q.   Can you tell us what Mr. Cruz did with the pink thing
19  in connection with your body?
20        MS. BLOCH:   Objection, Your Honor, not relevant
21  here.
22        MR. CHONTOS:   Sidebar?
23        THE COURT:   Yes.
24     (On record at sidebar as follows.)
25        THE COURT:   Yes.

Margie - Cross

1          MR. CHONTOS:  The despicable acts that Cruz

2     committed on these children I think are relevant because it

3     allows me to make my argument that Cruz is virtually a

4     monster, a despicable human being, and should not be trusted.

5     They should give his testimony no weight whatsoever.

6          THE COURT:  Yes.

7          MS. BLOCH:  Your Honor, I don't think the testimony

8     he is eliciting has anything to do with his veracity, for one.

9          Two, we are now getting into details of a sexual

10    assault that is not the subject of the pending indictment nor

11    the subject of her direct examination.

12         THE COURT:  I sustain the objection.  I don't

13    believe it's relevant to this inquiry for this witness.

14         (Back on record in open court.)

15         MR. CHONTOS:  That is all I have.  Thank you.

16         THE COURT:  Any redirect?

17         MS. BLOCH:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19    BY MS. BLOCH:

20    Q.   Margie, just a couple of questions.  You were asked on

21    cross about the camera.  I am going to show you a camera and

22    ask you if you recognize it.  This is Government's

23    Exhibit 12.1 through 12.3.  Does this look like Earl Warner's

24    camera?

25    A.   Yes.

Margie - Redirect

1   Q.   What about it looks like his camera?

2   A.   The lens and how it's black.

3   Q.   When Earl took pictures of you, Margie, where did he

4   get the camera from, do you know?  Did he have any place he

5   kept it in particular?

6   A.   On a high shelf.

7   Q.   In his bedroom or in his living room?

8   A.   In the kitchen.

9   Q.   Did he always go for that same camera when he would

10  take pictures of you?

11  A.   No.

12  Q.   Did he use something else to take pictures of you?

13  A.   Yes.

14  Q.   What else did he use to take pictures of you?

15  A.   He used Armando's camera.

16  Q.   Separate from that one?

17  A.   Yes.

18  Q.   How did he get Armando's camera?

19  A.   He borrowed it.

20  Q.   Did he borrow it to sort of -- this plan that you just

21  were talking about with Earl's attorney, what was Earl's plan

22  to get back at Cruz?

23  A.   He said he wanted to steal me and Faith from him.

24  Q.   He wanted to steal the two of you from him.  Did taking

25  pictures of you fit into the plan?

Margie - Redirect

1    A.    No.

2    Q.    Would he sometimes take out the memory card to the

3    camera?  Do you know what that is?

4    A.    Yes.

5    Q.    Okay.

6          THE COURT:  Who is the "he?"

7    BY MS. BLOCH:

8    Q.    Did Earl sometimes do that when he took pictures of you

9    or after he did?

10   A.    No.

11   Q.    He wouldn't take the memory card out?

12   A.    No.

13   Q.    So when you said to Mr. Chontos that Earl wanted to get

14   back at Mr. Cruz --

15   A.    Yeah.

16   Q.    -- did you know how he planned on doing that?

17   A.    No, not fully.

18   Q.    Did you have some inkling?

19   A.    Yeah.

20   Q.    What did you think the plan was?

21   A.    That he was going to hurt him.

22   Q.    To steal the two of you away?

23   A.    Yeah.

24   Q.    Would he tell you this when he was taking naked

25   pictures of you?

Margie - Redirect

1    A.    No.

2    Q.    When would he tell this to you?

3    A.    I don't remember.

4    Q.    You talked about a computer.  You said when you were in

5    the shower -- when you were in the shower and Faith or Bri

6    took pictures of you, you said Earl was downstairs on the

7    computer.

8    A.    Yes.

9    Q.    Did you ever see the computer?

10   A.    No.  Not by myself.

11   Q.    Not by yourself.  Did you ever see it with someone

12   else?

13   A.    Yes.

14   Q.    Who were you with?

15   A.    Bri and Faith.

16   Q.    Was the computer black?

17   A.    Yes.

18   Q.    Was it a laptop computer?

19   A.    Yes.

20   Q.    Did it look to you to be new?

21   A.    Yes.

22   Q.    How did you know that it was new?  Tell me what made

23   you think --

24   A.    Because I was there when they bought it.

25   Q.    You were at the store with them or when it came to his

Margie - Redirect

1  house?

2  A.    When they bought it.

3  Q.    Do you remember what kind it was?

4  A.    No.

5  Q.    Do you remember where he bought it?

6  A.    Wal-Mart in Hermitage.

7  Q.    You were with him and who else was with you?

8  A.    Faith and Bri.

9  Q.    Did he have a special place where he kept the computer?

10  A.    No.

11  Q.    Were you ever at his house when he was playing computer

12  games?

13  A.    Yes.

14  Q.    How often did he do that?

15            MR. CHONTOS:  Judge, a little beyond the cross.

16            THE COURT:  Sustained.

17            THE WITNESS:  Almost all the time.

18            THE COURT:  Ma'am, I sustained the objection, so

19  you don't need to answer.  Thank you.

20            Any additional questions?

21            MS. BLOCH:  One moment, Your Honor, please.

22            No further questions, Your Honor.

23            THE COURT:  Any additional questions?

24            MR. CHONTOS:  Yes.

25                    *      *      *      *      *

Margie - Recross

RECROSS-EXAMINATION

1

2 BY MR. CHONTOS:

3    Q.   Young lady, the black camera that you just talked

4 about, was that the camera that Faith used to take pictures

5 too?

6    A.   No.

7    Q.   It was different?

8    A.   Yes.

9    Q.   Describe that one for me.  Black?

10   A.   Yes.

11   Q.   At Earl Warner's house, right?

12   A.   Yes.

13   Q.   And it was upstairs?

14   A.   Yes.

15        MR. CHONTOS:  Thanks.

16        THE COURT:  Any additional questions?

17        MS. BLOCH:  No further questions.

18        THE COURT:  May the witness be excused on behalf of

19 the Government?

20        MS. BLOCH:  She may.

21        THE COURT:  On behalf of the Defendant?

22        MR. CHONTOS:  Yes.

23        THE COURT:  Just be careful, there is a little step

24 stepping down there.  Thank you.

25        (Witness excused.)

Faith - Direct

 1            THE COURT:  All right.  Next witness.

 2            MS. BLOCH:  Your Honor, the Government calls Faith.

 3            THE COURT:  I thought you said you were going to do

 4   Mr. Cruz.

 5            MS. BLOCH:  No, I said if there was time after that

 6   I would go to Mr. Cruz.

 7            THE COURT:  Okay.

 8            MS. BLOCH:  I said I wasn't sure there would be

 9   time.

10        FAITH, a witness herein, having been first duly sworn,

11   was examined and testified as follows:

12                      DIRECT EXAMINATION

13   BY MS. BLOCH:

14   Q.    Will you just state your first name.

15   A.    Faith.

16   Q.    Faith, how old are you?

17   A.    14.

18   Q.    What is your date of birth?

19   A.    4/6/99.

20   Q.    Did you used to live in Mercer, Pennsylvania?

21   A.    Yes.

22   Q.    You don't live there any longer, is that correct?

23   A.    No.

24   Q.    How long did you spend in Mercer?

25   A.    I am not really sure.

Faith - Direct

1    Q.    Most of your young life?

2    A.    Yeah.

3    Q.    When you lived in Mercer, who did you live with?

4    A.    My mom.

5    Q.    Do you have sisters too?

6    A.    Yes.

7    Q.    How -- well, I am going to take you back actually to

8    the summer of 2011 and ask you if you remember what grade you

9    were in then?

10   A.    (No response.)

11   Q.    Are you in eighth grade now?

12   A.    Yes.

13   Q.    So were you in sixth grade then?

14   A.    Yes.

15   Q.    Do you remember what school you went to?

16   A.    Mercer.

17   Q.    Faith, who do you live with now?

18   A.    My foster parents, Theresa and Craig, and my sisters.

19   Q.    When you were living in Mercer, did you get to know a

20   person by the name of Earl Warner?

21   A.    Yes.

22   Q.    How did you meet him?

23   A.    My friend Marissa introduced me to Bri, and Bri

24   introduced me to her dad.

25   Q.    Marissa is who?

Faith - Direct

1    A.    Armando's daughter.

2    Q.    Was Marissa quite a bit older than you?

3    A.    Yes.

4    Q.    You became friends.  How did you become friends?

5    A.    My friend Caitlin introduced me to her.

6    Q.    Did you live with your mother anywhere close to all

7    these other young women?

8    A.    I lived in a trailer park, but not very close.

9    Q.    Did you live -- not very close to Armando's house or

10   not very close to Earl's house?

11   A.    Armando's.

12   Q.    How would you get to Armando's house if you wanted to

13   play with Marissa?

14   A.    Armando would come and pick me up with Marissa and

15   Caitlin.

16   Q.    For how long were you friends with Marissa before you

17   were introduced to Bri?

18   A.    I am not really sure about that one.

19   Q.    Did you meet Bri at Marissa's house?

20   A.    No.  I met her at a park.

21   Q.    Was the park -- where was the park, I should say?

22   A.    It was right along the apartments where Bri lived.

23   Q.    Do you remember the name of the apartments where she

24   lived?

25   A.    Brandy Springs.

Faith - Direct

1   Q.   Did you and Bri become good friends?

2   A.   Yes.

3   Q.   Did you spend quite a bit of time at her house too?

4   A.   Yes.

5   Q.   When you would spend time at Armando's house, were you

6   ever there alone with Marissa or were all of these girls there

7   usually when you were there?

8   A.   I would be there sometimes alone with Marissa.

9   Q.   Was her father, Armando, usually at home?

10  A.   Yes.

11  Q.   When you went to Bri's house, were you ever there

12  alone?

13  A.   Sometimes, but not very often.

14  Q.   Who would go with you to Bri's house?

15  A.   Either just myself or Marissa would be with me.

16  Q.   Did you have a cousin by the name of Margie, right?

17  A.   Yes.

18  Q.   Did she ever go with you to Earl's house?

19  A.   She would meet me there.

20  Q.   How would she get there?

21  A.   Her mom.

22  Q.   Do you know a girl named Harley?

23  A.   Yes.

24  Q.   How do you know Harley?

25  A.   She came over from Louisiana.  I met her through Bri

Faith - Direct

1    and Marissa.

2        Q.    Okay.  Was she sometimes with you at Armando's house

3    when you were there?

4        A.    Yes, she was.

5        Q.    Was she ever with you at Earl Warner's house with you

6    and Bri?

7        A.    Yes.

8        Q.    Did you spend a lot of time with Armando and Earl?

9        A.    Yes.

10       Q.    Can you describe Armando to me?

11       A.    He's big, I think he's Mexican.  He's got like tan,

12   like a dark skin color.  He's got big fingers.

13       Q.    How does he sound when he talks?

14       A.    He's not very deep, but it's like an in between a deep

15   and a soft voice.

16       Q.    Describe Earl, the person that you're speaking about.

17       A.    He's kind of chubby.  He's got -- he had like really

18   dirty nails, toenails.  He had a deep voice with like a

19   crackling sound.

20       Q.    Is he Mexican?

21       A.    No.

22       Q.    Describe his skin color as compared to Armando's?

23       A.    It's paler.

24       Q.    Do you see him in the courtroom today?

25       A.    Yes.

Faith - Direct

1   Q.   Can you describe for the record what he's wearing?

2   A.   A white top with blue tie.

3   Q.   When you would spend time at Armando's house, did he

4   take pictures of you?

5   A.   Yes.

6   Q.   Did he take pictures of you sometimes when you were

7   naked?

8   A.   Yes.

9   Q.   Would he -- did you ever see any of the pictures of

10  yourself that Armando took?

11  A.   Yes.

12  Q.   Did you see them on his computer?

13  A.   Yes.

14  Q.   When you were at Earl's house, did Earl ever take

15  pictures of you when you were naked?

16  A.   Yes.

17  Q.   Where did he take those pictures?

18  A.   Either his bedroom or his living room.

19  Q.   Did he ever take pictures of you in the bathroom?

20  A.   Not that I know of.

21  Q.   Did you sometimes take pictures of your friends in the

22  bathroom?

23  A.   No.

24  Q.   Do you remember Bri ever taking a picture of you when

25  you were in the bathroom?

Faith - Direct

1    A.    Nope.

2    Q.    When you spent time -- so did your friendship with Bri

3  develop while you were hanging out at Armando's house?

4    A.    Yes.

5    Q.    At some point in time did you, like in and around the

6  early part of the summer of 2011, did you start going to Bri's

7  house instead of Armando's house?

8    A.    Yes.

9    Q.    Why was that?  Tell me.

10   A.    Because after I found out that Marissa was a whole lot

11 older than me, that she was a bad influence on me, and I was

12 starting to get really close to Bri.

13   Q.    So how old did you think Marissa was until then?

14   A.    She looked 12 and she told me she was 12.

15   Q.    Then how old did you find out she was?

16   A.    She was 16.

17   Q.    Did you ever tell your mother or another adult that

18 Armando was taking these pictures of you?

19   A.    Yes, I told my mom.

20   Q.    Did your mother do anything about that?

21   A.    She said she was going to, but I don't think she did.

22   Q.    Did she ever direct you not to go to Armando's house?

23   A.    She told me not to go there anymore.  Marissa was

24 allowed to come up to my house, but I told Marissa that she

25 wasn't able to because she started getting into fights, I

Faith - Direct

1   mean, she's had the cops follow her and I just couldn't take

2   that chance.

3   Q.   So did your friendship sort of fizzle out when you

4   stopped going over to Armando's house?

5   A.   Yes.

6   Q.   When you went to Bri's house to hang out, what would

7   you girls do?

8   A.   We would go to the park.  We would do our nails.  We

9   would listen to music on the computer.  We would play on

10  Facebook.

11  Q.   What kind of computer were you using that you were

12  listening to music?

13  A.   A laptop.

14  Q.   Do you remember what it looked like?

15  A.   It was like gray, dark gray.

16  Q.   Was it new?  Was it old?

17  A.   I am not sure if it was new or old.

18  Q.   Where did you sleep -- I should say first, when you

19  went to Bri's house, did you spend evenings sleeping over?

20  A.   Yes.

21  Q.   More often than not when you were there did you spend

22  the night?

23  A.   Yes.

24  Q.   What was the plan?  Where were you planning to sleep

25  when you stayed at their house?

Faith - Direct

1    A.   I would want to sleep with Bri, but Earl wouldn't let

2    me.

3    Q.   What would he tell you?

4    A.   If I didn't sleep in his room, he would get really mad.

5    One time I -- it was like before our volleyball game or

6    practice and I was staying over at Bri's and I wanted to go to

7    sleep in her room and he like slammed the door and got really

8    mad.

9    Q.   So what you're describing is most of the time you were

10   there you would sleep in his room?

11   A.   Yes.

12   Q.   Are those -- would that provide the opportunity for him

13   to take pictures of you in his room when you were naked?

14   A.   Yes.

15            MR. CHONTOS:  Objection, leading.

16            THE COURT:  Sustained.

17   BY MS. BLOCH:

18   Q.   Did he take pictures of you naked when you were in the

19   room at night?

20   A.   Yes.

21   Q.   Did he take pictures of you in his bedroom at other

22   times of the day?

23   A.   Yes.

24   Q.   Would you actually go to sleep in Earl's bed or would

25   you stay up all night?

Faith - Direct

A.    I would go to sleep in Earl's bed.  At times we would

stay up if we went to Sheetz or if Bri didn't want to go to

sleep, then I wouldn't go to sleep.  But other than that, I

would usually sleep.

Q.    Was there ever an occasion when Mr. Warner woke you up

to take pictures of you?

A.    No.

Q.    Can you describe a little bit the inside of Earl's

house to me?

A.    There was a staircase by his door.  In his living room

there was two sofas.  There was a big screen TV.  And Bri had

trophies.  There was a, like, window type thing between the

wall and his kitchen.  His kitchen was a little small.  His

bathroom had like black curtains and then it was like some

kind of design in behind the curtains of his shower.

      Then there would be his room would be somewhat big.

It was like a -- there was like big closet.  Bri's was a lot

smaller than Earl's.

Q.    Was the bathroom in Earl's house upstairs or

downstairs?

A.    Upstairs.

Q.    When he would take naked pictures of you in his bedroom

or in his living room, would he tell you what he wanted you to

do?

A.    Yes.

Faith - Direct

1    Q.   Would he tell you the positions to get into?

2    A.   Yes.

3    Q.   Would he take pictures of you while you were

4    undressing?

5    A.   Yes.

6    Q.   How often would you say this would happen to you when

7    you were staying at Bri's house?

8    A.   Didn't happen like too often, but it did happen quite a

9    few times.

10            MS. BLOCH:   I am going to ask you to pull up --

11            THE COURT:   How many photographs?

12            MS. BLOCH:   I wanted to -- I am just going to show

13   a couple for each of the counts.

14            THE COURT:   That means two?

15            MS. BLOCH:   Two.

16            21A, please -- I mean, 2.1A, excuse me.

17   BY MS. BLOCH:

18   Q.   Do you recognize that photo?

19   A.   No.

20   Q.   Do you recognize yourself in the photo?

21   A.   Yes.

22   Q.   Do you recognize where you are laying?

23   A.   On the living room floor.

24   Q.   Whose living room floor?

25   A.   Earl's.

Faith - Direct

1    Q.   Did he sometimes have you sleep there?

2    A.   We mostly would sleep in his room.

3    Q.   Do you know how you got into that position?

4    A.   No.

5             MS. BLOCH:  Let's look at Exhibit 2.10A -- or,

6    rather -- strike that.  2.14A.  Sorry.

7    BY MS. BLOCH:

8    Q.   Do you recognize the hand in that photograph?

9    A.   Yes.

10   Q.   Whose hand is that?

11   A.   Earl's.

12   Q.   Did Earl do this to you?

13   A.   Yes.

14   Q.   More than once?

15   A.   Yes.

16            MS. BLOCH:  If you could please pull up

17   Exhibit 3.14A.

18   BY MS. BLOCH:

19   Q.   Who is that?

20   A.   That's me.

21   Q.   Do you remember taking the pictures in the Steeler

22   dress?

23   A.   I remember taking a picture in a Steelers dress, but I

24   don't remember that picture.

25   Q.   Did Earl tell you to take these pictures?

Faith - Direct

1    A.    Yes.

2    Q.    Where are you sitting in this picture?  Do you

3  recognize it?

4    A.    It looks like the first sofa against the wall.

5         MS. BLOCH:  If you could pull up image 3.16A,

6  please.

7  BY MS. BLOCH:

8    Q.    Do you recognize that photo?

9    A.    No.

10   Q.    Is that you?

11   A.    Yes.

12   Q.    Where are you laying there?

13   A.    On the same sofa against the wall.

14   Q.    Do you remember Earl taking pictures of you wearing

15  this dress?

16   A.    I remember one that didn't show anything, it was just

17  me standing.

18   Q.    Why do you think you don't remember taking this

19  picture?

20   A.    Armando had like pills that he would put in your drink

21  and it would make you feel you had nothing to do, you had

22  no -- like you had no way to know what you're doing.  It could

23  make you sleep.  I did feel dizzy a lot of the times.

24        MR. CHONTOS:  Judge, I am going to object.  It's

25  totally nonresponsive to the question.  I move to strike.

Faith - Direct

1          MS. BLOCH:  I will follow it up with a question

2     that I believe will --

3          THE COURT:  I sustain the objection and strike the

4     answer.  You should disregard the answer you just heard,

5     ladies and gentlemen of the jury.

6          Let's ask a little more pointed question, please.

7     BY MS. BLOCH:

8     Q.   Faith, were there ever occasions at Mr. Warner's home

9     where you felt groggy and sleepy and not completely aware of

10    what you were doing?

11    A.   Yes.

12    Q.   How often did that happen?

13    A.   A couple of times I did feel a little dizzy, but other

14    than that, it didn't happen very often.

15    Q.   Did anyone other than Earl Warner take naked pictures

16    of you at Earl Warner's house?

17    A.   No.

18         MS. BLOCH:  Can you please bring up image 4.15A.

19    BY MS. BLOCH:

20    Q.   Do you recognize this picture, Faith?

21    A.   No.

22    Q.   Do you know who is standing next to you?

23    A.   Harley.

24    Q.   Do you remember -- if you don't recognize the picture,

25    is it because you haven't seen it or you just don't remember

Faith - Direct

1  this particular occasion?

2   A.   I don't remember this.

3   Q.   I am going to show you then --

4        MS. BLOCH:  If you could please bring up 4.5A.

5  BY MS. BLOCH:

6   Q.   This picture is not as clear, but do you recognize

7  who's in the picture in the front?

8   A.   That's Harley.

9   Q.   Do you recognize the girl that's beside her?

10   A.   Yes.

11   Q.   Who is that?

12   A.   That's me.

13   Q.   Do you remember, did Earl ask you and Harley to take

14  these pictures?

15   A.   Yes.

16   Q.   Where are you laying?

17   A.   On his bed.

18        THE COURT:  Any other questions?

19        MS. BLOCH:  Yes, I do.

20        THE COURT:  Excuse me?

21        MS. BLOCH:  Yes, I do.  Your Honor, I would like to

22  address Counts 5 and 6, which are the videos.

23  BY MS. BLOCH:

24   Q.   Were there occasions, Faith, when Mr. Warner took

25  videotapes of you?

Faith - Direct

1    A.   Not that I know of.

2    Q.   Have you ever seen a videotape that depicts you?

3    A.   Yes.

4    Q.   What videotape have you watched that depicts you?

5    A.   The one where I was dancing and at the end you can

6    actually hear his voice telling me what to do.

7    Q.   When you listened to that and watched that video, did

8    you immediately recognize the voice?

9    A.   Yes.

10   Q.   Is there anybody else you know that sounds like that?

11   A.   No.

12   Q.   Faith, when you were at Earl's house, did you ever

13   shave your private parts in the shower?

14   A.   Yes.

15   Q.   Why did you shave there?

16   A.   Me and Bri were standing at the computer.  Earl told us

17   that most girls do shave down there, that a lot of dancers do,

18   and it's common for girls to shave down there, and people that

19   don't shave down there is pretty much disgusting is what he

20   said.

21   Q.   Where did you guys get the razor?

22   A.   I had a razor, and Bri got some razors that she's had

23   them when she was shaving her legs.

24   Q.   Did you go in the shower and then shave your pubic

25   area?

Faith - Direct

1    A.    Yes.

2    Q.    The pictures that you have looked at today show you

3    shaved, is that correct?

4    A.    Yes.

5    Q.    So you would have had hair there had you not shaved at

6    Earl's house?

7    A.    Yes.

8    Q.    Did you ever have an incident where you cut your pubic

9    area shaving there?

10   A.    I had like a rash, but I never cut myself.

11   Q.    Was there ever an occasion when Earl put medicine on

12   your pubic area?

13   A.    Yes.

14   Q.    Let's talk about that for a minute.  Why don't you tell

15   the jurors what happened.

16   A.    He would sit there and like I would be, like be

17   itching, I mean, it was burning.  And I would tell him.  And

18   he would bring out the stuff that he said he got and put it on

19   there and it never really helped at all.

20   Q.    Was it burning and itching where you shaved or on the

21   inside?

22   A.    Where I shaved.

23        MS. BLOCH:  One second, Your Honor.

24   BY MS. BLOCH:

25   Q.    Faith, do you have a beauty mark somewhere in your

Faith - Direct

1  pubic area?

2  A.   Yes.

3  Q.   When you shave, does it show?

4  A.   Yes.

5  Q.   When you don't shave, is it covered up?

6  A.   I can see it, but yes.

7         MS. BLOCH:  I don't have any further questions,

8  Your Honor.

9         THE COURT:  Thank you.  Any questions?

10        MR. CHONTOS:  Judge, I do.  The client has provided

11 a lot of notes.  I would -- I can go forward or we can pick up

12 first thing in the morning.

13        THE COURT:  We are going forward.  The jury said

14 they want to be here until 5, so that gives us 43 minutes.

15                   CROSS-EXAMINATION

16 BY MR. CHONTOS:

17 Q.   Young lady, the reason why you stopped going to the

18 Cruz house was you and Marissa just weren't hitting it off any

19 longer; that was part of it, right?

20 A.   Yes.

21 Q.   The second part was naturally your relationship with

22 Brianna grew -- it just grew more, you became better friends?

23 A.   Yes.

24 Q.   At some point, young lady, you told Bri to tell your

25 dad what Cruz is doing?

Faith - Cross

1    A.    Yes.

2    Q.    And did Brianna -- did you tell Brianna any more

3    specifics as to what Mr. Cruz was doing in the sense that,

4    hey, he is taking photos of us naked?

5    A.    No.

6    Q.    How did you characterize it to Brianna to, hey, go tell

7    your dad?

8    A.    I told her that we needed to stop what Armando was

9    doing and so I told her, I said, you need to tell your dad

10   that Armando is taking pictures and we need to figure out a

11   way to stop it.

12   Q.    Do you know by your later interaction with Mr. Warner

13   if Bri held true to your request for Bri to go tell her dad?

14   A.    Yes.

15   Q.    Did you and Mr. Warner then talk about that at his

16   place?

17   A.    No.

18   Q.    Did you and Bri ever revisit that topic, hey, what's

19   your dad doing, we need to do something, et cetera, anything

20   like that with Bri?

21   A.    No.

22   Q.    So one time you tell Bri, go tell your dad, and that's

23   it?

24   A.    Yes.

25   Q.    When you tell Bri to go tell Earl, is that before you

Faith - Cross

1    tell your mom, hey, Mom, Mr. Cruz is doing X, Y, and Z to me?

2    A.    Yes.

3    Q.    So the announcement to Bri to go tell your dad, that

4    was before you tell your mom?

5    A.    Yes.

6         THE COURT:   Who is the "your dad" in the question?

7    Why don't you rephrase the question because it is unclear who

8    the "your dad" is.

9    BY MR. CHONTOS:

10   Q.    You communicated something to Bri, right?

11   A.    Yes.

12   Q.    About what Armando was doing?

13   A.    Yes.

14   Q.    We need to figure out some way to stop it, right?

15   A.    Yes.

16   Q.    Then the last part of your communication with Bri was,

17   you need to tell your dad?

18   A.    Yes.

19   Q.    So the dad reference is to Mr. Warner?

20   A.    Yes.

21   Q.    That communication to Bri, that takes place sometime in

22   the summer of 2011, right?

23   A.    Yes.

24   Q.    Young lady, are you able to tell us when that shift,

25   when that change took place?  And what I mean by "the shift"

Faith - Cross

1  or "the change" is when you transitioned from the Cruz place

2  to your primary hangout place being the Warner residence.

3     A.   No.

4     Q.   The best you can do is summer of 2011?

5     A.   Yes.

6     Q.   September of 2011 you would have started what grade?

7     A.   Sixth grade.

8     Q.   So your visits at the Cruz residence, was that after

9  fifth grade ended, maybe the 1st of June, or were you

10 beginning to go to the Cruz place the tail end of that fifth

11 grade year?

12    A.   I am not sure about that one.

13    Q.   Do you recall what precisely you told your mom?

14    A.   Yes.

15    Q.   Tell us.

16    A.   I told her, I said, Armando is taking pictures and I'm

17 not wanting to go back over there.  And she told me not to go

18 back over there or Marissa would have to come over to our

19 house.

20    Q.   When you told your mom that, did you ever disobey your

21 mom and appear at the Cruz residence?

22    A.   No.

23    Q.   Young lady, do you know after you told your mom

24 Mr. Cruz is taking photos of us, do you know if your mom ever

25 communicated with Mr. Warner on that same topic?

Faith - Cross

1      A.    Yes.

2      Q.    You know that because you were present in a

3  conversation with your mom?

4      A.    Yes.

5      Q.    And your mom reported to you words to the effect, hey,

6  I talked to Earl --

7           MS. BLOCH:  Objection, Your Honor, hearsay.

8           MR. CHONTOS:  It's the Defendant's statement.

9           MS. BLOCH:  No --

10           THE COURT:  Patience.  I sustain the objection.

11  You may rephrase.

12  BY MR. CHONTOS:

13      Q.    Your mom communicated something to you, right?

14      A.    Yes.

15      Q.    She communicated after she had a conversation with

16  Mr. Warner?

17      A.    Yes.

18      Q.    Did you feel comfortable that Mr. Warner was going to

19  do something about that?

20      A.    I felt safe about that one.

21      Q.    When you say you "felt safe," did the word "safe"

22  include Mr. Warner taking action?

23      A.    Not necessarily.  It did not, like, affect me by any

24  way, but it did affect me by whatever he -- when I found out

25  that he didn't do anything about it.

Faith - Cross

1   Q.   That's in your view that he didn't do anything about

2   it, right?

3   A.   Yes.

4   Q.   What did you hope?  What did you expect Mr. Warner to

5   do?

6   A.   To turn him in to the police.

7   Q.   Did you have that same expectation of your mom?

8   A.   Yeah.

9   Q.   She failed you?

10   A.   Yes.

11   Q.   Young lady, at the time that you are spending a lot

12   more time at the Earl Warner residence, did there come a time

13   where Earl was upset about Mr. Cruz?

14   A.   Yes.

15   Q.   Did Earl convey to you that he was going to get back at

16   Mr. Cruz?

17   A.   Yes.

18   Q.   Did you like that idea?

19   A.   I liked it, but I wasn't sure what he was going to do

20   to get back at him.

21   Q.   Did Mr. Warner then talk about what his idea and his

22   plan was?

23   A.   Yes.

24   Q.   Did that include putting images on Mr. Cruz's computer?

25   A.   Yes.

Faith - Cross

1    Q.    Those images would need to have been pictures of young

2  girls?

3    A.    Yes.

4    Q.    You were going to be one of those young girls?

5    A.    Yes.

6    Q.    Young lady, you talked a little bit about a rash

7  itching in your private area, right?

8    A.    Yes.

9    Q.    Is a contributing reason to why you shaved because you

10 had an issue with lice?

11   A.    No.

12   Q.    Is a contributing reason to why you shaved is because

13 you had crabs?

14   A.    No.

15   Q.    The ointment or whatever Mr. Warner got to try to help

16 you, that just didn't work, right?

17   A.    Correct.

18   Q.    Now, you talked a little about the layout of the Warner

19 residence.  There's two bedrooms upstairs, right?

20   A.    Yes.

21   Q.    One you can clearly tell just by the decorations that

22 that was Bri's room, right?

23   A.    Yes.

24   Q.    The other room was larger.  If you didn't know any

25 better, that would be the master bedroom?

Faith - Cross

1    A.    Correct.

2    Q.    In that master bedroom is a television, right?

3    A.    No.

4    Q.    Okay.  Is the television in that house on the first

5    floor or second floor?

6    A.    First.

7    Q.    Is there a television on the second floor?

8    A.    No.

9    Q.    Now, young lady, the house rules, so to speak, were

10   that when Brianna has guests over, Brianna sleeps in her room

11   and the guests sleep in that bigger bedroom, right?

12   A.    Yeah.

13   Q.    In those situations where you would spend an overnight

14   you are not telling us that Mr. Warner would sleep in the same

15   bed with you, right?

16   A.    He did sleep in the same bedroom as me.

17   Q.    Were you on the bed and he on the floor?

18   A.    No, he was on the bed too.

19   Q.    Okay.  So it's not your recollection that he always

20   slept downstairs on the living room couch?

21   A.    No.

22   Q.    Did he ever sleep down on the living room couch?

23   A.    No.

24   Q.    Young lady, when you were at the Warner residence, was

25   Margie ever there with you?

Faith - Cross

1    A.    Yes.

2    Q.    Your relationship to Margie are cousins?

3    A.    Yes.

4    Q.    Are you able to tell us in that summer of 2011 how many

5    times Margie was there?

6    A.    No.

7    Q.    Likewise, you couldn't tell us how often you were

8    there?

9    A.    No.

10    Q.    Were you there at least more than once a week?

11    A.    Yes.

12    Q.    But not as extensive as every day, meaning seven days a

13    week?

14    A.    Yes.

15    Q.    Somewhere in between?

16    A.    Yes.

17    Q.    Some weeks it would be a little more, some weeks it

18    would be a little less?

19    A.    Yes.

20    Q.    Young lady, your relationship, your interaction with

21    Mr. Cruz, is it fair to say that he did some terrible things

22    to you?

23    A.    Yes.

24    Q.    Now, there were occasions where you would play amateur

25    photographer and take photos of your friends, right?

Faith - Cross

1    A.   No.

2    Q.   So there was never an opportunity, you never grabbed a

3    camera there in the Warner household and start clicking away?

4    A.   No.

5    Q.   Did Brianna ever play amateur photographer and take

6    photos of you or Margie?

7    A.   No.

8    Q.   How about Margie being amateur photographer and taking

9    photos of you or Brianna?

10   A.   No.

11   Q.   Young lady, about the incident where you were itching

12   in your private parts area, you indicated that you told

13   Mr. Warner about that, right?

14   A.   Yes.

15   Q.   Your relationship with him at that point, you know, you

16   felt comfortable sharing that information with him?

17   A.   Yes.

18   Q.   Did you also learn during your tenure there at the Cruz

19   residence of Mr. Cruz doing terrible things to Margie?

20   A.   Yes.

21   Q.   Did Margie tell you?

22   A.   Yes.

23   Q.   Did Margie impart that knowledge to you about what Cruz

24   was doing to her --

25   A.   Yes.

Faith - Cross

1    Q.    Longer question.  When Margie imparted that information

2    to you, was that before you told Brianna to go tell her dad?

3    A.    No.

4    Q.    That was after?

5    A.    Yes.

6    Q.    After you learned that, that information from Margie

7    that Cruz is doing these terrible things to me, did you share

8    that information with Mr. Warner?

9    A.    No.

10   Q.    Kept that to yourself?

11   A.    I had told my mom again.

12   Q.    Okay.  So the first time you tell your mom is all about

13   what he was doing to me?

14   A.    Yes.

15   Q.    The second time you tell your mom is, oh, hey, Mom, by

16   the way, he is also doing it to Margie?

17   A.    Yes.

18   Q.    Are you able to tell us a time gap between your first

19   revelation to your mom and the Margie-based revelation to your

20   mom?

21   A.    No.

22   Q.    Was it days or weeks or we don't know?

23   A.    No.

24              MR. CHONTOS:  That's all I have.

25              THE COURT:  Are we done?

Faith - Redirect

1        MR. CHONTOS:  Yes, Judge.

2        THE COURT:  Okay, thank you.  Any questions?

3        MS. BLOCH:  I have just a few, Your Honor.

4                    REDIRECT EXAMINATION

5   BY MS. BLOCH:

6    Q.    Faith, just so it's clear, Mr. Chontos asked you a lot

7   of questions about a plan that Earl had to get even with Cruz.

8    A.    Yeah.

9    Q.    What was the plan that Earl told you he was going to

10  do?

11   A.    He was going to take pictures of me and other girls, he

12  was going to put it on a computer card, and he was going to

13  switch them out and like tell Armando that he has pictures of

14  girls on here, and he was going to give one that doesn't have

15  anything on it.  He was going to give that one to him and then

16  get his and take his computer card and give it to the police

17  and show them what he's been doing.

18   Q.    So his plan was -- was that how he got you to start

19  taking the naked pictures?

20   A.    Yes.

21   Q.    Is that how he got you to take pictures that involved

22  his hands and other things on your body?

23   A.    Yes.

24   Q.    To the best of your knowledge, did he ever do anything

25  with those pictures other than keep them?

Faith - Redirect

1    A.    No.

2    Q.    Mr. Chontos asked you if Armando Cruz did terrible

3    things to you, and you said yes.  By "terrible things," do you

4    mean sexual things?

5    A.    Yes.

6    Q.    Did Mr. Warner do those same terrible things to you?

7    A.    Not that I know of.

8    Q.    Is sticking his hand inside your vagina a terrible

9    thing?

10   A.    Yes.

11            MS. BLOCH:  No further questions.

12                      RECROSS-EXAMINATION

13   BY MR. CHONTOS:

14   Q.    I just need to slow down that plan because it has a lot

15   of component parts.  Take pictures of you and other girls,

16   that's one part, right?

17   A.    Yes.

18   Q.    Put them on a storage device?

19   A.    Yes.

20   Q.    Take that storage device to Cruz's house?

21   A.    Yes.

22   Q.    Put what's on that storage device on Cruz's laptop?

23   A.    Yes.

24   Q.    And then I got lost about some sort of switch.  So go

25   over that again.

Faith - Recross

1    A.    He also took -- he also said he was going to take an

2    empty one and after he showed Armando, he was going to switch

3    them out.   Instead of putting them on the computer, he was

4    just going to hand him one.   And he was going to take the one

5    that Armando gives him and take it to the police and turn him

6    in for it.

7    Q.    So show Armando on disk A some photos of girls, but

8    give Armando disk B that's blank?

9    A.    Yes.

10              MR. CHONTOS:   Thank you.

11              THE COURT:   All right.   May she be excused?

12              MS. BLOCH:   She may.

13              THE COURT:   May she be excused?

14              MR. CHONTOS:   Yes.

15              THE COURT:   Ma'am, be real careful stepping down,

16   don't trip.   Thank you.

17              (Witness excused.)

18              THE COURT:   All right.   Mr. Cruz, correct?

19              MS. BLOCH:   Correct.

20              THE COURT:   Okay.   Bring Mr. Cruz in, please.

21              Ladies and gentlemen, while that's occurring, I

22   want to remind you again that you are not supposed to discuss

23   this case with anyone or permit anyone to discuss the case

24   with you.   Until you retire to the jury room at the end of the

25   case to deliberate your verdict, you simply do not talk about

Cruz - Direct

1    this case even among yourselves.

2              Second, don't read or listen to anything about the

3    case.  Don't conduct any investigation or Internet searches.

4              Finally, do not form an opinion until all the

5    evidence is in.  Keep an open mind until you start your

6    deliberation at the end of the case.

7              Mr. Cruz, come back over here, please.

8              ARMANDO CRUZ, a witness herein, having been first duly

9    sworn, was examined and testified as follows:

10             THE WITNESS:  Armando Cruz, A-R-M-A-N-D-O, C-R-U-Z.

11             THE COURT:  Okay, Mr. Cruz, just get up here and

12   get comfortable.  Make sure you get close to the microphone,

13   please.

14                      DIRECT EXAMINATION

15   BY MS. BLOCH:

16    Q.   After, if you can please state your name a little

17   louder, please, for the jurors.

18    A.   Armando Cruz.

19    Q.   Mr. Cruz, you are currently incarcerated, is that

20   correct?

21    A.   Yes.

22    Q.   You were arrested on February 15th of 2012, am I

23   right?

24    A.   Yes.

25    Q.   At that time you were arrested by the Mercer County

Cruz - Direct

1    detectives and the state police?

2    A.    Yeah.

3    Q.    Mr. Cruz, at the time of your arrest did you live in

4    Mercer, Pennsylvania?

5    A.    Yes.

6    Q.    Were you arrested on the same day that the agents and

7    officers searched your home?

8    A.    Yes.

9    Q.    Later you entered a plea of guilty, is that correct?

10   A.    Yes.

11   Q.    Specifically you pled guilty to a charge of producing

12   sexually exploitive pictures of children?

13   A.    Yes.

14   Q.    Is that right?

15         You lived in Mercer with two children, am I right?

16   A.    Yes.

17   Q.    One of whom was your daughter, Marissa?

18   A.    Correct.

19   Q.    Did she make friendships with some other girls that

20   lived in and around your neighborhood that would come to your

21   home?

22   A.    Yeah.

23   Q.    If you could only use their first names, I would

24   appreciate it.  What were the names of some of those girls?

25   A.    Faith, Margie, Brianna, Harley.

Cruz - Direct

1    Q.   At some point -- strike that.

2         When they came to spend time at your home, did they

3    spend time -- did they stay overnight?

4    A.   Yeah.

5    Q.   Did you spend time with them?

6    A.   Yeah.

7    Q.   Did you take them swimming and other places?

8    A.   Yeah.

9    Q.   Did you take sexually explicit photographs and videos

10   of them?

11   A.   Yes.

12   Q.   Did you share those photographs and videos with other

13   individuals?

14   A.   Yeah.

15   Q.   How many other individuals did you share those with?

16   A.   Two or three.  I don't remember really.  Maybe around

17   four people.

18   Q.   Do you know an individual by the name of Earl Warner?

19   A.   Yeah.

20   Q.   How do you know that individual?

21   A.   He was -- he's Brianna's father.

22   Q.   How did the friendship between your daughter and these

23   girls, including Brianna, how is it -- how did it build?

24   A.   Brianna was friends with one of the other girls,

25   Harley.  That's how they met.

Cruz - Direct

1    Q.    Would Brianna bring Harley and then did that apply to
2    Faith too, is that how they came --
3    A.    No.  She became friends with Brianna because of Harley.
4    Q.    Okay.
5    A.    And that's how they ended up talking and meeting.
6    Q.    How old -- I am going to take you back to 2011 before
7    you were arrested.  How old was your daughter then?
8    A.    2011, 16 I think.
9    Q.    So she was quite a bit older than the other girls?
10   A.    Yeah.
11   Q.    How did you -- so you said you got to know Earl Warner
12   through his daughter.  Is that how you met him, through
13   Brianna?
14   A.    Through Harley and Brianna.
15   Q.    Did you build a friendship with Mr. Warner?
16   A.    Yeah.
17   Q.    What kinds of things did the two of you do together?
18   A.    We took the girls swimming and played computer games
19   and stuff together.
20   Q.    What kind of computer games did the two of you play?
21   A.    I don't remember the name.  It was some -- like a
22   medieval strategic game.
23   Q.    Did you play the games at your house, at his house, or
24   both?
25   A.    His house.  Or I would be at my house and he would be

Cruz - Direct

1   at his house.

2      Q.    So you could play from a distance?

3      A.    Yeah, it was an online game.

4      Q.    At any point in time during your friendship did you

5   ever tell Mr. Warner that you were taking these sexually

6   explicit images of the girls?

7      A.    Eventually we got to the point where we both, you know,

8   realized that we both liked that type of stuff.  So we ended

9   up telling.

10     Q.    How did the two of you -- how did you come to realize

11  and he come to realize that the two of you enjoyed the same

12  kind of what you're referring to as stuff?  By "stuff," do you

13  mean sexual images of young girls?

14     A.    Yeah.

15     Q.    How did you make that connection?

16     A.    I really don't remember, but just somehow he told me

17  that he -- I don't remember how, but he said -- he came to me

18  and said that he realized that I was into that stuff and so

19  was he.

20     Q.    Did he indicate to you that his daughter or one of the

21  other girls had told him that they were the subject of your --

22  of these photographs we are speaking about?

23     A.    I don't remember if he told me that for sure.

24     Q.    Once the two of you realized that you shared this

25  common interest, did you have any future discussions about it?

Cruz - Direct

1    A.    Yeah.  Yeah, off and on, you know, we looked up
2    pictures online and stuff.
3    Q.    Of young girls?
4    A.    Uh-huh.
5    Q.    Did you do that at your house or his house?
6    A.    At his house.
7    Q.    What kind of computer or computers did Mr. Warner have,
8    do you recall?
9    A.    At first he didn't have one.  Then he ended up buying a
10   laptop.
11   Q.    Had he -- did you have a laptop?
12   A.    Yes, I had a laptop.
13   Q.    Had he ever seen yours?
14   A.    Yes.
15   Q.    What kind did you have back then?
16   A.    It was an Acer.  I got from Wal-Mart.
17   Q.    Did he admire your laptop?
18   A.    He asked me where I got it and how much it cost.
19   Q.    Then he went and bought one?
20   A.    Yes, he went and bought one.
21   Q.    Do you remember approximately how long he had that
22   computer before you were arrested?
23   A.    I don't remember exactly.  It had to be at least six
24   months to a year, but I don't remember exactly how long he had
25   it.

Cruz - Direct

1    Q.   Were there ever occasions that you showed Mr. Warner

2    the pictures you were taking of Faith and Margie and Harley

3    and Bri?

4    A.   I never showed him the pictures I took, no.

5    Q.   Was there ever an occasion that you --

6    A.   Wait, I did show him some, yeah, but not -- I showed

7    him some, but not all of them.

8    Q.   Some meaning pictures of girls?

9    A.   No, of the girls.

10   Q.   But not all of them?

11   A.   Nuh-uh.

12   Q.   What kind of pictures did you show him?

13   A.   Just of them nude.

14   Q.   Did that include Bri?

15   A.   No.

16   Q.   Did Mr. -- when you -- at the point where you showing

17   him some of the pictures you had taken, did you think or did

18   he say that he had taken pictures of the girls as well?

19   A.   He said he had seen them nude in the house and stuff

20   and he had taken pictures, but then he said he erased them.

21   Q.   Did you ever personally when in his home see him take

22   pictures of the girls?

23   A.   No.

24   Q.   Did you ever take pictures of Faith or Harley or Margie

25   with your camera or his camera in Mr. Warner's home?

Cruz - Direct

1    A.    No.  Just regular pictures, not any nude pictures.

2  Just, you know, them playing around.

3    Q.    Was there ever an occasion on which you saw images of

4  these girls on his computer when you were at his home?

5    A.    Yeah.

6    Q.    When did that occur?

7    A.    It had to be about six to eight months before I got

8  arrested.  It may have been longer than that.  About that.

9  Six to eight months, somewhere around there.

10   Q.    Was there -- before you were arrested, was there a

11  period of time in and around the early summer of 2011 when

12  you -- when the girls stopped coming to your house, but were

13  going to Earl's house?

14   A.    Uh-huh.  Yeah.

15   Q.    Do you know why that started to occur?

16   A.    I heard from one of the girl's mother told me that he

17  told her that I was taking pictures of them.

18   Q.    Did this mother say that her daughter would not be

19  permitted to come to your home because of that?

20   A.    No.  She called me and asked me about it, you know,

21  asked me why he was saying that.  I said I didn't know why he

22  was saying that.  She believed me.

23   Q.    Did you have discussions directly with Earl about the

24  fact that the girl -- that he was telling parents or things

25  about you --

Cruz - Direct

1    A.    No.

2    Q.    Never?

3    A.    Nuh-uh.

4    Q.    Did the two of you continue to play computer games and

5    spend time together?

6    A.    I was starting to spend less time over there, but my

7    daughter, Marissa, she didn't have many friends and I was

8    tired of seeing her sitting at home by herself, so -- and

9    these girls kept calling her to come over.  So I relented and

10   started bringing her over again.

11   Q.    Bringing her over to Earl's?

12   A.    Yes.

13   Q.    Did he live in the Brandy Springs Apartment then?

14   A.    Yeah.

15   Q.    How far away from your house is that?

16   A.    Half mile I guess.

17   Q.    Did you ever see the camera that Mr. Warner used to

18   take the pictures?

19   A.    Yes.

20   Q.    What kind of camera was it, do you know?

21   A.    It was a smaller -- I think it was a Canon camera that

22   he had.

23   Q.    What color?

24   A.    Black.

25   Q.    You used cameras too, am I correct?

Cruz - Direct

1    A.    Yeah.

2    Q.    Were the cameras that you used to take these pictures

3    of the girls in your home, was that camera or cameras seized

4    during the search of your house?

5    A.    Yes.

6    Q.    At any time did you take your camera and leave it with

7    Mr. Warner?

8    A.    No, not that I remember, no.

9    Q.    Were you upset at any time that the girls were now

10   instead of coming to your home heading over to Earl's and not

11   accessible to you anymore?

12   A.    No, not really.

13   Q.    Not really?

14   A.    No.

15   Q.    Before your arrest, Mr. Cruz, did you have an

16   opportunity to not only view images on Mr. Warner's computer

17   of the girls, but download them?

18   A.    Yes, before, yes.

19   Q.    Why don't you tell us approximately when that occurred

20   and what you did.

21   A.    After I got wind -- after the girl's mother told me

22   that he's trying to set me up or something, you know, so I

23   took the opportunity to get some pictures, I had seen the

24   pictures on there when he didn't know, so I put the pictures

25   on a flash drive and, you know, take them home so I had proof

Cruz - Direct

1    that he was doing the same thing.  That was -- that had to be

2    at least, I am not sure, I think a couple of months before I

3    got arrested, maybe three months, in that area.

4    Q.   So you took a flash drive, that's one of the sticks you

5    stick in a computer, correct, where you can take information

6    off?

7    A.   Uh-huh.

8    Q.   You are saying what prompted you to do that is you had

9    received a phone call from one of the mothers saying that he

10   was --

11   A.   Yeah.

12   Q.   That caused you to fear he was going to turn you in to

13   the police or set you up?

14   A.   Yeah.  Uh-huh.

15   Q.   Who was it who called you?

16   A.   It was Faith's mother.

17   Q.   So on this occasion when you downloaded the images, how

18   were you able to do it without Earl knowing that you did it?

19   A.   He would go upstairs or something and he would leave me

20   down there with his computer, we were playing a game at the

21   same time, so I just took that opportunity to do that.

22   Q.   Once you have the image, were there videos as well as

23   part of that?

24   A.   Oh, yeah, I took a few videos.

25   Q.   You took the flash drive home, then what did you do?

Cruz - Direct

1    A.    Well, I had it for a little while, then I ended up

2    putting it on some DVD disks.

3    Q.    How many disks?

4    A.    I think it was two.

5    Q.    Where did you stick the two disks?

6    A.    I had them at my house for awhile, then I ended up

7    hiding them at my work place.

8    Q.    Where did you work at the time?

9    A.    Richardson Cooling Packages.

10   Q.    Do you remember where you had hid them?

11   A.    It was in our warehouse storage area on some beams, you

12   know, out of sight.

13   Q.    Were these just standard blank disks or DVDs?

14   A.    Yes, they were the burners you could get anywhere.

15   Q.    Do you remember if they were -- were they out in the

16   open, were they in an envelope, were they in a sleeve?

17   A.    They were in a sleeve.

18   Q.    Do you remember the color of the sleeve?

19   A.    White.

20   Q.    Prior to this sort of, you know, separation between you

21   and Mr. Warner as it gets closer to your arrest, was there

22   ever an occasion on which you and Mr. Warner discussed how to

23   get the girls comfortable with taking the naked pictures?

24   A.    Yeah.  We -- I mean, the whole time once we got to

25   where we knew both of us were into that, you know, we were

Cruz - Direct

1   just trying to get them comfortable around us.

2   Q.   What does that mean to you "getting them comfortable,"

3   what would you do to make them comfortable around you?

4   A.   Just, you know, horseplay with them and let them

5   horseplay.  Basically we would allow them to do a lot of stuff

6   they wanted.  We have videos of them just slipping and sliding

7   in the kitchen, he would pour water and stuff, you know, then

8   he would have them put on their bathing suits and do all of

9   that in there.  Just stuff like that.

10   Q.   Did Mr. Warner ever specifically ask you to assist him

11   in making them more comfortable since you had been successful?

12   A.   I don't remember if he did or not.  I don't know.

13   Q.   Sometime after your arrest, Mr. Cruz, you had counsel

14   and you made the decision to plead, as you indicated.  Did you

15   also agree to be interviewed by the FBI at that time?

16   A.   Yes.

17   Q.   So did you sit -- in March, approximately, of 2012, did

18   you sit down and meet with Agent Carter and explain to him

19   what you had been up to, what had happened?

20   A.   Yes.

21   Q.   Who you were sharing images with?

22   A.   Uh-huh.  Yes.

23   Q.   Did you provide information at that time about Earl

24   Warner?

25   A.   Yeah.

Cruz - Direct

1    Q.    The man we are speaking about through this testimony,

2    Mr. Warner, is he in the courtroom today?

3    A.    Yes, he is.

4    Q.    Will you please describe on the record what he's

5    wearing?

6    A.    A white shirt, blue tie.

7    Q.    When you talked to Agent Carter, did you tell him about

8    the disks you just described?

9    A.    Yeah.

10   Q.    What did you tell Agent Carter?

11   A.    That I, you know, I told him about the other guy that I

12   was sharing with and told him I had evidence of another one.

13   I told him about the disks, and he asked where they were

14   located and I told him.

15   Q.    So to the best of your knowledge did he then retrieve

16   those disks?

17   A.    Yeah.

18          MS. BLOCH:   One moment, Your Honor.

19   BY MS. BLOCH:

20   Q.    Mr. Cruz, you indicated that you -- you had been to the

21   upstairs of Mr. Warner's home, is that correct?

22   A.    Yeah.

23   Q.    Have you ever used his bathroom?

24   A.    Yeah.

25   Q.    Do you remember what it looked like?

Cruz - Direct

1    A.    I think it was painted white and a closet.

2    Q.    Did it have a bathtub with a shower curtain?

3    A.    Yes.

4    Q.    Do you remember what the shower curtain looked like?

5    A.    I think it was a two-part shower curtain and it was

6    black and then one part was clear.  I think it had like fish

7    or something on it.

8    Q.    Without you sort of sneaking a peek of the images that

9    Mr. Warner had taken and were on his computer, did he ever

10   actually show you any pictures he had taken?

11   A.    He did, yes.

12   Q.    What kinds of pictures did he show you?

13   A.    The girls in the bathroom and in his room on the bed

14   and stuff.

15   Q.    By "girls," do we mean Margie, Faith, Harley?

16   A.    Yeah.  It was mainly Harley and Faith.  And a couple of

17   Margie.  And Brianna in one of them.

18   Q.    Were the girls naked in some or all of these pictures?

19   A.    Yes, in all of them.

20   Q.    Did you ever see, among those images that we are

21   talking about now, images of Faith wearing a child's Steelers

22   cheerleading outfit?

23   A.    Yes.

24   Q.    Did you see one or a whole series?

25   A.    Several, yes, a whole series.

1          MS. BLOCH:  No further questions, Your Honor.

2          THE COURT:  Okay.  Ladies and gentlemen, we are

3    going to break for the evening.  Again, remember my cautionary

4    instructions.

5          Everyone is going to remain seated while you go

6    back and get your coats and leave the building, so I don't

7    want anybody to leave the courtroom until the jury is cleared

8    from the back of the room.  So I ask my law clerk to go back

9    there and make sure that that occurs.

10          The deputy clerk will take you all back to the jury

11    room.

12          (Jury exits courtroom.)

13          (In open court; jury not present.)

14          THE COURT:  The marshals may remove Mr. Cruz.

15          Tell me about the rest of the Government's case,

16    please.  What witnesses are left?

17          MS. BLOCH:  Your Honor, I believe following

18    Mr. Cruz's testimony I will be calling Trooper Troy Owen and I

19    will be recalling Special Agent Carter.

20          THE COURT:  Okay.  That's not to limit you if you

21    decide something overnight, I am just trying to figure out the

22    schedule.

23          So it sounds like if everything goes in order that

24    the Government should be resting by noon tomorrow, does that

25    sound fair?

 1              MS. BLOCH:  That sounds fair.

 2              THE COURT:  If you need longer, that's fine, I am

 3   just trying to work the work schedule out.

 4              Yes, sir, did you want to say something?

 5              MR. CHONTOS:  Right.  I have a few witnesses lined

 6   up for 1 o'clock tomorrow to be here.  I think I can then

 7   consume the rest of the afternoon with Mr. Warner's testimony.

 8              Then if we're successful during the day tomorrow,

 9   potentially even this evening, some additional witnesses for

10   Friday.  Just to give you a flavor, a fact witness and a

11   growing number of character witnesses.

12              THE COURT:  All right.  Thank you for that.

13              Now, I just want to go through my schedule.  I have

14   all day tomorrow.  As you can see, this jury seems to be

15   willing to go to 5.

16              I have Friday until around noon.  Then we are going

17   to have to break and we will have to pick up, since next week

18   is full, we will have to pick up on February 3rd.  So that's

19   the schedule and that's what I have available.  So you can

20   just plan accordingly if you would for me, please.

21              MR. CHONTOS:  Judge, before we leave, what I plan

22   on, as things came out here today, and I will file something

23   before the bewitching hour of midnight tonight, I can see a

24   particular jury charge that we're seeking, and that would be

25   the defense of necessity.  So I will flesh that out in an ECF

```
 1   filing and go from there.
 2             THE COURT:  Sure.  Anything else you would like to
 3   talk about this evening?
 4             MR. CHONTOS:  Well, Judge, could, once the
 5   courtroom is clear, could Mr. Warner stay put, and family
 6   members are here, so they can engage in a conversation?
 7             THE COURT:  That's up to the marshals.  He needs to
 8   get back to wherever he's incarcerated, correct?
 9             THE DEPUTY MARSHAL:  Yes, sir.
10             THE COURT:  So that's not going to work tonight,
11   correct?
12             THE DEPUTY MARSHAL:  Yes, sir.
13             THE COURT:  All right.  So --
14             MS. BLOCH:  May I ask one question of scheduling
15   before you --
16             THE COURT:  Well, we will see what maybe can be
17   arranged tomorrow, but it's not going to occur tonight.  He
18   needs to be back to where he is incarcerated and he needs to
19   get his dinner, so we need to take care of that with the
20   Defendant in that regard.
21             THE DEPUTY MARSHAL:  Judge, would you like him up
22   here early tomorrow morning?
23             THE COURT:  That would be fine.  Maybe 9:15, does
24   that work?
25             THE DEPUTY MARSHAL:  Sounds good.
```

```
 1              THE COURT:  So he can come up here at 9:15 and do
 2    some chatting as long as it's consistent with whatever the
 3    marshals believe is proper for security purposes.
 4              Does your question require the Defendant to be
 5    present?
 6              MS. BLOCH:  Probably.
 7              THE COURT:  Okay.
 8              MS. BLOCH:  Your Honor, obviously it's not in the
 9    Government's interests to see a trial get protracted after it
10    puts its entire case on with the passage of, you know, ten
11    days.  So I guess what I am going to ask is that, to the
12    extent Mr. Chontos moves more quickly than he is anticipating
13    right now, would the Court, if we got to closings and
14    deliberation, would the Court allow the jury to deliberate on
15    Friday even if the Court is not available?
16              THE COURT:  No, but if there is closing and the
17    jury was charged, then the jury could come in and deliberate
18    next week.  But it can't deliberate without me being here.
19    But I can do other things in the courtroom while they're
20    deliberating.  But the -- that's a function of how much more
21    the Government has to offer and I am certainly not going to
22    limit the defense in any way in presenting whatever witnesses
23    they want.  So that's why I am just telling you the time I am
24    available this week is tomorrow through 5 o'clock and until
25    noon on Friday.
```

1          Yes, sir.

2          MR. CHONTOS:  Thanks for reading that inquisitive

3   look.  So if we don't do closings and charge by 11:55 on

4   Friday, those last two functions of our jury trial would just

5   take place on the 3rd?

6          THE COURT:  Correct.

7          MR. CHONTOS:  All right.

8          THE COURT:  Marshals, you may remove the Defendant.

9       (Court recessed until January 23, 2014.)

10

11                    I N D E X

12  WITNESS                  DIRECT   CROSS  REDIRECT  RECROSS

13  For the Government:

14  Thomas Carter               9       42       54       --
    Robert Pearson             57      104      116      120
15  Fawn Mills                121      132      ---      ---
    Laura Holmes              137      143      ---      ---
16  Margie                    146      162      171      176
    Faith                     177      194      205      206
17  Armando Cruz              208      ---      ---      ---

18

19

20                 C E R T I F I C A T E

21          I, Richard T. Ford, certify that the foregoing

22  is a correct transcript from the record of proceedings in the

23  above-titled matter.

24  S/Richard T. Ford  _____

25