IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,

       Plaintiff,

     vs.

EARL D. WARNER,

       Defendant.
_____

Criminal Action

No. 12-107


    Transcript of proceedings on January 23, 2014,
United States District Court, Pittsburgh, Pennsylvania,
before Arthur J. Schwab, District Judge


APPEARANCES:

For the Government:        Carolyn J. Bloch, Esq.


For the Defendant:         David B. Chontos, Esq.


Court Reporter:           Richard T. Ford, RMR, CRR
                        6260 U.S. Courthouse
                        Pittsburgh, PA  15219
                        (412) 261-0802


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1          (Proceedings held in open court; January 23, 2014.)

2               THE COURT:  You may be seated.

3               Ladies and gentlemen of the jury, thank you for

4     being back and for being here on time.  We are still on the

5     Government's case in chief, and the witness yesterday,

6     Mr. Cruz, testified on direct.  He now will be cross-examined.

7               Sir, would you just come a little closer to the

8     microphone for me, please.  Thank you.

9               You may begin.

10              MR. CHONTOS:  Thank you.

11              ARMANDO CRUZ, a witness herein, having been previously

12    duly sworn, was examined and testified as follows:

13                          CROSS-EXAMINATION

14    BY MR. CHONTOS:

15    Q.    Sir, you indicated to us that after you snuck into Earl

16    Warner's house and did the thumb drive and went back to your

17    house and burned them to a CD -- do you remember talking about

18    that?

19    A.    Yeah.

20    Q.    I think you also told the jury that you had waited

21    awhile before you actually burned them to the CD, right?

22    A.    Yeah.

23    Q.    Then you waited a little bit longer before you actually

24    hid them at your work place, right?

25    A.    Yes.

Cruz - Cross

1   Q.   That's about the extent of you being able to tell us

2   dates or time frame, correct?

3   A.   Well, awhile -- probably a couple weeks before I burned

4   them.  A couple weeks on the hiding.

5   Q.   Why don't we do it this way.  You get arrested in

6   February, 2012, right?

7   A.   Yes.

8   Q.   How much time before that do you hide them at your work

9   place?

10   A.   It would be maybe -- I am not sure, but it had to be

11   around a month.

12   Q.   Okay.  So that takes you to sometime in January, the

13   latter part of January, right?

14   A.   Uh-huh.

15   Q.   Are you able to tell us when you snuck into Earl's

16   house and downloaded the stuff?

17   A.   I don't remember the exact time period.

18   Q.   Now, sir, during activities at your house with the

19   girls befriending your daughter and you befriending them, you

20   got to know the respective parents, did you not?

21   A.   Yeah.

22   Q.   Through your children you were at those child related

23   functions, such as maybe a birthday party or something at

24   school, things like that?

25   A.   Uh-huh.  Yeah.

Cruz - Cross

1    Q.   Is it through those meetings that you also met

2  Mr. Warner?

3    A.   No, I don't think so.

4    Q.   All right.  So you met Mr. Warner after meeting Bri,

5  who was a friend of your daughter, right?

6    A.   She was a friend of Harley.

7    Q.   Correct.

8    A.   Yes.

9    Q.   So Bri is a friend of Harley.  Harley then brings Bri

10 to your house with your daughter, right?

11   A.   Uh-huh.

12   Q.   From that, through your children, you get to meet

13 Mr. Warner?

14   A.   Yeah.

15   Q.   All right.  Sir, did you ever pay Harley's mom money to

16 have Harley come to your house?

17   A.   No.

18   Q.   Sir, was there a time where -- you are familiar with

19 Facebook?

20   A.   Uh-huh.

21   Q.   You know how that all works?

22   A.   Yeah.

23   Q.   You know how to get on?

24   A.   Yeah.

25   Q.   Did there come a time when you knew Mr. Warner that

Cruz - Cross

1    there was an access issue with Mr. Warner getting onto

2    Facebook?

3        A.    Yes.

4        Q.    Did that access issue require you to help him?

5        A.    Yes, he asked me to try to help him.

6        Q.    He is not too computer literate, is he?

7        A.    He seems all right.  It was just a Facebook issue.

8        Q.    Did that require a photograph to be taken of

9    Mr. Warner's license?

10       A.    I don't remember.  I don't remember that.

11       Q.    What was the Facebook issue that you then solved for

12   him?

13       A.    I don't remember if we solved it or if he set up

14   another account, but he couldn't sign on.

15       Q.    Did you learn the reason why he needed to sign on?

16       A.    That's where we played our computer game, I know that.

17       Q.    So the reason why was not because some nude photos

18   showed up and they were posted by someone and Earl wanted to

19   get those photos down?

20       A.    I remember something like that happened, like a nude

21   photo of Faith showed up.

22       Q.    Okay.

23       A.    I don't know if that was the issue with his account,

24   but I remember that.

25       Q.    Was that in the summer of 2011?

Cruz - Cross

1    A.   I think so.

2    Q.   Your recollection was that Mr. Warner took steps to get

3    the poster of that nude photo to take it down?

4    A.   Yeah, he had told me he had -- he was looking into it.

5    Q.   Now, sir, in this -- well, was there an occasion during

6    this time frame that you knew Mr. Warner that there was

7    something with YouTube and some nude photos on YouTube?

8    A.   On YouTube?  I don't remember that.  But it may have

9    been the same instance.

10   Q.   Sir, during the girls being at your house, did you

11   become aware that the girls liked to take pictures of each

12   other without any clothes on?

13   A.   Yeah.

14   Q.   All of them?

15   A.   Yeah -- well, Brianna usually never did.

16   Q.   Faith, Harley, Margie, they would all play amateur

17   photographer with the other two being subjects of the photos?

18   A.   Yes.

19   Q.   While they were doing that, were you present?

20   A.   Yeah.

21   Q.   Sir, I want to transition to your case.  You were

22   charged with four counts of production of material depicting

23   the sexual exploitation of a minor, right?

24   A.   Uh-huh.  Yeah.

25   Q.   One option that you had to resolve that case was just

Cruz - Cross

1   plead guilty and be sentenced on all four; fair?

2   A.   Uh-huh.

3          THE COURT:   Excuse me, say yes or no if you would

4   for me, please.

5          THE WITNESS:   Yes.

6          THE COURT:   Thank you.

7   BY MR. CHONTOS:

8   Q.   You didn't choose to exercise that option, did you?

9   A.   No.

10  Q.   You chose another option, and that was to work out a

11  deal with the Government, right?

12  A.   Yes.

13  Q.   A plea agreement?

14  A.   Yes, plea agreement.

15  Q.   From four original counts you resolved your case by

16  pleading guilty to two counts?

17  A.   Yes.

18  Q.   One of the reasons you did that was the benefit that

19  would come your way as a result of that agreement; fair?

20  A.   Fair.

21  Q.   Now, sir, the resolution of your case ended up in you

22  getting sentenced, right?

23  A.   Yes.

24  Q.   At Count 1, which was a production of material

25  depicting the sexual exploitation of a minor, your sentence

Cruz - Cross

1    was 210 months, correct?

2            MS. BLOCH:  Objection, Your Honor.  Objection.  I

3    don't see how what his sentence was --

4            THE COURT:  Overruled.

5    BY MR. CHONTOS:

6    Q.    Your sentence at Count 1 was 210 months?

7    A.    Yes.

8    Q.    Your sentence at Count 4 was 210 months?

9    A.    Correct.

10   Q.    They were made to run consecutive, or back-to-back,

11   right?

12   A.    Uh-huh, yes.

13   Q.    210 months plus 210 months, 420 months, that equals 35

14   years, right?

15   A.    Yes.

16   Q.    Sir, how old are you today?

17   A.    45.

18   Q.    Sir, when I earlier mentioned you resolved your case by

19   way of an agreement that you had with the Government, that

20   agreement was memorialized in a writing, right, a letter?

21   A.    I guess.  I don't remember what you are talking about.

22   Q.    Sir, I am going to show you a ten-page document.  And

23   really focus on Page 1, orient yourself with Page 1, then look

24   at Page 10.

25   A.    Uh-huh.

Cruz - Cross

1  Q.   Have you looked at it?  Do you need some more time?

2  A.   No.

3  Q.   Okay.  Have I taken that document away from you?  Have

4  I taken that document away from you?

5  A.   Yes, I don't have it.

6  Q.   Is that your signature?

7  A.   Yeah.

8  Q.   And the date is July 26th, 2012?

9  A.   Yes.

10  Q.   That signature is your lawyer?

11  A.   Yeah.

12  Q.   That signature is the United States Attorney?

13  A.   Yes.

14  Q.   Sir, do you see on Page 6, Section C1(a), where I have

15  highlighted it?

16  A.   Uh-huh.  Yeah.

17  Q.   That says:  The penalty that may be imposed upon

18  Armando Cruz at each count of conviction -- and could you read

19  that (a) section for me.

20  A.   Not less than 15 years and not more than 30.

21  Q.   It really says:  A term of imprisonment of not less

22  than 15 years and not more than 30 years, correct?

23  A.   Yes.

24  Q.   Your understanding of that language is that that is a

25  mandatory minimum amount of time, 15 years, right?

Cruz - Cross

1    A.    Yes.

2    Q.    Sir, during your resolution of your case did you come

3    to learn what sentencing guidelines are?

4    A.    Yeah.

5            MS. BLOCH:   Objection, Your Honor.

6            THE COURT:   Sustained.

7    BY MR. CHONTOS:

8    Q.    Sir, I have highlighted Paragraph 9 of your agreement.

9    It makes reference in Paragraph 9 that the Defendant is

10   subject to a sentence of life imprisonment under the

11   sentencing guidelines.   Do you see that?

12   A.    Yes, I see it.

13   Q.    The very next paragraph indicates that the parties

14   agree that the appropriate sentence is 35 years.   Isn't that

15   what it says?

16   A.    Yes.

17   Q.    Now, 35 is different than life, right?

18   A.    Correct.

19   Q.    35 is different than 60 years, four times 15?

20   A.    Uh-huh.   Yes.

21   Q.    Now, sir, part of your plea agreement was that when you

22   plead guilty to those two counts, what was to happen to the

23   other two counts?

24   A.    I don't remember.   They would go away I guess.

25   Q.    Your understanding is they were dismissed?

Cruz - Cross

1      A.    Yes.

2      Q.    My next couple of questions are regarding Paragraph 15.

3  Paragraph 15 reads:   If at any time the United States Attorney

4  determines that Armando Cruz has provided any information or

5  evidence that is not full, complete, accurate, and truthful,

6  or that Armando Cruz has not provided assistance or testimony

7  upon request, they can do something to you, right?

8      A.    Yeah.

9      Q.    Your understanding of what they could do to you is to

10  bring back the two dismissed counts and you face those two

11  dismissed counts, right?

12      A.    Right.

13      Q.    They could also prosecute you for perjury, right?

14      A.    Correct.

15      Q.    They could also prosecute you for obstruction of

16  justice?

17      A.    Yes.

18      Q.    I take it you don't want any of that to happen?   You

19  don't want to be facing those two dismissed counts, right?

20      A.    No.

21      Q.    You don't want to be prosecuted for perjury, right?

22      A.    No.

23      Q.    You don't want to be prosecuted for obstruction of

24  justice?

25      A.    No.

Cruz - Cross

1   Q.   Sir, back to Paragraph 15.   Is it your understanding as

2   to who makes the decision whether you have provided truthful

3   and accurate testimony is the United States Attorney, right?

4   A.   Yeah.

5   Q.   That's how you read Paragraph 15?

6   A.   Yes.

7   Q.   Now, Mr. Cruz, your conduct here in Mercer, PA, that

8   ended up getting the eye of law enforcement in Denver and in

9   San Diego, right?

10  A.   Yeah.

11  Q.   You got -- you got on someone's radar screen there in

12  Denver and/or San Diego because you sent someone out there

13  stuff, right?

14  A.   Yes.

15  Q.   The stuff that you sent them was pictures of Faith,

16  Margie, Brianna, Harley?

17  A.   Correct.

18  Q.   Other girls?

19  A.   Yeah.

20  Q.   How many?

21  A.   It was two or three.

22  Q.   In return for you sending stuff to Denver and

23  San Diego, did you then get stuff in return?

24  A.   Yes.

25  Q.   Of a similar type of stuff?

Cruz - Cross

1    A.    Correct.

2    Q.    Young girls?

3    A.    Yeah.

4    Q.    Sexually explicit conduct?

5    A.    Yes.

6    Q.    Now, sir, early in your testimony yesterday you talked

7    about that you took sexually explicit photos of those girls.

8    Do you remember that?

9    A.    Yes.

10   Q.    Do you remember when the Government used the phrase

11   "terrible things?"  Do you remember that?

12   A.    I don't remember hearing that, but probably.

13   Q.    Fair to characterize what you did as terrible things?

14   A.    Yeah.

15   Q.    Regarding Faith, how many times did you put your penis

16   in her vagina?

17   A.    Never.

18   Q.    Wasn't three times?

19   A.    No, we never had intercourse like that.

20   Q.    What about the pink thing, did you ever use a pink

21   thing, a dildo, with Faith?

22   A.    Yes.

23   Q.    How many times?

24   A.    Once or twice that I remember.

25   Q.    In one of those pink things instances with Faith,

Cruz - Cross

1    wasn't a buddy of yours there?

2              MS. BLOCH:  Objection, Your Honor, I don't see how

3    this is relevant to cross-examination.

4              THE COURT:  Overruled.

5              THE WITNESS:  No, there was not.

6    BY MR. CHONTOS:

7    Q.    So this person, Tim, wasn't there?

8    A.    No.

9    Q.    On that incident?

10   A.    Nuh-uh.  No.

11   Q.    Was he there with some other stuff with Faith?

12   A.    He was there -- he was going across the country and he

13   stopped by my house.

14   Q.    Okay.

15   A.    That one time.

16   Q.    Did you ever have Faith suck your penis?

17   A.    Yes.

18   Q.    How many times?

19   A.    Once.

20   Q.    Did you ever perform oral sex on Margie?

21   A.    Yes.

22   Q.    How many times?

23   A.    A couple times.

24   Q.    Dealing with Margie, did you come up with the phrase

25   like two minutes or two licks?

Cruz - Cross

1    A.    That was on the Internet.  One of the guys from

2  San Diego or Colorado, I don't remember which one.

3    Q.    Did you have oral sex with Faith?

4    A.    Yes.

5    Q.    How many times?

6    A.    Three or four times.

7    Q.    While that's going on, the sex aspect that you did with

8  these children, they are being filmed, right?

9    A.    Yeah.

10   Q.    Is that film, that video, is that what got sent to

11 Denver and/or San Diego?

12   A.    Some of them, yes.

13          MR. CHONTOS:  That's all I have.

14          THE COURT:  Any redirect?

15                    REDIRECT EXAMINATION

16 BY MS. BLOCH:

17   Q.    Mr. Cruz, you talked a lot about the plea agreement you

18 entered into with the United States Attorney which resolved

19 your case back in 2012.  I just want to make something clear.

20 The 35-year sentence that you received was an agreed upon

21 sentence, correct?

22   A.    Yes.

23   Q.    That's been imposed?

24   A.    Yes.

25   Q.    Do you get anything extra for testifying here today?

Cruz - Redirect

1    A.   No.

2    Q.   You indicated that you understood the terms of

3    Paragraph 15 of this agreement that talked about the

4    expectations that the Government has that you will provide

5    truthful testimony?

6    A.   Yes.

7    Q.   Are you providing truthful testimony here today?

8    A.   Yes, I am.

9    Q.   At any time, Mr. Cruz, did Mr. Warner ask you, given

10   your successes with the girls, Margie, Faith, Harley, to come

11   to his house and help him make the girls more comfortable with

12   doing the same thing there?

13   A.   Yes, that was the whole point of getting them all to

14   come to his house and taking them swimming and doing the

15   things they wanted to.

16   Q.   So that was at least in part requested by Mr. Warner?

17   A.   Yes.

18        MS. BLOCH:   No further questions, Your Honor.

19        THE COURT:   Any recross?

20        MR. CHONTOS:   No.

21        THE COURT:   May the witness be excused on behalf of

22   the Government?

23        MS. BLOCH:   He may.

24        THE COURT:   Defendant?

25        MR. CHONTOS:   Yes.

17

Carter - Direct

1            THE COURT:  Sir, you may step down.  Be careful

2    getting down, please.

3            (Witness excused.)

4            THE COURT:  Call your next witness, please.

5            MS. BLOCH:  Your Honor, the Government calls

6    Special Agent Thomas Carter.

7            THOMAS CARTER, a witness herein, having been

8    previously duly sworn, was examined and testified as follows:

9            THE COURT:  You are still under oath, sir.

10                    DIRECT EXAMINATION

11   BY MS. BLOCH:

12   Q.   Agent Carter, I am going to be asking you some

13   questions about the -- your investigation towards the end as

14   it advances to the search warrant executed at Mr. Warner's

15   residence.

16            I believe you testified the first time you were on

17   the witness stand yesterday that there was an interview

18   undertaken of Mr. Warner on April 3rd of 2012, is that

19   correct?

20   A.   Yes.

21   Q.   If you could just explain to the jurors how that

22   particular interview was arranged, where it took place,

23   approximately what time it took place.

24   A.   Yes.  Mr. Warner was asked to come to the Pennsylvania

25   State Police barracks by Trooper Owen of the state police who

Carter - Direct

1    I have been working with on this case.  Mr. Owen -- Trooper

2    Owen had called Mr. Warner to come to the state police

3    barracks.

4              Mr. Warner then showed up at the state police

5    barracks with his mother.  Trooper Owen went out and escorted

6    Mr. Warner back to the back to be interviewed, actually it was

7    the corporal's desk room.  We interviewed Mr. Warner inside

8    the corporal's room.

9    Q.   Did you both pose questions to Mr. Warner or was the

10   interview primarily conducted by you?

11   A.   I was the lead interviewer.  Trooper Owen assisted, but

12   I primarily conducted the interview.

13   Q.   Now, as you indicated, you had previously spoken to

14   Mr. Warner on February 15th of the same year, 2012.  When

15   you first came in contact with Mr. Warner on this particular

16   date, was your exchange cordial?

17   A.   Yes.

18   Q.   So you indicated he was seated in this room.  Other

19   than you and Trooper Owen, was anyone else in the room?

20   A.   No.

21   Q.   Did you engage the conversation first by explaining to

22   Mr. Warner what the nature of your inquiry was going to be?

23   A.   Yes.  Mr. Warner was made aware that the investigation

24   was continuing.  That we were looking into individuals that

25   had taken photographs of child exploitation matters.

Carter - Direct

1   Mr. Warner was advised that his name had come up after

2   interviewing several witnesses, that Mr. Warner's name had

3   come up of having taken pictures of young girls.

4   Q.   Did you indicate to him as well that you had actually

5   interviewed some of the alleged victims?

6   A.   Yes.

7   Q.   Did you indicate to Mr. Warner that you had actually

8   interviewed or had the opportunity to interview Mr. Cruz?

9   A.   Yes.   I conveyed to Mr. Warner that I had spoken to

10  Mr. Cruz and his defense counsel prior to interviewing him on

11  that date.

12  Q.   At any time was Mr. Warner free to leave just as he was

13  free to come to the interview?

14  A.   Yes, in the very beginning he was told he was not under

15  arrest.   We were going to be asking questions.   He could leave

16  at any time.   He could stop the interview.   And he said he

17  understood those parameters.

18  Q.   So when you initiated this conversation about the

19  substance of your inquiry, did you come right out and ask him

20  whether or not he had been taking pictures of the various

21  victims you had identified?

22  A.   I did.   Initially he said --

23          MR. CHONTOS:   Judge, objection to the

24  characterization.

25          THE COURT:   Overruled.   Be sure you answer -- your

Carter - Direct

1    answers are fairly fast, so would you just slow the pace down
2    a little bit since we have a long day ahead of us.
3              THE WITNESS:  Yes, sir.
4              THE COURT:  Thank you.  I overruled the objection.
5    You may answer the question.
6              THE WITNESS:  Could you repeat the question.
7    BY MS. BLOCH:
8     Q.   My question was, did you indicate to Mr. Warner, did
9    you come right out and ask him about whether or not he had
10   information or had engaged in the production of pornography as
11   it applied to the various young victims that you had
12   questioned?
13    A.   Yes.  Initially I asked him if he had taken any
14   photographs.  He denied it.
15             Then I asked him if he knew who Faith and who
16   Margie was, who they were.  He initially told me Faith was
17   like a daughter to him, and then he questioned me whether
18   Margie was the girl with freckles, which I responded she was.
19    Q.   What about Harley, was she referenced as well at the
20   beginning of this interview?
21    A.   Not in the very beginning, but later on, yes.
22    Q.   So how long would you say this question and answer
23   session went where Mr. Warner was denying engaging in the
24   activity you're questioning him about before you changed sort
25   of the dynamics of how you were handling the interview?

Carter - Direct

1    A.    Several minutes.  Very quickly after his denial I had

2   already cued up the video that has been played here with Faith

3   dancing over top of Mr. Warner.  I had that video cued up.  I

4   pushed play on the video; and while the video was playing, I

5   asked Mr. Warner if he had -- if he agreed that he had a

6   unique voice.  He told me he did have a unique voice and it

7   was unique and different than most people's.  As the video

8   played, Mr. Warner said he did not recall that video.  He knew

9   nothing about it.

10        As the video progressed to his voice, that's when

11   he realized, when it got to the voice part, that's when he

12   said, yeah, that's my voice, it's me, I took that video.

13   Q.    Did he go on to discuss the making of the video with

14   any more detail than just that, acknowledging that he had

15   taken it?

16   A.    Yes, actually I asked him, why would you take that

17   video?  And he said it was Faith's idea to take the video.

18   Q.    Did you have conversation on this occasion at that

19   point about whether or not he had been playing video games

20   with Mr. Cruz and had been otherwise socializing with the

21   girls with Mr. Cruz?

22   A.    Right after that I explained to him that that video

23   that we had just watched and he admitted to was part of the

24   video -- or images that were received from Mr. Cruz and that

25   Mr. Cruz -- and I explained to him that Mr. Cruz had told me

Carter - Direct

1    he copied the video along with other images from two CDs he

2    produced from his computer, and that I was in possession of

3    those two CDs.

4       Q.   Okay.  Did he, when you were talking to him about the

5    information you had regarding the CDs and how they were

6    created through a download from his computer, did Mr. Warner

7    acknowledge that he had a black laptop computer?

8       A.   He advised that he did have a black laptop and they

9    used to play video games on it.  And he also told me back when

10   I first interviewed him on February 15th that Cruz had been

11   in his residence the night before.

12      Q.   The night before what?

13      A.   Which would mean the 14th of February, prior to me --

14   I interviewed him on the 15th.  He reiterated to me during

15   this interview Cruz was at his residence on the 14th, the

16   night before I interviewed him.

17      Q.   Did he -- did you engage in some conversation with him

18   at this point during the interview about how the girls were

19   starting to come to his house or had begun to come to his

20   house rather than going to Mr. Cruz's house?

21      A.   Yes.  Mr. Warner stated he basically told some of the

22   parents, he told Faith's mother, Fawn, about the cigarettes

23   and alcohol, that Mr. Cruz was buying the girls cigarettes and

24   alcohol, and he had told the girls' parents that Mr. Cruz was

25   buying these girls cigarettes and alcohol.

Carter - Direct

1    Q.    Did he indicate, though, that he had confronted Faith

2    on that and that she had denied it?

3    A.    Faith denied it, yes.

4    Q.    Was there any reason for him to bring up this notion

5    that there were cigarettes and alcohol involved at Mr. Cruz's

6    house?

7    A.    No.

8    Q.    At some point you said you discussed, in addition to

9    Margie and Faith, you discussed with Mr. Cruz Harley.  Did

10   Mr. Warner acknowledge knowing who Harley was?

11   A.    Yes, Mr. Warner began to tell me about Harley, about

12   Harley and Mr. Cruz.  Mr. Warner advised that Mr. Cruz told

13   him that at 3 a.m. he took Harley to Wal-Mart to buy her

14   clothes and that she allowed Cruz to take pictures of her.

15   Q.    Was that Harley who told him that or Cruz that told him

16   that, according to Mr. Warner?

17   A.    That Harley told Mr. Warner that this is what Cruz was

18   doing.

19   Q.    Did he indicate at that point when he heard this from

20   Harley that he contacted the police or something of that

21   variety?

22   A.    No.  I asked him if he had called the police or if he

23   told the police.  He said he told his daughter, and he

24   informed his daughter to tell her mother.

25   Q.    "Her" being her own mother?

24

Carter - Direct

1    A.    Her own mother, yes.

2    Q.    Did you discuss, given Mr. Warner's articulated

3    concerns about what was going on at Mr. Cruz's, in particular

4    the cigarettes and alcohol, did you ask him questions as to

5    whether or not his own daughter, Bri, was still going there

6    and, if so, why?

7    A.    Yes.  I asked him why he would allow his daughter to go

8    back.  He told me that his daughter and Cruz's daughter were

9    still friends.

10   Q.    So if I understand you correctly, he didn't deny that

11   his daughter was still going to Mr. Cruz's home?

12   A.    No.  He said some of the other girls had stopped.  In

13   fact, he said it worked by telling the parents, he said it

14   worked and the other girls stopped going there.  But he felt

15   sorry for Cruz's daughter and he still allowed Bri to go to

16   Cruz's house to visit Marissa, Cruz's daughter.

17   Q.    You are looking down and reading from a report of this

18   interview, is that what you're glancing at?

19   A.    To refresh my memory, yes, the date of the interview.

20   Q.    Did you and Mr. Warner engage in some conversation

21   about Faith regarding her shaving her pubic area and why and

22   information that Mr. Warner saw fit to provide you at that

23   point?

24   A.    Yes.  Mr. Warner advised that Faith had come over, and

25   when she would come over she would take a shower.  He revealed

Carter - Direct

1    that on one occasion he remembers her being upstairs with his

2    daughter, Brianna, and Brianna running downstairs claiming

3    that Faith had cut herself and that he went running upstairs

4    to apply medicine to the wound that Faith -- and there was

5    blood all over and he said that she opened herself wide open.

6    Q.   First did he indicate -- did he claim that the other

7    girls were making fun of Faith?

8    A.   Yes.  He told me that the other girls used to call her

9    "gorilla," call Faith "gorilla."

10   Q.   This incident that he claimed occurred where she was

11   bleeding and he had to apply medicine, did he indicate whether

12   or not he, in applying the medicine, had his hands or fingers

13   on her vagina and in her vagina?

14   A.   Yes.  He advised that he rubbed it all around and

15   inside the vagina of Faith.

16        I then asked him if he took her to the hospital

17   because of this wound that was bleeding so badly.  He said,

18   no, she refused to go, so he didn't take her to the hospital.

19   Q.   Did your conversation with Mr. Warner continue, sort of

20   get redirected back to the taking of images, sexually

21   exploitive images of these girls and the allegations that you

22   had that in fact he had taken these pictures -- well, and the

23   fact you had the disks from Mr. Cruz?  You had told him that,

24   is that correct?

25   A.   Yes.  I asked him if he had taken any additional -- I

Carter - Direct

1    asked him if he had taken any photographs of Margie, Harley,

2    and Marissa, Jodi Lynn, or Faith.  He thought about it and he

3    said he does not think he took any photographs of the other

4    girls, but he did take photographs of Faith.

5    Q.   So did he say -- did he indicate any particular

6    photograph that he believed he took of Faith?

7    A.   He said he remembered taking a photograph of Faith

8    standing next to his wall.

9    Q.   At that point did you show him a series of images that

10   reflected Faith both clothed and unclothed in front of a wall

11   in his living room?

12   A.   Yes.  I then proceeded to show the first photograph of

13   the Steeler sequence.  I showed him the photograph of Faith

14   standing completely dressed in the Steeler outfit.  He

15   immediately stated, yeah, I took that picture, that's my

16   daughter's Steeler outfit.  I did take that picture.

17            After that, I then proceeded to show him the

18   sequential photographs where each picture of Faith reveals

19   more of her body until the last photograph I showed him where

20   she was seated on top of the couch completely -- exposing her

21   lower vagina area.

22            He acted shocked.  He said he didn't know who would

23   have taken that picture.  Didn't remember who took that

24   picture.

25            I explained to him that he just admitted to me he

Carter - Direct

1    took the picture approximately 20 minutes earlier.  He said he

2    didn't remember, but he did admit that it was his couch, his

3    residence, and his house, his residence and the couch.  And it

4    was his daughter's dress.

5      Q.    Similarly, Agent Carter, did you have a set of images

6    of Margie that you were prepared to show Mr. Warner as part of

7    this interview?

8      A.    Yes.  I showed the pictures of Margie seated on the bed

9    when she first starts out clothed.  I showed that sequence.

10   He did not know who took those pictures.  But admitted that it

11   was his bedspread and his pillows that Margie was on in his

12   house.

13     Q.    So, in other words, when you say he didn't know, did he

14   in fact deny that it was he who took the pictures?

15     A.    No, he did not know who took those photographs is what

16   he said.

17     Q.    Now, you indicated that he first said that he took a

18   picture of Faith before you showed him the Steeler

19   cheerleading outfit photographs.  That he had taken a picture

20   of her in front of a white wall.  You had a separate series,

21   did you not, of images of Faith wearing a different outfit,

22   not the Steelers outfit, in front of the white wall?

23     A.    Yes.

24     Q.    Did that become, that series of images of Faith where

25   she's progressively more exposed, also become the subject of

Carter - Direct

1   your interview?

2   A.   Yes.  I then showed him the series of photographs when

3   she was standing next to the white wall fully clothed in a

4   white top.  He told me that, yes, that's the picture I was

5   just talking about with the white wall in my apartment.

6   Q.   So he acknowledged that you had pulled the right

7   photograph that he was referring to?

8   A.   Yes.

9   Q.   Was it too the beginning of a very short series of

10  images of her progressively getting undressed?

11  A.   Yes.

12  Q.   Did you show him images that appeared at the end of

13  that particular series?

14  A.   Yes.

15  Q.   Did he acknowledge ultimately that he had in fact taken

16  those pictures?

17  A.   Yes, there were approximately 12 photographs and he

18  admitted to taking approximately three images of Faith when

19  she was nude.

20  Q.   Did he speak at all again, much as you have articulated

21  already, about whose idea it was to take these pictures?

22  A.   Yes.  He said it was Faith's idea to have the

23  photographs taken and it wasn't his idea.

24  Q.   At some point did he acknowledge that he had in fact

25  taken another video, one that didn't depict child pornography,

Carter - Direct

1    but did depict all of the girls in the kitchen, his kitchen?

2    A.    Yes, toward the end, yes.

3    Q.    Some of your interview of Mr. Warner that day did still

4    pertain to Mr. Cruz and some of the individuals such as the

5    person identified here in court today as Tim, some of those

6    people and Mr. Warner's knowledge of them, am I correct?

7    A.    Yes.

8    Q.    Did you have a particular exchange with Mr. Warner

9    pertaining to this guy named Tim?

10   A.    Yes.  Mr. Warner knew who he was.  He said he was

11   trying to get Harley to fly back from New Orleans and he also

12   said that he mentioned that Tim used to have access to pills

13   due to his job to drug the girls.

14          MS. BLOCH:  I have no further questions,

15   Your Honor.

16          THE COURT:  You may cross-examine.

17                    CROSS-EXAMINATION

18   BY MR. CHONTOS:

19   Q.    Mr. Carter, the number of interviews you had with

20   Faith, two, three, four during this investigation?

21   A.    Probably three or four.

22   Q.    In those interviews the subject of Earl Warner and

23   Faith sleeping in the same bed, that never came up, did it?

24   A.    No.

25          MS. BLOCH:  I am going to object, Your Honor, to

Carter - Cross

1   this line of questioning as it's not responsive to direct.

2   THE COURT:  Is that the only question you have on

3   this area?

4   MR. CHONTOS:  Yes, new chapter.

5   THE COURT:  Okay.  Overruled.  You may move to a

6   new chapter.

7   BY MR. CHONTOS:

8   Q.   Mr. Carter, regarding Count 4, that's the count with

9   Harley, correct me if I am wrong, but some of the images that

10  support Count 4 were on Cruz's CD at his job site, but some

11  were not; do I have that right?

12  MS. BLOCH:  Again, objection, Your Honor, I don't

13  see how that is responsive to direct.

14  MR. CHONTOS:  Judge, during the --

15  THE COURT:  Patience.

16  Yes, sir.

17  MR. CHONTOS:  During his first visit to the witness

18  box I wanted to explore that, there was an objection, your

19  inquiry back to me was, do you want to wait for later.  I

20  said, wait, with a big circle.  So now is my chance.

21  THE COURT:  You would like it to be your chance,

22  correct?

23  MR. CHONTOS:  Absolutely.

24  THE COURT:  Objection is overruled.  You may

25  continue.

Carter - Cross

1    BY MR. CHONTOS:

2    Q.    Do I have the source of Count 4, the Harley count,

3    correct?  Some of the images were from Cruz's work place CDs,

4    but some were not?

5    A.    No.  I believe the Count 4 images come from the memory

6    cards that were discovered at Mr. Warner's residence.

7    Q.    Mr. Carter, during your investigation did you learn or

8    not learn about Mr. Warner's Internet access at his house?

9    A.    I did not learn about that.

10   Q.    So as you sit here today he could have had it or he

11   could not have had it?

12   A.    That's correct.

13   Q.    No question in your mind that Mr. Cruz had Internet

14   access because he sent the stuff elsewhere?

15   A.    That's correct.  Because when we searched Cruz's

16   residence, Cruz's computer was hooked up and running.  When we

17   searched your client's residence, he didn't have a computer

18   and the hard drives weren't in the other ones.

19   Q.    Sir, is it your position that Count 5, the video clip,

20   Count 6, the video clip with the audio, those were both

21   produced by the Canon camera?

22        MS. BLOCH:  Objection, Your Honor, this is clearly

23   not relevant to direct examination.

24        MR. CHONTOS:  Well, Judge, we can --

25        THE COURT:  Overruled.  You may continue.

Carter - Cross

1    BY MR. CHONTOS:

2       Q.    Do I have it right?

3       A.    Could you ask that again, please?

4       Q.    Sure.  The two counts dealing with videos, 5 and 6,

5    those in your view were both taken by the Canon camera?

6       A.    I recall talking to Corporal Pearson about that.  I

7    asked him if that is what his opinion was, and he conveyed to

8    me, yes, that was his opinion, so I would have to say, yes,

9    that would be the source.

10      Q.    For Count 5 and 6, those videos were found on the disks

11   at Cruz's work place?

12      A.    That's correct.

13      Q.    Now, in reference to some questioning that you engaged

14   Mr. Warner with there at the Mercer state police barracks, he

15   indicated about, yeah, that's my voice, that's me, I took that

16   video.  You then asked him why.  He advanced:  Faith's idea.

17      A.    Yes.

18      Q.    During your interview with Mr. Warner you showed him

19   selected images, and to a large extent his response was, he

20   didn't know who took those photos.  Is that fair?

21      A.    That was his reply to me, that he didn't know who took

22   them, yes.

23      Q.    Right.  Right.  Okay.

24            MR. CHONTOS:  Your Honor, one moment.

25            THE COURT:  Certainly.

1      MR. CHONTOS:  Thank you.  That's all I have.

2      THE COURT:  Any redirect?

3      MS. BLOCH:  Just one moment, Your Honor.

4      I have no further questions, Your Honor.

5      THE COURT:  May the witness be excused?

6      MS. BLOCH:  He may.

7      MR. CHONTOS:  Yes.

8      THE COURT:  Okay.  Would you step down, sir.

9         (Witness excused.)

10     THE COURT:  Any other witnesses in the Government's

11  case in chief?

12     MS. BLOCH:  I am going to confer with Agent Carter

13  for a moment if you don't mind.

14     THE COURT:  Certainly.

15     MS. BLOCH:  I apologize, Your Honor, I have maybe a

16  couple more questions to ask Agent Carter and then I will be

17  resting.

18     THE COURT:  Certainly.

19        (Thomas Carter retakes the witness stand.)

20                   REDIRECT EXAMINATION

21  BY MS. BLOCH:

22   Q.   Agent Carter, I would kindly redirect you to the

23  April 3rd interview of Mr. Warner and just -- I believe I

24  skipped an area of questioning that I intended to pose.  That

25  is, in addition to the video, which we talked about that

Carter - Redirect

1  Mr. Warner made admissions with regard to and the various

2  series of photographs of Faith, there were some additional

3  pictures that you showed him.  One of which is Exhibit 2.15,

4  the image which the jurors have seen during the opening and

5  during the remainder of the case.  That image reflects what?

6      A.    It reflects Mr. Warner's thumb and forefinger inside

7  the vagina of Faith.

8      Q.    Did you specifically show that particular image to

9  Mr. Warner?

10     A.    Yes, I did.

11     Q.    Did you show it to him in a hard copy or on the screen?

12     A.    In a hard copy.

13     Q.    Did you ask him if had taken that picture or if that

14  was his hand?

15     A.    Yes, I did.

16     Q.    How did you pose the question to him?

17     A.    I showed him the picture and I asked if he remembered

18  that picture.  I asked if he took this picture.  He said,

19  yeah, I touched her, that's my hand.

20     Q.    Was this a picture that you, if you -- you could tell

21  by looking at it was Faith?

22     A.    I could tell because of the beauty mark that was

23  previously described that she has on her private area.

24     Q.    So that was exposed in the particular image?

25     A.    Yes.

Carter - Redirect

1          MS. BLOCH:  No further questions, Your Honor.

2          THE COURT:  Any additional questions?

3          MR. CHONTOS:  No.

4          THE COURT:  You may stand down, sir.

5       (Witness excused.)

6          THE COURT:  Any additional witnesses in the

7    Government's case in chief?

8          MS. BLOCH:  No additional witnesses, Your Honor.

9          THE COURT:  All right.  Let's look at the exhibit

10   list and make sure we have all the exhibits.  The series 1, 2,

11   3, 4, 5, 6, and 7 are all in evidence.  Correct?

12         MS. BLOCH:  Exhibits 1 -- actually 1, 2, 3, 4, 5,

13   6, 7, and 8.

14         THE COURT:  1 through 7 are in evidence, correct?

15         MS. BLOCH:  That is my understanding, yes.

16         THE COURT:  Now, as to 8, the series of 8 are in

17   evidence.  Do you want them to go out to the jury?

18         MS. BLOCH:  Well, I don't believe we were allowing

19   the jurors to have the images of pornography in the

20   deliberation room, but, rather, that they would have access to

21   them if they so chose.

22         THE COURT:  Do you want the 8 series to be -- do

23   you want the jury to have access to the 8 series just like 1

24   through 7?

25         MS. BLOCH:  Yes, Your Honor.

```
 1              THE COURT:  Then we have the 9 series that's in
 2   evidence.   Correct?
 3              MS. BLOCH:  Correct.
 4              THE COURT:  Then a series of Government's Exhibits
 5   10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25,
 6   26.  Is that correct?
 7              MS. BLOCH:  Your Honor --
 8              THE COURT:  As far as I have gone, is that correct?
 9              MS. BLOCH:  Are you asking me?
10              THE COURT:  Yes.
11              MS. BLOCH:  Yes, that is as far as we have gone.
12              THE COURT:  Okay.
13              MS. BLOCH:  Your Honor, if I may just say one
14   thing.  Exhibits 10.1, .2, and .3 have not been referred to
15   yet in the proceedings.  So if they are not used for purposes
16   of cross-examination hereafter, we will seek to withdraw
17   those.
18              THE COURT:  Okay, thank you.  Are there exhibit
19   numbers beyond Government Exhibit No. 26?
20              MS. BLOCH:  Only to the extent that pursuant to the
21   Court's request from yesterday, we have had additional images
22   of the side of the Acer box, as well as the back sides of the
23   SanDisk memory cards taken by an FBI photographer who could
24   capture what you were looking for.  They have not yet been
25   loaded for purposes of your review and the jury's review, but
```

1    they will have a sub-exhibit number and I will, when I am

2    completed, I will offer them into evidence as well.

3             THE COURT:  Okay.  Any objection to those

4    additional exhibits that yet do not have a number?  I think I

5    have already ruled on those.

6             MR. CHONTOS:  Judge, my only reservation is, and

7    the Government touched upon it, is the 10 series.

8             THE COURT:  Fine.  So the additional exhibits

9    showing the box and the camera, the source of those, will be

10   admitted into evidence and we just need to have those numbers

11   once they're assigned.

12            Does the Government rest its case in chief?

13            MS. BLOCH:  Before I do that, Your Honor, may I

14   just make sure I understood what you were saying.  With regard

15   to all of the other exhibits up to and including 26 have been

16   moved into evidence and have been admitted?

17            THE COURT:  Yes.  I have an exhibit list, but it

18   doesn't have a date on it, but everything that's on the

19   exhibit list, Exhibits 1 through 26, excluding 11, I believe,

20   are admitted into evidence subject to two additional exhibits

21   showing the country of origin and subject to the Government

22   withdrawing exhibits in the 10 series if they are not used.

23            MS. BLOCH:  Yes, thank you.  The Government rests.

24            THE COURT:  Do you want to talk to me at side for a

25   moment?

1          MR. CHONTOS:  I think it might be lengthy at side.

2          THE COURT:  Well, do you have a motion you wish to

3    make?

4          MR. CHONTOS:  I do.

5          THE COURT:  Okay.  Why don't we move to sidebar.

6    Do you have anything in writing?

7          MR. CHONTOS:  No.

8          (On record at sidebar as follows.)

9          THE COURT:  Yes, sir.

10         MR. CHONTOS:  Judge, my first request would be

11   maybe give the jury a moment to stretch their legs while we

12   are arguing because I don't plan on arguing just for a minute,

13   but --

14         My Rule 29 motion is -- I have four of them.  The

15   first is really addressing all Counts 1 through 6.  I don't

16   think there has been any evidence of Earl Warner's knowledge

17   that he should have known the camera memory cards traveled in

18   interstate commerce.

19         My position, and I think we touched upon it during

20   our preliminary jury charge that we talked about, I think

21   that's a requirement.  The Government's push-back is that one

22   particular case, I think it begins with an S.  That's the

23   motion that I make as to Counts 1 through -- all counts, 1

24   through 7.

25         THE COURT:  Okay.

 1             MR. CHONTOS:  Judge, do you want me --

 2             MS. BLOCH:  May I respond?

 3             THE COURT:  Sure.

 4             MS. BLOCH:  The law is clear on this, Your Honor,

 5    and the statute is very clear.  Defendant need not know or

 6    have reason to know that the particular materials he used to

 7    produce the images traveled in interstate commerce.  The

 8    Government only has to prove as one possibility of

 9    establishing such nexus with commerce that they were in fact

10    manufactured outside the State of Pennsylvania.

11             THE COURT:  I agree with the Government's position

12    that the Government does not need to prove that the Defendant

13    had knowledge that they were shipped in interstate commerce

14    and will deny that motion.

15             Thank you.

16             MR. CHONTOS:  Next the Rule 29 motion is again

17    addressing Counts 1 through 6.  We believe that Congress

18    exceeded its power under the Commerce Clause based on its face

19    and it is unconstitutional.  I will give you two citations

20    that run contrary to my view, but they are wrongly decided.

21    Rhodia, 194 F.3d, 465, it is from the Third Circuit 1999 and

22    Gall, 239 F.3d, 572, 2001 from the Third Circuit.  Both of

23    those decisions are contrary to my present argument.

24             But I rely upon other circuits' decisions that say

25    that Counts 1 through 6 are, especially as it relates to this

1  case when they are just talking about a camera and memory

2  devices.   That is, Commerce Clause violations is the bottom

3  line what we are arguing there.

4        MS. BLOCH:   I can't speak, Your Honor, to these

5  particular cases he is citing here today, but I know it is

6  well-established that the Commerce Clause, or the commerce

7  nexus that's required in these particular violations and

8  statutes have been clearly upheld and it would not form the

9  basis of a Rule 29 motion.

10        THE COURT:   I will deny the motion.   I don't

11  believe it is limited by the Commerce Clause.   The way the

12  Supreme Courts are defining the Commerce Clause, there doesn't

13  seem to be much limit to its scope.   But certainly not

14  applicable in this case.

15        MR. CHONTOS:   Judge, my next argument is singularly

16  directed to Count 4, the Harley count.   We all know she didn't

17  testify.   There's nothing direct, it is circumstantial at

18  best.

19        Where I am going is when you look at the evidence

20  minus the testimony that came out today, which is essentially

21  the Defendant's statement, we have a corpus delicti problem.

22  What that rule says is that you need evidence of the corpus of

23  the crime before you can use the Defendant's own words against

24  him.

25        We think that that rule has not been satisfied as

1    it pertains to Count 4.  So as for just Count 4, the

2    Government hasn't demonstrated sufficient evidence.

3    Recognizing that rule, Count 4 should be dismissed.

4            MS. BLOCH:  Your Honor, I believe there's

5    significantly more than circumstantial evidence, most

6    importantly in the form of Faith's testimony during which she

7    was specifically asked to identify who produced the images in

8    which she and Harley appear, which are relevant to Count 4 and

9    which are referenced in Count 4.  She unequivocally said Earl

10   Warner.

11           THE COURT:  I will deny the motion.  I believe

12   there is certainly sufficient evidence for the case to proceed

13   as to Count 4.

14           MR. CHONTOS:  Count 7 is the subject matter of my

15   next Rule 29 motion.  It really comes into play with double

16   jeopardy.  If we take a look at the indictment, the indictment

17   says, "photos and videos."  We know Count 5 is a video count,

18   July 13th.  Count 6 is that video plus audio, and that's

19   July 23.  The source of those is Cruz's CDs from his work

20   place.

21           The source -- the original source of that, if you

22   believe some of the Government's evidence -- and at this stage

23   we have to -- that came from Earl Warner's laptop.  But those

24   videos were possessed on a different date, 4/9/12.

25           Count 7, that's the possession count, is all the

1    stuff they gathered at his house, the search on April 9th.

2           So why they are bringing forward with the phrase,

3    "and videos," they're including Count 5 conduct, Count 6

4    conduct, into that possession count at 7, and he is being

5    placed in jeopardy a second time for identical conduct.

6           Notice I am not saying anything about the photos

7    subject to Count 6.  I'm slicing off the videos because they

8    charged it photographs and videos.

9           So my request is Rule 29 should be granted as to

10   partial Count 7 as it pertains to the videos.

11           MS. BLOCH:  Okay.  First, I am going to articulate

12   that the videos referenced in Count 7 are not in fact the

13   videos referenced in Counts 5 or 6, although I don't think

14   that would be dispositive on this particular motion.

15           There was, Corporal Pearson testified, a very short

16   video that was contained on the eight gigabyte memory card

17   that he was referring to.  Just a snippet of a video.

18           Secondly, I think the Government only has to

19   establish for purposes of Count 7 that he possessed one image,

20   whether that be in the form of a photograph or video, we

21   always charge in the conjunctive.  We don't have to prove in

22   the conjunctive.  The law is clear on these counts I only have

23   to prove one image per count or more, but one.

24           THE COURT:  I will deny the motion.

25           Any other motions, sir?

1            MR. CHONTOS:  No, that exhausts my Rule 29 tab in

2     my notebook here.

3            THE COURT:  Thank you.

4            MR. CHONTOS:  Judge, some more practical issues.

5     Things went quicker than I anticipated.  I have some witnesses

6     set to appear here at 1 o'clock.  What we can do to chew up

7     the time between now and then is I can have my client testify,

8     and I intend to do that, but we have not had the time to

9     adequately prepare his direct examination.  So all I am asking

10    for is 20 minutes to do that.  That's all I am asking.

11           THE COURT:  So in addition to your client, who else

12    is testifying?

13           MR. CHONTOS:  I have two character witnesses.

14           THE COURT:  What are their names?

15           MR. CHONTOS:  Sheila, S-H-E-I-L-A, Nickel, just

16    like the coin; and Delores, D-E-L-O-R-E-S, O'Neill; third

17    witness is a Theresa, T-H-E-R-E-S-A, Gilbert, a fact witness

18    on this issue.

19           Here's my proffer.  By the way, Judge --

20           THE COURT:  No, wait.  We have two character

21    witnesses that you mentioned.  Now you are talking about a

22    third witness?

23           MR. CHONTOS:  Right.

24           THE COURT:  That's a fact witness?

25           MR. CHONTOS:  Correct.

1          THE COURT:  Okay.

2          MR. CHONTOS:  In addition to Mr. Warner.

3          THE COURT:  Fine.

4          MR. CHONTOS:  Consistent with --

5          THE COURT:  So what's the proffer as to the fact

6    witness?

7          MR. CHONTOS:  She was approached by Earl after he

8    got that initial wind from the girls, hey, this is what Cruz

9    is doing to us.  He then approached another citizen and

10   expressed concern and solicited their view as to, hey, what

11   should I do.  Corroborative of what he is going to testify to.

12         THE COURT:  Okay.  So that's a total of five

13   witnesses.  That's all of your witnesses?

14         MR. CHONTOS:  Four.

15         THE COURT:  Four plus the Defendant, right?

16         MR. CHONTOS:  No, three plus the Defendant.

17         THE COURT:  Okay, great, thank you.  That's four.

18         MR. CHONTOS:  Judge, as we've progressed through

19   here, the defense has only materialized very, very late in the

20   game, principally driven by what I have gotten from the

21   Government.  As we've progressed, I mean, it's only as of

22   yesterday does Mr. Warner give me names of people that I had

23   no clue as to.

24         So while -- and he's wanting to have those people

25   appear.  They are very similar in providing supportive

 1   testimony, corroborative testimony, just like Ms. Gilbert
 2   would, of some things in that summer of 2011.
 3           THE COURT:  I am trying to plan the schedule.  You
 4   all were upset yesterday that I said we would have to delay
 5   for a week.  So I am just trying to plan the afternoon because
 6   we have got closings, we have got jury instructions I need to
 7   get to you.  So do you have any more witnesses other than
 8   those four so I can plan the rest of the day with this jury?
 9           MR. CHONTOS:  I don't have anything more than those
10   four for today.
11           THE COURT:  Okay.  What's the emphasis on today?
12   Do you have someone tomorrow?
13           MR. CHONTOS:  I doubt very seriously if I am going
14   to be able to track those people down today.  And, Judge, your
15   earlier comment about some level of distress by your
16   articulation here of your schedule, there is no distress here.
17           THE COURT:  All I am trying to find out is if all
18   you have is four witnesses, then we will be able to close
19   today and I will be able to charge the jury.  I want to tell
20   the jury what the schedule looks like.
21           So you look like you have something else you want
22   to say but you are not telling me, so I would like to hear so
23   I can plan the day and I could be courteous to this jury as to
24   what their schedule looks like.
25           MR. CHONTOS:  Here's what I would like.  We take as

1    long today to get rid of these four witnesses.  Come back on

2    February 3rd.  I put forth those additional fact witnesses.

3    They would be very, very short in the sense that each would be

4    individually short, probably consume, my guess is, no longer

5    than 40 minutes, then we progress right to closing.

6              THE COURT:  No, I can't do that to this jury.

7    Their two weeks are over and I just can't part them because

8    you don't have your witnesses here.

9              So --

10             MR. CHONTOS:  Judge, you asked me what I wanted.  I

11   have articulated that.

12             THE COURT:  So what you are asking for is a

13   continuance at the end of today for you to go find more

14   witnesses?

15             MR. CHONTOS:  Correct.

16             THE COURT:  That's denied.

17             Maybe you can work out with Government counsel that

18   there would have been two other witnesses that would say the

19   same thing that X would have said.  If you work something like

20   that out, that's fine with me, but that's up to you.  We have

21   had this trial scheduled for a long time and obviously this

22   Defendant has been thinking about this case for a long time.

23             All right.  So you would like 20 minutes, and I

24   would be pleased to give you 20 minutes to meet with your

25   client.

1              MS. BLOCH:  May I, just for purposes of scheduling,

2    and these witnesses and the Defendant and preparing for

3    closings and instructions, would the Court be amenable to our

4    having this afternoon our necessary discussions regarding the

5    final jury instructions with the idea in mind that we instruct

6    the jury in the morning and close?

7              THE COURT:  Then there is not going to be enough

8    time --

9              MS. BLOCH:  So we would be completed with

10   everything today to have that be how we proceed in the

11   morning.

12             THE COURT:  No, I can't commit to that because we

13   are not going to quit at -- we just have to see how the

14   schedule goes, but if there's time, we are going to close

15   today and we are going to instruct today if we have time to do

16   that.

17             So let's just take witness by witness.  So we will

18   take a break, we will give you 22 minutes.

19             MR. CHONTOS:  Thank you.

20             THE COURT:  Which is more than 20.

21             MR. CHONTOS:  Thank you.  Judge, just so my view is

22   on the record, I agree with Carolyn, finish today, 9 o'clock

23   we close and charge tomorrow.  I think that that's fair and

24   just.

25             THE COURT:  Well, I told you yesterday that I have

1   to be done by noon tomorrow.  So all you are doing is having

2   the jury have, what, an hour deliberation and then forcing

3   them to come back sometime in the future.  That's not really

4   fair to the jury.

5            So if we have time, you will close.  This case is

6   not that complicated and you two are very sophisticated, so I

7   don't think either of you would have a problem closing if

8   that's what it turns out to be today.

9            If it was less experienced lawyers, I might think

10  so, but not with the experience level of you two.

11           (Back on record in open court.)

12           THE COURT:  Ladies and gentlemen, we are going to

13  take a break until ten after 11.  Then we are going to come

14  back and we are going to begin the Defendant's case.

15           So we will see you in approximately 20 minutes.

16           (Recess taken.)

17           (Back on record in open court.)

18           THE COURT:  Counsel, are you ready to begin the

19  Defendant's case in chief?

20           MR. CHONTOS:  We will, Your Honor.  We call Earl

21  Warner.

22           THE COURT:  Have you had adequate time to talk with

23  him?

24           MR. CHONTOS:  Yes.

25           THE COURT:  Sir, would you stand up, come over here

Warner - Direct

1   and be sworn, please.

2                EARL D. WARNER, a witness herein, having been first

3   duly sworn, was examined and testified as follows:

4                THE DEFENDANT:  E-A-R-L, D., W-A-R-N-E-R.

5                          DIRECT EXAMINATION

6   BY MR. CHONTOS:

7       Q.   Sir, you are Earl Warner?

8       A.   Yes, sir.

9       Q.   You are the gentleman charged with these crimes?

10      A.   Yes.

11      Q.   How old are you today, sir?

12      A.   55.

13      Q.   Do you recall being arrested back in April of 2012?

14      A.   I am old, but not that old.  Yes, I remember.

15      Q.   Agent Carter is the one who arrested you?

16      A.   Yes, sir.

17      Q.   Sir, did you graduate from high school?

18      A.   No.

19      Q.   How far did you go?

20      A.   I got my GED and -- because I left for military before

21  my class graduated because I had enlisted and I had to leave

22  before I graduated, so they gave me a GED.  But I went to a

23  couple -- I got -- I got some college credits.

24      Q.   Do you recall when you got your GED?

25      A.   19 -- it will be '77 or '78.

Warner - Direct

1    Q.   What branch of the service did you go into?

2    A.   I was in the Army.  I was in the 82nd Airborne down in

3  Fort Bragg, North Carolina.

4    Q.   Is that 82nd?

5    A.   Yes.

6    Q.   How long were you in there?

7    A.   I was in there for two and a half years.

8    Q.   Discharged?

9    A.   Yes.

10   Q.   Honorably?

11   A.   Yes.

12   Q.   Sir, when you left the military, where did you go?

13  Where was home?

14   A.   My home has always been Pennsylvania.  I am from a

15  little town up north, Mercer.

16   Q.   Did you get married?

17   A.   No, not right away.

18   Q.   Did you get married at all?

19   A.   Yes.

20   Q.   When?

21   A.   I'd say probably about -- maybe the middle, somewhere

22  around in the '80s.

23   Q.   How long were you married?

24   A.   I was with the lady for probably about six years, but

25  we were only married for about a year.

Warner - Direct

1    Q.   Was that Gwen?

2    A.   No.

3    Q.   Was Gwen wife No. 2?

4    A.   Yes.

5    Q.   When did you get married to Gwen?

6    A.   I married Gwen on Valentine's Day of 2001.

7    Q.   How long were you together?

8    A.   About -- we had about 26 years together.

9    Q.   So you were with her for a long time, but you only got

10   married in 2001?

11   A.   Right.  Hold on one second.  We have been married a few

12   years longer than that -- I mean, we have been seeing each

13   other a lot longer than that.  I met her right before I turned

14   26 years old.

15   Q.   So when you are about 26 you meet Gwen and you stay

16   with Gwen until you are how old?

17   A.   55.

18   Q.   Did you and Gwen have any children?

19   A.   No, we did not.

20   Q.   How did Brianna end up being part of your household?

21   A.   We were -- a lady had approached Gwen's mom, and her

22   mom knew that we wanted kids real bad.  So Gwen's mom and her

23   husband, Butch, helped us adopt a child.

24   Q.   So you and Gwen adopted Brianna?

25   A.   Yes, sir.

Warner - Direct

1   Q.   Brianna is how old today?

2   A.   She's 13.  She will be 14 February 24th.

3   Q.   Mr. Warner, after you get out of the service, while

4   you're with Gwen, do you work at all?

5   A.   Off and on.

6   Q.   What kind of work did you do?

7   A.   I am a construction worker.  So I just worked for a

8   bunch of different companies.  I worked out of the union hall

9   for awhile, stuff like that.

10  Q.   What kind of union?

11  A.   I worked out of the Laborers Hall, New Castle, 964.

12  Q.   Mr. Warner, in April, 2012, were you employed?  That's

13  when you got arrested.

14  A.   Oh, no.  I was just putting times through my head.

15  Q.   Got you.

16       Using April, 2012, as our anchor, what is your most

17  recent employment?

18  A.   I was building custom counters, kitchens and stuff.

19  Q.   How long had you been doing that?

20  A.   I would say probably -- I was doing it off and on, up

21  to being arrested because the guy was teaching me.  He said

22  once I got it down pat, he would give me a full-time job.

23  Q.   How long had you been doing that?

24  A.   Off and on, for probably two years.

25  Q.   Had you worked prior to that?

Warner - Direct

1    A.    Yes.

2    Q.    Sir, I want to ask you some questions now about Armando

3  Cruz.

4    A.    Yes, sir.

5    Q.    Do you know that gentleman?

6    A.    Yes, I do.

7    Q.    Did you see him in court today?

8    A.    No.

9    Q.    Did you see him in court today?

10   A.    Yes.

11   Q.    Did you see him yesterday?

12   A.    Yes.

13   Q.    Do you have a recollection as to like the beginnings of

14 when you first met him, tell us about that.

15   A.    My daughter had a friend from preschool, her name was

16 Harley.  Her dad had -- he killed himself.

17   Q.    Harley's dad killed himself?

18   A.    Yeah.  He was a nice guy.

19         And I took me and my -- me and my mom, it was April

20 of 2012 -- no -- yeah, 2012, end of April, I would say

21 probably the last week of April, we went over to a steakhouse

22 where you eat steak over in Hermitage.  And Harley showed up

23 with this guy and his daughter.

24   Q.    So, Mr. Warner, you have indicated like the last part

25 of April of 2012.

Warner - Direct

1   A.   Yes, sir.

2   Q.   Are you mistaken about that because April of 2012 is

3   when Mr. Carter arrested you.

4   A.   It would have been '11.

5   Q.   So April, 2011, at a restaurant, Harley comes to that

6   restaurant, you happen to be there?

7   A.   When we pulled in, they pulled in at the same time.

8   Q.   When you say "they pulled in," who is they?

9   A.   It was Harley, Marissa -- which is Mr. Cruz's

10  daughter -- and Mr. Cruz.  They got out of a vehicle that was

11  parked above us.

12  Q.   Did the whole group, your group and Cruz's group, go in

13  and dine in the restaurant?

14  A.   We did, but we really weren't together.  There was me

15  and my -- there was me, my mom, and my daughter.

16  Q.   Were you introduced to Mr. Cruz?

17  A.   No.

18  Q.   Did your daughter indicate, oh, hey, that's my friend

19  over there?

20  A.   The two girls when they see each other, they're like

21  sisters, they just hang all over each other.  So Mr. Cruz and

22  them sat at the table beside us so that the girls can mingle.

23  Q.   So that's the beginning of your knowledge about

24  Mr. Cruz, April of 2011?

25  A.   That is the first time I met him.

Warner - Direct

1    Q.   Did the relationship with Mr. Cruz change from that

2   initial meeting?

3    A.   Yes.

4    Q.   In what way?

5    A.   About I would say a week or so later we had a girl at

6   our house and she informed us that she was not allowed -- she

7   would not be around Harley no more.

8    Q.   Who is that girl?

9    A.   Her name is Jodi Lynn.

10    Q.   Jodi Lynn?

11    A.   Yes, sir.

12    Q.   Jodi Lynn tells you, hey, Harley is not allowed to be

13   around anymore?

14    A.   No, it was the opposite.  She said, I am not going

15   around Harley no more.  She said, to simplify it, over there

16   her mom has me and Harley go to the neighbor's house.  And I

17   asked her who that was.  She informed me it was that Mr. Cruz,

18   who I didn't know who he was, and that he was furnishing the

19   kids cigarettes.

20           When I was informed of that there, first thing I

21   did is I brought my daughter over and I told her, I said, I

22   better not catch you smoking.

23    Q.   Was your daughter at your house when that information

24   was imparted to you?

25    A.   Yes.

Warner - Direct

1    Q.    So when you said you called your daughter, you didn't
2    go to the phone, you just went to where she was in the house?
3    A.    Well, we were in the -- I was in the kitchen.  My
4    daughter and Jodi Lynn had made something to eat and they were
5    in the dining room and they were walking back and forth
6    getting food.
7    Q.    All right.  So you scold your daughter or warn her
8    about the cigarettes, right?
9    A.    Yes, I told her, I better not catch you smoking.
10   Q.    What's the next interaction you have with Mr. Cruz?
11   A.    It was weird because I would say a week later or maybe
12   ten days later the girl returned.
13   Q.    Jodi Lynn?
14   A.    Jodi Lynn.
15   Q.    All right.
16   A.    This time she made it a point, I was on the computer
17   playing video games and she made it a point to come in and sit
18   down at the dining room table and she told me, she thought she
19   better tell me something.  And I asked her, what's that.
20         She told me that she wasn't allowed at Harley's --
21   or she wasn't going over no more.  I said, yeah, you already
22   told me that.
23         She said, well, I didn't tell you the whole story.
24   I said, okay.
25         And she said, well, she says, we were -- he was

Warner - Direct

1   giving them alcohol.

2   Q.   Who is the "he?"

3   A.   Mr. Cruz.

4   Q.   Okay.  So a week earlier you learned Cruz is giving

5   cigarettes.  Now you learn Cruz is giving the young girls

6   alcohol.

7   A.   Yes.

8   Q.   Does that -- what is your reaction to that news?

9   A.   Well, the girls are 11 and 12 years old.  But the bad

10  part about it was this Jodi, she is Mexican and everything,

11  but they -- all of these kids, the way they exaggerate, you

12  don't know what to believe.

13  Q.   So after this information about the alcohol, what do

14  you do?  What's next as it relates to Mr. Cruz?

15  A.   Well, the first thing I did was my daughter had went to

16  Mr. Cruz's house maybe, I might say, maybe two to three times.

17  Q.   Up to that point?

18  A.   Right.  For slumber parties.  Because my daughter was

19  not allowed to stay over nowhere.  Me and my wife, we tried to

20  be protective of her.

21  Q.   All right.  Strict parents?

22  A.   Yeah.  Brianna was our God's gift.  But I just sat down

23  and talked to her and I says, honey, I said, I don't want you

24  up there, going up there anymore when he's there and you won't

25  be going there no more and you are not going to be around

Warner - Direct

1  alcohol and cigarettes.

2  Q.   The "he" that you made reference to in that answer --

3  A.   Mr. Cruz.

4  Q.   -- is to who?

5  A.   Mr. Cruz.

6  Q.   What's the next significant interaction you had with

7  Mr. Cruz after you tell your daughter you're not going up

8  there anymore?

9  A.   I didn't know what to do.  I didn't know what to

10  believe.  So I went and talked to a couple of my neighbors

11  that are real into the church and stuff and asked them what

12  they thought I should do.

13  Q.   Did they give you some advice?  I am not asking what

14  the advice is.  Did they give you some advice?

15  A.   They said that --

16  Q.   Mr. Warner, I am not asking what advice they gave you.

17  I am asking, did you receive some advice from them?

18  A.   Yes.

19  Q.   Did you act upon that advice that they gave you?

20  A.   Yes.

21  Q.   What did you do?

22  A.   The -- one of them told me maybe I should call --

23  Q.   Mr. Warner, we are not asking what they told you.

24  A.   Okay.

25  Q.   We are asking, and you have already indicated, that you

Warner - Direct

1   got some information from them, some advice.  We want to know

2   what you did after you heard that advice.

3       A.   Well, once -- I talked to a few people about that.

4       Q.   Right.

5       A.   And one of them was a cousin of mine and different

6   people.  I was getting different things back from different

7   people.  They said they was checking into things for me.

8            I think the CYS, Child Youth Services in Mercer,

9   one of them contacted them and asked them about it, what

10  should be done.  They said nothing can be done without proof.

11      Q.   Okay.

12      A.   And one of the other people informed me that I better

13  keep my mouth shut because I could be arrested and sued for

14  defamation of character.

15      Q.   Excuse me, I want to make a note.  Okay.

16           So that advice seeking that you got from people

17  that you trusted, did that all happen in one day or did it

18  take a span of days or weeks?

19      A.   I'd say a couple weeks.

20      Q.   During that information gathering phase are you having

21  any interaction with Mr. Cruz?

22      A.   No, I never met him.

23      Q.   At some point after you get these various tidbits of

24  advice on what to do and you act upon them do you then have

25  any interaction with Mr. Cruz?

Warner - Direct

1    A.   Yes.

2    Q.   Tell us about that.

3    A.   At the last week of May, which was right before school

4    was released, my daughter was down at Brandy Springs Park and

5    when I went down, I couldn't find her.  I heard she went down

6    there.  She wasn't allowed down there unless she was with a

7    group of people.  But I had to have her about every half hour

8    or so, I would walk down or get on a bike and go down and

9    check on her, make sure she is all right.

10   Q.   So not knowing where your daughter is, your

11   11-year-old, did that cause you some concern?

12   A.   Yes.

13   Q.   What did you do?

14   A.   I ran back to the house to make sure she wasn't there

15   because I walked around the park and I thought maybe I might

16   have missed her.

17   Q.   At some point did you find your daughter that day?

18   A.   A vehicle pulled in.

19   Q.   Whose vehicle was it?

20   A.   Mr. Cruz.

21   Q.   What happens?

22   A.   And he is standing there and I look up and my daughter

23   and his daughter was walking up from the park.  He was looking

24   for his daughter also.

25   Q.   So did you have an opportunity to speak to Mr. Cruz?

Warner - Direct

1    A.    For about five minutes.  He was introduced to me and
2    that's about it that particular day.
3    Q.    Mr. Warner, in the days and weeks leading up to that
4    chance meeting with Mr. Cruz you are getting this vibe that
5    things aren't right up at the Cruz household --
6              MS. BLOCH:  Objection, Your Honor, leading.
7              THE COURT:  Sustained.
8    BY MR. CHONTOS:
9    Q.    Why is it that you don't confront Mr. Cruz right there
10   when he pulls up to your house looking for his daughter?
11   A.    Well, a couple different reasons.  Like I said, I was
12   told if I made any accusations I get there, I could get in
13   trouble.  I had no proof.
14             Like I said -- put it this way, one little girl was
15   supposed to come over to play on Friday after school.  The
16   following week she hadn't -- she hadn't come.  The following
17   week when she come, she said, do you know why I didn't come
18   last week to play?
19             I said, why?
20             She said, I flew to Hawaii for the weekend.
21             You know that can't be possible flying from Mercer
22   to Hawaii for the weekend, but this is the stories that they
23   tell.  So you just don't know what to believe.
24   Q.    Next significant action with Mr. Cruz is what?
25   A.    I'd say probably roughly four, five days later he

Warner - Direct

1   came --

2      Q.   Where is it?

3      A.   Huh?

4      Q.   Where is the interaction?

5      A.   At my apartment again, Brandy Springs Apartment.   He

6   dropped his daughter off.   And --

7      Q.   For a play date with your daughter?

8      A.   Yes.

9      Q.   What happens?

10      A.   He stood there and I said hi to him and everything.

11   And we're talking.   He said something, just regular talk, you

12   know, for about five, ten minutes.   And I offered him a cup of

13   coffee.

14      Q.   Did he accept?

15      A.   Yes.

16      Q.   Go in the house?

17      A.   No.

18      Q.   So did you go in and get the coffee and bring it out?

19      A.   Yeah.   I had a -- it was summertime.   So the kids were

20   playing out there, riding their bikes and stuff, and I sat

21   down there, like patio furniture, like tables and you have a

22   picnic on or something.

23      Q.   So you and Cruz sit down.   Did you have a discussion

24   with him?

25      A.   We talked.

Warner - Direct

1    Q.   What do you talk about?

2    A.   The girls.  And he was telling me how active my

3    daughter was and stuff.  I said, yeah, because my daughter was

4    at the top of a tree.

5    Q.   What do you mean by that?

6    A.   Every time I couldn't find my little girl, I go out and

7    she's always at the top of this tree.

8    Q.   She would climb a tree?

9    A.   Yeah.

10   Q.   Okay.

11   A.   She would always be up there.  And we talked about

12   that.  And he left and came back probably about two hours

13   later to pick up his daughter.  We probably just talked again

14   for a few minutes.  And he left again.

15        And at this time we were, me and my wife, we were

16   separated, we were sharing my daughter and we tried to make

17   sure she spent time with both of us.

18   Q.   What was that arrangement?  Was your daughter there

19   Monday through Friday at your place and weekends at the other

20   parent?  What?  Tell us.

21   A.   My wife was, how can I -- she had a lot of -- she's

22   been through hell.  She's had a lot of medical problems as far

23   as like back and stuff like that.

24   Q.   I am just trying to ascertain what the arrangements

25   were.

Warner - Direct

1    A.   So I was the main thing.

2    Q.   You were the primary custodial parent?

3    A.   Yes, because I'm from Mercer, where she's already in

4    school, and her mom had moved closer to her parents where she,

5    you know, she could get help and stuff.

6    Q.   So your daughter wanted to stay in that school

7    district?

8    A.   Yes.   That's was my main concern.

9    Q.   When was the next interaction you have with Mr. Cruz?

10   A.   I would say about a week later.

11   Q.   What happens?

12   A.   He comes down to the house and I'm -- me and my wife

13   was in the middle of a court battle trying to figure out where

14   my daughter should be, where the best place for her should be.

15   But, of course, my wife loves her and wanted her to be with

16   her; I love her and I wanted her to be with me.

17        So I was at the end of my wits, so I -- and I

18   didn't know what to do.   So when he pulled in, the girls were

19   out there, and I confronted him.

20   Q.   About what?

21   A.   About what I heard.

22   Q.   You had heard alcohol, cigarettes, that type of thing?

23   A.   Yeah.   And the last time -- when I heard about the

24   alcohol, one of the other things I was told was she thought it

25   was weird.   And I said, what was that?   And she said, 2,

Warner - Direct

1    3 o'clock in the morning that Harley, he would wake her up and
2    they would all go to Wal-Mart.  And he would buy Harley all
3    kinds of clothes.
4        Q.   So what do you recall -- you have characterized that
5    interaction with Mr. Cruz as you confronted him.  Tell us
6    specifically what you said, what he said.
7        A.   I pressed him and I told him, I says, I don't know you,
8    you don't know me.  I says, right now I got a lot going on.  I
9    said, I'm trying to get my daughter and I don't have time to
10   deal with this here and to pussyfoot around this here, the way
11   to do this is to come straight up and tell you what I heard.
12       Q.   What did you tell him?
13       A.   I said, I heard you were giving the kids alcohol and I
14   heard you were giving them smokes and you are taking pictures.
15       Q.   Does Mr. Cruz have a reaction?
16       A.   Yes.
17            MS. BLOCH:  Objection.
18   BY MR. CHONTOS:
19       Q.   Does he have a reaction?
20            THE COURT:  You can answer yes or no.
21            THE WITNESS:  Yes.
22   BY MR. CHONTOS:
23       Q.   What is his reaction?
24       A.   He --
25            MS. BLOCH:  Objection, hearsay.

Warner - Direct

1        THE COURT:  Sustained.

2    BY MR. CHONTOS:

3    Q.   Mr. Cruz said something to you?

4    A.   Yes.

5    Q.   Do you have a reaction to that?

6    A.   Yes.

7    Q.   What's your reaction?

8    A.   It was what his reaction was to me, it was, like, oh,

9    it's all a lie, and he just pushed it off.

10   Q.   What's going on in your brain when you're hearing that?

11   A.   I'm back to the point in my head, was this kid telling

12   me the truth, is this -- you know, am I saying something to

13   this guy that could get myself in trouble?  I just didn't

14   know.

15   Q.   Does that conversation wind up?

16   A.   Yeah, there were a few other things said, which I can't

17   remember, but I just told him I better not ever catch -- find

18   out it was happening.  I says, because if I ever find out it's

19   true, I says, I am going to come down and I am going to kick

20   your door in and I am going to kick the shit out of you and

21   then I am going to call the cops.

22   Q.   Does he leave at that point?

23   A.   Yes.

24   Q.   Do you ever see him again?

25   A.   Probably about four, five days later he --

Warner - Direct

1    Q.    Where?

2    A.    He come back down to the apartment to drop his daughter

3    off.

4    Q.    Another play date with your daughter?

5    A.    Yes.

6    Q.    Does he get out of the car?

7    A.    Yes.

8    Q.    Do you have interaction with him?

9    A.    He come up to me and he said, you wouldn't happen to

10   have a cup of coffee, would you.  I said, yes, I can make a

11   pot.

12   Q.    So you guys, you know, have a discussion?

13   A.    Yes, sir.

14   Q.    Inside or out?

15   A.    Outside.  There was me, him, and Al, my next-door

16   neighbor.

17   Q.    Can you put like a label on that discussion?

18   A.    Just, we just, you know, man, this is a nice day, stuff

19   like that, just common stuff.

20   Q.    That discussion you had with Mr. Cruz, was any of it

21   about girls and photos?

22   A.    No.

23   Q.    Okay.  Mr. Warner, during these interactions with

24   Mr. Cruz do you ever express to him a desire for child porn?

25   A.    No.

Warner - Direct

1    Q.    During your interactions with Mr. Cruz does he ever

2    articulate a desire for that stuff to you?

3    A.    At the beginning?  No.

4    Q.    Well, how about at any time?

5    A.    Later on he at a -- how can I explain it?  You see

6    people on TV like this -- it's -- I am not sure how to frame

7    people for whatever they are interested, but you see like when

8    people were visiting the United States and usually like if

9    they are, for example, Oriental or something, they are always

10   standing with cameras, taking pictures of everything.

11   Q.    Okay.

12   A.    Mr. Cruz was like that.  He always had his cameras

13   wrapped -- in his vehicle and was constantly -- and he had

14   real expensive film, the same kind of thing, constantly taking

15   pictures.

16   Q.    In those early interactions when he is dropping his

17   daughter off, are you seeing that stuff, the camera that you

18   made mention?

19   A.    This is when I am -- where I am at.  When this started

20   happening, then that just made it worse because after I was

21   told, now all of a sudden I am seeing this camera all the

22   time.  So it just made me more, even more leery.

23   Q.    That conversation ends.  Do you have any other contacts

24   with Mr. Cruz?

25   A.    After about probably the following day, he -- it was a

Warner - Direct

1    nice summer that year.  Every time we turned around he was

2    calling and asking us to go for ice cream, asking us if we

3    wanted to go swimming.

4    Q.    You say "we."  Who is we?

5    A.    Me and my daughter, Brianna.

6    Q.    So Cruz invites you.  Do you accept the invite and go

7    there and go here?

8    A.    Yes.  At first when I -- I thought, and Mr. Cruz told

9    me some circumstances about how he was here and how he was a

10   single father.  So there was something we had in common.  And

11   it's hard to be a father raising a girl and trying to explain

12   things, different things.

13   Q.    Did the two of you talk about that, the difficulty

14   being a single dad raising a daughter?

15   A.    Yes, yes.

16   Q.    Any other significant interaction with Mr. Cruz?  Let's

17   continue down the trail.

18   A.    From then on every time he would come to my house,

19   which was almost like starting to be almost like -- I don't

20   want to say a daily thing, but in the summer he would drop his

21   daughter off or pick her up, he would drop her off and go to

22   work.  When he got off work, he would come to pick her up.  I

23   would say, hey, you know, I know that you don't want to go

24   home and cook supper or anything, I got plenty made, why don't

25   you come in and sit down and eat.  I would make him supper

Warner - Direct

1    every night.

2    Q.   At this point in the relationship it has now gotten to

3    the point you are hosting him for dinner?

4    A.   Yes.

5    Q.   Did there come a point you began to do recreational

6    things other than going swimming, such as playing computer

7    based games?

8    A.   A few months later that started, yes.

9    Q.   And --

10   A.   It's something I have always done, the only thing I

11   knew about a computer is how to play video games.  And the

12   games I play, you have to play them off Facebook.  You log

13   onto Facebook, there a big list of games, and you punch in on

14   that there and your game will open up.  You punch in your

15   code, and it opens up to -- it's a role playing game.

16   Q.   Were those the types of games that your opponent or

17   your co-player could play at a distant location, meaning at

18   their house?

19   A.   There was over 300,000 fighting.

20   Q.   So the answer so my question is yes?

21   A.   Yes.

22   Q.   So to play one of those games you didn't have to be

23   seated right there at the same screen?

24   A.   No.  The game, one game will last you three to four

25   years before it ends.

Warner - Direct

Q.    So at this point where you are friendly enough with
Mr. Cruz to break some bread with him and now you are playing
some video games with him, does the relationship continue
further?

A.    Yeah.  I was getting to the point where I was starting
to be comfortable around him and it got to the point where I
thought, well, the girl had lied to me and it wasn't true.
Because I had talked to my mother and different people about
him.  And they said, what do you think?  They said, should you
be talking to him?  I said, well, I think the girl was lying.
I said, he don't seem like that type.  Then again, how do you
type something like that?  And I really didn't believe it.

          So I was actually -- my mom didn't like him at
first either and she come down and he start joking with my
mom.  My mom even said, you know --

          MS. BLOCH:  Objection, Your Honor.

BY MR. CHONTOS:

Q.    We are just really interested in your reaction.

A.    My family, we just thought he was starting to be an
okay guy.

Q.    At some point did that feeling that you had, okay guy,
change?

A.    Yes.

Q.    Can you pinpoint that, some event or some date?

A.    We took about the 2nd of June, he had brought a girl

Warner - Direct

1    to the house with his daughter.

2        Q.    Did you know the girl before then?

3        A.    Huh?

4        Q.    Did you know the girl before then?

5        A.    No.

6        Q.    So this is Mr. Cruz; his daughter, Marissa; and a

7    stranger?

8        A.    Yes.

9        Q.    The stranger was a young female?

10       A.    Yes.

11       Q.    Continue.

12       A.    Then when we go to pick her up at her -- for them to go

13   swimming and stuff, we would go to that trailer park and pick

14   these people -- pick this little girl up to go swimming also.

15       Q.    Okay.  So does Cruz join the swimming party?

16       A.    Yes, it's his swimming party.

17       Q.    So what transpired at that swimming party to -- because

18   my question in this area was, at some point something changed.

19   What was the event that changed you?

20       A.    Well, the first couple times we went swimming it was

21   okay.  But then -- the first one I start -- what opened my

22   eyes is we went to a -- it was a river.  The kids were jumping

23   in and the current was real strong dragging them down.  And I

24   said, I ain't getting in that and I don't think the kids

25   should swim in that there.  And then he proceeded to tell me

Warner - Direct

1    that the first time that they came there that when they found

2    it, the girls had started jumping in in their underclothes and

3    was swimming.

4              Well, automatically I think, you know, most

5    underclothes are white so if they got wet.  And he says, I

6    think -- he says, the whole time he's taking pictures.  As the

7    kids were jumping in the water and coming down, he would stand

8    there as they were coming down and take pictures, take

9    pictures as they were coming down.

10   Q.   Your reaction to him taking pictures of the girls in

11   the water?

12   A.   It didn't bother me until he -- what's her name?  There

13   was some -- there was another girl there, I don't know who it

14   was, she was climbing up an embankment.  Well, she wasn't

15   looking at him.  I was sitting at the picnic table away from

16   him.  I was sitting over there rolling a cigarette.  When I

17   turned around, she was climbing the hill, she wasn't looking

18   at him.  He took a picture of her butt.

19   Q.   Mr. Warner, you mentioned rolling cigarettes.  Earlier

20   we heard some testimony from Faith's mom about you sharing

21   tobacco.

22   A.   Yes.

23   Q.   So you would roll your own cigarettes and so would

24   Faith's mom?

25   A.   Yes.  She would -- she would smoke one after another,

Warner - Direct

1   she would smoke like four packs a day.  She always had one.

2   Every time I turned around she would be coming to my house

3   asking to bum some tobacco off me.

4       Q.   At some point at that swimming party with Mr. Cruz

5   taking the pictures, is this the first time you were at a

6   swimming party and he is taking pictures?

7       A.   Yes.

8       Q.   Continue.  After that, what is your next interaction

9   with Mr. Cruz?

10      A.   Faith's mom, Fawn, walked her and -- her and her

11  boyfriend, Don, walked from the trailer park, which is

12  probably four miles or so, five miles, from there clear to my

13  house.

14      Q.   So Faith's mom and the boyfriend walked to your house?

15      A.   Right.

16      Q.   Do you have a discussion with Faith's mom?

17      A.   No.  What happened was when they got there, they had

18  walked there for tobacco because they both wanted a cigarette.

19      Q.   Okay.

20      A.   And he had a stroke.

21      Q.   Who?

22      A.   Don, whatever his name.

23      Q.   The boyfriend?

24      A.   Yeah.

25      Q.   We want to get to Mr. Cruz.

Warner - Direct

1    A.    Okay, that's what I am doing.  Sorry the statement is

2  long.

3          So she called Cruz up.  Cruz came and got him and

4  took him to Grove City Hospital.

5    Q.    All right.

6    A.    When they got released from then, on the way back he

7  asked to use Cruz's cell phone.  When he used Cruz's cell

8  phone, whether he hit the wrong button or whatever, pictures

9  of Faith popped up on the telephone.

10   Q.    Okay.

11   A.    And he threw -- he was mad and he threw a fit and they

12 were pictures of Faith in a bathing suit.

13   Q.    He is telling you this?

14   A.    No, Fawn told me.

15   Q.    All right.  How long after that telephone revelation --

16 first we had the swimming party where he's -- Cruz is taking

17 photos.  How much of a time period passes before cell phone

18 picture of Fawn -- or not Fawn, Faith, I'm sorry?

19   A.    A week, if even that.

20   Q.    All right.  Did that cause you some concern?

21   A.    I told her -- I informed Fawn that I was there and the

22 kids were just getting out of the water when the pictures were

23 taken.  Me and her start talking about the way he was with his

24 camera.  If -- if you are standing there eating and you

25 take -- I give you a chili dog and you take a big bite of it

Warner - Direct

1  and you're -- you are going to eat it, the last thing you want

2  to do is have someone pop up beside you, put this big lens

3  camera in your face, and take a picture of you chewing on a

4  hot dog.  He was getting that carried away with his camera.  I

5  got mad.  I told him, I said, I am getting annoyed him putting

6  the camera in my face.

7      Q.   Tell us about the next interaction with Mr. Cruz.

8      A.   I get -- I got a phone call --

9      Q.   From him?

10     A.   No.  I got a phone call from Harley.

11     Q.   Harley is one of the girls?

12     A.   Yes.

13     Q.   Sister -- your daughter's -- sister of your daughter's

14  friend?

15     A.   Yes, from back in preschool.

16     Q.   Had you talked to Harley on the phone before?

17     A.   Yes.

18     Q.   Do you recognize her voice?

19     A.   Yes.

20     Q.   She told you some things?

21     A.   Yes, sir.

22     Q.   What was your reaction to those things that she told

23  you?

24     A.   I informed her that I think there was stuff she better

25  go tell her mother.  She said she already had and nothing was

Warner - Direct

1  being done.

2  Q.   So this is Harley?

3  A.   Yes.

4  Q.   The fact that Harley's mom wasn't doing anything, did

5  that upset you?

6  A.   Yes.

7  Q.   What's the next interaction with Mr. Cruz?

8  A.   Now he would come around and different things are

9  happening.  So for -- for when you say, what was the next

10 interaction, now by this time these interactions are starting

11 to be mumbo-jumbo.

12 Q.   Starting to be what?

13 A.   They're -- they're all mixed up.  In other words, I

14 can't tell you the order of what the next time was.

15 Q.   Right.  How about if I phrase it, tell us the next

16 significant interaction with Mr. Cruz.

17 A.   The year -- for that summer, there was a thing that we

18 constantly got together and -- the day that we went to that

19 river, I had informed Mr. Cruz that there was a beach that we

20 go to and we didn't have -- the girls shouldn't be swimming in

21 that river.

22 Q.   So did you go to the beach?

23 A.   He said he didn't know where it was.

24      MS. BLOCH:   Objection, Your Honor.

25      THE COURT:   Sustained.

Warner - Direct

1   BY MR. CHONTOS:

2      Q.   Did you go to that beach area?

3      A.   Yes.

4      Q.   Was Mr. Cruz there?

5      A.   Yes.

6      Q.   You there?

7      A.   Yes.

8      Q.   Was your daughter there?

9      A.   Yes.

10     Q.   Faith there?

11     A.   Yes.

12     Q.   Harley?

13     A.   Yes.

14     Q.   Okay.  What takes place at that beach there?  What do

15  you see Mr. Cruz doing?

16     A.   There was a little girl there with freckles that he

17  just kept picking her up and throwing her.

18     Q.   Did you later learn that person's name to be Margie?

19     A.   Yes.

20     Q.   Was his camera out and about?

21     A.   Yes.

22     Q.   Did you see him taking pictures?

23     A.   Yes.

24     Q.   Did you have a reaction to that?

25     A.   Not at first.

Warner - Direct

1    Q.   So at some later point during the beach incident you
2    had a greater level of reaction?
3    A.   When we were leaving.
4    Q.   What happened?
5    A.   My daughter and Faith and them and Harley were messing
6    with his camera -- no, I'm sorry, it wasn't his camera, it was
7    his phone.
8    Q.   Something happen -- something get revealed on the
9    phone?
10   A.   Well, what it was was -- it wasn't like that, it was
11   like Harley did today (indicating), like that there.  They
12   just start giggling.  She's --
13   Q.   Mr. Warner, when you saw that reaction from Harley,
14   where were you?  How far away?
15   A.   I always sat in the passenger side front seat, the
16   girls all sat in the back seat, and Mr. Cruz always drove.  I
17   didn't have -- one of the things that kind of got us going to
18   this swimming and going for ice cream and stuff was I didn't
19   have a driver's license.
20   Q.   Okay.
21   A.   I couldn't afford insurance and stuff, so I just never
22   got my driver's license.
23   Q.   Did you have a car?
24   A.   It was broke down.
25   Q.   Okay.  So we have that observation by you of one of the

Warner - Direct

1   girls seeing something on the cell phone.

2       A.   Right.

3       Q.   What's the next significant interaction event you

4   remember with Mr. Cruz?

5       A.   I had a -- he had a laptop and I didn't have a computer

6   for a long time.

7       Q.   How do you know he had a laptop?

8       A.   Because it was always with him.

9       Q.   So in addition to his camera, he's taking his laptop

10  with him?

11      A.   Oh, yeah, always.  They were always together.

12      Q.   Okay.

13      A.   The girls would sit and play on his computer and he --

14  me, every time I wanted to play my game, my next-door neighbor

15  was nice enough to let me come over and use his computer.

16      Q.   That Facebook game that you mentioned earlier, in order

17  for you to play you had to go next door to your neighbor?

18      A.   Yeah.  Yeah, and I did it -- he let me go every day.

19      Q.   Because at that time you didn't have a computer?

20      A.   No.

21      Q.   Did your daughter have a computer at that time?

22      A.   No.

23      Q.   At some point as of April, 2012, did your daughter have

24  a computer?

25      A.   Wait, 2011 do you mean?

Warner - Direct

1    Q.   April, 2012, when your house was searched.

2    A.   Oh, no, there was no -- the laptop broke probably about

3  two months prior to that.

4    Q.   Okay.  I am referencing your daughter's.  Did your

5  daughter have a computer in April, 2012?

6    A.   Yes.

7    Q.   Was it operational?

8    A.   Yes.

9    Q.   Did it work?

10   A.   Prior to --

11   Q.   April, 2012, when law enforcement came and searched

12  your house, did your daughter have a computer?

13   A.   Yes, but it wasn't operable.

14   Q.   Did you have what's called a tower unit in April, 2012?

15   A.   Yes.

16   Q.   Was that working?

17   A.   No, that had been broke for a couple years.

18   Q.   So in order for you to play those video games, you had

19  to go next door to your neighbors?

20   A.   Yes.  Neighbor's.

21   Q.   All right.

22   A.   I would go to my cousin's a couple times.  She lived up

23  the street.  I would play at her house a couple times too.

24   Q.   Again jumping back to significant interaction with

25  Mr. Cruz.  What is the next significant event?

Warner - Direct

1    A.   My -- he kept showing me his laptop.  So he -- well,

2  first of all, he had a camera and the -- he was always taking

3  these pictures and everything.  I told him, you know, I'm -- I

4  said, I am not -- I don't like the pictures, I don't want

5  pictures of me on the camera.  I don't want pictures taken of

6  me all the time.  I was sort of upset about it.  The next

7  thing you know, the camera quit coming around.

8    Q.   So he listened to you?

9    A.   Yes.

10   Q.   What about the laptop?

11   A.   The laptop still was there.

12   Q.   You indicated that he was showing you some stuff on the

13  laptop?

14   A.   No, it was on the cell phone.

15   Q.   Okay.

16   A.   What I didn't like about it was it wasn't him, it was

17  the girls that come up with it.  Like I said, when we got in

18  the vehicle that day, they didn't have no heads.

19   Q.   Pardon me?

20   A.   They didn't have no heads.

21   Q.   They didn't have any?

22   A.   Any heads.

23   Q.   What didn't have any heads?

24   A.   The pictures.

25   Q.   So you saw the photos on the cell phone?

Warner - Direct

1    A.    Yes.

2    Q.    Take us forward now to the next significant interaction

3    you have with Mr. Cruz.

4    A.    Well, he went and helped me pick out a camera.   That

5    was probably -- that was in June, the end of June sometime.

6    Q.    Where did you go?

7    A.    Huh?

8    Q.    Where did you go?

9    A.    Wal-Mart, Hermitage.

10   Q.    Did you buy a camera?

11   A.    Yes.

12   Q.    Do you remember what kind?

13   A.    No.

14   Q.    Do you remember the color?

15   A.    Black.

16   Q.    You took it home from the Wal-Mart?

17   A.    Yes.

18   Q.    Did you begin to open it?

19   A.    Yes.

20   Q.    Did you begin to use it?

21   A.    Yes.

22   Q.    Did Mr. Cruz show you how to use it?

23   A.    Yeah, because I am kind of stupid about stuff like

24   cameras.

25   Q.    Okay.

                              Warner - Direct

1    A.    I am used to the camera you take a picture and you hold

2    it and it develops in your hand.

3    Q.    You are a Polaroid guy?

4    A.    Yeah, I'm sorry.

5    Q.    Did there come a time where Mr. Cruz also provided you

6    some assistance in purchasing a computer?

7    A.    Yes.

8    Q.    Tell us about that.

9    A.    He took me two or three times over to Wal-Mart and a

10   couple times -- my mom always took me to get groceries and

11   stuff.  Every time I went over, I was constantly looking at

12   the laptops trying to figure out -- I didn't know what to buy.

13   Q.    Did he give you some assistance?

14   A.    Yes.

15   Q.    Did you ultimately end up buying a computer?

16   A.    Yes, I did.

17   Q.    Same Wal-Mart there in Hermitage?

18   A.    Yes.

19   Q.    Do you remember the brand of computer?

20   A.    All I know is it was the same brand he had.  Because he

21   said he had had good luck with his.

22   Q.    If you were to see a box -- I mean, when you left the

23   store, it came -- you carried a box out of the store, right?

24   A.    Yes.

25   Q.    If you saw that box, would that refresh your memory as

Warner - Direct

1    to --

2    A.    Yes.

3    Q.    Okay.  15.1, I have handed you Government's

4    Exhibit 15.1.  Is that the box you left the Wal-Mart store in

5    Hermitage with?

6    A.    I believe so.

7    Q.    Mr. Warner, in that plastic bag there's a black camera.

8    A.    Yes.

9    Q.    Did you buy that camera?

10   A.    Yes, I did.

11   Q.    That's the one Mr. Cruz helped you purchase and helped

12   you set up and start running it?

13   A.    There -- there was nothing -- when it came -- it didn't

14   come with like the thing that shows, so -- to like set

15   anything, so I had to go back and the Wal-Mart, they told me

16   it would be about a week or two, and when one came in, they

17   would give me the book out of it.

18   Q.    So when you purchased the camera, it didn't have an

19   instruction manual; is that what you're telling us?

20   A.    Yes.

21   Q.    So about a week later did you go back and get the

22   instruction manual?

23   A.    Yes.

24   Q.    Struggle through it and get it up and going?

25   A.    Yeah.  That's about it, struggle.

Warner - Direct

1   Q.   Next significant interaction with Mr. Cruz is what?

2   A.   He come down and I was having problems and the -- my

3   daughter and Faith were setting on the couch, and his

4   daughter, and they went, a-ha.  They said, oh, my God, oh, my

5   God.

6            MS. BLOCH:  Objection, Your Honor, hearsay.

7            MR. CHONTOS:  Judge, I don't believe that that's

8   hearsay because it's designed to elicit his reaction to the

9   statement.  It's not offered for the truth.  His reaction is

10  what's relevant.

11           THE COURT:  Sustain the objection.  You may

12  rephrase the question, please.

13  BY MR. CHONTOS:

14  Q.   You are in your house?

15  A.   Yes.

16  Q.   Your daughter is there with who?

17  A.   Faith, Marissa, and -- I believe it was me and Carol.

18  Q.   Who is Carol?

19  A.   The churchgoing lady that lives next door.

20  Q.   So a neighbor?

21  A.   Yeah.

22  Q.   All right.  What did you hear from the girls?  What did

23  you see the girls doing?

24  A.   Blushing.

25  Q.   Where were they seated?

Warner - Direct

1    A.    On the couch.

2    Q.    Were they looking at anything or listening to anything?

3    What?

4    A.    Their laptop.

5    Q.    Whose laptop?

6    A.    Brianna's.

7    Q.    Do you see the blushing or see and hear the blushing?

8    A.    Both.

9    Q.    What do you do?

10   A.    I wanted to know what was up.

11   Q.    Do you walk over there?

12   A.    No.

13   Q.    Do you at some point see what they were looking at?

14   A.    Yes.

15   Q.    How did you get to see what they were looking at?

16   A.    I asked them what was up and I said, what's going on?

17   They said, nothing.

18          I say, I want to look also or I am taking the

19   computer off you.

20   Q.    Did you end up taking it?

21   A.    No.

22   Q.    How is it then you got to see what you think that they

23   were looking at?

24   A.    They brought their laptop over to me.

25   Q.    What did you see?

Warner - Direct

1    A.   Facebook.

2    Q.   A Facebook page?

3    A.   Yes.

4    Q.   Was there something on that Facebook page?

5    A.   Yes.

6    Q.   What was that?

7    A.   A boy talking, he was reading letters.

8    Q.   So was the boy -- was there a boy talking?  Did you

9    actually see him talking?

10   A.   No, it was -- in Facebook, if you have never seen it,

11   but Facebook, what it is is if I write you, everything's

12   backwards.   In other words, you wouldn't start at the top.

13   You would start at the bottom and go up.

14   Q.   New conversations go on top?

15   A.   The newer they are, they come up.

16   Q.   So you saw some conversations?

17   A.   Right.

18   Q.   Typed out sentences and words, right?

19   A.   Right.

20   Q.   But you talked about on that Facebook page, did you see

21   an actual human being's face?

22   A.   No.

23   Q.   Did you --

24   A.   Just his name.

25   Q.   Did you read the printed words that you saw?

Warner - Direct

1    A.    Yes.

2    Q.    Happy, sad, or indifferent about what you read?

3    A.    It started out like the first one was like, I want to

4    be your friend, please accept me into your face.

5    Q.    Did it stay at that level?

6    A.    No.

7    Q.    It went elsewhere?

8    A.    Yes.

9         MS. BLOCH:    Objection, hearsay, Your Honor.

10        THE COURT:    Sustained.   You may rephrase.

11   BY MR. CHONTOS:

12   Q.    Mr. Warner, did you take -- you read everything that

13   you saw on that Facebook page?

14   A.    Yes, I did.

15   Q.    Did you take some action as a result of what you read?

16   A.    I most certainly did.

17   Q.    What action did you take?

18   A.    As I read up to them, it was aggressive.

19   Q.    We are not interested in your characterization of what

20   you read, what we're interested in right now is your reaction,

21   what action did you take after you read that stuff?   What did

22   you do?

23   A.    There's no way for me to explain that without

24   explaining the first part.

25   Q.    Well, we need to.   So what action did you take after

Warner - Direct

1    you read those line item entries in that Facebook posting?

2    A.    There was code.

3    Q.    Okay.  Mr. Warner, did you say anything?

4    A.    No.

5    Q.    Did you type some response?

6    A.    No.

7    Q.    What did you do?

8    A.    There's a thing, I hit on it, on one of the

9    conversations.  When I did, this thing lit up on the computer.

10   And it was something called YouTube.

11   Q.    Okay.  So a -- so on the Facebook you clicked on it and

12   up popped YouTube?

13   A.    Yes, sir.

14   Q.    Did you then see something in that YouTube box?

15   A.    Yes, sir.

16   Q.    What did you see?

17   A.    Did you ever see how like in the old VCRs and stuff

18   when you tried to put something in, you saw the clock and

19   something is going like that?

20   Q.    Right.

21   A.    It was doing that there.

22   Q.    At some point did that little magic winding clock end?

23   A.    Yes.

24   Q.    Did you then see something different than the magic

25   winding clock?

Warner - Direct

1   A.   Yes.

2   Q.   What did you see, Mr. Warner?

3   A.   The -- Faith was talking on the computer.

4   Q.   Were you able to tell Faith's manner of clothing?

5   A.   No.

6   Q.   Was she clothed?

7   A.   You couldn't tell.  She was like --

8   Q.   The bottom of that screen -- you recognized that young

9   woman as Faith?

10  A.   Yeah, it was her face.

11  Q.   Where was the bottom of the screen in relationship to

12  her body?

13  A.   Here (indicating).

14  Q.   You are pointing to about --

15  A.   Right shoulder level, a little below.

16       And she -- she was sitting there.  And typing like

17  she's talking to somebody.  And it was being recorded.  And in

18  big bold letters across the top of the screen was her name.

19       And I looked at it and I didn't think anything of

20  it, you know.  One of the phrases it said was, how would you

21  like me to send this to all your friends, family, and school

22  mates?  I thought, big deal.

23       Then --

24  Q.   Did it become a big deal?

25  A.   Yeah.

Warner - Direct

1    Q.   Tell us about it.

2    A.   Very.  She stood up and backed up like this.

3    Q.   So at that point where she stood up and backed up,

4  where's the bottom of the screen, that YouTube screen, at in

5  relationship to her body at that point?

6    A.   Maybe her knees.

7    Q.   Are you seeing the top of her head?

8    A.   Yes.

9    Q.   Is she clothed?

10   A.   No.

11   Q.   What do you do?

12   A.   I freaked.  What the hell is this shit?  And I looked

13 and I have a -- my sister bought me a light that is unique, it

14 looks like a cowboy boot.  You don't see a lot of.  I decorate

15 in western.  And I seen that boot in the background.  And I

16 asked her, I said, what the hell are you doing?

17   Q.   So when you are making this observation of that YouTube

18 video, is Faith right there next to you?

19   A.   Yeah.

20   Q.   And you ask her, well --

21   A.   What the hell was you doing?

22   Q.   Does she say something?

23   A.   I don't remember that ever being done.

24        I said, well, Faith, it's you, this -- her mother

25 had -- her mother has the exact same laptop that Cruz had.

Warner - Direct

1    Q.   But you were about ready to say something, Mr. Warner,

2    that that's you, and did you recognize some things that led

3    you to believe that it happened at your house?

4    A.   Yes.  It was my apartment in the background.

5    Q.   Okay.  What action did you take in relationship to that

6    YouTube pop-up video?

7    A.   In the picture, she kept going like this (indicating).

8    And it was -- where my thing was, it was like in my dining

9    room.  And you could see down the hallway to my door.  And you

10   could tell she kept looking at the door.

11         So I hit on it, on the picture, and got this thing

12   that came up.  I didn't know what it was at first.  And here

13   it was a thing like that one officer was showing, that was a

14   thing with a time and day.

15   Q.   Okay.

16   A.   And when I looked at it, the time and day, it was on --

17   this is in July this happened.  When I looked at the day, it

18   was on a weekend.

19   Q.   Why is that significant?

20   A.   Because I traced it back and my daughter wouldn't have

21   been there.  And I looked on my calendar and I worked that

22   day.

23         So when Faith was there, she --

24   Q.   Did you confront Faith about that?

25   A.   Yes.

Warner - Direct

1    Q.   Okay.

2    A.   And so I was working.  My daughter had just taken off

3    to go spend the weekend with her mom.  And Faith was there

4    waiting for her mother to pick her up.

5    Q.   Mr. Warner, did you take some action in relationship to

6    that YouTube video?

7    A.   Yes, I did.

8    Q.   What did you do?

9    A.   I wrote the boy and told him I wanted it taken down

10   immediately.

11   Q.   Okay.  Was there some success?

12   A.   After about three days of fighting.

13   Q.   Okay.

14   A.   I told him, I says, I says, that's my daughter, and I

15   said, I want that off of there.

16        And he said, what will you do?  He said, I live in

17   Canada.  He said, what can you do about it?

18        I begged him to please take it down, you know.  And

19   he did not believe that I was an adult.  He asked me to meet

20   him on something called -- I don't know if I am getting this

21   right, this part, I am not sure -- there was something called,

22   for an example, like YouthChat.

23   Q.   Ultimately after three -- after some days that YouTube

24   with Faith, in your mind, no longer was out there?

25   A.   Well, the boy finally agreed to meet me on Skype.

Warner - Direct

1    Q.    Okay.  Did you Skype with him?

2    A.    Yes.

3    Q.    As a result of that Skype conversation did that YouTube

4    video with Faith go down?

5    A.    As soon as it came on, I seen the boy --

6    Q.    Presumably he saw you?

7    A.    Oh, yeah.  But he was panicked so fast that instantly

8    the camera went down and he would just type me.  And he wrote

9    me and told me it was taken care of.

10   Q.    Very well.  Next significant event with Mr. Cruz, tell

11   us what that is.

12   A.    I went back, hit the button, and seen it had been taken

13   down.

14   Q.    Okay.

15   A.    When Mr. Cruz came in, they had taken and -- his

16   daughter and them was sitting there, and Faith and them, and

17   they showed him what had been on on YouTube.

18   Q.    I thought it went down.

19   A.    It did.

20   Q.    So Mr. Cruz saw it before your efforts to get it to go

21   down?

22   A.    Yes.

23   Q.    Okay.

24   A.    Then once it was taken down, there was a thing that one

25   of the girls did something and I guess that's how they record,

Warner - Direct

1   this YouTube thing, whatever it is, has something to do with

2   music.  But they like music videos and stuff like that.  Well,

3   the girls liked someone named Justin Bieber, this kid they

4   liked --

5   Q.   So the girls would listen to music through that device;

6   is that what you're saying?

7   A.   All the time.  But they could record the videos like

8   what that one was, they could record that.

9   Q.   What's the next significant interaction you have with

10  Mr. Cruz?

11  A.   He told me, you know, that he couldn't believe how hard

12  I worked to get that off of there.  I says, well, just like I

13  told the girls, I says, you know, Miss America lost her title

14  because of pictures, and I said, you can't be doing that.

15  Q.   So you communicate that to Mr. Cruz?

16  A.   He's sitting when I'm doing it.  I'm next to the girls.

17  Q.   Can you identify and talk about the next significant

18  interaction you have with Mr. Cruz.

19  A.   I would say time-wise I don't know.

20  Q.   What about event-wise?

21  A.   Like I had said, I don't know which order they're in.

22  But he showed me a picture, he was talking and he got a

23  picture over his telephone.  Somebody in -- somebody around --

24  somewhere in Pennsylvania, one of his friends was at a cabin

25  and sent him a picture of --

Warner - Direct

1    Q.    Did Mr. Cruz show you that picture?

2    A.    Not intentionally.

3    Q.    Okay.  So you saw it accidentally?

4    A.    Yes, sir.

5    Q.    How did you see it accidentally?

6    A.    I was sitting there when he opened it.

7    Q.    Where was he?

8    A.    Operating the phone.

9    Q.    So he --

10   A.    We were sitting on a blanket, do you want me to tell

11   you which one?  His phone made this weird, this weird noise.

12   Q.    What was on the phone that you accidentally saw?  What

13   did you see?

14   A.    A small video.

15   Q.    Okay.

16   A.    It was of three little girls playing.

17   Q.    Were those three little girls clothed or naked?

18   A.    Underclothes.

19   Q.    Like pajamas?

20   A.    No.

21   Q.    Underwear?

22   A.    No shirts on, just underwear.

23   Q.    All right.

24   A.    But they were young.  I am saying like five.

25   Q.    Do you like get up off the blanket and say, what the

Warner - Direct

1    hell's that on your phone about?

2    A.   I just told him, I said, what the hell did you just

3    open up?  He says, oh, a friend of mine always sends me

4    pictures of his kids, they're cute, they're playing.

5          And so I said to him, I said, well, if that's his

6    kids, I says, he shouldn't really be doing that with them in

7    their underwear sending you pictures like that.

8    Q.   Right.

9          MS. BLOCH:  Objection, Your Honor, hearsay.

10         THE COURT:  Sustained.

11   BY MR. CHONTOS:

12   Q.   Mr. Warner, do you understand that what someone says

13   outside this courtroom, you can't relay it here in the

14   courtroom.  Okay?  That's why --

15   A.   That's what I said.

16   Q.   Well, what you say is fine.  So let's go on to that

17   next significant interaction you have with Mr. Cruz after that

18   swimming event on the beach where you see something

19   accidentally on his phone.  What's the next --

20   A.   Well, now everything -- every time something like that

21   would happen I automatically have flashbacks of everything

22   that was told, everything that was shown.

23   Q.   Back from the beginning?

24   A.   Yes.  And we made sure Cruz didn't come around.

25   Q.   Come around?

Warner - Direct

1   A.   We didn't let him -- I didn't let my daughter play with

2   his for a couple months.

3             And then she came down one day and she was running,

4   it was raining, and they were running and diving into this

5   water and sliding across the yard.  I am sitting there

6   drinking a cup of coffee and I am laughing.  And --

7   Q.   Did Mr. Cruz come?

8   A.   No, not at this time yet.

9             When they were running, his daughter got up and

10  they would go back to run again.  She had a white T-shirt on

11  and this like, I don't know, what do you call it, but this

12  other thing she had on top of it.  When she got up, I

13  recognized that she wasn't a little girl.

14  Q.   Okay.  Take us forward from that point, your next

15  interaction with Mr. Cruz.

16  A.   I told Mr. Cruz, I told him, he come down and I said --

17  you know, first I called his daughter over and I said, how old

18  are you?  I told Mr. Cruz, I said, my daughter doesn't want to

19  play with your daughter because she has to play with girls her

20  own age.

21  Q.   Okay.

22  A.   He said --

23  Q.   Mr. Warner, after you told Mr. Cruz that, did your

24  daughter continue to play with her friends, minus Mr. Cruz's

25  daughter?

Warner - Direct

1    A.    Yes.

2    Q.    All right.  How long did that last?

3    A.    I would say a couple months.

4    Q.    Because you heard Mr. Cruz say that, you know, after a

5    couple months his daughter got kind of lonely and he started

6    to feel bad, so there was a rejoining by his daughter to your

7    daughter?

8    A.    Right.

9    Q.    Did that occur?

10   A.    Yes.  She called me up and --

11   Q.    When the rejoining of Mr. Cruz's daughter to the play

12   group took place, do you then begin to have some additional

13   contacts with Mr. Cruz at that point?

14   A.    Off and on.

15   Q.    Much less at that point than before?

16   A.    Less than we were.  We were at the point where he

17   stopped at our house on a daily basis.

18   Q.    So that two-, three-month gap, when it starts again,

19   where his daughter is now part of the play group, are we

20   talking on a calendar basis, we talking now Halloween,

21   Thanksgiving of 2011?

22   A.    I would say a couple times, maybe in -- during --

23   throughout this cooling off period, we bumped into them a few

24   times like at Fawn's house for birthday parties and stuff.

25   Every so often he -- he would drop Faith off down at the

Warner - Direct

1    house, you know what I mean, he would like come and go because

2    he knew he wasn't welcome.

3       Q.    Mr. Warner, have we talked about all of those

4    significant interactions in the summer of 2011, you and

5    Mr. Cruz?

6       A.    No.

7       Q.    Okay.  Let's talk about those other ones that you deem

8    to be significant.

9       A.    I started getting -- constantly he was on the phone.

10      Q.    To who?

11      A.    To Harley.

12      Q.    How do you know that?

13      A.    Because he would say, hey, Harley wants -- he would get

14   mad because Harley would say, hey, I want to speak to my dad.

15            MS. BLOCH:  Objection, Your Honor, hearsay.

16            THE COURT:  Sustained.

17   BY MR. CHONTOS:

18      Q.    Are you in the company of Mr. Cruz and you hear him say

19   things in relationship to Ms. Harley?  Do I have it right?

20      A.    Yes.  And I talked to her.

21      Q.    And you talked to Harley?

22      A.    He handed me the phone.

23      Q.    Okay.

24      A.    The --

25      Q.    And does Harley impart some information to you about

Warner - Direct

1   Mr. Cruz?

2      A.   Yes, sir.

3      Q.   Does that knowledge you just gained from Harley cause

4   you to do something?

5      A.   Yes, sir.

6      Q.   What do you do?

7      A.   I wanted to kill him.

8      Q.   Who?

9      A.   Cruz.

10     Q.   Did you?

11     A.   I could have.  He --

12     Q.   All right.

13     A.   Excuse me.

14     Q.   The next significant event with Mr. Cruz after that

15  Harley revelation is what?

16     A.   Harley called me up.

17     Q.   Who?

18     A.   Harley.

19     Q.   Okay.  So you and Harley had a conversation, right?

20     A.   Yeah.

21     Q.   All right.  As a result of that conversation what did

22  you do?

23     A.   She said she wanted --

24     Q.   Now, Mr. Warner, it's just your reaction to the

25  conversation.

Warner - Direct

1     A.    My reaction.

2     Q.    What did you do?

3     A.    Oh, I was excited to hear from her because these -- my

4   daughter and Harley and Faith, they were like my daughters.

5   They -- I cared about them and I felt like, I don't know, like

6   I had to protect them because they had nobody else to protect

7   them.

8     Q.    All right.

9     A.    Harley's dad was dead and Faith never had a dad ever.

10  They told me everything all the time.

11    Q.    Okay.  Did there come a time where you had a

12  conversation with Faith about what was going on up at

13  Mr. Cruz's house?

14    A.    Yes.

15    Q.    Was your reaction to that information that Faith gave

16  you similar to your reaction you just told us about when

17  Harley told you some things?

18    A.    Yes.

19    Q.    Was the subject matter the same?

20    A.    Pretty much.

21    Q.    Did you and Faith have a discussion, Faith's telling

22  you things and you're talking to her, right?  It's back and

23  forth, is that fair?

24    A.    Before that there, Faith had told my daughter --

25          MS. BLOCH:  Objection, Your Honor.

Warner - Direct

1          THE COURT:  Sustained.

2          THE WITNESS:  My daughter came to me --

3   BY MR. CHONTOS:

4   Q.   Mr. Warner, at some point you had a discussion with

5   Faith, right?

6   A.   Yes, sir.

7   Q.   She told you things?

8   A.   Yes, sir.

9   Q.   You then told her things in response, right?

10  A.   Yes, sir.

11  Q.   The things in response, that's what I'm interested in.

12  What did you tell Faith after you heard --

13  A.   I don't know how, every time I open my mouth I am not

14  allowed.

15  Q.   Now, there's a way that you're going to be able to tell

16  your story, we just need to comply with the rules.

17          So, Mr. Warner, when Faith told you what she told

18  you, you didn't -- did you stand there silent?

19  A.   No.

20  Q.   Okay.  How would you characterize your whole demeanor

21  at that time?

22  A.   Rage.

23  Q.   Your rage would be directed to who?

24  A.   Cruz.

25  Q.   Did you communicate your rage about Cruz to Faith?

Warner - Direct

1    A.    Yes.

2    Q.    And how did you communicate your rage that you had

3    against Mr. Cruz to Faith?

4    A.    I told her I was worried about it.   I told her -- I

5    told her I would try to protect her.

6    Q.    I'm sorry?

7    A.    I told her I would try to protect her.

8    Q.    Did you tell her anything else?

9    A.    I just told them or her that -- there was Faith,

10   Harley, and Jodi Lynn on a conference call on the cell phone.

11   And that they just more or less proceeded to tell me things

12   that I didn't know, that they hadn't told me before.

13   Q.    When you got that new bit of information, that was on a

14   conference call you said?

15   A.    Yeah.

16   Q.    So your definition of a conference call is you are on

17   one end, right?

18   A.    Yep.

19   Q.    And who is on the other end?

20   A.    Harley is on there, on the phone.

21   Q.    Okay.

22   A.    And -- I don't know why I call it a conference call.

23   What do you call it when you hit the button on the phone where

24   everybody can hear?

25   Q.    Speakerphone?

Warner - Direct

1    A.   That's what it was on.

2    Q.   Okay.  So when you're speaking to Harley, there were

3    some other voices there that you heard?

4    A.   No.

5    Q.   So --

6    A.   Faith, Jodi Lynn -- Faith, Jodi Lynn, there was someone

7    else there, I can't remember who it was, but there was another

8    girl.  Anyhow --

9    Q.   Mr. Warner, this conversation, is that different than

10   that individual conversation you had with Harley or are we

11   talking about the same thing?

12   A.   It is different.

13   Q.   Okay.  Then this speakerphone conversation that you

14   have made mention to, is that different than the conversation

15   you had with Faith?

16   A.   Yes.

17   Q.   Okay.  Is the topic of that speakerphone conversation

18   the same topic?

19   A.   Yes.

20   Q.   All right.

21   A.   It was like a pyramid.  Every time, every time I turned

22   around it -- it just kept getting worse.  I felt like my hands

23   was tied behind my back and no matter what I did, it wasn't

24   helping.

25           We took it -- every time someone -- I talked to

Warner - Direct

1    somebody, this shit just kept coming up.  I was like, damn,
2    there was just more and more and more and more.  And it was
3    like I couldn't stop it.  It was just like a flood.  And it
4    just kept coming.

5    Q.   Mr. Warner --

6    A.   I was stupid.  I --

7    Q.   Why do you say that, sir?

8    A.   It had to come to an end.

9    Q.   Were you the person to devise a plan to make it end?

10   A.   I was one of them.

11   Q.   Did you have some helpers?

12   A.   I had -- the girls were fed up.

13   Q.   You had girls fed up?

14   A.   Yeah.

15   Q.   Girls fed up with what?

16   A.   Cruz.

17   Q.   Okay.  What girls are we talking about?

18   A.   Mainly Harley and Faith.

19   Q.   What about Margie?

20   A.   No.  Margie was -- Margie, she was a -- there's no way

21   to explain Margie.  Margie -- Margie is like a -- was like

22   a -- the only way I can explain it is she was real

23   super-sheltered to the point where instead of her being like

24   an 11-, 12-year-old like my daughter, she really -- she had a

25   hard time with the other kids because she was more like a

Warner - Direct

1   six-year-old.

2    Q.   Very well.  Mr. Warner, I want to leave that topic,

3   okay, and I want to ask you some questions about the layout of

4   your house.

5          How many televisions did you have in your house,

6   April of 2012?

7    A.   Four.

8    Q.   Where were they?

9    A.   One in my closet, there was one about that big that my

10  mom had bought me.

11         I had a 45-inch in the living room.

12         My daughter had a brand new one in her bedroom I

13  bought her for Christmas that me and my wife had got her.

14         And I had an old TV in my bedroom.

15   Q.   How many bedrooms in your house?

16   A.   Two.

17   Q.   Were they on the first floor or second floor?

18   A.   The bedrooms were upstairs.

19   Q.   Is yours the what I will describe as the master

20  bedroom, is that the larger of the two?

21   A.   Yes.

22   Q.   There was a television in that room?

23   A.   Yes.  My bedroom wasn't just my bedroom.

24   Q.   I'm sorry?

25   A.   My bedroom room wasn't just my bedroom.

Warner - Direct

1    Q.    What do you mean by that?

2    A.    My daughter's bedroom was smaller and she had like a, I

3    don't know, canopy bed, is that what they call them?

4    Q.    Maybe a daybed?

5    A.    It looks like a daybed, you know -- it's -- the bed is

6    sideways and the frame goes like on the side of the bed at

7    both ends and it came up and there was a canopy.  And so with

8    that in there, the girls -- when my daughter had her friends

9    over, they had no place.  So --

10   Q.    So when your daughter entertained her friends, what

11   were sleeping arrangements for the friends?

12   A.    They all slept in my room.

13   Q.    Even your daughter?

14   A.    Sometimes.  Sometimes I would go up and find her in her

15   own room.

16   Q.    Now, Mr. Warner, when you're playing host to your

17   daughter's friends and they would have a sleep-over, you get

18   bounced out of your bedroom --

19   A.    No.

20   Q.    Where do you sleep when they're in your bedroom?

21   A.    Anybody who knows me will tell you that I sleep on the

22   living room floor.  I have done it for years.

23   Q.    Mr. Warner, we talked about the, you know, at the time

24   in April, 2012, when law enforcement came and searched your

25   house and we talked about your daughter's laptop and the tower

Warner - Direct

1   unit.  We didn't broach the topic of that laptop that you

2   indicated came out of the Wal-Mart store in that box that you

3   saw.  In April, 2012, where was the laptop?

4      A.   I don't know.

5      Q.   Okay.  The day before they came and searched your house

6   was it at your place?

7      A.   No.

8      Q.   Where was it?

9      A.   About, I am guessing, the end of January, what do you

10  call it --

11     Q.   Stopped working?

12     A.   Yeah, it wouldn't boot.

13     Q.   Okay.  It wouldn't start up?

14     A.   Yeah.  When you hit the button, which the computer came

15  on, this thing kept coming up.  I just kept going up -- it

16  would shut itself off and come back and kept doing that there.

17     Q.   So you were having a problem with your laptop?

18     A.   Yeah.

19     Q.   Did you take any efforts to get it fixed?

20     A.   Yes, sir.

21     Q.   What efforts did you take to get it fixed?

22     A.   I asked -- Armando said he had a program that could fix

23  it.  And my brother-in-law gave me a program which we tried to

24  fix it with.  We tried to reinstall Windows.  Nothing would

25  work, it wouldn't accept nothing.

Warner - Direct

1    Q.   Okay.

2    A.   So Mr. Cruz said that he had a computer technician

3    where he works who could probably fix it, and he said that he

4    would take it and have him look at it.

5    Q.   So that's a couple months before April of 2012?

6    A.   That was in January.

7    Q.   Okay.  Now, Mr. Warner, it's before January of 2012

8    when you have that revelation from Harley, it's before January

9    of 2012 when you have that revelation from Faith, right?

10   A.   It was December -- November or December.

11   Q.   I am not asking you when.  I am trying -- January,

12   2012, you have that computer issue, right?

13   A.   Yes, sir.

14   Q.   It's before that time where you have this rage based

15   upon revelation from Harley and revelation from Faith?

16   A.   Yes.

17   Q.   The rage is directed to Mr. Cruz, right?

18   A.   Yes.

19   Q.   But when you need your computer fixed, you interact

20   with Mr. Cruz.  That just doesn't seem right.  Explain that.

21   A.   He came down and asked why -- I was the leader on this

22   game.  He wanted to try it.  Well, they wanted to know where I

23   was.  And I was -- I had -- I was -- in this game I was more

24   or less like the king where I had control of the game and I

25   have 200 people I am responsible for.

Warner - Direct

1    Q.   So you and Cruz are having this discussion about the
2    game?
3    A.   No.  He came down and told me I had to do something and
4    he dropped his computer off.
5    Q.   Dropped his computer off?
6    A.   Yes.
7    Q.   So did Cruz reach out to you or did you reach out to
8    him?
9    A.   He, the people on my game, talked to him and told him
10   that I -- they had to talk to me.
11   Q.   Because you hadn't been playing in awhile?
12   A.   Right.  I couldn't get on.
13   Q.   So Cruz then comes down to your house?
14   A.   Yes.
15   Q.   Do you like punch him in the mouth?
16   A.   No.
17   Q.   Do you like shut the door?
18   A.   No.
19   Q.   Why?  Why not?
20   A.   I had a bunch of people at the house and it was none of
21   their business bringing them stuff.
22   Q.   So do you give him your computer?
23   A.   He had that before.  He had that, like I said, the end
24   of January.
25   Q.   You recognize you are having a problem with your

Warner - Direct

1  computer?

2     A.    Right.

3     Q.    So Cruz is your ticket to get the computer fixed,

4  right?

5     A.    Right.

6     Q.    Do you give him your computer to go fix?

7     A.    Yes.

8     Q.    Does it ever come back to you?

9     A.    No.

10    Q.    So all of February, 2012, you don't have a laptop,

11  right?

12    A.    In February?

13    Q.    Yes.

14    A.    No.

15    Q.    How about March?

16    A.    No.

17    Q.    Sir, before you had your laptop did you have the

18  ability in your household to surf the Internet?

19    A.    We did, but I didn't have Internet.

20    Q.    So if you didn't have access -- if you didn't have

21  Internet, how are you able to surf the Internet?

22    A.    I don't know how it works.  All I know is that when

23  Cruz would bring his laptop down before, that the kids would

24  play on there all the time on that YouTube, and it had

25  something to do with the computer, it did a scan somehow and

Warner - Direct

1  it would find Internet.

2    Q.    Did you have cable in your house to allow you to get

3  out to the Internet?

4    A.    No.  I couldn't afford cable.

5              See, this is -- I don't know if this is relevant or

6  not, but this is just how things were.  We had just lost our

7  home.  We were not -- it was hard because we had -- I had --

8              MS. BLOCH:  Objection, Your Honor, it is not

9  responsive to any questions.

10             MR. CHONTOS:  Correct.

11 BY MR. CHONTOS:

12   Q.    Mr. Warner --

13             THE COURT:  Sustained.

14 BY MR. CHONTOS:

15   Q.    -- you got to your apartment, when did you move into

16 Brandy Springs?

17   A.    The summer of I believe 2010.

18   Q.    Okay.  Had you lived in a home before that?

19   A.    Yes.

20   Q.    Had a mortgage?

21   A.    Yeah, 900 a month.

22   Q.    Did you end up losing the home?

23   A.    Yes.  The company I worked for for a job, they sold out

24 to another company.

25   Q.    You lost your job?

Warner - Direct

1   A.   And I lost my job.  And it was hard because the --

2   other than we worked part-time, a caregiver for an older

3   gentleman, cooking his meals and cleaning and washing his

4   clothes and stuff for him --

5   Q.   Sir, when you had your laptop there at Brandy Springs,

6   did you have an email account?  Did you email things?

7   A.   I had one because you have to have one to get a

8   Facebook.

9   Q.   Okay.

10   A.   But I don't know how.  I don't use it.

11           THE COURT:  Approximately how much longer do you

12   have?  I am not rushing you, I just want to give an idea of

13   when to have lunch for the jury.

14           MR. CHONTOS:  Judge, I -- I have got awhile to go.

15   So maybe this would be a good time to break.

16           THE COURT:  So does that mean an hour, does that

17   mean a half an hour, does that mean three hours?

18           MR. CHONTOS:  I am trying to figure out how long I

19   have gone.  I think probably a solid hour.

20           THE COURT:  Okay.  Fair enough.  Thank you for

21   sharing that.  I am not going to hold you to that, I just

22   wanted to get an idea.

23           Ladies and gentlemen of the jury, can you be back

24   here by 1:45?  Does that give you enough time?  Okay.  We will

25   stand in recess until 1:45.

Warner - Direct

1          You may now be seated.  We will let the jury go out

2     to get lunch first.

3               (Jury exits courtroom.)

4               (In open court; jury not present.)

5               THE COURT:  Now, the Defendant has filed a request

6     to have an instruction on the defense of necessity.  Does the

7     Government want to file a written response or would you just

8     prefer to handle that by argument sometime today?

9               MS. BLOCH:  I would prefer to handle it by argument

10    today, Your Honor.

11              THE COURT:  Okay.  Anything else before we break

12    for lunch on behalf of the Government?

13              MS. BLOCH:  Nothing, Your Honor.

14              THE COURT:  Defendant?

15              MR. CHONTOS:  No, Judge.

16              THE COURT:  Okay.  Marshals may remove the

17    Defendant.  See you after lunch.  Thank you.

18              (Lunch recess taken.)

19              (After lunch recess; on record in open court.)

20              THE COURT:  Everyone may be seated.  You may

21    continue your direct examination of the Defendant in

22    Defendant's case in chief.

23              MR. CHONTOS:  Thank you, Your Honor.

24                  CROSS-EXAMINATION (Continued)

25    BY MR. CHONTOS:

Warner - Direct

1    Q.    Mr. Warner, the next set of questions have to do with

2  Faith's mom and your interaction with her.

3              Did you get to learn and get to know Fawn Mills?

4    A.    Yes, sir.

5    Q.    Was that through primarily the relationship your

6  daughter had with Faith?

7    A.    Yes.

8    Q.    You were present when Fawn Mills testified earlier,

9  right?

10   A.    Yes.

11   Q.    Would you disagree with her characterization of your

12 relationship with her as good friends?

13   A.    Um, she -- Fawn is a -- I don't know how you explain

14 her or our relationship.

15   Q.    Well, did you help her out occasionally by giving her

16 some money?

17   A.    She borrowed money off me a couple times.

18   Q.    You say "borrow."

19   A.    Yes, sir.

20   Q.    Does that mean that she then paid you back?

21   A.    No, she never did.

22   Q.    What about food, did you give her food?

23   A.    Never.

24   Q.    What about the tobacco?

25   A.    Nonstop.

Warner - Direct

1    Q.   You guys shared that?

2    A.   Well, if she gives me about 30 bags of tobacco, we

3  would probably share.

4    Q.   Mr. Warner, when you gave Ms. Mills some money, it

5  sounds as though you weren't flush with money yourself?

6    A.   Sir, the last couple years when I lost my job and got

7  pushed into taking an apartment, I said I would never rent

8  ever again.  I was forced into it.  It was so hard because --

9  this is embarrassing to say -- but we were living on $225 a

10  month.

11    Q.   You and your daughter?

12    A.   Yeah.

13    Q.   Is that like after you paid the rent and utilities?

14    A.   When I got my apartment, I was trying to figure out how

15  to pay for it, we were looking at different apartments.  I

16  looked at that one, and they sent me a paper saying I was

17  approved to move in.  We had to have a criminal background

18  check done, we had to have --

19    Q.   All for Brandy Springs?

20    A.   Oh, yeah.

21    Q.   So eventually you got in there?

22    A.   Yeah.  Before we went in, they told me -- I told them I

23  couldn't move in for a month or so because I had to scrape up

24  the money.

25    Q.   Like a deposit?

Warner - Direct

1    A.    The rent and a deposit.

2    Q.    Eventually you got in there?

3    A.    Yes, I got something called a Section 10 or Section

4  something or another, which I never even heard of such a

5  thing, but here I end up moving in so I didn't have to pay

6  rent.

7    Q.    Do you recall having discussions with Faith's mom about

8  your desire and willingness to adopt Faith?

9    A.    Yes.

10   Q.    Why was -- what was your motivation for doing that?

11   A.    It wasn't mine, it was Faith came to me, her and

12  Brianna, and they said they wanted to be sisters.  Because

13  they were like sisters.  And she proceeded to tell me that she

14  had never had a dad and asked me if I would adopt her.

15        THE COURT:  Excuse me one minute.  We are all

16  watching the sequestration order that's in place I presume?

17        MR. CHONTOS:  Yes.

18        THE COURT:  Thank you.

19        MR. CHONTOS:  Thanks for being the eyes behind me,

20  Judge.

21  BY MR. CHONTOS:

22   Q.    Were you okay with that, adopting Faith?

23   A.    She is a real good girl, yes.

24   Q.    Did you communicate that willingness to her mom?

25   A.    I told Faith, I said, honey, your mom ain't going to

Warner - Direct

1    let me adopt you.  I says, you have your mom and stuff.  She

2    says, will you ask.

3                    MS. BLOCH:  Objection, Your Honor, hearsay.

4                    THE COURT:  Sustained.

5    BY MR. CHONTOS:

6    Q.    Did you approach Faith's mom?

7    A.    I approached Fawn and I said, the -- I, my words, I

8    told Fawn that her daughter had asked me to adopt her.

9    Q.    Okay.

10   A.    And Fawn said, let me think about it.

11   Q.    Okay.

12   A.    I was shocked.

13   Q.    Was there ever a point where you got word from Faith's

14   mom that, hey, I have thought about it and the answer is

15   yes/no?

16   A.    Never.

17   Q.    So that's how it was left?

18   A.    Yes.

19   Q.    Okay.

20   A.    She kept calling me up and --

21   Q.    Who?

22   A.    Fawn.

23   Q.    To talk about the adoption?

24   A.    She asked if she could move in with me.

25   Q.    Your response to that was no?

Warner - Direct

1    A.    No, and I told her, no, I had a place for her and her

2    children to move into.

3    Q.    There was some testimony, some evidence about a cell

4    phone and Faith.  Did you get Faith a cell phone?

5    A.    Not exactly.

6    Q.    Well, talk about the "not exactly" part.

7    A.    We ran a -- I had a couple different friends who didn't

8    have cell phones.  They had -- I got a thing through the mail

9    one day from Verizon saying I could get another phone put on

10   my thing for $10, it would only cost me $10, and they had a

11   thing where they could only call and talk to Verizon

12   customers.

13   Q.    Okay.

14   A.    That way it wouldn't cost me no minutes or nothing.

15   Q.    So did you go ahead and respond to that advertisement?

16   A.    Yes, I did.

17   Q.    Did you then get that third phone?

18   A.    Yes, sir.

19   Q.    The first phone was yours, second was your daughter's,

20   now you added a third phone, right?

21   A.    Yes.

22   Q.    Did you then give that phone to someone?

23   A.    Yes, sir.

24   Q.    Who?

25   A.    Marissa.

Warner - Direct

1    Q.    Marissa?

2    A.    Yes.

3    Q.    Mr. Cruz's daughter?

4    A.    Yes, sir.

5    Q.    Why would you give a phone to Marissa Cruz?

6    A.    They didn't have a home phone and she used the phone

7    to -- to see if we were home, she would call over to Brianna

8    before she walked all the way across town.  And about a week

9    later she gave me the phone back because she kept on losing

10   it.  And I told her I couldn't afford to replace it, and she

11   kept losing it, so she gave it back to me and I gave it to

12   Faith this time.

13   Q.    Now we have come full circle.  So the first person to

14   have this third phone was Ms. Marissa Cruz, right?

15   A.    Yes, sir.

16   Q.    Okay.  That didn't work out.  You then gave it to

17   Faith?

18   A.    Yes, sir.

19   Q.    How long did that last?

20   A.    She had the phone and her mom got mad at it because --

21   Q.    Mr. Warner, how long did that last?

22   A.    Three, four months.

23   Q.    At around this time did you know if Fawn Mills, Faith's

24   mom, had a cell phone?

25   A.    She didn't at the time.

Warner - Direct

1    Q.    Okay.  So you heard some testimony about, you know, a

2    blocking of the number.

3    A.    Right.

4    Q.    Do you recall that?

5    A.    Yes.

6    Q.    Do you have an explanation behind that?

7    A.    She didn't have a Verizon phone.

8    Q.    So the significance of that is?

9    A.    She had a Verizon phone.

10   Q.    Who?

11   A.    Fawn.  That was a home phone, the land line, however

12   you want to say it.  My cousin had it, he had Verizon.  That's

13   who she moved in with is my cousin.

14   Q.    Mr. Warner, if Faith's mom had a Verizon phone for

15   phone No. 3 to talk to another Verizon customer, I think you

16   indicated there would be no additional charge?

17   A.    Right.

18   Q.    So was the third phone that Faith had for a period of

19   time blocked?  Was it blocked so she couldn't communicate with

20   her mom?

21   A.    No.  No, she got something -- they call it -- I can't

22   remember what you call it, it is named after some president.

23   The president's phone where you get so many minutes free a

24   month.  And it's a free phone, cell phone.  She didn't have --

25   it wasn't Verizon.  A Verizon phone could not call this phone.

Warner - Direct

1    Q.    The person you are referring to that had this free
2  minute phone without a name was Faith's mother?
3    A.    Yes.
4    Q.    Before this third cell phone in your household going to
5  Faith, Faith spent overnights at your place?
6    A.    Yes, sir.
7    Q.    Would her mom occasionally call to talk to her daughter
8  while at the sleep-over?
9    A.    I always made her call her mom.
10    Q.    When you did that, did your household have what's
11  called a land line?
12    A.    No.
13    Q.    So Faith used, before the third cell phone, Faith used
14  your cell phone, right, to make that call?
15    A.    Mine or my daughter's.
16    Q.    Now, Mr. Warner, there was also some testimony from
17  Faith's mom about knocking on the door, things like that.  Do
18  you care to explain that?
19    A.    My daughter and Faith were at school and Faith was at
20  my house a lot.  She would probably go home two days a week.
21  She -- her and Brianna had a volleyball thing to go to.  My
22  daughter was into a lot of things.  Volleyball, they had to go
23  to.
24         Well, instead of going to volleyball, she had got
25  off the school bus at home.  Well, nobody had seen her for a

Warner - Direct

1    couple of days.  Brianna called down to their home and asked,

2    you know, asked about her.

3       Q.   So as a result of that phone conversation did that

4    prompt you to do something?

5       A.   Yeah.

6       Q.   What did you do?

7       A.   We were invited over to their house.

8       Q.   Did you go over?

9       A.   We walked clear across -- it's clear across the side of

10   town we are on and we walked in the rain all the way across.

11      Q.   How long of a walk?

12      A.   Mercer -- the only way I can explain it is Mercer is on

13   top of a hill.  On this side of the hill is where we lived.

14   They lived down on the other side of the hill on the opposite

15   side of town on kind of like toward the top of the hill.  So

16   we had to go from the bottom of the hill, go across, the top,

17   go across, and come down to their house.  It was quite a walk.

18   I would say one, two, three, probably, I am guessing, nine,

19   ten blocks.  And it was, you know --

20      Q.   Now, Mr. Warner, was there a time where Faith's mom

21   talked to you about Mr. Cruz?

22      A.   A few times.

23      Q.   Why don't you tell us about the most significant of

24   those conversations you had with Faith's mom.

25      A.   It was brought to my attention, the girls had said that

Warner - Direct

1   they had found something.

2            MS. BLOCH:  Objection, Your Honor.

3            THE WITNESS:  And I wanted to see --

4            THE COURT:  Sustained.

5   BY MR. CHONTOS:

6    Q.    You had a discussion --

7    A.    Let me rephrase that.  The girls found something and

8   brought it to me.  When they brought it to me, they found --

9    Q.    What did you see?

10   A.    A folder that they had downloaded somehow or another

11  off of Cruz's computer.

12   Q.    What was on that folder?

13   A.    It was pictures of some guy, which later on, I didn't

14  know who it was at that time, I found out it was that guy from

15  California.  And --

16   Q.    What was he doing?

17   A.    He was holding Margie up -- having her picture taken

18  and he had his hand between her legs like that there and she

19  had her arms around his neck and giving him a kiss on the

20  cheek.

21   Q.    Was Margie in that photo naked?

22   A.    She was in her underwear.

23   Q.    So you had a conversation with Faith's mom about that

24  discovery?

25   A.    When they --

Warner - Direct

1   Q.   Mr. Warner, it is a relatively simple question.  Did
2   you have a discussion -- hold on, we can't both talk at the
3   same time.
4        When you gained that information, did you have a
5   discussion with Faith's mom about that?
6   A.   Yes.
7   Q.   Did you take any action as a result of that discussion
8   with Faith's mom?
9   A.   I made her come down and see for herself.
10  Q.   Did you then show Faith's mom that?
11  A.   Yes.
12  Q.   Was there another discussion that you had with Faith's
13  mom, topic being Mr. Cruz?
14  A.   Yes.
15  Q.   Can you tell me, days or weeks apart from the first
16  one?
17  A.   We had -- we talked about -- man, it's so hard.  We
18  talked about Mr. Cruz a lot.  They got -- she had got on
19  something, I don't know what you call it, on the computer and
20  she showed it to me.  It was a printout.
21  Q.   During that conversation, Mr. Warner, did you tell her
22  that, hey, before you accuse someone, you need some proof?
23  A.   I told her that -- just what I was told.
24  Q.   No, my question is, during a conversation with Faith's
25  mom did you tell her that, hey, before you make an accusation,

Warner - Direct

1    you need to have some proof?

2      A.    No.

3      Q.    Did you tell her that your kids have been molested

4    twice and if it happens a third time you will lose your

5    children?

6      A.    No.

7              MS. BLOCH:  Objection, Your Honor, leading.

8              THE COURT:  Sustained.

9              THE WITNESS:  No.

10   BY MR. CHONTOS:

11     Q.    What did you say to Faith's mom after Faith told you

12   what was going on?

13     A.    When she came down and I showed her the pictures, I did

14   not know that Faith had been molested twice.

15     Q.    You learned that in that conversation?

16     A.    Yes, sir.  She -- when I showed her them pictures, she

17   said to me, she said, oh, my God, oh, my God, she says, you

18   have to let me handle this --

19             MS. BLOCH:  Objection, Your Honor, hearsay.

20             THE COURT:  Sustained.

21             THE WITNESS:  You --

22   BY MR. CHONTOS:

23     Q.    Mr. Warner, you have a question.  So Faith's mom sees

24   this stuff and you -- are you in a position to observe her

25   reaction?

Warner - Direct

1    A.    Yes, sir.

2    Q.    How would you characterize her reaction to seeing that

3    stuff?

4    A.    Shocked.

5    Q.    Okay.  As a result of you seeing this woman that's

6    shocked, what do you do?

7    A.    I told her that I felt that she should take what the

8    girls had found and she should take it to someone and show it

9    to them.

10   Q.    Did you give any suggestions?

11   A.    No, I -- I told her that I contacted CYS and they said

12   they had to have proof.  And I told her I felt this here would

13   be proof enough, even though it wasn't -- there was no -- but

14   what the girls got, there was no nudity on it.  It was -- all

15   the girls are playing, they were dressed in weird clothes.  It

16   was like -- the only way I can explain it is the clothes were

17   like -- like something you would see from the circus.  Like

18   somebody would wear that would maybe like be walking the

19   tightrope or something weird like that.  And there was a bunch

20   of them.

21   Q.    That, how you have described that like circus clothing,

22   that was in that folder that the girls saw and then Faith's

23   mom saw?

24   A.    Yes, sir.

25        MS. BLOCH:  Objection, there has been no reference

Warner - Direct

1    to a folder.

2         THE COURT:  Sustained.  You may lay some foundation

3    if you wish.

4         THE WITNESS:  The folder --

5    BY MR. CHONTOS:

6    Q.   First of all, you can only respond to questions.

7         When the girls -- when you called Faith's mom down

8    to your house, you showed her something, right, or the girls

9    showed her something, right?

10   A.   Yes, sir.

11   Q.   What was shown to Faith's mom?

12   A.   I sat her down and showed her the pictures and the

13   movies.

14   Q.   Those came from what source?

15   A.   Cruz's laptop.

16   Q.   Now, Mr. Warner, did you have any interaction with

17   Harley's mom?

18   A.   Sometimes.

19   Q.   Can you -- tell us in a general sense where in the

20   circumstances of your interaction with Harley's mom?

21   A.   My daughter met Harley at preschool when they were

22   four.  They became real good friends.

23        During that time Harley had birthday parties and

24   Brianna had birthday parties and the girls would go back and

25   forth like that.

Warner - Direct

1   Q.   So is that the sum and substance of your relationship
2   with Harley's mom is school related activities?
3   A.   Yeah, pretty much, and going to drop Brianna off there
4   to play or vice versa.
5   Q.   Sure.   What about your interaction with Margie's mom?
6   A.   I didn't know her.
7   Q.   Okay.
8   A.   I met her just like to drop her daughter off and pick
9   her up.
10   Q.   On a scale of things, limited contact with Margie's
11   mom, a little more contact with Harley's mom, the most contact
12   with Faith's mom, is that right?
13   A.   Pretty much.   Harley's mom came a few times into the
14   house and would sit and talk.   She -- Faith -- Harley quit
15   coming around.   We took -- the girl had never been to a fair,
16   amusement park, never seen fireworks, nothing.   There they
17   were, they didn't live -- they moved away for awhile.   Harley
18   kept writing Brianna.   They moved to Florida.
19   Q.   Okay.
20   A.   But we took Harley everywhere we went, to fairs and
21   stuff like that.
22        Mrs. whatever her name was, she just got married,
23   but her mom would get upset because they have a boy also and
24   we wouldn't take him.
25   Q.   Harley has a brother?

Warner - Direct

1    A.   Yes.

2    Q.   Okay.

3    A.   And I couldn't afford to take the both of them.  So on

4  the phone the one day my wife was pretty upset about it,

5  Harley couldn't go and I think it was Kennywood, I think it

6  was, I may be wrong, but we were supposed to go somewhere and

7  Harley couldn't go because we wasn't paying for her brother to

8  go.  So my wife made a comment about it and the answering

9  machine picked up on it and from that time on Harley was not

10  allowed to come around Brianna no more.

11    Q.   Sir, I want to take you to your interaction with law

12  enforcement.  First time you have interaction with Agent

13  Carter, February of 2012?

14    A.   15th, yes.

15    Q.   Where was that contact?

16    A.   Cell phone.

17    Q.   Did he call you?

18    A.   Yes.

19    Q.   Did you arrange a meeting?

20    A.   I thought it was a joke.

21    Q.   Did you arrange a meeting?

22    A.   No.

23    Q.   How long did the conversation last?

24    A.   A few minutes.

25    Q.   At the end of the conversation what happened?

Warner - Direct

1    A.   I told him, I said, Brian, quit screwing around.

2    Q.   Who?

3    A.   A friend, my cousin, friend.  My mom has a cell phone.

4    Q.   You did too, right?

5    A.   No, not at the time.

6    Q.   So February, 2012, you did not have a cell phone?

7    A.   No.

8    Q.   Okay.

9    A.   I took and -- my mom has a cell phone, which it's not

10   under her name.

11   Q.   So you have this -- Mr. Warner, you have this cell

12   phone one day and it rings and you answer it, right?

13   A.   I'm in the car and my mom's cell phone rings.

14   Q.   You answer it?

15   A.   She asked me to answer it, yes.

16   Q.   The voice on the other side identifies himself as an

17   FBI agent?

18   A.   Yes, sir.

19   Q.   You essentially thought it was a joke?

20   A.   Yes, sir.

21   Q.   At some point after that cell phone did you realize

22   that it wasn't a joke?

23   A.   No, not really.

24   Q.   At some point after that cell phone conversation did

25   you have a face-to-face meeting at your house there in Brandy

Warner - Direct

1    Springs with Agent Carter?

2        A.    Yes, sir.

3        Q.    Was that like a day or two after the cell phone call?

4        A.    No.

5        Q.    Later that day?

6        A.    I'm guessing maybe, I don't know, anywhere from a half

7    hour to an hour.

8        Q.    So 30 minutes, 60 minutes later after you hang up on

9    the cell phone Carter is on your doorstep?

10       A.    I was buying groceries at the time.

11       Q.    Mr. Warner, that's a pretty simple question.

12       A.    When I got home --

13       Q.    Mr. Warner --

14       A.    I got out of the car --

15       Q.    Mr. Warner, 30 to 60 minutes after you hang up the cell

16   phone you have a face-to-face with Mr. Carter, right?

17       A.    Yes, sir.

18       Q.    You talked to him maybe half hour, 45 minutes?

19       A.    I would say 45 minutes to an hour.

20       Q.    Is it fair to characterize the topic discussed at that

21   February, 2012, meeting is Armando Cruz?

22       A.    Yes, sir.

23       Q.    He's asking you questions about what you knew about

24   him?

25       A.    No.

Warner - Direct

1    Q.   He's asking you questions about --

2    A.   He didn't say nothing.

3    Q.   Does he ask you -- well, he had to say something, you

4    just didn't look eye-to-eye for 45 minutes, right?

5             MS. BLOCH:  Objection, leading.

6             THE WITNESS:  There was some guy --

7             THE COURT:  Overruled.  Go ahead.

8             THE WITNESS:  There was some guy with him.  He was

9    talking.

10   BY MR. CHONTOS:

11   Q.   All right.  During that discussion with Mr. Carter's

12   fellow law enforcement officer the topic discussed was Armando

13   Cruz?

14   A.   Yes, sir.

15   Q.   Any other topics?

16   A.   No, not really.

17   Q.   Did your daughter's name in connection with Armando

18   Cruz come up in that February --

19   A.   No.

20   Q.   Okay.

21   A.   Not -- they had informed me that they had been to my

22   apartment earlier and they thought I was in there and wondered

23   why I wasn't answering the door.  So they came in and looked

24   for me.  And I wasn't home.  I was gone.

25   Q.   This is in February?

Warner - Direct

1    A.   February 15th.

2    Q.   Okay.  I want to transition to April.  Two months

3    later, early part of April.  Did you have a second opportunity

4    to be in a room at the Mercer police barracks with Agent

5    Carter and a state trooper?

6    A.   Yes, sir.

7    Q.   There was a series of phone calls back and forth to

8    arrange you coming to the Mercer barracks, right?

9    A.   Yes, sir.

10   Q.   You got to the Mercer barracks, right?

11   A.   Yes, sir.

12   Q.   Your mom drove you?

13   A.   Yes, sir.

14   Q.   She parks outside.  The two of you walked in, right?

15   A.   Right.

16   Q.   You approach the desk sergeant --

17           MS. BLOCH:  Objection, leading.

18           MR. CHONTOS:  Judge, is it really significant?

19           THE COURT:  Overruled.  Go ahead.

20   BY MR. CHONTOS:

21   Q.   You approach the desk sergeant, for lack of a better

22   phrase, say, hey, I'm Earl Warner, I am here for an interview?

23   A.   Yes.

24   Q.   A period of time passes, and Trooper Owen comes out and

25   chats with you, right?

Warner - Direct

1    A.   Yes, sir.

2    Q.   He introduces himself?

3    A.   Yes, sir.

4    Q.   What do you say?

5    A.   I told him who I was and told him, I says, I'm sorry, I

6    came a little bit earlier than I -- I showed up a little bit

7    early.  I asked him, I told him, I would like to have a lawyer

8    present.

9    Q.   You continued walking in?

10   A.   He asked me to empty my pockets.

11   Q.   Do you?

12   A.   Yes.  All I had was some change and a pair of

13   fingernail clippers.

14   Q.   Okay.

15   A.   He took the fingernail -- no, I take that back.  I

16   think I may have had a little pen knife.  I can't remember.  I

17   won't say for sure.  But he took the fingernail clippers.  And

18   he said something to me, which I can't remember what it was,

19   and I told him, I says, again I repeated, I would like to have

20   a lawyer present.  And he took me to a back room.

21   Q.   So he escorts you back to an internal office?

22   A.   Yeah, we went like back and went through a hallway and

23   come clear back to the front of the building.  And he took me

24   into an office where --

25   Q.   Mr. Carter was there?

Warner - Direct

1    A.    Yes, sir.

2    Q.    Did you recognize Mr. Carter from that prior meeting in

3    February?

4    A.    Not right off.  But I --

5    Q.    Pretty soon thereafter?

6    A.    But I didn't have to because I was told ahead of time,

7    I was asked if he could be present, and I said that would be

8    fine.

9    Q.    So you have two agents, two law enforcement officers,

10   and you, you are in a room, right?

11   A.    Yes.

12   Q.    You sit down, they sit down?

13   A.    No.  I didn't sit down at first.  I was surprised.

14   Q.    What were you surprised about?

15   A.    There was a -- oh, it's one of them boards that you

16   take magic marker and write on.

17   Q.    So it is not a chalkboard?

18   A.    No.  This is --

19   Q.    What color is the board?

20   A.    White.  There was a thing on there, it looked like a

21   family tree is the only way I can explain it.  Like where the

22   first is on top and it goes down and it had -- it had a

23   person's name, where they're from.  It came down and it had

24   some number.  Then it came down and there was some guy's name.

25   There was some location, 96 kids.  It came down and it hit

Warner - Direct

1    Cruz.  And that thing came down and it said -- I can't

2    remember if it was 12 or 14 kids.

3              Then there is a thing that came down and there was

4    my name and it said, I believe it said two kids.

5    Q.   Did you have a reaction to seeing that family tree with

6    your name part of the tree?

7    A.   Hell yeah.  Especially in a law enforcement thing,

8    yeah.

9    Q.   Did you show that surprise to the two law enforcement

10   officers?

11   A.   I don't know.

12   Q.   Okay.  So you make that observation.  Do you then

13   eventually sit down?

14   A.   Yes.  Up against the wall right underneath that board.

15   Q.   So the white board is behind you?

16   A.   Yes.

17   Q.   Does questioning begin?

18   A.   Not right away.

19   Q.   Did they introduce themselves?

20   A.   The -- I am sorry about their names, Owens.

21   Q.   Owen?

22   A.   Said to me, he said, this is -- he introduced me to

23   him, the FBI agent, and I said, yeah, I know him.

24              And then he proceeded to tell me that I was not

25   under arrest, that they just had a few questions for me and

Warner - Direct

1  that I would be free to go and he informed me that I was not

2  being, no matter what, I can say whatever I wanted to because

3  that day I was not being arrested.

4     Q.   So you were going to be free to go?

5     A.   Huh?

6     Q.   You were free to go at the end of the interview?

7     A.   Yeah, that's what he said.

8     Q.   Okay.  Did the questioning then start?

9     A.   Yes, sir.

10    Q.   Did the questioning, the first part of the questioning,

11 was it any like show-and-tell or was it just questioning?

12    A.   Questioning.

13    Q.   Did it then segue, transition to the officers actually

14 showing you things?

15    A.   Yes, sir.

16    Q.   What did they show you?

17    A.   The -- they showed me pictures and stuff like that.

18    Q.   Did they ask you who took the pictures?

19    A.   Yes, sir.

20    Q.   Did they ask you, did you, Earl Warner, take the

21 pictures?

22    A.   Yes, sir.

23    Q.   Did you have a response to their question, hey, who

24 took these photos?

25    A.   One they showed me I told them I didn't know.

Warner - Direct

1    Q.   As you sit here today, was that the truth?

2    A.   Yes, sir.

3    Q.   Is that the truth for all of those photos?

4    A.   No.

5    Q.   Let me ask some questions about that.  So the photos

6    that are part of this case, some of them you took?

7    A.   Yes, sir.

8    Q.   Do you know who took some of the ones that you didn't,

9    do you know who took those?

10   A.   The girls.

11   Q.   During that interview was there a showing of a

12   videotape?

13   A.   Yes.

14   Q.   Was that done on like a computer?

15   A.   Yes.

16   Q.   Did you see the whole videotape or what you were led to

17   believe was the whole videotape?

18   A.   I thought so.

19   Q.   Do you have any idea how long the tape was that you

20   watched?

21   A.   I'd say, I don't know, two and a half, three minutes.

22   I don't know.

23   Q.   The tape that you saw, was there background music in

24   it?

25   A.   Yes.

Warner - Direct

1    Q.    At a certain point into the tape was there a -- some

2    words spoken, direction given to the girl in the tape?

3    A.    Yes.

4    Q.    Well, is the person giving those directions you?

5    A.    Yes, sir.

6    Q.    Did the question and answer session then pretty much

7    wind up after that videotape was shown or was there some more

8    questions?

9    A.    That video was more toward the end.  I was shown other

10   pictures, not some -- the room I was in was real small.  There

11   was a -- the only way I can explain it is when you walked in

12   the door, here's a desk here and there's a big, I think they

13   call them, a lateral --

14   Q.    Lateral file cabinet?

15   A.    Yeah, where the drawers, the things slide out like

16   that, if that's what you call them, on this side.

17          There was a desk here.  Then the desk sat like this

18   (indicating).

19          There was another smaller desk or something sitting

20   like that behind that desk (indicating).

21   Q.    Creating an L?

22   A.    Yeah.  And Mr. Carter was running the computer and he

23   was in a chair with wheels and he would shoot over to that

24   there and shoot back.  Then the Owens, he sat in another chair

25   in front of the desk.

Warner - Direct

1    Q.    Start to finish, how long were you in there?

2    A.    I would say maybe an hour, maybe more, a little bit

3    more.  Not much more.

4    Q.    How did the interview end?

5    A.    Well, a couple different times I asked for a lawyer.

6    Every time I did, it was just like it was being ignored.  And

7    I could stand up.  Every time I would stand up, Mr. Owens

8    would stand up.  And he took and -- I was asked some question,

9    and I don't know what it was, I can't remember what the

10   question was exactly, but when I answered the question,

11   Mr. Owens said, I'm sick of the hmm hmm hmm lying, and stood

12   up and grabbed the chair and threw it up off the wall.

13   Q.    In your answer there you kind of like didn't say what

14   Mr. Owens said.  Knowing the subject matter we're here about,

15   I think we can all deal with the language, the actual language

16   that was used.  So why don't you share with us actual

17   language.

18   A.    He just said, I'm sick of all the goddamn lying -- I

19   don't like to use that -- but I am sick of the goddamn lying

20   going on here, and he picked up the chair and he threw it, and

21   it hit probably shoulder level between the desk and there was

22   a little piece that come out and the door.

23   Q.    Did you have a reaction to that?

24   A.    Yeah.  Shocked.

25   Q.    What was your reaction?

Warner - Direct

1    A.    Shocked me.  I was scared.

2    Q.    So you're scared.  You get up and leave?

3    A.    No.  Mr. Owens was there in front of me.  And I -- in

4    my mind it was like I am watching that TV show, good cop, bad

5    cop.

6    Q.    Who was the good cop?

7    A.    This gentleman here.

8    Q.    Who was the bad cop?

9    A.    Mr. Owens.

10   Q.    Did Mr. Owens ever leave the room?

11   A.    He stormed out of the room.  And when he did -- and I

12   kept thinking in my head, I don't think he meant to throw the

13   chair the way he did, I think he meant to take the chair and

14   throw it up against the wall, you know, back to where it was

15   setting.  I think it slipped out of his hands is what happened

16   and that's when it went flying.  But he went out and what he

17   did, the FBI agent came from behind the desk and picked the

18   chair up and sat where the state cop was sitting.

19   Q.    From that position questioning started again?

20   A.    He told me that, he said, you know what, he said,

21   here's what we are going to do.

22   Q.    This is Agent Carter talking to you?

23   A.    Yes.  He said that if I -- the judges and stuff from

24   the courthouse down here would look favorable on me if I do

25   whatever I could to help them with Cruz and just tell the

Warner - Direct

1    truth about stuff.

2        Q.   All right.  How long was Officer Owen out of the room?

3        A.   Long enough for the FBI agent to talk, probably tell me

4    a couple different things.  And he said that, he stood up and

5    he went out.  He said, would you like to have something to

6    drink?  And I said, please.  And he went out for a couple

7    minutes.  And when he came back, he brought me a Coke.

8        Q.   Who did?

9        A.   The FBI agent.  He brought me something to drink, which

10   was nice because by that time my throat was -- I was so scared

11   I was just dry.

12       Q.   You left the interview room at some point?

13       A.   Yes.

14       Q.   How did the interview end?

15       A.   We sat there and they went back and they both came back

16   in -- well, I don't know why, I can't remember why it has been

17   so long now --

18       Q.   Well, Mr. Warner, who decided to end the interview, you

19   or the agents?

20       A.   Well, first the state cop left again.

21       Q.   Okay.

22       A.   When he did, when the door was open, the FBI agent

23   said, this is -- they said something about -- he said, I will

24   have copies of this disk made and make sure you get them, he

25   told the state police officer.

Warner - Direct

1          And then the weird -- something real weird
2   happened.

3      Q.   What was so weird?

4      A.   He took both CDs and I'm sitting right there, he sat
5   them right on the corner of his desk, and he stepped out of
6   the room for a minute.

7      Q.   Okay.  So he steps out, Agent Carter leaves the room?

8      A.   Yes.  After he said, these are the only two disks there
9   was.

10     Q.   I am going to ask some follow-up.  Agent Carter leaves
11  the room, right?

12     A.   (Witness nods head.)

13     Q.   You need to answer.

14     A.   Yes.

15     Q.   The only one in the room is you?

16     A.   Yes.

17     Q.   Right before Agent Carter left the two evidence disks,
18  for lack of a better phrase, are within your grasp?

19     A.   That close.

20     Q.   Did you do anything with them?

21     A.   No.

22     Q.   Eventually the officers come back in and how did the
23  interview terminate?  How did it end?

24     A.   They said something to me, and I don't know what it
25  was, but it got me fired up.  Something about -- it was

Warner - Direct

1   something, it was a stupid question, and he asked -- he asked

2   me -- they called me a liar about it, and it was a common

3   question.  I got fired up and I said, I have had enough of

4   this.  I said, I'm leaving.

5       Q.   Looking back on things, they were right, weren't they,

6   Mr. Warner, calling you a liar?

7       A.   For the questions they asked me at that time, no.

8   There was questions -- if -- how will I put this?  If I would

9   have had a lawyer -- I have never been in trouble in my life.

10  I have never been around the police.

11      Q.   Well, Mr. Warner --

12      A.   I was scared --

13      Q.   Mr. Warner, haven't you had a DUI or two?

14      A.   Yes, but I didn't deal with the cops other than --

15      Q.   But when you say the phrase, "I have never been in

16  trouble," you were arrested?

17      A.   I had a DUI years ago and I had -- prior to that there

18  I had a public drunkenness.

19      Q.   So you know why I asked those questions because out of

20  your mouth came the phrase, "I have never been in trouble."

21      A.   Well, I mean, I have never been in jail or nothing.

22      Q.   Okay.  So interview terminates and you leave, right?

23      A.   Yes, sir.

24      Q.   You and your mom leave the barracks and go home?

25      A.   Yeah.  When we left, the first thing I did was I called

Warner - Direct

1  my brother up and told him about what happened.

2     Q.    All right.  Sir, I want to transition to your camera.

3  You indicated earlier where you bought it and things like

4  that.

5     A.    Yes.

6     Q.    Was that the only camera in your household there on

7  Brandy Springs?

8     A.    Yes.  We had a -- there was another one there, but it

9  didn't work.

10     Q.    Did you keep that camera in a special place?

11     A.    We kept it in the kitchen, on the top shelf in the

12  kitchen beside -- in a cupboard beside the refrigerator.

13  That's where we kept stuff like our spare change and stuff,

14  you know.

15     Q.    How high up the wall is the camera kept?

16     A.    You would have to open the cupboard up and it would be

17  like that.  (Indicating).

18     Q.    All right.  During your interaction during this time

19  period, did you see Faith use the Canon camera?

20     A.    Yeah -- did I see her use the camera?

21     Q.    Yes.

22     A.    Yes.

23     Q.    Did you see Harley use the camera?

24     A.    Yes.

25     Q.    What about Margie?

Warner - Direct

1    A.    I don't remember.  I don't think so.

2    Q.    What about your daughter?

3    A.    I could be wrong.

4          Yes.  Yes, she got in trouble because she had it in

5    the bathroom, and I got mad because I was afraid that she

6    would get -- drop it in the sink or something and get it wet.

7    That camera was like $400.

8    Q.    Mr. Warner, when Margie was present at your place --

9    A.    Yes.

10   Q.    -- was there ever a time when Margie was there without

11   Faith?

12   A.    Never.

13   Q.    Those two were always together?

14   A.    Yes.  They fought like cats and dogs, because they

15   was -- like family do, you know, I am sure, but they would --

16   there was a lot of hostility there because all the medicine.

17   Q.    Hostility between who?

18   A.    Faith and Margie and the two mothers.

19   Q.    Now, Mr. Warner, at a certain point you had a

20   discussion with Faith about getting back at Armando, right?

21   A.    Yes, sir.

22   Q.    Did Faith tell you, we need to stop what Armando is

23   doing?

24         MS. BLOCH:  Objection, Your Honor.

25         THE COURT:  Sustained.

Warner - Direct

1          MR. CHONTOS:  Judge, it's -- I am curious as to the

2    basis.

3          MS. BLOCH:  Well, it's calling for -- you are using

4    the statement.  It is calling for him to speculate about a

5    statement that would otherwise be hearsay.

6          MR. CHONTOS:  It is not hearsay, Judge, because

7    this witness already testified to the same thing, so it is now

8    corroboration of what that witness said.

9          MS. BLOCH:  The attorney is testifying --

10          THE COURT:  I sustain the objection.

11   BY MR. CHONTOS:

12   Q.   Did --

13   A.   Excuse me.

14   Q.   No.  What?

15   A.   I have a question for the Judge.

16   Q.   I am going to move on here, Mr. Warner.

17          Mr. Warner, did you come to learn that your

18   daughter was part of Mr. Cruz's collection of photos?

19   A.   Not until February 23rd of 2012.

20   Q.   Your source for that was one of the agents?

21   A.   No.

22   Q.   What was your source?

23   A.   They came to my house and --

24   Q.   Who is "they?"

25   A.   A Mercer Borough police officer and some lady from CYS,

Warner - Direct

1    Child and Youth Services I think it would be.

2    Q.   Mr. Warner, was there -- I know you indicated earlier

3    there was a plan that you had and you had some helpers.  Tell

4    us, you know, what your plan was to get back at Mr. Cruz.

5    A.    They took and -- it was brought up about trying to get

6    pictures that was taken at the house.  When I asked what kind

7    of pictures, we talked about the pictures that had the --

8    where they were wearing them outfits and stuff.  They said,

9    no, that there was pictures taken in his bedroom.

10   Q.    Okay.

11   A.    And --

12   Q.    Well, Mr. Warner, what was your plan?

13   A.    To get our hands on the pictures.

14   Q.    To get your hands on what pictures?

15   A.    The nude pictures with something, as the kids were

16   explaining it, something pink in it.

17   Q.    Were they Cruz's pictures?

18   A.    Yes, sir.

19   Q.    What was your -- what were the steps that were going

20   through your mind in order to accomplish that goal?

21   A.    What was planned out of it was that pictures were

22   taken.  Those pictures, Harley was going to show one or two of

23   them, well, to Mr. Cruz and say she wanted to trade some of

24   them for some of the other ones.

25                And when that happened, I was going to take -- and

Warner - Direct

1    she was going to slip me that disk and I was going to give her

2    a blank to give to him.  Then that way he wasn't getting

3    nothing and then we would destroy that plus the one that Cruz

4    had.  The ones we got from Cruz, we were going to use them to

5    take to the police.

6    Q.    The plan was a little short in the execution, right?

7    A.    We were outsmarted.

8    Q.    By who?

9    A.    Mr. Cruz.  He beat us to the punch line.  Before we

10   could do anything, he stole the pictures that was going to be

11   offered and which we didn't even know that he had taken.

12         MR. CHONTOS:  Thank you.  The Government's lawyer

13   might have some questions for you.

14         THE COURT:  Do you have any questions?

15         MS. BLOCH:  I do.

16         THE COURT:  You may proceed.

17                    CROSS-EXAMINATION

18   BY MS. BLOCH:

19   Q.    Mr. Warner, I am going to start by asking you questions

20   about the plan.

21   A.    Okay.

22   Q.    You tell me what your plan is.  It's not clear to me

23   that I have got that.  You are going to take pictures, sexual

24   pictures of these children, correct?  The plan is you, Earl

25   Warner, is going to take sexually exploitive pictures of these

Warner - Cross

1  girls?

2     A.    We were going to trade pictures for pictures.

3     Q.    The plan was you were going to take pictures of the

4  girls, which you did?

5     A.    Yes.

6     Q.    You took a lot of them?  221 I believe?

7           MR. CHONTOS:   Judge, one question at a time I think

8  is fair to the witness.

9  BY MS. BLOCH:

10    Q.    You took a lot of pictures?

11    A.    I took some of them.

12    Q.    Mr. Warner, there are 221 pictures and three videos.

13    A.    I don't care if there are 5,000.  I said I took part of

14  them.

15    Q.    So your plan was to take sexually exploitive pictures

16  of these children --

17          MR. CHONTOS:   Objection, it has been asked and

18  answered.

19          THE COURT:   Overruled.  We are on

20  cross-examination.

21  BY MS. BLOCH:

22    Q.    Then you were going to take those pictures, sort of,

23  you were going to try to barter with Mr. Cruz for his

24  pictures, but not really give him your pictures, you were

25  going to give him a blank?

Warner - Cross

1     A.    Right.

2     Q.    So then you really didn't need to take pictures of the

3   girls if the intention was to give Mr. Cruz a blank?

4     A.    If I stood there and didn't show you a picture of what

5   was supposed to be on the CD, would you take it?

6     Q.    Mr. Warner, you want these jurors to believe that your

7   tears for these children are real and then yet you stuck your

8   hand in the vagina of these girls and took a picture of it and

9   expect them to believe that this was all part of your plan to

10  get Mr. Cruz?

11    A.    First of all, I think if you look back and -- which

12  some of the other people that came to testify, there was a cut

13  and there was bleeding and I was asked to put medicine on it

14  and, yes, I did.

15    Q.    Mr. Warner, you would agree with me that there are

16  multiple images of your hand or a video of your hand --

17    A.    Yes.

18    Q.    -- abusing Faith's vagina?

19            MR. CHONTOS:   Judge, we will object to the phrase

20  "abuse."

21            THE COURT:   Sustained.   You may rephrase.

22  BY MS. BLOCH:

23    Q.    You would agree with me, would you not, that you are

24  manipulating her vagina with your hand?

25    A.    I touched it, yes.

Warner - Cross

1    Q.    You will agree that there's no blood anywhere?

2    A.    No.

3    Q.    And you are not applying medicine?

4    A.    Pardon me?

5    Q.    And you are not applying medicine?

6    A.    There was medicine.

7    Q.    You are going to suggest in each of those pictures

8    where your hand is touching her that you were applying

9    medicine?

10    A.    I think if you look at her testimony, she will -- she

11    said that she came to me and asked me to put medicine on her a

12    few different times, yes.

13    Q.    I do believe, Mr. Warner, that the jurors and I were in

14    the room when she was testifying, as you were, and she

15    indicated there was never an occasion on which she was

16    bleeding, but that she had a rash from shaving her pubic area

17    because you told her she should?

18    A.    I never told her that she should.  That was never asked

19    of me.

20    Q.    You never told the agents that the girls or you made

21    fun of her that she was a gorilla?

22    A.    I never said that.  And that's gross.  As a matter of

23    fact, I never even heard that saying or anything like that

24    until today.

25    Q.    Your daughter shaved her pubic area too, didn't she?

Warner - Cross

1    A.   I don't know.  I don't believe so.

2    Q.   Did you have Harley shave her pubic area?

3    A.   No.  I had none of them shave.

4         MS. BLOCH:  Ms. Wikert, if you could pull up

5    Exhibit 117A.

6         THE COURT:  What was the number again, please?

7         MS. BLOCH:  117A.

8    BY MS. BLOCH:

9    Q.   Mr. Warner, you will agree with me that this is young

10   Margie, she's 11 years old, and she's on your bed partially

11   dressed now on your quilt?

12   A.   Yes.

13        MS. BLOCH:  120A.

14   BY MS. BLOCH:

15   Q.   Margie again on your bed?

16   A.   Yes.

17   Q.   She looks pretty unhappy, huh?

18   A.   Bored, yep.

19   Q.   Bored?

20   A.   Bummed out, yes.

21        MS. BLOCH:  Let's look at 124A, please.

22   BY MS. BLOCH:

23   Q.   Margie?

24   A.   Yes.

25   Q.   On your bed standing there?

Warner - Cross

1    A.    I think so.

2    Q.    She looks pretty sad in this photo, wouldn't you agree?

3    A.    I can't see her face.

4    Q.    Look a little closer, please.

5    A.    All I can see is her left eye.

6          MS. BLOCH:  125A, please.

7  BY MS. BLOCH:

8    Q.    Mr. Warner, is Margie taking off her clothes on your

9  bed?

10   A.    Yes.

11         MS. BLOCH:  127A.  Judge, I think this -- is this

12 video on?  Mr. Chontos, if you could please turn the video.

13         MR. CHONTOS:  Why?

14         MS. BLOCH:  Because there are people in the

15 background, we were turning them so they wouldn't have to see

16 it.

17         THE COURT:  I thought we had an agreement.  Lisa,

18 would you go make sure those two back monitors are off.

19         MS. BLOCH:  I believe those are off.

20         MR. CHONTOS:  Yes, these ones are.

21         MS. BLOCH:  Like the one with Agent Carter, we had

22 it twisted.

23         THE COURT:  Why don't you turn your screen.  Thank

24 you.

25         MS. BLOCH:  I am sorry, what was the last one I

Warner - Cross

1    called?

2    BY MS. BLOCH:

3      Q.   Margie, Mr. Warner?

4      A.   Yes.

5      Q.   You took that picture, didn't you?

6      A.   No.

7            THE COURT:  You can take it down.

8            MS. BLOCH:  137A.

9    BY MS. BLOCH:

10     Q.   You took that picture, Mr. Warner, didn't you, to get

11   even with Mr. Cruz?

12     A.   No.

13           MS. BLOCH:  Look at 139A.

14   BY MS. BLOCH:

15     Q.   That one?

16     A.   No.  To save you a lot of time, Margie herself, I never

17   took a picture of Margie.

18     Q.   I am sure you heard Margie's testimony in court?

19     A.   I did.  Faith, I did take pictures of her.  Margie, I

20   did not.

21           MS. BLOCH:  Let's go straight to 215A, please.

22   BY MS. BLOCH:

23     Q.   I believe this is the picture that on April 3rd,

24   2012, you advised Agent Carter and Trooper Owen that was your

25   hand, am I right?

Warner - Cross

1    A.    No.

2    Q.    That is the image that they showed you, correct?

3    A.    No.  That's what I am saying, no.

4    Q.    Did they show you another picture with your hand --

5    A.    Yes.

6    Q.    Might it be No. 216?  Is that it?

7    A.    No, this -- here the person was standing up like that

8    and there was -- the hand was like off to the left like that.

9    Q.    Which picture have you seen since we've initiated this

10   trial that you were asked about?

11   A.    Well, every gross picture that you've got.

12   Q.    Which picture are you referring to?  Did it have an

13   exhibit number?

14   A.    I'm sure it did.  But this picture was like this here

15   on the left-hand side and it showed on the top like that

16   there, it was shown to me.  I told Mr. Carter and I says, with

17   all the things today, with computer enhancements and

18   everything the FBI and everybody has, I showed him right where

19   they needed to zoom and try to see where she laid herself

20   open.  What the poor kid did was she took and -- when I went

21   up -- I was kind of scared because I was downstairs and my

22   daughter came running to me --

23   Q.    Mr. Warner, I believe we heard your testimony about

24   that.  You will agree with me that Faith testified that never

25   happened, correct?

Warner - Cross

1    A.    Oh, it did.

2    Q.    You will agree with me that Faith testified that none

3    of that ever happened?

4    A.    I think -- I don't know if she was directly asked that

5    question or not.

6    Q.    Were you in the courtroom?

7    A.    Yes.

8    Q.    You watched Faith's testimony, I presume, pretty

9    carefully?

10   A.    I have been watching everybody's testimony.  Like I

11   said, I don't remember if she was asked that particular

12   question.

13        MS. BLOCH:  If we could pull up Exhibit No. 31,

14   please.  31A, I apologize.

15   BY MS. BLOCH:

16   Q.    You will agree with me, Mr. Warner, you took this

17   picture?

18   A.    Yes.

19   Q.    You took Exhibit No. 3.7A?

20   A.    Yes.

21   Q.    And you took Exhibit 3.9A?

22   A.    Yes.

23   Q.    3.11A?

24   A.    I think -- I might -- I am guessing yes.

25   Q.    Why are you guessing yes?

Warner - Cross

1    A.    Because I don't remember.

2          MS. BLOCH:   Will you please bring up 3.11, without

3    the A.

4    BY MS. BLOCH:

5    Q.    You will agree with me, Mr. Warner, that this picture

6    was taken on June 12, 2011, at 9:39 a.m., with your Canon

7    PowerShot SX120?

8    A.    What am I looking for?

9    Q.    You are looking for the date and time and the camera.

10   A.    Okay, 9/12/11 something.

11   Q.    Correct.

12   A.    Yes.

13   Q.    And the picture taken with which you agree you took,

14   which is No. 3.19A, is the same date -- whoops.  I am sorry,

15   3.9 and 3.9A.  This picture was taken four minutes earlier,

16   correct?

17   A.    I don't know.

18   Q.    Can you look at the metadata on the side.

19   A.    Yes.

20   Q.    You would agree this appears to be as each picture

21   unfolds a series of images of Faith progressively getting

22   undressed in her Steelers outfit?

23   A.    Well, like I told you before, I said I probably took

24   the other picture.

25   Q.    Pardon me?

Warner - Cross

1    A.   When you showed me that other picture, I said I
2 probably took that picture.  I don't remember.
3    Q.   You continued to take a series of photographs of her in
4 this outfit on that date?
5    A.   Yes.
6    Q.   Eventually she's completely exposed from the waist
7 down?
8    A.   Yes.
9         MS. BLOCH:  319A, please.
10 BY MS. BLOCH:
11   Q.   This is a picture you took of Faith?
12   A.   No.
13   Q.   So if you took the pictures before that picture, who
14 did you -- did you give the camera to somebody else?  I mean,
15 it was only a matter of a minute.
16   A.   Bring the times up.
17   Q.   You want me to go through every single one?
18   A.   No, I said, bring the time up on that one compared to
19 the last picture.
20   Q.   Okay.
21        MS. BLOCH:  This was 3.19A -- I mean 19, excuse me,
22 to the metadata, and 3.18.
23 BY MS. BLOCH:
24   Q.   3.18, Mr. Warner --
25   A.   These are two different pictures.

Warner - Cross

1    Q.    I know they are two different pictures, sir.  We are

2    looking at the time that you took the first one and the time

3    you took the second one.

4    A.    And I told you to bring the one up which is prior with

5    the Steeler outfit on it with the time on it.

6    Q.    This is the one you acknowledge you took --

7            THE COURT:  Don't interrupt him, please.

8    BY MS. BLOCH:

9    Q.    Go ahead, finish.

10   A.    These are the two -- the two -- two I am looking at

11   right here are completely different than what you just showed

12   me.

13   Q.    Well, I showed you 3.18.

14   A.    You showed me one with a girl in the Steeler outfit.

15   Then you showed me one with pink underwear on and hearts or

16   something on it.  The ones I am shown here are two girls bent

17   over.

18   Q.    I never showed you one that had pink underwear with

19   hearts on it.

20   A.    They had underwear on and you asked me if I took that

21   picture, and I told you I didn't remember.  I said I probably

22   did.

23   Q.    Right.  We are looking at the same series, Mr. Warner,

24   all related to Count 3, all of which flow in a series of Faith

25   in her Steelers dress getting progressively undressed.  You

Warner - Cross

1  indicated that Exhibit 318A was taken by you.  I asked you if

2  3.19A was taken by you.  You said, well, let's look at the one

3  you just showed me.

4          MR. CHONTOS:  Judge, is there a question coming?

5          MS. BLOCH:  Yes.

6  BY MS. BLOCH:

7   Q.   You said, let's look at the metadata, so I am pulling

8  up the metadata for you.

9   A.   I am talking about, show me the picture and the date

10  and time with the one you showed me with the girl in the

11  underwear that you asked if I took a picture of.  Then show me

12  the time on this one.  These two pictures here look like they

13  were taken at the same time, I can say that.  But this does

14  not show me what time the ones in the Steeler outfit were

15  taken.

16   Q.   These are in the Steeler outfit, Mr. Warner, we just --

17          MR. CHONTOS:  Objection, Judge, counsel is

18  testifying.

19          THE COURT:  Overruled.

20  BY MS. BLOCH:

21   Q.   We looked at this image.  You were the one that asked

22  me to pull up the time related to it.  We were looking at 318.

23  You acknowledged that you took it.  We got to 319 and you

24  weren't sure that you did and you asked to see the metadata to

25  see how close in time it was.  The metadata reflects, does it

Warner - Cross

1    not, that it was taken in the very same minute?

2              MR. CHONTOS:  Objection, Judge, that calls for this

3    witness to opine on the accuracy of metadata.

4              THE COURT:  Overruled.  Why don't you ask a new

5    question, please.

6              MS. BLOCH:  Let's go to Exhibit 4.1, please --

7    4.1A.

8    BY MS. BLOCH:

9    Q.   This is Harley, is it not?

10   A.   Yes.

11   Q.   She's laying on your bed, correct?

12   A.   Yes.

13   Q.   Next to her is Faith?

14   A.   Yes.

15   Q.   You took this picture, did you not?

16   A.   Yes.

17   Q.   You took this entire series, did you not, of Harley and

18   Faith on the bed and into the bathroom?

19   A.   No.

20   Q.   Why don't you tell me which ones you took.

21   A.   None of the ones in the bathroom.

22             MR. CHONTOS:  Wait a minute, I think that's very

23   just wrong because he doesn't have what she's referring to.  I

24   mean, tell us which ones you took?  Well, get them up there so

25   he can peruse and say which ones are there.

Warner - Cross

1      THE COURT:  I sustain the objection.  You may ask

2  another question.

3  BY MS. BLOCH:

4  Q.   You have acknowledged taking 4.1A.  Let's see 4.2A.

5  Did you take that one?

6  A.   I am not sure.

7  Q.   Would it help you to know that it was taken in the same

8  minute that the earlier one was taken?

9  A.   No.  I don't know.  I don't remember.  I don't -- on

10  these here, when they start taking these here, there was a

11  desk sitting there and they were trying to do it with a timer.

12  They came and got me and they was asking me about it.  I don't

13  know how to use the timer on it.  So that's when I went ahead

14  and took them pictures with all of them laying on the bed.

15  Q.   So 4.3 you believe you took.  Let's look at 4.4A.  Do

16  you believe you took 4.4A?

17  A.   I don't know.

18  Q.   4.5A?

19  A.   Yes.

20  Q.   That one.

21      4.6A?  Again, is that Harley and Faith?

22  A.   Yes.

23  Q.   4.7A?

24  A.   Yes.

25  Q.   And you directed them into what positions they should

Warner - Cross

1   be in when you snapped these shots?

2      A.    No.

3      Q.    Let's go to 4.8A.  Who is that in the middle,

4   Mr. Warner?

5      A.    Brianna.

6      Q.    So your daughter is in between the two naked girls on

7   your bed?

8      A.    Yes.

9      Q.    Faith on the left, Harley on the right?

10     A.    Yes.

11     Q.    You took it?

12     A.    No.

13     Q.    Who took this photo?

14     A.    I don't know.  I think that's one of the ones -- I

15  think that was one of the first ones they took when they were

16  using the timer on it.  Ones -- most of the ones whenever they

17  tried to use the timer they would come out like blurred.

18     Q.    Let's look at 4.10A.  You took this picture, did you

19  not, of Harley?

20     A.    I might have.  I don't know.

21     Q.    She's shaved in that photograph, is she not?

22     A.    No.  At least it didn't look like it.

23          MS. BLOCH:  If you could please pull up 4.21A.

24  BY MS. BLOCH:

25     Q.    Harley again, Mr. Warner, am I correct?

Warner - Cross

1    A.    Yes.

2    Q.    You took this photograph of her on the bed?

3    A.    Yes, I did.

4          MS. BLOCH:  4.22A, the very next photo.

5    BY MS. BLOCH:

6    Q.    Picture of Harley's vagina, correct, Mr. Warner?

7    A.    I don't know.  Sorry, but there was no face in that

8    picture, I don't know who it was.

9    Q.    Do you remember taking pictures like that of Harley?

10   A.    No.  It's possible.

11   Q.    It's possible?

12   A.    Yes.  Like I said, there's no face in there, so I don't

13   know who the picture is.  That could be a picture of somebody

14   else, I have no idea.

15   Q.    You will agree with me that these images I have just

16   shown you that portray Harley and Faith on your bed were on

17   one of the memory cards in your house, specifically the one on

18   the coffee table?

19   A.    That I don't know.

20   Q.    You will agree with me that Armando Cruz didn't take

21   those photographs?

22   A.    Yes.

23        THE COURT:  Do you want to close the door, please.

24   BY MS. BLOCH:

25   Q.    Mr. Warner, you will agree with me that you admired

Warner - Cross

1   Margie's hair, did you not?

2    A.    Pardon me?

3    Q.    You admired Margie's hair?

4    A.    It's hair.

5    Q.    What do you mean "it's hair?"  Did you admire her hair?

6    A.    Not really.

7    Q.    Did you touch her feet and touch her hands?

8    A.    No.

9    Q.    Did you touch her private parts?

10   A.    No.

11   Q.    You were in the courtroom when Margie testified as

12   well, were you not?

13   A.    Yes, I was.

14   Q.    She very quietly indicated that you had touched all

15   those parts of her body?

16   A.    I heard everything she said.  And, yes, I sat here and

17   heard every bit of it.  And, no, I never touched that kid.

18          MS. BLOCH:  If you could please pull up 833A.

19   BY MS. BLOCH:

20   Q.    Would this be the picture that you remember taking of

21   the girl in the heart underpants?

22   A.    No.

23   Q.    You would agree with me those are heart underpants?

24   A.    Yes.  The one I was talking about is they were pink, I

25   think, hearts all over them.  The ones with the Steeler dress

Warner - Cross

1   on that Faith had.

2   Q.   You would agree with me, will you not, Mr. Warner, that

3   you took --

4             MS. BLOCH:  If you could please pull up 8.38A.

5   BY MS. BLOCH:

6   Q.   -- this photograph of Margie in your bathroom after she

7   got out of the shower?

8   A.   No, I did not.

9   Q.   What about 839A?

10  A.   No.

11  Q.   So far you have agreed to taking the pictures which are

12  a part of Count 4 and taking the pictures, some of the

13  pictures that are a part of Count 3 --

14  A.   If there was -- if there's pictures, okay, and there's

15  a picture of a butt and there's a picture of a vagina that I

16  am admitting that I took, it would be really stupid to do

17  something minor as a little butt.  No, I did not take them

18  pictures in the bathroom.  And as far as going as far as the

19  ones in the bathroom are concerned, I know who took them, but

20  you didn't ask me that question.

21  Q.   Who do you believe took those pictures?

22  A.   In the bathroom?  Brianna.

23  Q.   Did you ask Brianna to take those pictures for you?

24  A.   No.

25  Q.   Why would she take pictures of Margie's butt, as you

Warner - Cross

1    referred to it?

2    A.    She wasn't taking a picture of her butt.  She was

3    taking a picture of her hair.

4    Q.    But one of the pictures I showed you was clearly of her

5    rear end.

6    A.    Well, that's true.  But I am saying the last one you

7    showed me was her hair.  But all the pictures -- you showed me

8    a picture earlier that had Faith and Harley in it in the

9    bathroom.

10   Q.    Actually I didn't show you a picture like that, but

11   there are pictures like that that are the subject of this

12   case.

13   A.    Right.  Maybe it was earlier when I seen it.  But the

14   pictures in the bathroom, one of the kids took these pictures.

15   Q.    Was that part of your plan, Mr. Warner, that the girls

16   sometimes take pictures of each other in the bathroom and you

17   take the ones on your bed?

18   A.    No.  It was not planned, period.

19   Q.    You have testified that you had a plan and the whole

20   plan was --

21   A.    But you can't just say, okay, you know what, you take

22   pictures in this room, I will take pictures in that room, we

23   will take pictures over here with this light on, you take

24   pictures with that light.  We didn't break it down to that

25   point.  We weren't planning at all except trying to figure out

Warner - Cross

1    how to do what we had to do.

2       Q.   Do what you had to do.  You will agree with me at no

3    time, Mr. Warner, did you pick up the phone and dial 911?

4       A.   With what?

5       Q.   With what?  With the information you had that you

6    believe Mr. Cruz was taking sexual pictures --

7       A.   I had no proof.

8       Q.   You claim to have all the girls.

9       A.   And what proof is that?

10      Q.   Well --

11      A.   We had nothing.

12      Q.   You had everything.  You had the girls saying that this

13   was happening to them.

14      A.   This is what was reported to CYS and they said, without

15   proof there's nothing we can do.

16      Q.   Mr. Warner, let's talk about Exhibit No. 5.2, which is

17   a short video which I believe you will agree with me is you

18   filming Faith laying on the floor.

19           MS. BLOCH:  If you could please play 5.2.

20         (Video played.)

21   BY MS. BLOCH:

22      Q.   See that foot that just popped up, Mr. Warner?

23      A.   What's that?

24      Q.   Did you see the foot that just popped up?

25      A.   Yes.

Warner - Cross

1    Q.    Your foot, correct?

2    A.    I don't know.

3    Q.    It looks like your foot, doesn't it?

4    A.    Like I said, I don't know.  From what I can see there,

5    I don't know.

6    Q.    You took this video of Faith, did you not, laying on

7    your floor?

8    A.    I don't know.

9           MS. BLOCH:  If we could just play a short --

10          THE WITNESS:  There should be more.  If you do

11   this, I can probably answer your question.  All I am seeing

12   is -- I don't know what -- all I see is a foot and you showed

13   it and stopped.

14          MS. BLOCH:  Let's show 5.11 first.

15          (Video played.)

16   BY MS. BLOCH:

17   Q.    Is the girl in the picture bleeding, Mr. Warner?

18   A.    No.

19   Q.    That's Faith, isn't it?

20   A.    I don't know.  I think so.

21   Q.    You think so?

22   A.    (Witness nods head.)

23   Q.    Are you manipulating her vagina in this picture?

24   A.    Pardon me?

25   Q.    Are you manipulating her vagina in this video?

Warner - Cross

1     A.    Am I touching that?  Yes.

2     Q.    That's you, your hand --

3     A.    I said yes.

4     Q.    Based upon your direct testimony, Mr. Warner, it is my

5    understanding that you are acknowledging taking the video and

6    directing the video which is the subject of Count 6, 6.1,

7    which is the video that has the audio, that has the music in

8    the background and your voice, am I right?

9     A.    No.  Just in the --

10    Q.    I believe you testified it was your voice and I believe

11   you testified that you were directing her?

12    A.    I repeat, no.  Yes and no.

13    Q.    You testified you directed her, correct?

14    A.    I have not as of yet, no.

15    Q.    Mr. Warner, you directed her in Exhibit 6.1, correct?

16    A.    Yes.

17    Q.    It is your voice that we can all hear telling her how

18   to gyrate her body with her vagina over your camera?

19    A.    I don't know the question.

20    Q.    It is you who is telling her to gyrate her body and put

21   her vagina closer and closer to the eye of that camera?

22    A.    Yes.  The --

23          THE COURT:  There is not a pending question.

24   BY MS. BLOCH:

25    Q.    Mr. Warner, the plan, when was the plan going to end?

Warner - Cross

1    When were you going to have enough pictures?  Was it 100, 200,

2    300?  Where was it going to stop when you had enough pictures

3    where you thought you could actually go to the police?

4        A.   First of all, I never realized there was nowhere near

5    that many pictures.  They were trying to fill up one of them,

6    I don't know what you call them, it's the thing you slide into

7    the front of a computer.  Cruz had -- it was a -- it was about

8    that big.

9        Q.   Flash card?

10       A.   I don't know.

11       Q.   At some point you planned to download these onto

12   something to plant it on Mr. Cruz's computer, correct, or

13   plant it on -- wasn't that the plan?

14       A.   No.

15       Q.   Switch it with him?

16       A.   Switch it, yes.  But to plant something on his, no.  It

17   would not make -- anybody who has a brain would know that if I

18   stood there and planted something with my apartment in the

19   background, that would be on me, not on Cruz.  We needed

20   something with the background being his house, not mine.

21       Q.   So I guess you still need to answer my earlier

22   question, Mr. Warner, and that is:  When would it have been

23   enough?  How many pictures would have been enough to finally

24   dial 911?

25       A.   Like I said, they just wanted that disk.  And the

Warner - Cross

1    pictures you're talking about, those were taken at my house,

2    not his house.  We wanted pictures from his house.

3      Q.   You will agree with me, Mr. Warner, that there was no

4    end to the plan?  You were going to continue to take pictures

5    of yourself manipulating Faith's vagina for as long as you

6    could?

7      A.   No.  No.  Hell no.

8      Q.   You never did call the police, Mr. Warner, correct?

9    Never?  Never?

10     A.   I already testified to that, didn't I?

11           MS. BLOCH:  No further questions.

12           THE COURT:  Any redirect?

13           MR. CHONTOS:  Yes, I think so.

14                   REDIRECT EXAMINATION

15   BY MR. CHONTOS:

16     Q.   Mr. Warner, I have put in front of you the camera, have

17   I?

18     A.   Yes, sir.

19           THE COURT:  What's the exhibit number, please?

20           MR. CHONTOS:  It is a little confusing, Judge,

21   because there are two labels, I believe it may be 12.1, 12.3

22   but I also then see 13.1, 13.2.

23           THE COURT:  On behalf of the Government, what is

24   your exhibit number on that camera, please?

25           MS. BLOCH:  The camera is actually 12.1 through

Warner - Redirect

1    12.3 because --

2              THE COURT:   Thank you.

3    BY MR. CHONTOS:

4     Q.    Mr. Warner, I am going to ask you some questions about

5    a little round circle on the back side of that camera that

6    looks like the face of a clock.  Do you see what I am

7    referring to?

8     A.    This thing?

9     Q.    Yes.  At the 6 o'clock position on that camera there is

10   a little symbol, is there not?

11    A.    Yes.

12    Q.    Do you know what that symbol means?

13    A.    I believe that's the clock.

14    Q.    Do you know what that has the capability of doing on a

15   digital camera such as that?

16    A.    You set it to take pictures, snapshots, or whatever at

17   certain times.

18    Q.    So if you were to hit that button with the camera

19   facing me, you would hit the button, walk down to where I am,

20   and then you would be able to get in the picture?

21    A.    Right.

22              MR. CHONTOS:   That's all I have.  Thank you.

23              THE COURT:   Any additional questions?

24              MS. BLOCH:   No additional questions, Your Honor.

25              THE COURT:   You may step down, sir, thank you.

O'Neill - Direct

1          (Witness excused.)

2                THE COURT:  Are you going to call your next

3     witness?

4                MR. CHONTOS:  Judge, can I -- they are just

5     outside.

6                THE COURT:  Sure, please.

7          DELORES O'NEILL, a witness herein, having been first

8     duly sworn, was examined and testified as follows:

9                THE WITNESS:  Delores O'Neill, D-E-L-O-R-E-S,

10    O-N-E-I-L-L.

11               THE COURT:  Excuse me, are we okay on

12    sequestration?

13               MR. CHONTOS:  We are.

14               THE COURT:  Thank you.

15                     DIRECT EXAMINATION

16    BY MR. CHONTOS:

17    Q.   Ms. O'Neill, how do you know Earl Warner?

18    A.   Earl Warner is my nephew.

19    Q.   Known him all his life then?

20    A.   Yes, I did, from the time he was born.

21    Q.   Ma'am, what have you done in your life?  What kind of

22    work did you do?

23    A.   I was a teacher for 32 years.

24    Q.   Where?

25    A.   Greenville, Pennsylvania.

O'Neill - Direct

1    Q.   Greenville School District?

2    A.   Greenville School District, yes.

3    Q.   What grades did you teach?

4    A.   I taught four different grades.  I had fourth, I had

5    second, I had first, and kindergarten.

6    Q.   Are you doing that today?

7    A.   No, I have been retired for 18 years.

8    Q.   Have you had occasion through your life to see Earl

9    Warner in various social situations?

10   A.   Oh, yes.

11   Q.   Good, bad --

12   A.   He was -- we were a close-knit family, we did a lot of

13   things together.

14   Q.   Through your life experience and through your ability

15   to see Mr. Warner in various situations, do you have an

16   opinion as to whether he's honest and truthful?

17   A.   Yes, he is.

18   Q.   Well, you beat me to my next question.  So what is that

19   opinion?

20   A.   Pardon me?

21   Q.   What is that opinion that you have?

22   A.   I do have an opinion he's trustworthy.  He's

23   compassionate.  He's caring.  And he thinks -- the only thing

24   that I would say is he's kind of naive about people.  He

25   thinks everybody's honest and everybody's his friend, and he's

O'Neill - Direct

1   found out that that's not the case.

2           MR. CHONTOS:  All right.  That's all the questions

3   I have, ma'am.  The Government's lawyer might have some

4   questions for you.

5           THE COURT:  Any questions?

6           MS. BLOCH:  No questions, Your Honor.

7           THE COURT:  Thank you, ma'am, you may step down.

8   May she be excused, correct?

9           MR. CHONTOS:  She can.

10          MS. BLOCH:  She may.

11          THE COURT:  Thank you, ma'am.

12      (Witness excused.)

13          THE COURT:  Next witness, please.

14          MS. BLOCH:  May I have a proffer on the next

15  witness if it is another character witness.

16          MR. CHONTOS:  The same.

17          THE COURT:  Character witness.

18          MS. BLOCH:  If I may have a sidebar just briefly,

19  Your Honor.

20          THE COURT:  As to the character witness?

21          MS. BLOCH:  Correct.

22          THE COURT:  What's the character witness' name, the

23  next one?

24          MR. CHONTOS:  Ms. Nickel.

25          THE COURT:  Okay.  We will go to sidebar.

1           (On record at sidebar as follows.)

2           MS. BLOCH:  Your Honor, I believe the defense is

3   able legally to call character witnesses as long as they are

4   offering an opinion about a particular character trait that's

5   in question, such as, arguably, Mr. Warner's -- if they have

6   some perspective on his ability of how he treats children or

7   something of that nature, but not for his veracity or his

8   trustworthiness.

9           MR. CHONTOS:  I disagree.

10          THE COURT:  Okay.  I will overrule the objection.

11  Did you all form a stipulation as to there may be other

12  character witnesses that would say the same thing as the two

13  character witnesses?

14          MR. CHONTOS:  Judge, I haven't had a chance to even

15  like speak to them to engage in that discussion.  But what I

16  have done, Judge, is chat with my client and I have this

17  character witness and one more fact witness and we're going to

18  be done.

19          THE COURT:  Okay.  He is content with these two --

20          MR. CHONTOS:  Well, he doesn't like it.

21          THE COURT:  What I am saying -- I am trying to work

22  with you on this.  I am saying, do you want a stipulation from

23  the Government counsel that there may be other people that

24  would come in and say the same thing as the two character

25  witnesses would say?

Nickel - Direct

1              MR. CHONTOS:  But the difficulty for me doing that,

2      I need the factual basis to even tender the offer, and I am

3      not at that point.  So I appreciate it, Judge, but I am not

4      there.

5              THE COURT:  All right.  And the third witness

6      relates to your defense of necessity?

7              MR. CHONTOS:  It's corroborative of what Mr. Warner

8      testified to, that once he heard about it, he sought

9      neighborhood opinion, cousin's opinion.

10             THE COURT:  Why is that relevant?

11             MR. CHONTOS:  It's corroborative of what he said.

12             THE COURT:  But it relates to the defense of

13     necessity?

14             MR. CHONTOS:  Oh, absolutely.

15             THE COURT:  Okay, that's fine.  All right.  Thank

16     you.

17         (Back on record in open court.)

18             THE COURT:  Ma'am, come on up, please.

19         SHEILA NICKEL, a witness herein, having been first

20     duly sworn, was examined and testified as follows:

21             THE WITNESS:  Sheila Nickel.

22             THE COURT:  Ma'am, do you want to step up here for

23     me, please.  Be careful.

24             Just turn the chair around and be comfortable,

25     ma'am.  Speak into the microphone, if you would get real close

Nickel - Direct

1    to it if you would for me, please.  Okay, great.  Thank you.

2                    DIRECT EXAMINATION

3    BY MR. CHONTOS:

4       Q.    You are Sheila Nickel?

5       A.    Yes, I am.

6       Q.    N-I-C-K-E-L?

7       A.    That's correct.

8       Q.    Can you spell your first name for us.

9       A.    S-H-E-I-L-A.

10      Q.    Ma'am, do you know Earl Warner?

11      A.    Yes, I do.

12      Q.    How long have you known him?

13      A.    50 years.

14      Q.    Ma'am, how is it that you got to know Mr. Warner?

15      A.    Earl Warner and my son, Kevin, were very best friends

16   throughout all their school years.  My son was deaf in one ear

17   and hard of hearing in the other.  It made difficulties in

18   school for him getting the correct instructions.

19            Earl at the tender age of six recognized that fact,

20   and he cared enough to come home every day with Earl.  I saw

21   Earl -- or with Kevin.  I saw Earl every day for 12 years of

22   school because he came home with Kevin.

23      Q.    Okay.

24      A.    And --

25      Q.    When did school end between your son and Earl?

Nickel - Direct

1    A.    When did school end?

2    Q.    Right, the interaction that you have talked about is

3    during Kevin's, your son's, school tenure?

4    A.    Yes.  When Kevin graduated, he went to college.

5    Q.    When did he graduate, ma'am?

6    A.    Probably '76 or somewhere in there.

7    Q.    Okay.  Since then, since your son went to college, have

8    you had the opportunity to see and be in Earl Warner's

9    company?

10   A.    Yes.

11   Q.    Based upon that extensive interaction that you had with

12   Earl all through schooling and the more limited contact you

13   had with Earl after your son went to college, that's the base,

14   do you have an opinion as to whether or not Earl Warner is

15   honest and truthful?

16   A.    Yes, he certainly is.

17   Q.    Would you believe him under oath?

18   A.    Yes, I would.

19          MR. CHONTOS:  Ma'am, I don't have any more

20   questions.  The Government's lawyer might have some.

21          THE COURT:  Any questions?

22          MS. BLOCH:  Just one moment, Your Honor.

23          No questions, Your Honor.

24          THE COURT:  She may be excused on behalf of the

25   Defendant?

Nickel - Direct

1          MR. CHONTOS:  Yes, Judge.

2          THE COURT:  Government?

3          MS. BLOCH:  Yes.

4          THE COURT:  Thank you, ma'am.  Be careful, there is

5   a little step up there.

6          (Witness excused.)

7          THE COURT:  Call your next witness, please.

8          TERESA GILBERT, a witness herein, having been first

9   duly sworn, was examined and testified as follows:

10         THE WITNESS:  Teresa Gilbert, T-E-R-E-S-A,

11  G-I-L-B-E-R-T.

12         THE COURT:  You may begin.

13         MR. CHONTOS:  Thank you.

14                    DIRECT EXAMINATION

15  BY MR. CHONTOS:

16    Q.   Ms. Gilbert, good day.  How are you?

17    A.   Good, thank you.

18         THE COURT:  Do you want to move a little closer to

19  that microphone.  Thank you.

20  BY MR. CHONTOS:

21    Q.   Do you know Earl Warner?

22    A.   Yes.

23    Q.   How do you know him?

24    A.   He is my cousin and friend and neighbor for awhile.

25    Q.   Ma'am, I want to take you back just to get some frame

Gilbert - Direct

1   of reference to help you give your testimony.  October, 2011,

2   an event happened in your life that you remember.

3   A.    My mom passed away.

4   Q.    I want to talk first about the period of time before

5   that.  Okay?  Summer of 2011.  Did there come a time in the

6   summer of 2011 when Earl Warner approached you and you have a

7   memory of that approach?

8   A.    Yes.

9   Q.    What do you remember about Earl Warner coming to you?

10  A.    He was very, very upset and distraught and he just was

11  looking for some advice on what to do, one of his daughter's

12  friends had told him some stuff about a man in the

13  neighborhood or down the road across town that wasn't

14  believable, that it couldn't be true in Mercer, but what if it

15  was true and how could he figure it out.

16  Q.    Did you try your best to provide him some advice?

17  A.    We tried to calm him down a little bit and, you know,

18  we would talk to the parents of the girl.  Apparently there

19  had been some mistruths in the past and he just really didn't

20  think that would be a good place to start.  So we talked

21  about, you know, do you call an attorney, do you call the

22  police, or what do you do.

23       And he was still upset when he left, but he was

24  processing different thoughts and we talked about, you know,

25  what do you do.

Gilbert - Direct

1    Q.   How long was he there and how long was your discussion?

2    A.   Earl was over regularly.  In the evenings I really

3    don't -- maybe an hour.  It could be longer.  I don't know.

4    Q.   By the same token, it could be shorter?

5    A.   It could be shorter, yeah.  He lived next door

6    practically, just in the apartments beside our house.

7    Q.   Now, after you had that interaction with Earl, there

8    were several months where your duties and focus shifted to

9    your mom, right?

10   A.   Yes.

11   Q.   After your mom passed, was there a second contact with

12   Earl that you have a memory about?

13   A.   I didn't really see Earl just because of all the things

14   going on in our lives again until after he had been questioned

15   by the police, he came over.  And he was just -- like I

16   couldn't hardly understand him.  And we just had a

17   conversation, we were trying to calm him down and he was

18   trying to tell us this stuff.  And it's like, Earl, that's

19   ridiculous.  And we were a little confused because we said,

20   last time you referred to this man you thought -- and he said,

21   no, he had investigated it and just kind of thought that the

22   things were mistruths from the girls and he was comfortable

23   with it and he had actually thought that this man had become

24   his friend.  And now with all of this questioning and

25   everything that had just happened, it's like, well, it's just

Gilbert - Direct

1   ridiculous, Earl, they're just asking you --

2   Q.   Are you able to compare or contrast his demeanor on

3   that first visit in the summer of 2011 and then the second

4   visit sometime after October, 2011?  Do you understand my

5   question?

6   A.   Yeah.  He was so distraught both times.  I would say

7   the second one was elevated more because at that point at the

8   interviews they had told him stuff that he just prayed wasn't

9   true.

10          MR. CHONTOS:  Thank you.  I am done with my

11   questions.  The Government's lawyer might have a few questions

12   for you.

13          THE COURT:  Any additional questions on behalf of

14   the Government?

15          MS. BLOCH:  One moment, Your Honor.

16          I have no questions, Your Honor, thank you.

17          THE COURT:  Ma'am, you may step down.  She may be

18   excused?

19          MR. CHONTOS:  You can.

20          THE COURT:  Excused?

21          MS. BLOCH:  Yes.

22          THE COURT:  Be careful.

23       (Witness excused.)

24          THE COURT:  Any other witnesses on behalf of the

25   Defendant?

Gilbert - Direct

1          MR. CHONTOS:  Judge, the defense rests.

2          THE COURT:  Do you have any documents or exhibits?

3          MR. CHONTOS:  We don't.  We don't.

4          THE COURT:  All right.  The Government has rested,

5     the Defendant has rested.  Any rebuttal?

6          MS. BLOCH:  The Government does not have rebuttal,

7     Your Honor, thank you.

8          THE COURT:  Any objection to my closing the record

9     on behalf of the Government?

10         MS. BLOCH:  If I may, I just want to make sure that

11    those last few exhibits we discussed before break are now part

12    of the record.

13         THE COURT:  What are their numbers, please?

14         MS. BLOCH:  These exhibit numbers, Your Honor, are

15    13.3.

16         THE COURT:  Which is?  Why don't you say what each

17    number is and what it is, please.

18         MS. BLOCH:  13.3, Your Honor, is a second

19    photograph of the back of the SD card, the one which is four

20    gigabytes, so it could reflect the made in China stamp.

21         Exhibit 14.3 is the second image of the back side

22    of the eight gigabyte SD card, which too reflects the made in

23    China stamp.

24         And 15.2 is the side of the computer box, the Acer

25    box, that has the markings regarding the date it was

1    manufactured and the place of origin, which is China.

2                    THE COURT:  Any objection?

3                    MR. CHONTOS:  Judge, I don't.

4                    THE COURT:  They will be admitted without

5    objection.

6                    Do the 10 series of Government exhibits now drop

7    out?

8                    MS. BLOCH:  That is correct, Your Honor.

9                    THE COURT:  I would appreciate it if sometime

10   tonight the Government would file an updated exhibit list on

11   ECF so we have a final exhibit list.

12                   Any objection to my declaring the record closed?

13   On behalf of the Government?

14                   MS. BLOCH:  No objection, Your Honor.

15                   THE COURT:  Defendant?

16                   MR. CHONTOS:  None, Judge.

17                   THE COURT:  Counsel, do you want to join me at

18   sidebar, please, for a minute.

19              (On record at sidebar as follows.)

20                   THE COURT:  Do you have a motion?  Any motions?

21                   MR. CHONTOS:  I will repeat my Rule 29 stuff.

22                   THE COURT:  You renew your Rule 29 motions.

23                   MR. CHONTOS:  Correct.  And you are going to renew

24   your previous order at the close of the Government's case in

25   addressing those, right?

 1              THE COURT:  I am going to see whether she has some

 2   argument.

 3              MS. BLOCH:  I don't have additional argument, but I

 4   would make the same arguments that I made --

 5              THE COURT:  I will overrule the motion.  I think

 6   the record is sufficient to proceed.

 7              Let's -- we need argument on the defense of

 8   necessity and whether it should be included in the jury

 9   instruction.  I have read Document No. 132 on behalf of the

10   Defendant, which is the proposed jury instruction.  So what is

11   your argument --

12              MS. BLOCH:  Would you mind if I grab some of my

13   papers?

14              THE COURT:  No, no problem at all.

15              MS. BLOCH:  Your Honor, over the lunch break I did

16   a little research on the Third Circuit's position on the

17   providing of an instruction that either references necessity

18   or duress, which the Third Circuit does appear, based upon

19   some case law I found, that sort of treats them very

20   similarly.

21              First and foremost, it appears that the Court finds

22   that even in the presence of testimony by a Defendant or some

23   other witness that presents the notion that there may have

24   been some necessity or duress, if the elements of the offense

25   instructions pursuant to these elements otherwise address the

1   knowledge and intent of the Defendant, such as the charges we

2   have present in this indictment, the Court has found that such

3   a separate instruction is unnecessary and in some instances

4   inappropriate.

5          In this -- with respect to the charges in this

6   pending indictment, essentially the Court is advising the

7   jurors that they must find that -- and I believe I brought my

8   master list of the final jury instructions, and I believe we

9   have an instruction that talks about when something is done

10  voluntarily and not because of mistake or accident, and this

11  confers what the defense is likely to cover based upon its

12  case.  That Mr. Warner -- what his thought process was at the

13  time he developed the, quote-unquote, plan, his defense to the

14  charges.

15         I will say, I mean, the Third Circuit does

16  recognize such a charge.  There were some circuits that did

17  not recognize a duress or necessity charge.

18         I couldn't find any cases in which such a charge

19  was provided in a production of child pornography or in a

20  possession of child pornography case.

21         The examples used are not -- are not completely --

22  they are somewhat in keeping with the examples even the

23  defense articulates in his request to have said instruction

24  included --

25         THE COURT:  Do you want to tell your client to turn

1    around and not talk to them.

2        Thank you very much.

3        MS. BLOCH:  Specifically, it talks about cases

4    obviously where there is some threat to one's life or bodily

5    injury and the person having to act in some way that would

6    otherwise be deemed criminal if they -- and that's generally

7    speaking where duress or necessity lies, which I don't believe

8    factually we have present here under even the best of

9    circumstances.

10        THE COURT:  Do you have any response?

11        MR. CHONTOS:  Judge, I agree with the Government

12   that there is not a production case across the country that

13   articulates necessity.  That contributed to our coming up with

14   a defense rather tardy in the game.  But be that as it is

15   said, I am dusting off the cobwebs on this common law defense

16   to this particular charge.  I think that we have adequately

17   put forth a sufficient factual basis for us to get that

18   charge, and it is primarily driven by the Government's own

19   witnesses, Faith in particular.  She was a ready, willing, and

20   able, helpful helper to this conduct and this part of this

21   plan to get back at him.

22        So I think factually we've put forth enough

23   evidence on each of those requested elements for the Court to

24   give that charge.

25        Granted, there are some things there that we can

1  argue because, bottom line, what the necessity defense says,

2  Judge, is it's a value judgment.  Which value is our law going

3  to sanction?

4          The example I think is most appropriate is the one

5  where you and I are camping and you break your leg and we come

6  across a remote cabin and you need medical attention, you need

7  food, shelter, well, by golly, we're breaking into that remote

8  cabin.  It's a value judgment.

9          I think the value judgment in place here is that

10  plan that was Mr. Warner's defense, whether the jury is going

11  to say that the value judgment that he reached, meaning let's

12  do what he did to stop the greater harm, the greater harm was

13  Mr. Cruz.

14          THE COURT:  The Court's ruling is that I will deny

15  the defense of necessity and deny the proposed jury

16  instruction set forth in document 132.  I don't believe that

17  the Defendant satisfies any of the five prongs set forth in

18  the elements of the defense and certainly doesn't satisfy

19  every one of them.

20          I will issue an opinion later tonight supporting my

21  ruling.

22          MR. CHONTOS:  Judge, essentially what the Court has

23  done is --

24          THE COURT:  I guess the document is now -- what's

25  the document?

1            THE LAW CLERK:  134.

2            THE COURT:  The document has now been renumbered to

3    be 134.

4            Yes, sir.

5            MR. CHONTOS:  I knew that there was a risk, just

6    like in any trial, if you ask for a jury trial that the Court

7    might not grant that.  But the way that the case was tried

8    from my standpoint, recognizing the overwhelming evidence that

9    he did and satisfied the elements of the crime, in my view

10   that was the only possible defense that we had.  So the Court

11   denying that jury charge, we have basically no argument to

12   make because I can't continue with my proposed close because

13   the jury's then not going to get any guidance on that.

14   Without the Court instructing on necessity, basically I have

15   nothing to argue.

16           I know you have made your ruling and I don't think

17   that my little speech here is going to make you change that,

18   but --

19           THE COURT:  You have not satisfied any and

20   certainly not all of the five elements.  This is not something

21   that was a one-time event that somebody broke into a cabin.

22   This was a long pattern of conduct, and I don't believe any

23   reasonable jury could say that what he did was somehow less

24   harmful than what allegedly Mr. Cruz did.  So --

25           MR. CHONTOS:  Judge, see, you have made that value

1    judgment.  I believe that the jury should make that value

2    judgment.

3              THE COURT:  I have made the ruling that it does not

4    go to the jury.  I don't believe there is enough evidence

5    presented for it to go to the jury.

6              MR. CHONTOS:  Judge, well, let's not be surprised

7    if when it comes time for Mr. Warner to make closing argument

8    that there is no closing argument.  Because we really have no

9    argument because our whole defense was implicitly we have

10   admitted just on all the cross-examination of all of those

11   witnesses, we have implicitly recognized all those elements

12   had been satisfied.  But what we have tried to do is say, hey,

13   we recognize that, but we had a greater reason to do it.

14             THE COURT:  Okay.  No reasonable jury I believe

15   could find that the conduct that he allegedly engaged in was

16   somehow of a necessity.

17             All right.  Now, let's talk about where we go from

18   here.  We have our jury instructions done and they are out to

19   you.  My suggestion is that we take a break for about ten

20   minutes, give the jury a rest, and each of you then can do

21   your closing.  Then they will have tomorrow to hear my charge

22   and a reasonable amount of time to deliberate; and if they

23   don't reach a verdict tomorrow, then we will continue them

24   into next week.  I will not rush this jury to make a decision

25   because it is obviously very important.

```
 1              All right.

 2          (Back on record in open court.)

 3              THE COURT:  Ladies and gentlemen, thank you for

 4  your patience.  We are going to take a break until about five

 5  after 4 and then counsel is going to come back and do their

 6  closing arguments before you.

 7              We will then break for the evening.  You will come

 8  back tomorrow at 8:30, and I will give you my jury

 9  instructions.  Then you will begin your deliberations around

10  9:15 or so.

11              All right.  We will stand in recess until 4:05.

12  Thank you very much.

13          (Recess taken.)

14          (Back on record in open court.)

15          (Defendant and his counsel confer off the record.)

16              THE COURT:  Are you ready to begin?

17              MS. BLOCH:  Yes, Your Honor.  Shall I begin,

18  Your Honor?

19              THE COURT:  Excuse me?

20              MS. BLOCH:  Do you want me to begin?

21              THE COURT:  Sure, please.

22              MS. BLOCH:  Ladies and gentlemen of the jury, for

23  the alleged plan that the Defendant has articulated through

24  his case, primarily through his own testimony, you would have

25  to dispel -- you would have to virtually ignore virtually all
```

1  the Government's case to assume this plan the Defendant claims

2  to have arrived at and come to some agreement with the girls

3  in taking those pictures was a defense to having engaged in

4  sexually explicit conduct with these girls for the purpose of

5  producing images and videos of them.

6         The point of what will probably be a relatively

7  short closing statement to you is just to review very quickly,

8  recognizing that you have seen all the evidence in a very

9  short period of time in the last day and a half, and I feel

10 certain that you all remember, I feel like you have watched it

11 carefully, you have closely evaluated the demeanor and the

12 presentation that each witness has made, but I have to impress

13 upon you:  In order to believe this story that there was a

14 plan, that is that the plan was to get even with Armando Cruz

15 and not really a plan just to convince these young girls, who

16 are 11 and 12 years old, to engage in sexually explicit

17 conduct for the Defendant Earl Warner's pleasure, is

18 ludicrous.  In order to accept that notion, you would have to

19 ignore that there's 221 still images, most of which or many of

20 which you have seen throughout the past day and a half.

21         I am going to ask that Diane bring up

22 Exhibit No. 25 because I am going to ask -- you will have this

23 particular exhibit, not the images of child pornography, but

24 this exhibit to guide you through your deliberations.  On here

25 are those 221 still images and the three videos that we have

1   watched more than once together.

2          Those images and those videos were created, when

3   you examine this calendar, over 13 days of abuse in May and

4   June of 2011.  In order to believe the Defendant, you would

5   have to ignore that all the evidence reflects that all of the

6   abuse that is depicted in these images and videos occurred

7   inside the Defendant's home.

8          In order to believe even part of the Defendant's

9   defense, you would have to ignore the fact that the

10  Government's evidence, most importantly through the child

11  victims, was that they engaged in all of this conduct, they

12  engaged in the sexually exploitive conduct at the direction

13  and at the will of the Defendant.

14         With respect to this particular document, as you

15  have heard particularly Corporal Pearson testify, he prepared

16  this document after extracting all of the subject images that

17  have been discussed throughout this trial, laying it out on

18  this calendar for all of us to use and make it more

19  simplified.

20         What's important about it is not only does it

21  reflect just how many days in a matter of two months these

22  children endured this Defendant's sexual exploitation, this

23  has nothing to do with Armando Cruz, this is all about Earl

24  Warner.  Every single one of these days, every stretch of time

25  in a particular day is those three children's nightmare.

1          When you look at it, sometimes it's 20 minutes and

2     sometimes it's two or three times, four times in a two-day

3     period that these children endured and engaged in and were

4     persuaded and used and enticed to engage in the production of

5     these images and videos.

6          In order to believe the Defendant, you would have

7     to believe, as he in complicated fashion explained, that this

8     camera was his, of course, but conveniently he didn't purchase

9     it until right after all of these images were created.  I

10    submit that that is entirely nonsensical.  Somebody had to use

11    this camera and I doubt it was the person at Wal-Mart who came

12    to his home in May and June of 2011.

13         The same applies to these memory cards.  Without

14    those memory cards, he doesn't store the images that he

15    creates, he can't maneuver them from his camera to his

16    computer.

17         In order to believe the Defendant, you have to

18    believe that this Acer computer just magically disappeared

19    from his home on April 9th when the search was conducted.

20         I will refresh your recollection regarding the

21    various interviews and investigative tools that the agents

22    used as they investigated this case, first starting with

23    Armando Cruz.  I mean, the first contact, according to even

24    the Defendant, that he had with law enforcement was on

25    February 15th of 2012.  He wasn't arrested and served until

1    April 9th.  If he wasn't already alarmed by the interest

2    that law enforcement had in Armando Cruz and in turn the

3    potential for interest in his conduct, he certainly by

4    April 3rd when they conduct the full interview of him and

5    when Agent Carter explains that he has all of this evidence,

6    has interviewed the witnesses, and goes so far as to show him

7    the various images and videos that he's acquired during his

8    investigation, clearly Mr. Warner had enough time to get rid

9    of this computer.

10            I submit to you it's nonsensical to accept that he

11   would have two old computers in his house missing, missing

12   hard drives, and has no idea where the Acer computer from

13   which Armando Cruz was able to download all of these images

14   and videos had gone.

15            In addition to seeing that it was manufactured in

16   China on this particular box, Agent Carter testified, and you

17   can see, that -- and you may well remember that this was

18   manufactured in 2011.  So this was a brand new computer.  The

19   computer that Margie indicated she was with him when he

20   purchased.  That just disappeared.  And according to the

21   Defendant, it had already broken.

22            So I submit there's -- it's implausible to believe

23   that this Defendant had two computers in the house, neither of

24   which were working, and that the brand new missing computer,

25   of course, broke as well.

1          This was the computer that these images from those

2    memory cards were file created, were transferred from his

3    camera, like we all do with our images that we take every day

4    with our cameras, and he loaded it onto his computer to save

5    it, maybe to share it, to admire it, to get sexual pleasure

6    from.

7          In order to believe the Defendant, you would have

8    to believe that the only time that he took images of Faith in

9    this particular dress was when she was dressed.  You would

10   have to believe that he took the images which were not

11   sexually exploitive, but somehow seconds, minutes later for a

12   period of approximately 20 plus minutes she endures his sexual

13   exploitation for which he's creating images for his sexual

14   pleasure.

15         In addition to the physical evidence that was

16   seized from the Defendant's home, we talked a lot about the

17   metadata, and that obviously is what is reflected on this

18   calendar that Corporal Pearson carefully went through.  I am

19   sure it has already impressed in your mind that every single

20   image is from this particular camera.  There are no other

21   cameras.  It is this camera, the Canon PowerShot SX120 IS.

22         The series of images that you see charged in each

23   of the respective counts of production, that is Counts 1

24   through 6, all charge a range of time.  That is that during

25   that period of time a certain number of images were taken,

1   starting with the earliest, or at approximately that earliest

2   time, on or about the date in question to approximately the

3   latest time reflected in the indictment.

4         That too, for your assistance, is reflected in

5   Exhibit No. 25.  So it will be easy to work your way through

6   this indictment by following this particular document because

7   it will reference each of the respective counts.

8         In order to believe the Defendant, you have to

9   believe that a 53-year-old man who touched some of these

10  children, who placed them in positions that most of us cannot

11  dream of ever being in and having our picture taken, that he

12  did this, if you believe him, with some sort of unusual

13  consent or agreement by these young girls.

14        I submit to you that the reason that these laws are

15  in place are to protect girls who are only 11 or 12 years old,

16  they don't have the ability that someone who is 18 or older

17  has to make decisions about their bodies.  They don't know how

18  to say no to adults.  They are manipulated and they are

19  persuaded and they are provided gifts and cell phones and

20  cupcakes and all these small measures that vulnerable children

21  clearly are willing to accept in exchange.  They create fear,

22  they create distance, and they clearly create humiliation.

23        I am going to ask that Diane pull up Exhibit 124A.

24  I have asked Ms. Wikert to pull up this image because the

25  Government submits that this image, although not as

1   humiliating maybe or maybe not as graphic as some of the

2   images and videos you've had to watch through this trial, the

3   Government believes that that image actually reflects just how

4   this little girl felt on that particular day, June 4th,

5   2011, when Earl Warner was asking her for maybe the first time

6   to take off her underpants while she stood by herself on that

7   bed at 9:30 in the morning.  That is truly what this is all

8   about.

9           It's about the laws, federal laws protecting

10  children from this kind of exploitation, and there are

11  elements that the Government has to meet.  I submit to you

12  that each of those elements, which I will just reference now,

13  have been so clearly met in this case, not the least of which

14  is that the Defendant himself has admitted to taking the

15  images in Counts 2, maybe not all of them, the Government only

16  needs one per count, just one, you can find all or you can

17  find one.  The Judge will instruct you you just have to agree

18  on which one or more you find that he produced or possessed.

19          So for purposes of production, the Government has

20  to establish that the Defendant used, persuaded, enticed,

21  coerced, or manipulated a minor, someone under the age of 18

22  years old, to engage in sexually explicit conduct for the

23  purpose of producing an image of that conduct, whether that be

24  a video or a still image.

25          The Government has to prove that the Defendant

1  himself is the individual who produced that image.

2  Lastly, the Government has to establish that the

3  materials that he used to produce the image at some point

4  prior to their use by him for that purpose had traveled and/or

5  had a connection with interstate or foreign commerce.

6  I submit to you that in addition to the markings on

7  the camera and the memory cards and this box, you also have

8  the certificates from the particular companies that reflect

9  that they were all manufactured and/or originated in the

10  country of China.  Therefore, they had to be shipped,

11  transported, and have that interstate and foreign connection

12  in order to be possessed, used for the purposes alleged in

13  this indictment by Mr. Warner in Mercer, Pennsylvania.

14  The last count is possession, and it's pretty

15  straightforward as well.  The Government has to prove that the

16  Defendant actually possessed one or more images that depict

17  the sexual exploitation of a minor, that is, a child under the

18  age of 18.

19  Two, the Government has to prove that those images

20  were produced using materials that had traveled in interstate

21  or foreign commerce.

22  Let me make sure I get the last one right.  Last,

23  we have to prove that the Defendant knowingly possessed one or

24  more items which contained a visual depiction of a minor

25  engaging in sexually explicit conduct.

1           And that the item -- strike that, I have already

2     said that, I apologize.

3           So in essence, the possession count only relates to

4     those images that Mr. Warner was in possession of on

5     April 9th, 2012, when the search was executed.  So the

6     possession count, if it's not clear, applies to the images

7     that were on the memory cards.  So that included the one image

8     of the girl's chest on the four gigabyte SanDisk; it includes

9     all of the images on the SanDisk card that was located on the

10    coffee table.  So those include the images which are charged

11    at Count 4, the Harley images, as well as some additional

12    images, all of which, again, are reflected on the calendar to

13    sort of walk you through where all of those images were placed

14    from Count 7.

15          Then lastly, on this calendar are the additional

16    images, which you saw some of and which you heard lots of talk

17    about, and that is all of the images that Corporal Pearson was

18    able to extract, but which don't necessarily fit into the on

19    or about or the time frames reflected in the particular counts

20    of production.

21          So with that, I say, I believe that, as I indicated

22    in my opening statement to all of you, we would put on our

23    evidence, that our evidence would support the elements for

24    each of the seven counts in this indictment, that it would be

25    graphic, and it would be hard sometimes to watch and to listen

1  and to think about what occurred in the summer of 2011 for

2  Margie and for Harley and Faith, and I very much appreciate

3  you sitting as jurors and watching and living sort of their

4  life experience in that window of time.

5      When we are all done, I will ask you to return a

6  verdict of guilty on each of the seven counts charged in this

7  indictment.  Thank you.

8      THE COURT:  Sir.

9      MR. CHONTOS:  It's a tough case.  High risk, high

10 reward.  We tried this case a particular way.  The Judge made

11 a ruling:  Not going to instruct you on the law that we wanted

12 you to hear about.

13     Our system says that he gets to make that call.  We

14 disagree with that call.  An appellate court will ultimately

15 decide if he's right or I'm right.  That's the system that we

16 live in, that's the system that we have, and Mr. Warner thanks

17 you for participating in that system.

18     Thank you.

19     THE COURT:  Anything further on behalf of the

20 Government?

21     MS. BLOCH:  Nothing further, Your Honor.

22     THE COURT:  All right.  Ladies and gentlemen of the

23 jury, that concludes the closing arguments on behalf of the

24 Defendant and the Government.  We're going to gather together

25 again tomorrow at 8:30 and at that point I will give you your

1    final jury instructions and you will be able to begin your

2    deliberations.

3              I remind you of your caution, that you are still

4    not to talk about this case with anyone, including among

5    yourselves.

6              You should do no research on your own.  You should

7    keep an open mind.

8              If anyone should try to contact you about this

9    case, you should bring it to the attention of my staff.

10             Anything else before I discharge the jury for the

11   evening?

12             MS. BLOCH:  I don't believe so, Your Honor, thank

13   you.

14             MR. CHONTOS:  No, Judge.

15             THE COURT:  Okay.  I would ask the deputy clerk to

16   take the jurors out at this point.

17         (Jury exits courtroom.)

18         (In open court; jury not present.)

19             THE COURT:  You may all be seated.  I have given

20   you the final jury instructions at Document No. 135.  I give

21   you your choice, I can receive your objections or comments on

22   those now or I can meet with you tomorrow at 8 o'clock to

23   receive your comments thereon.

24             MR. CHONTOS:  Judge, when I left last night, I

25   brought document 132 with me, so I just haven't had a copy, I

 1    haven't had a chance to review it.  So I will be here bright

 2    and early at 8 a.m.

 3              THE COURT:  Bright and early is when I get here,

 4    which is 7 a.m., but I would be pleased to see you after the

 5    bright and early passes and sort of meet you at mid-morning at

 6    8 a.m.

 7              MR. CHONTOS:  Very well.  It's possible after

 8    review I may not end up having anything.

 9              THE COURT:  I think you will find them very

10    familiar, and since both counsel graciously worked together

11    and there was only a few disputes among them, so -- among you

12    all, so there may not be anything.  I think it would be best

13    to get together at 8 o'clock in the morning.

14              Any objection on behalf of the Government?

15              MS. BLOCH:  No objection.

16              THE COURT:  Defendant?

17              MR. CHONTOS:  No, Judge.

18              THE COURT:  I would appreciate it if you would work

19    with my deputy clerk before you leave so that there's

20    agreement on what's going back to the jury room and what

21    isn't, or you can do it at 8 o'clock tomorrow morning.  But I

22    want to be able to make sure there is no dispute as to what's

23    going back to the jury room from the standpoint of exhibits,

24    if any.

25              Anything else you would like to talk about?

 1              MR. CHONTOS:  Judge, yes, one more thing from me.

 2   I would like to really make an offer of proof.  At one point I

 3   was asking Mr. Warner some questions.  There was an objection.

 4   You sustained it.  I just want to expand upon where my

 5   questions would have gone.

 6              Really the purpose on that series, sequence of

 7   questions was for Mr. Warner to relay what Faith told him, in

 8   essence the following:  We need to stop what Armando is doing.

 9   He's taking pictures.  We need to figure out a way to stop

10   him.

11              I was blunted by the sustaining of an objection to

12   those -- to the elicitation of that testimony.  I juxtaposed

13   that with my cross-examination of Faith, which got out of

14   Faith those very facts.

15              So with that said, I don't have anything further.

16              THE COURT:  Just so the record is clear, I

17   sustained the objection to that question.  Nothing kept you

18   from asking further questions that would potentially be not

19   objectionable, and that was a tactical decision that you made,

20   and I respect that decision, but I didn't -- I did not make an

21   objection to a whole line of questions.  I didn't sustain an

22   objection to a whole line of questions.  I made a ruling on a

23   particular question, and you made a tactical decision of

24   whether to come back with a particular question.  And you are

25   a very experienced trial lawyer and I respect that decision,

1   but I did not bar a whole line of questioning, I barred one

2   particular question.

3           MR. CHONTOS:  Would the Court be -- my view, that

4   question was the first in the sequence.

5           THE COURT:  And I guess my response is, you just

6   keep marching down the sequence and see if a skillful lawyer

7   of your vast experience cannot -- would be able to rephrase

8   the question to satisfy any objection.

9           See you all tomorrow.  Thank you very much.

10          (Court recessed until January 24, 2014.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2   WITNESS               DIRECT   CROSS   REDIRECT   RECROSS

3   For the Government:

4   Armando Cruz              -        2        15        --

5   Thomas Carter            17       29        33        --

6

7   For the Defendant:

8   Earl Warner              49      152       176       ---

9   Delores O'Neill         178      ---       ---       ---

10  Sheila Nickel           182      ---       ---       ---

11  Teresa Gilbert          185      ---       ---       ---

12

13

14

15                      C E R T I F I C A T E

16          I, Richard T. Ford, certify that the foregoing

17  is a correct transcript from the record of proceedings in the

18  above-titled matter.

19  S/Richard T. Ford   _____

20

21

22

23

24

25
```