IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,

       Plaintiff,

         vs.

EARL D. WARNER,

       Defendant.
_____

Criminal Action

No. 12-107


Transcript of proceedings on May 30, 2014,
United States District Court, Pittsburgh, Pennsylvania,
before Arthur J. Schwab, District Judge


APPEARANCES:

For the Government:       Carolyn J. Bloch, Esq.


For the Defendant:        David B. Chontos, Esq.


ALSO PRESENT:           Vonita Baldt, Probation Officer


Court Reporter:         Richard T. Ford, RMR, CRR
                      6260 U.S. Courthouse
                      Pittsburgh, PA  15219
                      (412) 261-0802


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1              (Proceedings held in open court; May 30, 2014.)

2              THE COURT:  Good morning.  This is the time and

3    place that has been set for sentencing in Criminal

4    No. 12-00107, United States versus Earl Warner.

5              I would ask counsel for the Government to enter

6    your appearance, please.

7              MS. BLOCH:  On behalf of the United States, Carolyn

8    Bloch.

9              THE COURT:  On behalf of the Defendant, please.

10             MR. CHONTOS:  Your Honor, good morning, David

11   Chontos on behalf of Earl Warner.  He is seated here at the

12   table seated to my left.

13             THE COURT:  Thank you.  Sir, would you stand and be

14   sworn, please.

15          (Defendant duly sworn.)

16             THE COURT:  Sir, do you understand that having been

17   sworn your answers to my questions are subject to the

18   penalties of perjury or of making a false declaration if you

19   do not answer truthfully?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  The Court notes for the record that on

22   January 24th, 2014, Defendant was found guilty by a jury of

23   Counts 1 through 7 of a seven-count superseding indictment

24   charging the Defendant with six separate counts of production

25   of material depicting the sexual exploitation of a minor, in

1   violation of Title 18 United States Code Sections 2251(a) and

2   (e), and one count of possession of material depicting the

3   sexual exploitation of a minor, in violation of Title 18

4   United States Code Section 2252(a)(4)(B).

5           Following the guilty plea the Court directed the

6   probation office to prepare a presentence investigation report

7   and scheduled the sentencing hearing for today, May 30th,

8   2014.

9           The Court has received and reviewed the presentence

10  investigation report and addendum thereto prepared by the

11  United States probation office.

12          The Court has reviewed Defendant's position with

13  respect to sentencing factors wherein he raises three

14  arguments:

15          First, Defendant notes that one of the, quote,

16  victim impact statements, close quote, was prepared by the

17  Defendant's mother-in-law, who was not a Government witness

18  during trial and who was not the parent of any of the

19  Government's trial witnesses.  Defendant suggests that because

20  his mother-in-law has not been directly or proximately harmed,

21  her statement should be stricken from the record.

22          Second, Defendant objects to a two-level increase

23  for sexual contact in Paragraph 26 of the presentence

24  investigation report.  In support of his position, Defendant

25  argues that two of the photographs depicting the child victim

1    pulling her underpants away and exposing her groin area does

2    not meet the definition of sexual contact.

3         Third, Defendant objects to the two-level increase

4    for sexual contact in Paragraph 50 of the presentence

5    investigation report.  Defendant contends that Paragraph 50

6    was added to the presentence investigation report after the

7    draft version of the report was generated.

8         The Court also has reviewed the Government's

9    position with respect to sentencing factors.  Although the

10   Government raises no objection, the Government did note that

11   one of the impact -- victim impact statements was prepared by

12   the Defendant's mother-in-law, who was not a direct victim.

13   However, the Government notes that the mother-in-law's

14   statement reflects on the Defendant's history and

15   characteristics and, thus, can be considered by the Court

16   under Title 18 United States Code Section 3661 as, quote,

17   information concerning background, character, and conduct of

18   Defendant convicted of an offense which a court of the United

19   States may receive and consider for purposes of imposing an

20   appropriate sentence, close quote.

21        The Government also contends that the two-level

22   enhancement for Paragraph 26 is appropriate because the

23   photographs depict the child victim is touching her own groin

24   area.  The Government states that this meets the definition of

25   sexual contact and, thus, the two-point enhancement is

1    appropriate.

2              As noted, the probation office filed an addendum to

3    the presentence investigation report and in its addendum the

4    probation office addressed each of the Defendant's three

5    objections as follows:

6              First, in its addendum, the probation office

7    conceded that it may have incorrectly identified the letter

8    written by the Defendant's mother-in-law as a victim impact

9    statement.  However, the probation office also noted that in

10   its addendum that the Court could consider the mother-in-law's

11   letter as information concerning the background, character,

12   and conduct of the Defendant.

13             Second, the probation officer provided the

14   statutory definition of, quote, sexual contact, close quote,

15   in response to Defendant's objection that the two-point

16   enhancement set forth in Paragraph 26 was not appropriate.

17             Third, the probation office explained that

18   Paragraph 50, which included a two-point enhancement in the

19   final presentence investigation report, was not included in

20   the draft report.  However, the probation office indicated it

21   notified counsel for Defendant of this inclusion via an email

22   dated April 25th, 2014, the day the final pretrial

23   investigation report was filed.

24             The probation officer indicated that Defendant's

25   counsel had previously indicated he needed to review the

1   images before he could respond to the imposition of the

2   two-point enhancement.  The addendum indicated that the

3   probation office notified Defendant's lawyer that he could

4   raise his objection to the two-point enhancement referenced in

5   Paragraph 50 after reviewing the images, should he choose to

6   do so, by filing the same in his position with respect to

7   sentencing factors.

8           The Court finds the following with respect to each

9   of the Defendant's three objections:

10          First, the Court reviewed the mother-in-law's

11   letter and finds that it provides information concerning

12   background, character, and conduct of the Defendant.  The

13   Court, therefore, considers the information in this letter

14   solely for the stated purpose expressed in Title 18 United

15   States Code Section 3661 and has not nor will consider it for

16   any other purpose.

17          Second, Defendant notes -- strike that.  Second,

18   the Court notes that Defendant objected to the two-point

19   enhancement set forth in Paragraph 26 of the presentence

20   investigation report based upon the images of the child victim

21   in issue.  The Court finds that these two images depict the

22   child touching her groin area.  The Court notes that the

23   relevant portion of Title 18 United States Code Section 2246,

24   Subsection 3, defines sexual contact.  The Court finds that

25   these images meet that definition.  Accordingly, the Court

1   finds that the two-point enhancement is appropriate.

2          Third, the Court acknowledges the Defendant's

3   argument that Paragraph 50's two-point enhancement was not

4   included in the draft presentence investigation report and

5   should be applied, however, because Defendant did not have the

6   opportunity to address the matter via the administrative

7   procedure.  The alleged procedural deficiency has been cured

8   by his raising the matter in his position statement.  However,

9   Defendant's position statement failed to make a substantive

10  argument as to why the two-point enhancement should not apply.

11  Substantively, the Court finds that the images at issue in

12  Paragraph 50 meet the definition of sexual contact and, thus,

13  the two-level enhancement is appropriate.

14          The Court has also reviewed the sentencing

15  memorandum filed by the Government.

16          In addition, the Court has reviewed a letter from

17  one of the Defendant's child victims, letters from two

18  different parents of two different child victims, and, as

19  previously noted, the Court has considered the letter from the

20  Defendant's mother-in-law solely for the purpose of providing

21  this Court with a background, character, and conduct

22  information concerning the Defendant.

23          Finally, the Court has reviewed the sentencing

24  recommendation prepared by the probation office.

25          Sir, on January 24, 2014, you were found guilty by

1   a jury of your peers of all seven counts of a seven-count

2   superseding indictment at Criminal No. 12-00107 charging you

3   with six counts of production of material depicting the sexual

4   exploitation of a minor, in violation of Title 18 United

5   States Code Sections 2251(a) and (e), and one count of

6   possession of material depicting the sexual exploitation of a

7   minor, in violation of Title 18 United States Code

8   Section 2252(a)(4)(B).

9           Correct, sir?

10       (Defendant and his counsel confer off the record.)

11           THE DEFENDANT:  I guess.

12           THE COURT:  Well, were you found guilty of those

13   seven counts?

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  Would you kindly pull the microphone in

16   front of you, please.

17           Following your guilty plea I directed the probation

18   office to prepare a presentence investigation report which you

19   and your counsel have received.  Correct, counsel?

20           MR. CHONTOS:  That is correct, Judge.

21           THE COURT:  Correct, sir?

22           THE DEFENDANT:  Yes.

23           THE COURT:  I have reviewed the presentence

24   investigation report, the addendum thereto, and the sentencing

25   recommendation of the probation office.

1              Pursuant to the standing order of the Board of

2     Judges of this district the Court finds it's not appropriate

3     to disclose the recommendation of the probation office to the

4     parties nor to counsel.  However, in determining your

5     sentence, the Court will not consider any matter that's not

6     previously been disclosed to you or your attorney.

7              Counsel, have you reviewed the presentence

8     investigation report, addendum thereto, and discussed them

9     with your client?

10             MR. CHONTOS:  I have, Judge.

11             THE COURT:  Are there any errors in the presentence

12    report or addendum that you have not previously called to the

13    Court's attention?

14             MR. CHONTOS:  There are none.

15             THE COURT:  Sir, have you reviewed the presentence

16    investigation report, addendum, and other matters and

17    discussed them with your attorney?

18             THE DEFENDANT:  My attorney came up and showed me

19    some things, yes.

20             THE COURT:  Counsel, is there any legal cause why

21    sentence should not be pronounced?

22             MR. CHONTOS:  No, Judge, but in your little summary

23    you referenced two letters from two parents of victims.  I

24    read one before you came out on the bench, so I really would

25    like the opportunity to read that second parent letter.

1        THE COURT:  Certainly.

2        MS. BLOCH:  I haven't seen it either actually.  I

3  think that may have been the one that was submitted directly

4  to the Court.

5        THE COURT:  I may have misspoken.

6        MS. BLOCH:  I stand corrected, the three letters in

7  question are the ones that you have already referenced.  One

8  from victim FW, one from her mother, and one from the

9  Defendant's mother-in-law as you pointed out.

10       MR. CHONTOS:  Judge, those three I have reviewed.

11       THE COURT:  Okay.  I may have misspoke.

12       MS. BLOCH:  And I have as well.

13       THE COURT:  Because I did mention four letters in

14  total.  I received a letter, I guess that came directly to the

15  Court, that we will give to counsel.  You may take a few

16  moments and read it.

17       MR. CHONTOS:  Judge, just so the record is somewhat

18  clear, Mr. Warner has read the two-page handwritten letter

19  from a Mercer County mother.

20       THE COURT:  Thank you.  And you have had an

21  opportunity to read it also, correct, counsel?

22       MR. CHONTOS:  I have.

23       THE COURT:  Counsel, on behalf of the Defendant,

24  anything you would like to say now relating to the appropriate

25  sentence or the Defendant would like to say or anyone else

1   would like to speak on his behalf, now would be the

2   appropriate time, please.

3           MR. CHONTOS:  Judge, thank you.  I do have just a

4   few little comments.  First --

5           THE COURT:  Do you want to pull the microphone up

6   to you a little bit, please.  Thank you.

7           MR. CHONTOS:  Just to level an objection to the

8   Court's conclusion regarding Paragraph 26 and the sexual

9   contact.  It is our position under 18 2246 Subsection 3, which

10  defines sexual contact, that doesn't -- those two photos I

11  have laid out in my position paper does not satisfy that

12  definition.

13          So with that objection being leveled, Judge, we

14  would ask at the end of the day when you complete your

15  paperwork that you make the recommendation that Mr. Warner

16  serve his sentence at FCI Elkton.  It is in the eastern part

17  of Ohio.  A couple reasons.  One, that's one of the few

18  facilities in the United States that have programming for

19  someone that the BOP is going to deem, as Mr. Warner will be

20  qualified, as a sexual offender, they have that appropriate

21  program.

22          I think it is clear throughout this case, going

23  back to the suppression, Mr. Warner has a very loving family,

24  brother and sister and mom attended the trial as best they

25  could.  Mom even testified at the suppression.  Having him

1    close to their home there in Mercer County will benefit them,

2    but also benefit Mr. Warner as he begins to serve what in

3    reality is going to be a life sentence.

4                    Mandatory minimums at each --

5                    THE COURT:  Any objection to my making that

6    recommendation?

7                    MS. BLOCH:  I don't have any particular objection,

8    Your Honor, other than to say that I am not sure that FCI

9    Elkton, what the parameters of their specific sex offender

10   program is.  I do think the Bureau of Prisons is well-equipped

11   to make the assessment as to where, depending upon all sorts

12   of factors, the Defendant should serve his sentence.

13                    To the extent that he be close to family, I know

14   that's one of the factors, that piece of it I do not have an

15   objection to, they will factor that in along with all the

16   other important factors in considering his placement.

17                    THE COURT:  I will make that recommendation,

18   subject to the Defendant's classification and history.

19                    Go ahead.

20                    MR. CHONTOS:  Thank you, Judge.

21                    THE COURT:  You may continue, please.

22                    MR. CHONTOS:  Whatever his sentence is, it's life,

23   in all reality it is going to be a life sentence.  He stands

24   before you as a 56-year-old man.

25                    We have several production counts.  Congress has

1    established a 15-year mandatory minimum each.  Looking at it,

2    we have four young girls as part of separate counts.  So

3    what's a fair and reasonable sentence?  Very easy to go 15,

4    15, 15, and 15, you get to 60.

5              15 is going to -- Mr. Warner will leave jail in a

6    body bag.  That's what I am saying.  The Court has discretion

7    to run those sentences in this indictment concurrently.  We

8    ask the Court to exercise its discretion.

9              He is not all that of an unhealthy male, but there

10   are health issues, and you give him 15, 60, or any amount in

11   between, just be cognizant of the fact that he will die there

12   in prison.  That's all, Judge.

13             Mr. Warner does want to speak to the Court as well.

14             THE COURT:  Certainly, sir, you may remain seated

15   and if you would pull the microphone in front of you, I would

16   appreciate it.  And if you would speak slowly, that would be

17   helpful, so the court reporter takes down your full statement.

18             You may begin at your convenience.  Pull the

19   microphone in front of you, please.

20             THE DEFENDANT:  Yes, would you give me one minute,

21   please, I am reading that statement.

22             THE COURT:  Sure.

23             MR. CHONTOS:  Judge, what he is presently reviewing

24   is the mother-in-law's statement.

25             THE COURT:  Sir, anything you would like to say at

1   this time?

2          THE DEFENDANT:  Yes, Your Honor, I appreciate your

3   time for talking and I really appreciate that and there are a

4   few things I wanted to say to you.  I appreciate the

5   opportunity of doing so.

6          First of all, I want to thank the US Attorney,

7   Mrs. Bloch.  A couple times I became frustrated with not being

8   able to explain things that I felt should have been explained

9   and I couldn't get out and I wanted to apologize for kind of

10  getting hot under the collar about it, but I wanted to

11  apologize to her for that.

12         And I feel bad for all the victims here.  None of

13  this was supposed to be like this here.  It wasn't meant to

14  come out that way.

15         I want to say that I have seen heros in my time,

16  and I definitely have to say that the US Marshal will always

17  be my supermen now.  At one time I thought the FBI was until

18  different things, until there was lies made of things that was

19  not said, not done, and I never realized, I was blind to the

20  fact, I always thought that -- I never knew that they started

21  that thing where they don't have to read you your rights,

22  first of all.  I didn't realize when you ask for a lawyer and

23  you couldn't have one, even though I requested four different

24  times.

25         If anybody would -- I had the proof of everything

1    being such as, and it was pushed under the rug.

2         I had 100 percent proof that nothing went down in

3    that barracks the way they said it went down that day.  For

4    the simple fact there is no law officer in the United States

5    that is going to talk to somebody without being able to see

6    them.  If you look at those photos of that room, there's no

7    way they can sit behind the desk and see me with that file

8    cabinet there where they said it was.  I was on the opposite

9    side of them.  There is no way two police officers would fit

10   behind that desk.

11        I was told in May of 2012 that there is a private

12   investigator hired for my -- to help me.  I was told that him

13   and my attorney was meeting at my state lawyer's office and

14   they were going to go up the state police barracks.  That was

15   never done.

16        If that would have been done before things could be

17   fixed, there was no way the chair bounced off that wall that

18   there wouldn't have been marks to prove it.

19        I have the -- I am sorry, I am not real

20   intelligent, Your Honor, I stutter a lot.

21             THE COURT:  Take your time.

22             THE DEFENDANT:  There's a lot of things that are

23   being said and accused that it's not the way things were.

24   When I got arrested, when I seen that thing on TV, I was on

25   America's Most Wanted for awhile as far as TV was concerned.

1    If I wouldn't have known where I was, I would have shot me

2    because it was so -- because of the things they were saying

3    and doing.

4            I had spent a lifetime of doing nothing but caring

5    for people and doing whatever I could to help them out.  I

6    can't say that I was a choirboy or anything, which the -- I am

7    sure I have done a lot of sins and a lot of things I probably

8    regret, but I never got in trouble for it or anything.

9            One of the things at the beginning of this case, it

10   came to my attention on paper that I shouldn't be more or less

11   a professional with the way the law enforcement works.  Well,

12   that's kind of hard when the only thing I ever had was a DUI,

13   and after the arrest all I did was -- they took me to the

14   hospital, they took a blood test, then from then on my lawyer

15   got me the ARD.  So I never really dealt with police officers

16   before.

17           In my mind, the FBI and the state police are --

18   were supermen.  For God sake, the FBI is who took Al Capone

19   down.  And if you don't think it's scary to stand there and

20   pick up a piece of paper and see the US Government versus Earl

21   Warner, that's scary as hell, excuse my language.

22           I have -- I don't even know if you have them, but

23   some people in my -- I'm from a small town.  We only have one

24   cop car.  We knew everybody.  As a matter of fact, I was one

25   of the last people that was ever born in Mercer County

1  Hospital before they closed down, we don't even have a

2  hospital anymore.

3           But we are a close-knit thing where we take care of

4  each other and watch after everybody.  No matter what we do,

5  it is always to help someone else out.

6           We took -- I was taken -- requested to come to the

7  police station, and I did under respect.  I didn't have to; I

8  did.  When I got there, my brother start calling me as I was

9  walking in the door and says, I'm worried about this here, I

10  want you to ask for an attorney.  I said, okay, I'll do that.

11          When I walked in the door, not once, two different

12  times I brought that up before I was taken to the back room

13  where I repeated two more times.  The first two times was in

14  front of a 75-year-old woman who was my mother, who we was

15  raised by my grandfather to the point where you are only as

16  good as your word.

17          With this here, I did not want to answer questions

18  or do whatever until I had a chance to speak with an attorney,

19  so I was not answering the questions.  At the time Agent

20  Carter says, don't you worry about it, next time I come up I

21  will make sure I have an attorney for you.  I said, okay.

22  That's understandable.  This was after the state cop had

23  thrown a chair and bounced it off the wall and stormed out of

24  the room.

25          They claim they left the room, didn't have enough

1    room.  But yet they left two or three times.

2           They claim they were sitting behind a desk, but two

3    people can't fit behind it.

4           They claim they questioned me with a -- with one of

5    those file cabinets sitting on a desk, it would have been

6    blocking their view from seeing me.  No police officer would

7    do that.  They would stand there and they would want to see

8    the expression on that person's face or do whatever.  But

9    they're not -- you sit behind a wall where they can't see you

10   to talk to you, it don't make common sense.

11          Then I come down and they say I confessed to this

12   and I said this and I said that.  For a professional, which I

13   hope someone along the line catches this dude, not trying to

14   be disrespectful to the Court, but he's a total liar.  And if

15   this is how he -- it's good that he brings people down that

16   are being blamed for things I am being blamed for, I am glad

17   there are people like him to do that, but it should be done

18   under -- legally, not because of lies, anything and everything

19   that was done here.

20          When I -- when all of this went down, I stood there

21   and -- when I did this here and got here, my very first

22   hearing, you take -- they had some young kid there and he

23   spoke and what he did, he said he couldn't open my case up

24   because I think he was a new lawyer, I think he was young.

25   Anyhow, they took me downstairs.  I had a lady since then

1   Simpson, Ms. Simpson, Simmons, something like that from the

2   Public Defender's office down there.

3           She proceeded to tell me that I had to go talk to

4   two or three people, they were asking about my home life, and

5   within a couple of hours they would have me out on bond.  I

6   said, okay, that would be fine.  So we went on.

7           Well, when this happened, the US Marshals had to

8   hurry up and get me because they were taking me back to the

9   prison over in Youngstown.  So I didn't get to talk to them

10  people.

11          The following day I was brought up down here and

12  when I got down here, I met this gentleman who gave me his

13  qualifications.  And --

14          THE COURT:  You are referring to your attorney?

15          THE DEFENDANT:  Yes, sir.  And I was told that he

16  was new on my case, we were going to postpone my bond hearing

17  until he could see what my case was about.

18          On a -- every meeting I brought up, I want to have

19  a bond hearing, I want to have a bond hearing, I want to have

20  a bond hearing.  That never happened until last December right

21  before this trial.  I waved my arm at you and I was able to

22  tell you and you had him go ahead and let me have a bond

23  hearing after sitting in jail almost two years.

24          My lawyer in December of this past year finally got

25  enough information that he finally seen what was going on in

1  my case.  Prior to that there, me and him worked against each

2  other, to the point where I actually sent him letters from the

3  Mercer County Jail firing him.  But he would show up and we

4  would talk it out.

5        He turned out to be a fantastic attorney, which I'm

6  proud to have as an attorney.  But for the first year and a

7  half, I didn't have one that would listen to one word I had to

8  say.  Everything I said was -- at the very next meeting I

9  would say to him, and he would say, I didn't know that, and I

10 would say, I told you that at the last one.  But it was just

11 never taped.  That's part of it.

12        Now -- am I allowed to stand up?

13        THE COURT:  I think it's best if you just sit, that

14 way you're closer to the microphone and we can all hear you.

15        THE DEFENDANT:  I took -- and if you want to try

16 something hard, I took in in the last year and a half I was on

17 the streets, I was living on $225 a month income total.  If I

18 was making porn and selling it, I would have had money, first

19 of all.

20        Second of all, I'm smart enough, I am very good at

21 laying out and designing like paperwork for a company or

22 something like that like on Word or playing video games, I do

23 a lot of -- or did a lot of.  I have never, ever faxed -- not

24 faxed, what do you call it, emailed or opened an email in my

25 life.  With everything that the Government has, I'm sure that

1  would be easy for them to look up my email accounts and find

2  out there are probably thousands of emails in there I never

3  opened up in my whole life nor did I mail one out, ever,

4  because I don't know how.

5          These pictures that I am getting blamed for, which

6  was supposed to be porn or whatever, first of all, I never

7  sent nothing across state lines.  I never gave nothing to

8  nobody.  Yes, they were on the computer.

9          And the one person who I was hoping to see them

10 testify was -- had them -- I showed them for other purposes,

11 not for being porn or for being on the Internet or for being

12 given to anyone.

13         I am here because I bought a computer at Wal-Mart

14 that was not made in the State of Pennsylvania.  I am sorry,

15 no disrespect to the Court, but really?  When I -- how many

16 things do you buy that is not made in Pennsylvania?  The

17 computer was a laptop that I bought my daughter for a gift

18 that I had also used.  The computer for my use on it was just

19 to play video games, period.  And the store, like pick a name,

20 stuff like that.

21         It was not used to transport, send, or receive

22 anything from any other person or any other state.  If I would

23 have got prosecuted by the state, I would have to say, yeah, I

24 had that stuff; yeah, I did this, I did that.  But as far as

25 for the federal, no, I definitely don't.

1          Like I said, I didn't send nobody no photos.

2  Second of all, I never dragged nobody into my house.  I never

3  brought in nobody, I never paid nobody, or asked anybody to

4  take their clothes off or anything else.

5          I am 56 years old.  My -- I couldn't wait to join

6  the military, which I did, to fight for this country that I

7  believe in so much and which thank God I got in after the

8  Vietnam War, I didn't have to see any wartime action.  But I

9  do give the military credit for what they do, they do

10 fantastic.

11         Right now I feel like I'm standing here talking to

12 God because that's the kind of power you have over my life

13 right now.  I take -- and I have showed stupidity to the max.

14 I tried to make something right and all I did was make it

15 worse.  Everything I have done seems like -- that I have

16 touched has turned to mud.

17         So, like I said, I have never really had that much

18 involvement with the police to understand most of this.

19         Like I said, I didn't know if you ever received

20 them, but when this hearing started I had half the town

21 sending letters to my mom to hand them, to pass on through my

22 attorney to the courts, and I don't know if you ever seen

23 them.

24         I was told that I was going to have a psychologist

25 come speak to me.  That never happened.

1          I was told I was going to have an anger test done.

2   Never happened.

3          I was told I was going to have a bond hearing.

4   Never happened.

5          I was told that I had a bunch of witnesses coming

6   in on Friday to testify on my behalf, but the Court seen fit

7   to finish the hearing on Thursday before any of them testified

8   for me.

9          When the very first time I met my attorney, one of

10  the things that kind of shocked me was the very first thing

11  that he said to me was that he had talked to the prosecuting

12  attorney and he asked if they would accept 35 years.  And they

13  said, no way, I want the full max.

14         After a few months down the road, about a year or

15  so, they came to my -- it was brought to me as a plea bargain,

16  35 to 75 years.  I'm 55.  My dad died at 59, his dad died at

17  59.  I am not going to see you -- live this long to do 35.

18         When I turned that down, two months later it came

19  back to me, 45 to 85 years.  It didn't go down, it went up.

20  Well, if I can't do 35, how am I going to do 45?

21         I never got a plea bargain than those at all.  When

22  it did come to me right before my hearing in January, they

23  said I was offered 25 years.  But my lawyer was fighting for

24  15, but we would probably end up -- I would probably end up

25  doing 23 to 24 years.

1          In the paperwork, if you look at the paperwork for

2    Cruz's arrest and different things, he was told by a neighbor,

3    Ann Forrester, that I was going to try to take him down.  If I

4    could have, I would have.  If I would have known that he

5    touched my kid the way some of this paperwork is that I have

6    read, I would not be sitting here for child porn or anything;

7    I would be sitting here for murder because I would have blown

8    his brains out, to be honest with you, because the man, nobody

9    touches my kid.

10          Now me being in jail, I just here a week ago

11   finally finished it, because I'm slow, reading the Bible from

12   cover to cover.  With Cruz, it's like I can't afford to hate

13   people, I let God handle that when it comes to him, I have to

14   forgive people.  And I can deal with that.

15          When I read something like that that same day, then

16   they walked Mr. Cruz right here by me, the willpower for me

17   not to dive over this desk and grab him by the throat took

18   everything I had.  This Mr. Cruz, I didn't know the man that

19   long, for six months.  One of the things I seen was that me

20   and him were friends.  We weren't friends.  His daughter ran

21   with my daughter.

22          Was I ever at his house?  No.  The only time I

23   was -- I was asked if I went to his parties.  No.  Was I ever

24   at his house?  One time.  And I felt so weird and

25   uncomfortable there that from then on every time I went to

1    pick my daughter up, I sat out in the yard, I refused to even

2    go in the house, I never went in that man's house.

3                Yet he dropped his daughter off, I am so stupid

4    that he would go to work, he would come home and I would

5    say -- you know what, the other thing we had in common is we

6    were trying to raise kids as single fathers, which is hard.

7    And he come in and I said, you know what, I know there's no

8    sense in you going home to make supper, I know you can't do

9    that, I made supper for you.  I was so stupid I let that man

10   in my house after I hear rumors about what he was doing, which

11   I could not prove.

12               How -- when you have a child who says on a Friday,

13   I will be over Saturday, and they don't show up and next week

14   you see them and you say, oh, I thought you were coming over

15   last week, well, we went to Hawaii for the weekend.  Really?

16   How do you believe what this child is telling you when this is

17   how they tell you stuff.

18               So what I was told about Cruz I didn't know whether

19   to believe it or not.

20               When I heard about this a few years ago, not

21   knowing CYS was contacted, but nothing could be done unless

22   you have proof.  It was also brought to my attention to watch

23   out because what's the old saying, you open your mouth without

24   proof, you're going to jail for slander or being sued.

25               Well, I should have -- here's where I screwed up.

1   I should have went to the police anyhow, but I didn't.  That's
2   my stupidity.
3           They take and -- everything has been a nightmare.
4   The day they arrested me I had a stroke and instead of being
5   in the hospital, I was laying on the ground in a fire hall
6   for, I don't know, 30 minutes I'm guessing, whatever, when the
7   hospital was only 15 miles away.
8           I get there, I go -- and they tell me that I had a
9   stroke.  They said they took the test and the whole bottom of
10  my heart was black.  They said they are going to do a
11  catheterization of my heart.  I didn't know what it was.  I
12  said, okay.  They said, this here will either kill you or make
13  you have another stroke or heart attack.  I said, okay.  Right
14  away the person said, this is not happening, he is not allowed
15  to contact anybody.  A security person.  Fine.  So I had it
16  done.
17          When they got done, I got back and I wake up in my
18  room and the doctor said, I will be right back in here and see
19  you in about two hours.  I said, okay.
20          He left.  He wasn't even down the hallway around
21  the corner, they were throwing me in my clothes and telling me
22  to get them on and I was headed to jail.  That's where I ended
23  up.
24          If you see a picture of my ID, I am so doped up, I
25  didn't know what my own name was.  They had me there and they

1  kept me in a room and they said, if the thing opened up on my

2  leg, they put the tube up there, they said I would bleed out

3  in five minutes.  I was so doped up, they had two guys take me

4  into the Mercer Courthouse.  My daughter is standing from here

5  in front to the stand in front of me, I was told she was

6  yelling, I love you, Dad, I love you, I love you.  I didn't

7  see her.  I didn't hear her.

8          I went into the courtroom and they put -- they -- a

9  PFL or PFA, whatever, on me not to be able to see my daughter.

10  Well, I haven't seen her or been able to talk to her.

11          And I have been told that, looking at things like

12  this here from my mother-in-law, I don't even know if I am

13  married or not.  Whatever she wrote.  My daughter is the best

14  thing that ever happened to me in my life.  She's my God's

15  gift.  She is a person who is very intelligent.  I treat her

16  like an adult as far as talking to her.  So she has the

17  intelligence of an adult.

18          I am very proud that she says in here that she's

19  stubborn and bull-headed.  Yes, I'm glad she is that way.  I

20  don't want people walking all over my kid.

21          But she is very smart, she is very athletic.  If

22  you name a sport, she was in it.  When she was eight years old

23  she got a black belt in the Korean style Tae Kwon Do.  Why?

24  To protect herself I thought from people doing things to her.

25  That's the whole reason I put her in sports.  She was in

1    volleyball, basketball, cheerleading, you name it, she was in
2    it.

3              Now she's at her mother's, that is supposed to be a
4    good mother, she's not allowed to be in none of them sports.

5              I had rules.  She was not allowed to wear shorts
6    anywhere -- they had to be somewhere between halfway between
7    her knee and up.  Now she wears shorts that are even with,
8    excuse my language, her crotch.

9              My daughter laughed all the time.  Friends would
10   come over and they would laugh, she would be on the couch
11   sleeping, she would laugh in her sleep and just warm your
12   heart up, you never heard such a great laugh.

13             Now she's in a house with her mother who lets boys
14   spend the night and have sex with her and she just -- at 13,
15   now she's 14.

16             There's pictures of her on Facebook with dresses
17   she bought her that are again strapless, even with her crotch.

18             My daughter was not allowed to date until she was
19   16.  Now she has boys staying over and spending the night at
20   13.

21             She is on there with pictures of money which she
22   got from her birthday down there.  All excited because now she
23   might drive.  My kid was not allowed to be around anybody who
24   smoked or did drugs.  Now she is doing them and she smokes.

25             My daughter is 14 years old.  My sister is getting

1    texts from her begging her to come pick her up because she is

2    walking around different towns at 3:30 in the morning.   3:30

3    in the morning.

4            My daughter was not allowed to walk 200 yards to

5    Brandy Springs Park by our apartment building, even in a small

6    town, without two or three friends with her.   I live two

7    blocks from uptown.   She was not allowed to walk uptown

8    without me.   Now she's walking the streets.

9            My daughter has fallen through and been hurt by

10   this.   Again, this is my fault for letting myself get involved

11   in this.

12           This -- so this here, her mother takes and writes

13   letters like this.   I was working and had to be in Slippery

14   Rock -- I am -- or, I am sorry, Penn State College dropping

15   off cabinets because I build kitchens.   While I was there I

16   told my wife, please come home.   Whenever you're done, go home

17   when my daughter gets home from school.   No problem.   Well, I

18   knew she wouldn't.

19           So I called her friend and I said, you know what --

20   I told my bosses, can I use your cell phone?   He said, sure.

21   I called and asked, would you please send your son up to pick

22   up my daughter.   And see if she is okay and her mom's there --

23           MS. BLOCH:   Your Honor, the Government, we have

24   been listening for a long time to a lot of things that pray

25   about the Defendant's mind, but the Government would contend

1    much of what is being said and continues to be said really has

2    little to do with the imposition of sentence at this point.

3            It was not my inclination to object early on, to

4    allow the Defendant some time to get to the point, but I do

5    think that the Court could ask or his counsel could ask that

6    he focus on matters which pertain specifically to the Court's

7    business today and that is to impose a fair and just sentence.

8            THE DEFENDANT:  I believe that when you are telling

9    me that I am looking at 45 to 60 years of my life, I don't

10   think 40 minutes to an hour, hour and a half is asking that

11   much to be able to get this off my chest.

12           THE COURT:  Well, we appreciate that you have a lot

13   of things on your chest, but I would appreciate -- and I have

14   given you a substantial amount of time -- if you would speak

15   to what you think your sentence should be so that we can now

16   focus in on the sentence.  I have given you probably 40

17   minutes so far to cover the things that you said were

18   burdening you, and you certainly have done that, so do you

19   want to speak to your sentence for me if you would, please.

20   How many years you think it should be or how many months you

21   think it should be and why, please.

22           THE DEFENDANT:  I am the -- I don't know,

23   Your Honor, I can't answer that question.  I feel that, like I

24   said, I'm 56 years old.  I did not go out looking for kids to

25   take to my house to take pictures of them.  I did not send

1    pictures out.  I did not email pictures out.  I did not do

2    nothing other than to try to help these kids out, like I said.

3              Now, yes, I am guilty of this and, yes, I am sure I

4    deserve something because of it.  But I don't think I deserve

5    a life sentence to the point where I have no chance of seeing

6    daylight.

7              My mother, like I said, is 75 and my whole family,

8    the only thing that matters to me is my family.  We are very

9    family oriented.  From I am sure -- I don't know if you are

10   from Butler, but I know you come from Butler.  If you are up

11   that way, you know what families is about or the way of life

12   to the point where they are close-knit.  The only thing that

13   matters to me is my family.

14             As far as -- like all my life, like I said, I have

15   been helping people out.  I am to the point where I don't care

16   if I ever see another person.  I want to just be with my

17   family.

18             THE COURT:  Maybe you can help me understand.  It's

19   clear that you at least recently, you know, before the trial

20   and to the present you have been satisfied with your attorney.

21   Have you been getting along with him?

22             THE DEFENDANT:  I am sorry?

23             THE COURT:  You have been getting along with your

24   attorney?

25             THE DEFENDANT:  In December, halfway through

1   December when you gave him -- what is that paper thing you

2   give him?  He finally start picking up on the things I have

3   been telling him.

4            THE COURT:  Okay.  So from then on you have been

5   satisfied with him?

6            THE DEFENDANT:  Yes.

7            THE COURT:  Great.  Why don't we hear from the

8   Government now, please.

9            MS. BLOCH:  Yes, Your Honor.  It is not my

10  intention to reiterate the information I set forth or the

11  position I set forth in the Government's sentencing

12  memorandum.  I would just like to say a few things or

13  highlight a few things.

14            As I indicated to the Court, there are a number of

15  factors pursuant to Section 3553(a), Title 18, that the Court

16  must consider in imposing a fair and just sentence.  One of

17  the most important pieces of the imposition of sentence today,

18  other than the Court's purpose in punishing the Defendant for

19  his crimes, is to protect the public.

20            The Defendant -- the Government's evidence

21  established to the satisfaction of the jury that the Defendant

22  has shown himself to be a violent predator.

23            The Defendant engaged in repeated sexual

24  exploitation of young children and he memorialized that

25  exploitation in videos and photographs for his sexual

1    pleasure.  He didn't have to go out of the house to find

2    children because he was fortunate enough to have a young

3    daughter who drew them in innocently from the time she was a

4    little girl.

5            He has victimized three young girls identified in

6    the indictment numerous times and on multiple occasions during

7    the course of a two-month period at minimum.

8            He has furthermore exposed his own daughter, as is

9    depicted in some of those images, to the horror of watching

10   her friends be sexually abused by her daughter.  That is the

11   minimum of what he has exposed his daughter to.

12           I can't speak to her psychological well-being

13   today.  I have no doubt that given the exposure that she's had

14   that she suffers from all sorts of social problems.  Might

15   that be leading to her misbehavior?  It very well may.  That,

16   like everything else, is in fact the Defendant's fault.  It is

17   all the Defendant's fault.  It is nobody else's fault but his.

18   He engaged in sexual conduct with young children and it's time

19   that the punishment be set.

20           The Defendant has shown no remorse for his conduct,

21   nor has he set forth nor has counsel set forth any bases upon

22   which the Court could find that a downward variance or

23   downward departure was appropriate.

24           The sentencing guidelines have been calculated and,

25   as we are all aware from the filings with the Court, the

1  Defendant's calculation was way beyond even the ceiling that
2  is set by the sentencing guidelines.  In fact, it had to be
3  brought down to a level 43 from a 50.

4          Across the board, regardless of criminal history,
5  the Defendant at a 43 is exposed to a life sentence.  I submit
6  to the Court, as I did in writing, that there is absolutely
7  nothing on the record nor spoken here today nor submitted to
8  the Court that would justify a sentence that was less than
9  what the guidelines call for.

10         THE COURT:  Anything else on behalf of the
11  Defendant?

12         MR. CHONTOS:  No, Your Honor.

13         THE COURT:  Any objection to my talking to the
14  probation officer for a minute?

15         MS. BLOCH:  No objection.

16         THE COURT:  Any objection?

17         MR. CHONTOS:  No, Judge.

18         THE COURT:  Ma'am.

19      (The Court and probation officer confer off the record
20  at sidebar.)

21         THE COURT:  Pursuant to the Sentencing Reform Act
22  of 1984, it is the judgment of the Court that the Defendant,
23  Earl D. Warner, is sentenced as follows:

24         At Counts 1 through 6, Defendant is sentenced to
25  360 months at each count, to run concurrently; and at Count 7,

1    120 months, to run consecutive to the 360 months assigned to

2    Counts 1 through 6; resulting in a total of 480 months

3    imprisonment.

4         Defendant's term of imprisonment is to be followed

5    by a lifetime term of supervised release as to each of the

6    seven counts, to run concurrently.

7         Within 72 hours of release from the Bureau of

8    Prisons, Defendant shall report in person to the probation

9    office in the district in which Defendant is released to be

10   placed on supervised release.  The Court obviously

11   appreciates, as everyone does, that the length of the

12   imprisonment may mean that there's no supervised release, but

13   I am required to set forth the terms of supervised release

14   anyway.

15        While on supervised release the Defendant shall not

16   commit another federal, state, or local crime; shall comply

17   with the standard conditions that have been adopted by this

18   Court; and shall comply with the following additional

19   conditions:

20        One, Defendant shall not illegally possess a

21   controlled substance.  Supervised release must be revoked for

22   possession of a controlled substance.

23        Two, Defendant shall not possess a firearm,

24   ammunition, destructive device, or any other dangerous weapon.

25   Supervised release must be revoked for possession of a

firearm, ammunition, destructive device, or other dangerous weapon.

Three, the Defendant shall participate in a mental health and/or sex offender treatment program provided by the probation officer -- approved by the probation officer, until such time as the Defendant is released from the program by the Court and/or the probation officer.

Defendant shall abide by all program rules, requirements, and conditions for the sex offender treatment program, including submission to polygraph test, to determine if he is in compliance with the conditions.

Further, the Defendant shall be required to contribute to the cost of services for any such treatment in an amount to be determined by the probation officer, but not to exceed the actual cost.

The probation office is authorized to release the Defendant's pretrial -- excuse me, presentence investigation report to the treatment provider, if necessary.

Four, with the exception of brief, unanticipated, and incidental contact, the Defendant shall not associate with children under the age of 18 except in the presence of a responsible adult who is aware of the nature of Defendant's background and the current offense and who has been approved ahead of time by the probation officer.

Five, as required by Title 18 United States Code

1  Sections 3583(a)(8) and 3583(d), and the Sex Offender

2  Registration and Notification Act, Defendant shall report the

3  address where he is residing and any subsequent change of

4  residence to the probation officer responsible for Defendant's

5  supervision and shall register as a convicted sex offender in

6  any state where he resides, is employed, carries on a

7  vocation, or is a student.

8          Six, Defendant shall not possess or access with

9  intent to view any material, including pictures, photographs,

10  books, writings, drawings, videos, or video games depicting

11  and/or describing child pornography as defined in Title 18

12  United States Code Section 2256(8) or obscene visual

13  representations of sexual abuse of children as defined by

14  Title 18 United States Code Section 1466(a).

15          Seven, Defendant shall cooperate in the collection

16  of DNA as directed by the probation officer.

17          Eight, Defendant is permitted to possess and/or use

18  a computer and is allowed access to the Internet.  However,

19  Defendant is not permitted to use a computer or other

20  electronic communication or data storage devices, including

21  cell phones, to access child pornography or to communicate

22  with any individual or group for the purpose of promoting

23  sexual relations with children.

24          Defendant shall consent to the installation of any

25  hardware or software to monitor any computer or other

1  electronic communication or data storage devices used by the

2  Defendant to confirm Defendant's compliance with this

3  condition.  Defendant shall pay the monitoring cost as

4  directed by the probation officer.

5            Further, the Defendant shall consent to periodic

6  unannounced examinations by the probation officer of any

7  computer, cell phone, or other electronic communication or

8  data storage devices that Defendant has access to to confirm

9  the Defendant's compliance with this condition.

10            Additionally, Defendant shall consent to the

11  seizure and removal of hardware and/or data storage media for

12  further analysis by the probation officer based upon

13  reasonable suspicion of a violation of conditions imposed in

14  this case or based upon reasonable suspicion of illegal

15  conduct by the Defendant.

16            Defendant's failure to submit to monitoring and/or

17  search of computers and other electronic communication or data

18  storage devices used by the Defendant may be grounds for

19  revocation.

20            Nine, if the Defendant's employment requires the

21  use of a computer, the Defendant may use a computer in

22  connection with the employment approved by the probation

23  officer, provided Defendant notifies his employer of the

24  nature of his conviction.  The probation officer shall confirm

25  the Defendant's compliance with this notification requirement.

1          Ten, Defendant shall provide the United States

2     probation office with accurate information about his entire

3     computer system, including its hardware and software, and

4     other electronic communication or data storage devices or

5     media, to include all passwords used and the name of the

6     Internet service providers.

7          Defendant shall also abide by the provisions of the

8     Computer Restriction and Monitoring Program approved by the

9     Court.

10         Eleven, Defendant shall submit his person,

11    property, house, residence, vehicle, papers, business, or

12    place of employment to a search conducted by a probation

13    officer at a reasonable time and in a reasonable manner based

14    upon a reasonable suspicion of contraband or evidence of a

15    violation of a condition of supervision.  The failure to

16    submit to such a search may be grounds for revocation.  And

17    the Defendant shall inform any other residents that the

18    premises may be subject to searches pursuant to this

19    condition.

20         Twelve, the Defendant shall participate in a

21    program of testing and, if necessary, treatment for substance

22    abuse -- said program approved by the probation officer --

23    until such time as the Defendant is released from the program

24    by the probation officer and/or the Court.

25         Further, the Defendant is required to contribute to

1   the cost for any such treatment in an amount to be determined

2   by the probation officer, but not to exceed actual cost.

3               Defendant shall submit to one drug urinalysis

4   within 15 days after being placed on supervision and at least

5   two periodic tests thereafter.

6               The Court also imposes a mandatory special

7   assessment of $700, constituting $100 special assessment at

8   each count that Defendant has been found guilty of, which

9   shall be paid to the Clerk of Court forthwith.

10              Based upon the financial information contained in

11  the presentence investigation report, the Court finds the

12  Defendant does not have the ability to pay fine, and,

13  therefore, waives imposition of any fine.

14              Sir, the reason for your sentence is as follows:

15              The Court considers the sentence of 360 months

16  imprisonment as to Counts 1 through 6 to run concurrently and

17  the sentence of 120 months at Count 7 to run consecutive to

18  the term of imprisonment at Counts 1 through 6, for a total

19  imprisonment term of 480 months, plus the lifetime term of

20  supervised release as to Counts 1 through 7 to run concurrent,

21  to be sufficient but no greater than necessary to comply with

22  the goals of sentencing as set forth in the United States Code

23  Title 18 Section 3553(a)(2), which are to reflect the

24  seriousness of the offense, to promote respect for the law,

25  and provide for just punishment; to afford adequate deterrence

1  to criminal conduct; to protect the public from further crimes

2  by this Defendant; and to provide the Defendant with needed

3  educational or vocational training, medical care, or other

4  correctional treatment in the most effective manner.

5          The Court has considered all the sentencing factors

6  as set forth in Title 18 United States Code Section 3553(a),

7  including those presented by the Government and by the defense

8  and as set forth in the presentence investigation report and

9  addendum thereto.

10         The Court has, further, considered the following:

11         First, the nature and circumstances of the offense.

12  In December of 2011 the FBI began to investigate Armando Cruz

13  following the seizure of a photo memory card depicting Cruz

14  and another individual, Brandon Schroth, with three minor

15  female children.  These children were somewhat exposed.  These

16  photographs were seized during a legal search of a residence

17  in Colorado.

18         The individual who resided in the Colorado

19  residence, Jeffrey Mueller, M-U-E-L-L-E-R, began to cooperate

20  with authorities.  He was charged with producing images which

21  sexually exploited his four daughters, and he was sentenced to

22  480 months imprisonment in Colorado.

23         The memory card obtained from the Mueller residence

24  led the authorities to Mr. Schroth, a resident of California,

25  and they conducted a search of his San Diego home.

1          He identified Cruz, which led to a legal search of

2     Cruz's home in Mercer, Pennsylvania.  Cruz's Pennsylvania

3     residence was in some of the photographs.

4          Thereafter, the authorities identified the three

5     minor females depicted in the photographs as children from the

6     Mercer, Pennsylvania, neighborhood.  Interviews with these

7     minor victims confirmed that Cruz had taken nude photographs

8     of them and had also engaged in sexual acts with each of them.

9     Two of the three minor victims were able to identify other

10    children who were photographed by Cruz in various states of

11    undress.

12         One of these three minor victims not only confirmed

13    that Cruz had taken nude photographs of her and had sexually

14    abused her, but she also told the agent that she had been at

15    Defendant Warner's home, that he had attempted to get her to

16    take a bath with him while he was nude in the bathtub, and

17    that he viewed her taking a bath.  This victim statement led

18    the authorities to Defendant Warner.

19         Further investigation revealed Defendant to be an

20    associate and friend of Cruz.  Cruz and the Defendant became

21    acquainted through their minor daughters who were friends.

22         Upon legally searching the Cruz residence it was

23    determined that Cruz had taken nude photographs of his -- of

24    the Defendant's daughter.  Defendant was interviewed following

25    this discovery and he denied any knowledge of Cruz taking nude

1   photographs of his daughter or any other children.

2          When the authorities asked Warner's daughter about

3   the nude photographs, she denied any inappropriate sexual

4   contact with her father, the Defendant.  However, she

5   indicated that if she told authorities anything, she would be

6   placed in foster care.

7          Cruz was eventually indicted and was charged

8   federally with the production of child pornography.  Cruz told

9   authorities that he accessed Defendant Warner's laptop

10  computer and then downloaded pornographic images of child

11  victims onto a thumb drive.  Cruz also told the authorities

12  that he had made two DVDs from the thumb drives and hidden the

13  DVDs at his place of employment.

14         Authorities located the two DVDs at Cruz's place of

15  employment and reviewed their content.  An agent who had

16  previously been inside Warner's home reviewed the contents of

17  the DVDs and recognized that several images in the DVDs were

18  the same items he had seen in the Defendant's residence.  In

19  addition, numerous images were of the Defendant's own

20  daughter.

21         Following the review of the contents of the DVDs,

22  Defendant Warner was again interviewed by law enforcement

23  authorities.  He was shown a video which had been obtained

24  from the DVDs.  The video depicted child victim No. 2 dancing

25  completely nude over top of the Defendant while Defendant was

1    lying on the floor in his residence and filming upward.

2    Defendant's voice could be heard on the video.

3          During the interview Defendant admitted that he had

4    filmed child victim No. 2 and that it was his voice on the

5    video.  In addition, Defendant Warner was shown, quote, still,

6    close quote, pornographic photographs of a hand touching child

7    victim No. 2, and he admitted it was his hand in those

8    photographs.

9          A few days later a search warrant was executed on

10   Defendant's residence and agents recovered, among other

11   things, a Canon camera, memory cards, a computer -- desktop

12   computer, an empty laptop box, and a girl's Steeler

13   cheerleader outfit.  Child pornography was recovered from both

14   memory cards.

15         Defendant was subsequently indicted as follows:

16         Count 1 related to female victim -- female child

17   victim MC, who was 11 years old at the time that she was

18   sexually exploited.  The images of MC include depictions of

19   her touching her vaginal area.

20         Count 2 related to female child victim FW, who was

21   12 years old at the time she was sexually exploited.  Images

22   of FW included depictions of her touching her vaginal area.

23         Count 3 relates to a female child victim FW.  Some

24   of the images associated with this count depicted her in a

25   Steeler cheerleader outfit.  These images of FW included

1    depictions of her touching her vaginal area.

2              Count 4 relates to child -- female child victim HE,

3    who was 11 years old at the time she was sexually exploited.

4              Count 5 relates to female child victim FW, who was

5    the subject of a pornographic video.

6              Count 6 relates to a female child victim FW, who is

7    the subject of a pornographic video, and Defendant's voice can

8    be heard directing her actions.

9              Count 7 charges the Defendant with possession of a

10   total of 44 images, including images of child victim FW and

11   HE, which were not charged in the prior Counts 1 through 6.

12             The Court has attempted to carefully describe the

13   overall substance of the images relating to Counts 1 through

14   6.  However, having reviewed each of the images this Defendant

15   was accused of and now stands convicted of producing, this

16   Court can say with definitive authority that these images and

17   the Defendant's conduct in producing these images far exceeds

18   society's norms and is far beyond acceptable society morals.

19   His conduct in producing these images is completely depraved.

20   Defendant stands here convicted of six counts of producing

21   child pornography, which is another way of saying he

22   terrorized and victimized these three children in a sexual

23   manner and in a brutal and horrific fashion.

24             Count 7, of which Defendant was also found guilty,

25   concerns possession of child pornography.  While the crime of

1   child pornography seems to pale in comparison to the more

2   serious six counts of producing child pornography, it is not.

3   The Court finds that the viewing of child pornography is a

4   serious crime that Congress has strongly condemned with the

5   advent of the Child Pornography Prevention Act of 1996.  As

6   set forth by Congress and expressed by the United States Court

7   of Appeals for the Third Circuit in United States versus Goff,

8   G-O-F-F, 501 Fed 3d 250 of 2007, the real victims of child

9   pornography cases are the innocent children who have been

10  abused in the production of these videos and images.

11         The offense to which the Defendant has been

12  convicted is serious.  These are not victimless crimes.  The

13  children depicted in the Defendant's collection of child

14  pornography video files were real and vulnerable.  Moreover,

15  these files showed these children being sexually assaulted and

16  abused.

17         The production and distribution of child

18  pornography permanently records the victims' abuse, and their

19  continued existence and viewing of the videos and still

20  depictions causes the child victims of sexual abuse pervasive

21  and long-lasting harm -- emotionally, psychologically, and

22  physically.

23         The Defendant and other Defendants who have

24  committed similar crimes, being active consumers of child

25  pornography, bolster the market for abuse and exploitation of

1    children by creating an economic motive for persons who make

2    and distribute these materials.

3              The Court recognizes the directive of Congress, as

4    further implemented by the Sentencing Commission, to provide

5    just punishment for the production and possession of child

6    pornography.  The Court finds the child pornography

7    enhancements in this case are warranted and the application of

8    said enhancements adequately reflects the seriousness of this

9    offense, provides for just punishment, and promotes respect

10   for the laws against child pornography.

11             Secondly, the Court has considered Defendant's

12   criminal, family, and social history.  Defendant has no

13   criminal history.  He has no juvenile adjudications.  At age

14   49 he pled guilty to driving under the influence.

15             Defendant's family history is also unremarkable.

16   He reported he was raised by his mother and father and was

17   raised with two siblings in an intact family, devoid of any

18   abuse or neglect.

19             Defendant was 16 when his parents divorced and he

20   has lived primarily with his mother.  His father remarried and

21   died eventually in 1999.  His mother never remarried and she

22   maintained employment throughout her adult life.

23             Defendant enlisted in the military in 1977 and

24   returned to Mercer in 1980 following his honorable discharge.

25   In 1981 he obtained employment and established residency in

1  Mercer where he remained until his arrest.

2          Defendant married in the 1980s.  He was divorced in

3  the 1990s.  They had no children.

4          In 1991 -- excuse me, in 2001 Defendant again

5  married.  Defendant is unsure whether he is formally divorced

6  or just legally separated.  Defendant and this wife adopted a

7  daughter, who is now 14.  This is the same daughter that the

8  Court referred to earlier.  Presently Defendant's daughter

9  resides with her mother.

10          A letter from the maternal grandmother, which was

11  the subject of one of Defendant's objections, indicated that

12  the Defendant's daughter has refused to go to counseling and

13  is now experiencing serious behavioral issues.

14          The Court thoroughly has considered Defendant's

15  personal characteristics.  Defendant is 56 years old and has

16  some health issues.  He denies any substance abuse issues,

17  despite the driving under the influence conviction.  Defendant

18  also denies any mental or emotional problems.

19          Records indicate that Defendant dropped out of high

20  school in 1976 and that he was a below average student.

21  Defendant indicated he attended Mercer Vo-Tech school in 1992

22  and that he obtained his GED while in the military.

23          He had been self-employed in construction early in

24  his life and worked through the Laborers' Union from 1993 to

25  2003, possibly 2009.  He also worked from 2004 through 2009

1   for a company owned by his sister.

2          Prior to his detention Defendant resided in

3   Section 8 housing, was receiving food stamps, and his daughter

4   was receiving Supplemental Social Security income due to her

5   mother's mental illness.

6          In addition, the Court has had an opportunity to

7   observe Defendant during the course of these legal

8   proceedings, including a three-day jury trial, as well as

9   several proceedings before this Court, as well as his demeanor

10  today, including his lengthy statement that he presented

11  today.

12         The Court has also considered the kinds of

13  sentences available for this offense and the guideline

14  sentencing range under the advisory guidelines and applicable

15  policy statements adopted by the Sentencing Commission.

16         I have also considered the need to avoid

17  unwarranted sentencing disparities among defendants with

18  similar records who have been found guilty of similar conduct.

19  As I mentioned, there is a prior case where the individual got

20  sentenced in Colorado to 480 months and there is other

21  substantial long sentences throughout this country for the

22  commission of this heinous crime.

23         On behalf of the Government, does my statement of

24  reasons adequately address all objections, concerns, and

25  issues raised by the Government?

1          MS. BLOCH:  Yes, I believe it does.

2          THE COURT:  Defendant?

3          MR. CHONTOS:  Judge, I will stand by my earlier

4   objections both in writing and earlier today.

5          THE COURT:  Thank you.  But have I adequately

6   addressed those objections, concerns, and issues, even if you

7   don't agree with my decision relating thereto?

8          MR. CHONTOS:  Absolutely.

9          THE COURT:  Are there any other sentencing factors

10  under Section 3553(a) that the Court has failed to address, on

11  behalf of the Government?

12         MS. BLOCH:  No, Your Honor.

13         THE COURT:  Defendant?

14         MR. CHONTOS:  Judge, we believe -- we have an issue

15  with the merger of Count 7 into the other, so we just object,

16  we think that is an illegal sentence.

17         THE COURT:  Do you mean as a concurrent sentence?

18         MR. CHONTOS:  No, Count 7 you made 120 consecutive

19  to the 360.  We think your sentence of 120 is illegal based

20  upon the concept of merger.  We believe the substantive facts

21  as to Count 7 merge with 1 through 6.

22         THE COURT:  I understand.

23         Sir, I am going to speak about your right to

24  appeal.  You have the right to appeal from the orders of this

25  Court, from the judgment of guilty, and/or from the sentence

1   imposed.

2           You have the right to have a lawyer represent you

3   on appeal at no cost to you.

4           If you cannot afford them, certified copies of the

5   necessary records and transcripts will be furnished at the

6   expense of the United States Government.

7           If you appeal, the notice of appeal must be filed

8   within 14 days of today.  Otherwise, you will lose your right

9   to appeal.

10          I would appreciate it if you would talk to your

11  counsel and tell me whether you want the Clerk of Court to

12  immediately prepare and file a notice of appeal on your behalf

13  or, on the other hand, if you decide to appeal, that you will

14  use your current counsel.  So would you two -- counsel, would

15  you talk to your client and tell me if he wants the Clerk of

16  Court to immediately prepare a notice of appeal or whether you

17  will do it on his behalf.

18          MR. CHONTOS:  Judge, that is one of the topics I

19  discussed in our meeting from 9 to like 9:25 this morning.  I

20  think he has adequately advised about that and is willing to

21  respond to the Court's inquiry on that topic.

22          THE COURT:  Okay.

23          MR. CHONTOS:  The question is, do you want me to

24  continue with you being your appellate lawyer and file the

25  necessary appeals?

1        THE DEFENDANT:  Yes, I want him to do that there.

2  But I want to be on top of this thing.  I do not want for

3  something, for example, not being filed on time or something

4  to stop me from doing this because I definitely want to go

5  through this again.

6        THE COURT:  Okay.  So you want your current counsel

7  to handle your appeal?

8        THE DEFENDANT:  Yes, sir.

9        THE COURT:  And, counsel, you understand you must

10 do that within 14 days from today, correct?

11       MR. CHONTOS:  I absolutely understand that.

12       THE COURT:  Thank you.  Anything else on behalf of

13 the Government?

14       MS. BLOCH:  Nothing else, Your Honor.

15       THE COURT:  Defendant?  Anything?

16       THE DEFENDANT:  I would like to make a comment,

17 please.

18       THE COURT:  One moment.

19       MR. CHONTOS:  Nothing from counsel, Judge.

20       THE COURT:  You may make a brief comment.

21       THE DEFENDANT:  The only comment I wanted to make

22 is with the -- we went through a long time there and you said

23 something about a job and stuff like this here.  Well, at 96

24 years old I really don't think I am going to be going out and

25 getting a job and putting stuff on my computer and different

1   things, because I am not going to live until 96 years old.

2            THE COURT:  I have no control over how long you are

3   going to live.

4            The marshals may remove the Defendant.

5            THE DEFENDANT:  But I did find out one thing.  If

6   you shoot the President of the United States, you get less

7   time than what I got.

8            THE COURT:  Thank you, counsel, I hope you have a

9   great weekend.

10           Everyone should remain seated until the Defendant

11  is removed.

12       (Record closed.)

13

14

15

16                 C E R T I F I C A T E

17           I, Richard T. Ford, certify that the foregoing

18  is a correct transcript from the record of proceedings in the

19  above-titled matter.

20  S/Richard T. Ford  _____

21

22

23

24

25